FBUTSKE1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                  v.                        15 CR 317 (KMW)

5   DEAN SKELOS and ADAM SKELOS,

6                  Defendants.

7   ------------------------------x

8                                       New York, N.Y.
                                        November 30, 2015
9                                       9:30 a.m.

10  Before:

11                     HON. KIMBA M. WOOD,

12                                       District Judge

13
                            APPEARANCES
14
    PREET BHARARA
15       United States Attorney for the
         Southern District of New York
16  JASON MASIMORE
    TATIANA MARTINS
17  RAHUL MUKHI
    THOMAS McKAY
18       Assistant United States Attorneys

19  GAGE, SPENCER & FLEMING
         Attorneys for Defendant Dean Skelos
20  G. ROBERT GAGE, JR.
    JOSEPH EVANS
21
    ROPES & GRAY
22       Attorneys for Defendant Adam Skelos
    CHRISTOPHER CONNIFF
23  JOHN DANIELS

24

25

FBUTSKE1

1          (Jury not present)

2          THE COURT:  Good morning.  I think we have three

3    things to take up now.  We're going to check on whether Juror

4    Number 2 was able to follow what was happening in court until

5    she had a heart problem on Tuesday.  And then I need to hear

6    from you whether you want to recapitulate the testimony during

7    about the last half hour on Tuesday, which was the time she

8    said she was not following what was happening in court.

9          Ms. Buchanan is ready to come in whenever we like, and

10   I will be asking defense counsel what they wish to have her

11   look at here and answer.  And then we have the question of

12   purported exaggerations by Adam Skelos.

13         Why don't we take those up in reverse order.  With

14   respect to purported exaggerations by Adam Skelos, I find the

15   government possession persuasive, but I'm glad to hear anything

16   that defense counsel wish to argue.

17         MR. CONNIFF:  Thank you, your Honor, and I think it

18   relates not only to the instance and exhibit cited by the

19   government in their letter last evening, but also to a

20   transcript that I anticipate will come in either later today or

21   tomorrow through Mr. White's testimony.  I alerted the

22   government this morning to that exhibit as well.  It's

23   Government Exhibit 1611-T, your Honor.  I have a copy of it to

24   pass up to your Honor in case you don't have one handy.

25         THE COURT:  Thank you.  It's probably not as handy as

FBUTSKE1

1    you passing it up.  Thank you for that.

2           MR. CONNIFF:  Your Honor, it relates to page 1, lines

3    2 through 11.

4           THE COURT:  Okay, I will read them.

5           Yes.

6           MR. CONNIFF:  I think the issue is, your Honor,

7    defense's view this is another instance based on the June 22nd

8    letter from the government where Adam Skelos is exaggerating or

9    misstating what his father is actually doing on behalf of

10   AbTech.  And therefore, I believe that it's misleading to have

11   that information go in front of the jury without explanation or

12   limiting instruction.

13          I take the government's point on the initial issue,

14   because I understand Mr. Walker is a witness who is at that

15   wake and funeral with the senator and Mr. Mangano, so he will

16   essentially clear up, so to speak, what the transcript

17   suggests, which is that Mr. Adam Skelos was actually at that

18   funeral and wake as well.

19          I still have a bit of an issue with it because there's

20   going to be obviously a fairly decent amount of time between

21   when that transcript goes in which is today, probably, or

22   tomorrow, and when Mr. Walker appears, which is likely to be I

23   think at a minimum the end of this week or next week, but I

24   heard your Honor's ruling on that, so I will move to 1611-T.

25          As far as I understand, there is no similar Mr. Walker

FBUTSKE1

1   to clarify this, and so while I certainly understand that the

2   government is not going to argue to the jury something that

3   they know is in fact not true, I would never expect them to do

4   that, my concern more is that the jury is left with information

5   that is potentially unclear to them, and I think everybody's

6   interest here is to make sure that the facts are in front of

7   them so they can determine what those facts mean.  And my

8   concern on something like 1611-T, the first page there, is that

9   the jury could conclude, through no direct argument by the

10  government, that this actually occurred, when I think their

11  June 22nd letter suggests it probably did not.

12              THE COURT:  Mr. Masimore.

13              MR. MASIMORE:  Good morning, your Honor.

14              THE COURT:  Good morning.

15              MR. MASIMORE:  With respect to the portion of the

16  transcript in 1611, I believe that the main statement there was

17  related to Adam Skelos reporting that he says:  That was set up

18  and he got -- he -- my dad pretty much was behind getting the

19  support to do that, to ask that for the budget, and they did.

20  They did it as just water projects.

21              Your Honor, I think the June 22nd letter again was our

22  attempt, based on meetings we had with defense counsel, to

23  provide them with information that we thought might fit within

24  their themes.  This particular statement by Mr. Adam Skelos is

25  susceptible to several interpretations.

FBUTSKE1

1           Our investigation after hearing that statement was to

2    figure out was Adam Skelos claiming that Senator Skelos had

3    caused Carl Marcellino to put in a letter to Senator Skelos

4    requesting certain funds.  When we learned through our

5    investigation that in fact Senator Skelos had not asked Senator

6    Carl Marcellino to submit that letter, we provided that

7    information in our June 22nd letter because there is an

8    interpretation available that perhaps Mr. Adam Skelos was

9    referring to that.

10          However, if you look at the statement, what Adam

11   Skelos is referring to is simply the fact that his father,

12   Senator Skelos, was supportive of stormwater projects.  And

13   there's already been evidence elicited, I believe it's

14   Government Exhibit 1445, which was a conversation between

15   Senator Skelos and Senator Jack Martins that was intercepted on

16   our wiretap.  During that conversation, the Court may recall

17   Senator Skelos actually brought up stormwater.  We also intend,

18   as part of the trial, to present evidence that in late

19   December, early January, Senator Skelos sat for an interview

20   with city and state, and in that he noted that infrastructure

21   funds should go to stormwater.  And there's other evidence as

22   well.

23          So the government doesn't believe it's fair to sort of

24   be pinned in by its June 22nd letter.  That wasn't the intent

25   to say this was the only interpretation.  As Mr. Conniff

FBUTSKE1

1    acknowledged, as we said and as the Court knows, we're

2    certainly not going to intentionally advocate an argument that

3    we know to be false.

4           So if the Court has any questions for me, I don't want

5    to unpersuade the Court by talking any further, but I'm happy

6    to answer any questions about it.

7           THE COURT:  I do not see this as problematic.

8           If we're ready to turn to the next topic, I would like

9    to hear defense counsel on what you would like to ask

10   Ms. Buchanan.

11          MR. GAGE:  Your Honor, I think everybody's goal is to

12   make certain it was not a juror that was having a conversation.

13          THE COURT:  That's right.

14          MR. GAGE:  So I don't have an absolute road map, but

15   as we have throughout, we can have open dialogue with everyone

16   to get to the right level of thoroughness on this.  But I guess

17   my thought would be that if Ms. Buchanan is able to sit in the

18   courtroom, and I appreciate she didn't see a juror, but maybe

19   her recollection is refreshed.  I don't know that it would take

20   that long.  And perhaps I think there was a suggestion, it may

21   have been your Honor, that the voices of the male reporters --

22   could have a brief conversation with them, perhaps she

23   recognizes one of the voices.  Beyond that, I'm not sure what

24   else could be done.  Those are the two things that occur to me.

25          THE COURT:  That's all that occurred to me.

FBUTSKE1

1          Mr. Conniff?

2          MR. CONNIFF:  That's fine, your Honor.  I think that's

3     appropriate.

4          THE COURT:  So if she came at about -- she's available

5     any time.  If she came at about 10 to 1:00, she could take a

6     good look at the jurors, and then once the jurors leave the

7     room at 1:00, if we could have the male reporters who were part

8     of the conversation and/or any female reporter who was, stand

9     and speak, perhaps she will recognize a voice.

10          Is that what you have in mind?

11          MR. GAGE:  Yes, your Honor.

12          THE COURT:  Okay.

13          MR. GAGE:  If anything else occurs I will share with

14     the Court.

15          THE COURT:  All right.  May I ask the journalists who

16     are here, which men should we try to have here at 1:00?

17          MR. MUKHI:  I believe Mr. Gregorian was one who

18     specifically said he recounted something similar to what

19     Ms. Buchanan overheard.

20          THE COURT:  He was one.  Do we know who else was part

21     of the conversation?

22          MR. McKAY:  The other journalists mentioned were John

23     Riley and Will Bredderman.

24          THE COURT:  Okay.  I wonder if the journalists who are

25     here know whether we could have these three people here

FBUTSKE1

together at 1:00.

          AUDIENCE MEMBER:  Your Honor, John Riley is in house,
so I know he's here, unless he's off today.

          AUDIENCE MEMBER:  John Riley is my colleague.  He's at
the Silver trial.  I'm not sure if he will be able to get back
here at that time.

          AUDIENCE MEMBER:  Your Honor, I think Will Bredderman
is in the same situation.  He's bouncing between both trials at
this moment.

          THE COURT:  All right.  If you have their -- do they
have their iPhones with them or Blackberries?

          AUDIENCE MEMBER:  They do, but we don't.

          THE COURT:  Okay.  I wonder if you could email them
asking whether they can be in this courtroom at 1:00.  If not,
what time could they be here during a lunch break?

          AUDIENCE MEMBER:  The lunch break in Silver is usually
1:00 to 2:00.

          THE COURT:  Which is the same as it will be here.  So
that should work pretty well.  Do you agree?

          AUDIENCE MEMBER:  Yes.

          THE COURT:  All right.  I would appreciate you're
doing that and letting us know.

          MS. MARTINS:  Does anyone from the press know
Mr. Gregorian?  Because that seemed like the potential
likeliest candidate, given what he stated in court.

FBUTSKE1

1          THE COURT:  Mr. Gregorian, do you expect him here

2    today, or do you know?

3          AUDIENCE MEMBER:  I don't know.

4          THE COURT:  I will have one of my law clerks call

5    Mr. Gregorian.  He's with the Daily News?

6          MS. MARTINS:  Yes, your Honor.

7          THE COURT:  All right.  I'll ask my deputy or the

8    marshal to see if juror number two has arrived.  If so, we

9    would like to speak with her.

10         DEPUTY MARSHAL:  Not yet, your Honor.

11         THE COURT:  Okay.  If you could let us know when she

12   arrives, we would appreciate it, thank you.

13         DEPUTY MARSHAL:  We're short three jurors.

14         THE COURT:  Okay.  Thank you.

15         MR. CONNIFF:  Your Honor, the government may have

16   noticed this too, but on Tuesday when we were leaving -- and

17   Court may be aware of this, but when we were leaving there were

18   paramedics in the lobby of the building, and it appears Juror

19   Number 2 was with them.  I don't know whether she was being

20   treated by them or whatever, but it did seem to carry on after

21   she left us that afternoon.

22         THE COURT:  I didn't know that there were paramedics

23   there.  We did get a report from the marshal's office that they

24   had followed up with her and asked her to call the marshal when

25   she got home to make sure she got home safely.  And she did,

FBUTSKE1

and apparently felt fine.

What do you want to do about the last 20 minutes to 30 minutes on Tuesday of last week?  I pose this first to defense counsel.

MR. CONNIFF:  Can I speak to Mr. Gage?

THE COURT:  Certainly.

AUDIENCE MEMBER:  Your Honor, may I say something else, if you don't mind?

THE COURT:  Please do.

If you come to podium people could hear you better, the podium being right here.

AUDIENCE MEMBER:  As loathe as I am to be part of this at all, it's almost -- well, a distinct possibility there will be a verdict in another trial today, and I think that perhaps the best course of action might be to have Ms. Buchanan and these three reporters here tomorrow in the morning.  That way --

THE COURT:  No one will miss the verdict.

AUDIENCE MEMBER:  You could have some certainty to everyone's availability.

THE COURT:  Okay, thank you very much.

AUDIENCE MEMBER:  Thank you.

THE COURT:  Maybe we'll hold off for a while if counsel agree.

MR. GAGE:  That's fine, your Honor.

FBUTSKE1

1              MR. CONNIFF:  Your Honor, on the issue of Juror Number

2    2 and how to handle the last half hour, I guess just while

3    we're talking about it, I would raise kind of a broader issue,

4    which is my recollection of Juror Number 2 during the voir dire

5    was that she has this -- this was not a surprise in some

6    respects.  She has this chronic heart ailment, and that it's

7    exacerbated to some degree by stress, and certainly sitting on

8    a trial like this is increasing her own stress.

9              I wonder whether we should consider whether she should

10   remain on the jury in light of the fact I believe the

11   government is about a week away from resting, they will speak

12   to that, or maybe a week and a few days, and we do have the

13   alternates.  Because if we do the read back, I guess, to her

14   today, we may find ourselves doing it again on Friday or the

15   next Monday.

16             So I raise that just in the context of figuring out

17   what to do generally in terms of the readback.  We did have

18   some general discussions, the government and ourselves.  I

19   don't think doing the testimony over again is an appropriate

20   route because the other jurors all heard it the first time, and

21   that's -- we shouldn't have competing versions of kind of what

22   the evidence is, I would say.

23             So the only alternative would be I guess the court

24   reporter literally reading back the Q and A to I guess probably

25   the entire jury, although maybe that creates issues of kind of

FBUTSKE1

1   reemphasizing certain points for the other eleven plus the

2   alternates.

3           So that's some initial thoughts I guess, your Honor.

4           THE COURT:  I agree with all of your initial thoughts,

5   which lead us to no particular place.

6           Do you wish to be heard, Ms. Martins?

7           MS. MARTINS:  Your Honor, we agree with defense

8   counsel that the juror has indicated in her questionnaire

9   already some of these items, and that she I think took

10  medication that made her drowsy.  I think that we agree that

11  redoing the testimony would not be a good idea.

12          With respect to readback, if it's half an hour, it

13  seems kind of a lengthy amount of time in terms of the

14  witness's tone, demeanor, all the things that a juror sort of

15  observes as sort of the point of having a live witness as

16  opposed to doing it by affidavit or something like that.  And

17  given that we have four alternates, I think it's something that

18  we should consider at this time.

19          And I also think we raised it on Tuesday, perhaps

20  asking the juror if she's had other occasions when she hasn't

21  been able to follow.  The government has at least noticed, and

22  defense counsel may have as well, that she has appeared drowsy

23  at other points in testimony.  So our perspective is that she

24  has dosed a bit on and off at other times as well.

25          THE COURT:  I'll let defense counsel confer.

FBUTSKE1

1              MR. GAGE:  Thank you, your Honor.

2              MR. CONNIFF:  We wouldn't have an objection to

3    excusing the juror, your Honor, in light of her illness.

4              THE COURT:  I think that makes sense in light of what

5    we have seen and the inability to recreate what she missed on

6    Tuesday.

7              Does the government agree?

8              MR. MASIMORE:  Yes, your Honor.  Obviously the juror

9    has been very conscientious.  She's tried very hard to stay on,

10   but we agree with the position.

11             THE COURT:  Okay.  Mr. Gage, do you agree?

12             MR. GAGE:  I do, your Honor.

13             THE COURT:  Okay.  So I think we can call her in as

14   soon as she is here.  And she's here.  Could you ask her to

15   come in, please.

16             (Juror present)

17             THE COURT:  Please come and have a seat anywhere in

18   the jury box.

19             JUROR:  Good morning.

20             THE COURT:  How were you feeling on the weekend?

21             JUROR:  Fine.

22             THE COURT:  We think that because of your not having

23   been able to hear the testimony toward the end of the day on

24   Tuesday, and the fact that you have a heart condition, that

25   it's probably best for you not to serve on the jury.  We want

FBUTSKE1

1    to thank you for how conscientious you have been and how hard

2    you've tried to listen to the testimony and give it all the

3    attention it deserves.

4           So you leave with our thanks, and when the rest of the

5    jurors have taken their belongings out of the room you can go

6    back in and take yours out and your jury service will be

7    finished.

8           JUROR:  Okay.

9           THE COURT:  Thank you very much.

10          JUROR:  Thank you.

11          (Juror not present)

12          THE COURT:  So Juror Number 13, Richard Filingeri,

13   will replace Ms. Sheena Lewis, who was Juror Number 2, and he

14   will go to the Seat Number 2.

15          If counsel are ready, we can bring in the witness and

16   bring the jury in.

17          MR. MASIMORE:  We're ready to proceed, your Honor.

18          THE COURT:  Is the jury all there?

19          DEPUTY MARSHAL:  They're all present.

20          (Jury present)

21          THE COURT:  Mr. Richard Filingeri should sit in Seat

22   Number 2 replacing Sheena Lewis, who has been excused because

23   of a heart condition.

24          Good morning.  I hope you had a good Thanksgiving a

25   good, restful weekend.  Please have a seat.  We're ready to

FBUTSKE1                    White - direct

1    resume.

2                MR. MASIMORE:  Your Honor, with respect to the last

3    witness from last week, Mr. Rink, we have the understanding

4    that neither side has any further questions.

5                THE COURT:  Very good.  Thank you.

6                MR. MASIMORE:  At this time, your Honor, the

7    government calls Bjornulf White to the stand.

8                THE COURT:  Yes.

9     BJORNULF WHITE,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. MASIMORE:

14   Q.  Good morning.  How old are you?

15   A.  35.

16   Q.  Where do you live?

17   A.  In Connecticut.

18   Q.  Can you please describe for the jury your educational

19   background, beginning with college.

20   A.  Yes, I went to Cornell University for undergraduate, I went

21   to Cornell also for graduate school, and then I received my law

22   degree from George Washington University Law School.

23   Q.  Have you ever, in fact, been a licensed attorney?

24   A.  No, I have not.

25   Q.  Would you please describe your employment history since

FBUTSKE1                    White – direct

graduating law school.

A.   Sure.  I started working at a law firm in Washington DC,
and then I went on to Lockheed Martin Corporation, which is an
aerospace and technology company.  There I was responsible for
identifying new technologies and starting new program areas,
building engineering teams and providing solutions to the U.S.
military as well as various other security customers and
commercial customers.  And it was at my time at Lockheed I
became familiar with AbTech Industries technology and then went
on to work as a consultant for AbTech.

Q.   How did you become familiar with AbTech?

A.   Well, we were searching for different technologies that
were useful for primarily the military, and I was introduced to
the CEO of AbTech, Glenn Rink, and that's how I became familiar
with AbTech.

Q.   Approximately when did you meet AbTech's CEO, Glenn Rink?

A.   The first time I met him in person was in April 2009.

Q.   When did you begin working at AbTech?

A.   I started as a consultant in the summer, early summer of
2010.

Q.   What's AbTech's current corporate structure?

A.   There is a publicly traded company called AbTech Holdings,
and then it has two subsidiaries, AbTech Industries and AEWS
Engineering.

Q.   And are AbTech Industries and AEWS Engineering affiliated?

FBUTSKE1                    White - direct

1   A.  Yes, they are.

2   Q.  And they're affiliates?

3   A.  They're affiliates, yes.

4   Q.  What does AEWS stand for?

5   A.  AbTech Engineered Water Systems.

6   Q.  Who founded AEWS Engineering?

7   A.  I did in conjunction with AbTech.

8   Q.  And approximately when did you found AEWS?

9   A.  I started the formation of it in late 2011, and then it was

10  really formally started in 2012, spring.

11  Q.  And what was the purpose of forming AEWS?

12  A.  Well, the reason I started it was to put the engineering

13  capabilities, primarily civil and environmental engineering in

14  that separate company, and that would then become the front end

15  engineering that would work in conjunction with AbTech

16  Industries for technologies, because we were rolling out this

17  broader program of public private partnerships.

18  Q.  And we'll get to public private partnerships, but before

19  that, where was AEWS located?

20  A.  Headquarters were in Raleigh, North Carolina.

21  Q.  With respect to being a consultant at AbTech, what were

22  your duties and responsibilities?

23  A.  Well, when I first started I was responsible for developing

24  strategy and business development for really the U.S. federal

25  government, federal facilities and military bases and such, but

1    my role expanded beyond that as time went on.

2    Q.  And what did your role expand to encompass?

3    A.  Well, it expanded to include strategy and business

4    development for all of the market areas that AbTech was

5    involved in, including stormwater, produce water treatment for

6    the oil and gas sector, which included in particular frack

7    water, then the industrial sector, although most of my focus

8    was on stormwater and oil and gas.

9    Q.  When you were a consultant for AbTech, how much were you

10   paid?

11   A.  I was paid $10,000 a month retainer.

12   Q.  What were your working hours like when you were a

13   consultant?

14   A.  Well, very intense, I would say.  I would put in 60 to 80

15   hours a week.

16   Q.  Directing your attention to January 2012, did there come a

17   time when you stopped being paid as an outside consultant and

18   became employed by AbTech?

19   A.  Yes, I became a W-2 employee on January 1st, 2012.

20   Q.  And what, if any, positions did you hold at AbTech once you

21   became employed?

22   A.  Then I became executive vice president of corporate

23   strategy and business development, and then also was founder

24   and president of AEWS Engineering.

25   Q.  Focusing on your position as executive VP at AbTech, what

FBUTSKE1                      White - direct

1    were your duties and responsibilities?

2    A.  It was to develop basically the business strategy and

3    customer offering primarily for the stormwater and oil and gas

4    sector, and then to oversee business development in those

5    sectors.

6    Q.  What was your salary in this position?

7    A.  183,000 a year.

8    Q.  And same question, what sort of hours did you put in in

9    this position?

10   A.  Similar, if not more.  I was not compensated for my AEWS

11   Engineering role, so I was doing that in addition, and setting

12   up the office in North Carolina and such.  So it became

13   sometimes even seven days a week.

14   Q.  Did there come a time when your job titles and job duties

15   changed with respect to AbTech?

16   A.  Yes.  Well, in 2014 I resigned my position at AbTech and

17   became basically only the president of AEWS, and I volunteered

18   a salary reduction at that time.

19   Q.  Even though you were at AEWS but no longer employed by

20   AbTech, did AEWS maintain a close working business relationship

21   with AbTech?

22   A.  Yes, absolutely.

23   Q.  What, if any, duties and responsibilities did you carry

24   over from your time at AbTech that you continued to fulfill

25   after you focused solely on AEWS?

FBUTSKE1                          White – direct

1    A.  Well, I would say my role with respect to developing the

2    stormwater sector remained pretty much the same.  AEWS was

3    essentially teamed with AbTech and another company, so I was

4    still doing a lot of the same development of strategy and

5    pursuit of business in the stormwater sector.

6    Q.  While you were working at AbTech and AEWS, where did you

7    physically work out of?

8    A.  Well, I worked out of my home in Virginia, the AEWS office

9    in North Carolina, the AbTech office in Scottdale, Arizona, and

10   then I was traveling all across the country from West Coast to

11   East Coast and South all the time for business pursuits.

12   Q.  Are you familiar with something called Smart Sponge?

13   A.  Yes, I am.

14   Q.  What is Smart Sponge?

15   A.  It is the core technology for water filtration that AbTech

16   Industries developed.

17           MR. MASIMORE:  At this time the government offers

18   Government Exhibit 4808.

19           MR. GAGE:  No objection.

20           THE COURT:  Government Exhibit 4808 is received

21   without objection.

22           MR. MASIMORE:  The government offers 4804.  We

23   withdraw 4808.  I should have said eight instead of four, I

24   apologize.

25           MR. CONNIFF:  No objection.

FBUTSKE1                          White - direct

1            THE COURT:  Government Exhibit 4804 is received

2    without objection.

3            (Government's Exhibit 4804 received in evidence)

4    BY MR. MASIMORE:

5    Q.  Do you recognize this, Mr. White?

6    A.  Yes, I do.  It's a Smart Sponge installation that we were

7    referencing, Smart Sponge technology.

8    Q.  What does this do?

9    A.  Well, what you see is actually -- so it's an installation

10   of Smart Sponge, and there's actually a stormwater pipe that is

11   underground that is going into that concrete box and it's

12   coming from the road.  So as it rains and rain picks up

13   pollution, it goes into the storm drain, and normally it would

14   flow right out into a waterway.  But instead, this box is

15   essentially intercepting that water flow, forcing it through

16   the box, and then another stormwater pipe allows the water to

17   flow out into the water.  And by doing this, the water

18   therefore flows through the Smart Sponge technology and is

19   actually treated before it's discharged into the rivers and

20   waterways.

21   Q.  What's the gray rectangular box in the center of the

22   photograph?

23   A.  That's a gray concrete we call a vault that is basically

24   excavated and dropped into the ground to intercept the

25   stormwater pipe.

FBUTSKE1                    White - direct

Q.   And the smaller rectangle in the center with the white

material, what is that?

A.   Those are cartridges containing the Smart Sponge material,

and then the water is basically forced through that stack.

It's a little hard to see, but those are individual cartridges.

Q.   What kinds of customers purchased Smart Sponge in this

format?

A.   Well, a major focus was on municipalities, cities, towns,

villages, counties, and then in addition the U.S. military,

federal facilities, airports, marinas, industrial sites,

customers like that.

Q.   What are the primary uses for Smart Sponge technology?

A.   It's all water filtration, and it's water filtration for a

variety of contaminants, and it really stretches across

stormwater, wastewater, produced water from oil and gas for

fracking, and industrial process water treatment.

Q.   From 2011 to 2015, where was the Smart Sponge manufactured

and assembled?

A.   The core constituent parts, the raw material was

manufactured in multiple locations.  We had a supplier in the

U.S. Southeast, a supplier abroad, and they were all shipped to

Arizona where AbTech had a manufacturing site in Phoenix,

Arizona where it's finally assembled.

Q.   During that same time period, 2011 to 2015, did AbTech sell

Smart Sponge to customers in each of these years?

FBUTSKE1                    White – direct

1  A.  Yes.

2  Q.  In which states?

3  A.  Multiple states across the country.  To name some that I

4  withdrawal, California, Utah, North Carolina, Florida,

5  Virginia, Maryland, New York, Utah, I believe others.

6  Q.  Are you familiar with something called design, build and

7  operate?

8  A.  Yes, I am.

9  Q.  And what is design, build and operate?

10  A.  It's a program whereby in a single contract either one

11  company or a team of companies provides a full suite of

12  services, essentially starting from engineering consulting and

13  design, designing the infrastructure, overseeing building and

14  construction of it, and then being responsible for ongoing

15  operation and maintenance of that infrastructure.

16  Q.  And with respect to public works projects, could you

17  explain the difference between the way bidding would take place

18  regularly versus bidding in a design build, operate scenario?

19  A.  Yes.  Well, if you were to, for example, take a drinking

20  water plant, in a normal circumstance a municipality might

21  first hire consulting engineers to define their need.  They

22  might hire separate consulting engineers to design the solution

23  itself.  So those would be two separate processes.  And then

24  after that, the municipality would bid out and procure a

25  construction firm or a series of construction firms to build

1    that.  And then at the end of that, the municipality itself

2    would be responsible for operating it or they would bid out to

3    services companies to do that.

4          In the case of the design, build, operate, what's

5    happening is a municipality, using that example, would say we

6    want a drinking water plant built to meet these needs, and in a

7    single bid process they would ask for that, and companies or

8    teams of companies would respond to do everything.

9    Q.  What's an RFP?

10   A.  It's a request for proposal.

11   Q.  And what is a request for proposal?

12   A.  It is the process by which a buying agency, which could be

13   a city or town, requests proposals, including a description of

14   the price, what's going to be provided services-wise, and a

15   description of how they're going to be able to do it.

16   Q.  You mentioned before in your testimony the term public

17   private partnership.  Can you explain how a public private

18   partnership compares to design, build, operate?

19   A.  Yes.  Well, generally speaking, a public private

20   partnership is going to be a design, build, operate program

21   that also has private financing as a component of it.  So

22   whoever is responding and saying we're going to provide these

23   services, the private team or single company also is going to

24   finance that infrastructure.

25   Q.  Did there come a time when a consultant-based marketing

1    approach was developed to promote AbTech's products in New

2    York?

3    A.  Yes.

4    Q.  And can you describe what the consultant-based marketing

5    approach was?

6    A.  Yes.  Well, what AbTech was doing there was AbTech wanted

7    to reach customers, municipalities, and reach essentially the

8    decision makers within a municipality.  Those would be more

9    senior level for something like a public private partnership.

10   And the consultant model basically sought to hire people who

11   were connected to those decision makers and hire them to get

12   access to customers.

13   Q.  Do you see a binder sitting on the rail in front of you?

14   A.  Yes, I do.

15   Q.  Do you recognize that binder?

16   A.  Yes, I do.

17   Q.  How are you able to recognize that binder?

18   A.  It's a binder whose contents I have reviewed and I have

19   signed and dated it.

20   Q.  And in general, what are the contents of this binder?

21   A.  They're a variety of emails, either from me or to me all

22   pertaining to AbTech business.

23          MR. MASIMORE:  Your Honor, at this time the government

24   offers the materials in the binder specifically the government

25   Exhibit 2131, 2428, 2441, 2443, 2456, 2457, 2459, 2463 through

2465, 2468, 2470, 2472, 2474, 2477, 2482, 2484, 2485, 2489,

2490, 2497, 2502, 2506, 2507, 2509, 2513, 2516, 2517, 2522,

2523, 2532 through 2534, 2539, 2541, 2544 through 2547, 2548A

through 2548C, 2553 through 2555, 2562, 2563, 2577A, 2582A

through 2582C, 2586, 2587, 2589, 2590, 2598, 2599, 2605, 2613,

2515, 2617, 2619, 2622, 2625, 2627, 2629, 2631, 2633, 2634,

2638, 2639, 2652, 2673 through 2679.

THE COURT:  Any objection?

MR. GAGE:  May I have just a moment, your Honor?

THE COURT:  Yes.

MR. GAGE:  Your Honor, we have reviewed we believe

these documents, but as long as what in the binder are emails

to and from Mr. White, no objection, which I assume they are.

BY MR. MASIMORE:

Q.  Mr. White, the materials in the binder, are there any

materials other than emails that you were either the recipient

of or the sender of?

A.  No.

THE COURT:  All right.  The Court receives without

objection Government Exhibits 2131, 2428, 2441, 2443, 2456,

2457, 2459, 2463 through 2465, 2468, 2470, 2472, 2474, 2477,

2482, 2484, 2517, 2522, 2523, 2532 through 2534, 3539, sorry,

2539, 2541, 2544 through 2547, 2548A through 2584C, 2553

through 2555, 2562, 2563, 2577A, 2582A through 2582C, 2586,

2587, 2589, 2590, 2598, 2599, 2605, 2613, 2515, 2617, 2619,

FBUTSKE1                    White – direct

1    2622, 2625, 2627, 2269, 2631, 2633, 2634, 2638, 2639, 2652,

2    2673 through 2679.

3          MR. MASIMORE:  Your Honor, just three points of

4    clarification, I think your Honor said 2658A through 2584C,

5    it's 2548A through 2548C.

6          THE COURT:  Yes, thank you.

7          MR. MASIMORE:  And I think the your Honor said 2515,

8    it should be 2615.

9          THE COURT:  Yes.

10         MR. MASIMORE:  Then lastly, your Honor, I think the

11   court says 2269 and it's 2629.

12         THE COURT:  Thank you.

13         MR. MASIMORE:  It was a long list, your Honor.

14         THE COURT:  It's okay, thank you.

15         (Government's Exhibits 2131, 2428, 2441, 2443, 2456,

16   2457, 2459, 2463 through 2465, 2468, 2470, 2472, 2474, 2477,

17   2482, 2484, 2485, 2489, 2490, 2497, 2502, 2506, 2507, 2509,

18   2513, 2516, 2517, 2522, 2523, 2532 through 2534, 2539, 2541,

19   2544 through 2547, 2548A through 2548C, 2553 through 2555,

20   2562, 2563, 2577A, 2582A through 2582C, 2586, 2587, 2589, 2590,

21   2598, 2599, 2605, 2613, 2515, 2617, 2619, 2622, 2625, 2627,

22   2629, 2631, 2633, 2634, 2638, 2639, 2652, 2673 through 2679

23   received in evidence)

24   BY MR. MASIMORE:

25   Q.  So Mr. White, you were testifying about the

FBUTSKE1                    White - direct

1   consultant-based marketing approach with respect to AbTech's

2   products in the New York area.  Do you remember that?

3   A.  Yes.

4   Q.  Did there come a time when AbTech made efforts to hire a

5   consultant to market the design build approach in the New York

6   City area?

7   A.  Yes, there did.

8   Q.  Approximately when was that?

9   A.  In August 2012.

10  Q.  Who did AbTech look into hiring?

11  A.  Adam Skelos.

12  Q.  How did you first learn that AbTech was considering hiring

13  Adam Skelos to be a consultant?

14  A.  Well, AbTech's CEO Glenn Rink called me and said that

15  Charlie Dorego had told him if we were serious about rolling

16  out our public private partnership model in New York State that

17  we should hire Adam Skelos.  So that's how I learned.

18  Q.  And as best you can recall, what did Glenn Rink tell you

19  about Adam Skelos at this beginning time when you learned about

20  Adam Skelos?

21  A.  Well, he said that he was from a prominent political family

22  in Long Island and had access to and could open the doors to

23  all the municipalities we were trying to get into.

24         MR. MASIMORE:  Could we publish 2404 in evidence,

25  please.

FBUTSKE1                    White - direct

1   Q.  Do you see the bottom email there is from

2   charliedorego@aol.com to grink@abtech?

3   A.  Yes, I do.

4   Q.  Then Glen Rink forwarded this email to you, correct?

5   A.  Yes.

6   Q.  Who is Charlie Dorego?

7   A.  Charlie Dorego was one of Glenn Rink's advisers, I believe

8   friends, and he represented one of the major investors, one of

9   the early investors in AbTech.

10  Q.  Have you ever met Charlie Dorego in person?

11  A.  No.

12  Q.  Have you communicated with Charlie Dorego?

13  A.  Only via email chains that we were on together.

14  Q.  What, if any, relationship did Charlie Dorego have with

15  Adam Skelos?

16  A.  I believe -- well, based on what Glenn had told me, he was

17  close family friends, and Glenn said he kind of was almost like

18  an attorney for the family.

19  Q.  And if you look in 2404 on the screen, at the end of the

20  first paragraph it mentions that his dad is Dean Skelos, NYS

21  Senate Majority Leader?

22  A.  Yes.

23  Q.  Up through August 2012 when you received this, what

24  experience did you have with respect to New York State

25  politics?

FBUTSKE1                    White - direct

1    A.  I didn't have any.

2    Q.  Did there come a time when you personally met with the Adam

3    Skelos?

4    A.  Yes.

5    Q.  And what, if any, information about Senator Skelos did you

6    review before meeting with Adam Skelos?

7    A.  Well, I just had looked up who he was when I saw this

8    email, so just like his profile online.

9    Q.  Why did you look up Senator Skelos' profile?

10   A.  Because I had never heard of him, and so I just wanted to

11   see who he was.

12   Q.  How did it come to be that you met with Adam Skelos?

13   A.  Glenn Rink told me to meet with him the next time I was in

14   New York, so I went ahead and set that up per his request.

15   Q.  Where did you meet Senator Skelos or where did you meet

16   Adam Skelos?

17   A.  I met him at a hotel in Manhattan.

18   Q.  Which hotel?

19   A.  The W Hotel in midtown Manhattan.

20   Q.  Approximately when was the meeting?

21   A.  It was early one morning, I believe 8:00 or 8:30 a.m.

22              (Continued on next page)

23

24

25

1          MR. MASIMORE:  Could we publish 2428 in evidence,

2     please.  Just the top half, please.  Yes.

3     Q.  Do you see at the bottom on August 14 you e-mailed, "It's

4     the W New York on Lex"?

5     A.  Correct.

6     Q.  What was the purpose of sending that e-mail?

7     A.  To confirm which hotel it was that we were meeting at.

8          MR. MASIMORE:  Then moving up the e-mail.

9     Q.  Adam Skelos writes back to you on August 15, "I'm early.

10    In the seating area.  Table by the fireplace."

11    A.  Yes.

12    Q.  Is August 15 the date you met with Adam Skelos?

13    A.  Yes.

14    Q.  Who was at the meeting?

15    A.  Just Adam and myself.

16    Q.  As best you can recall, what did Adam Skelos say to you at

17    the meeting and what did you say to Adam Skelos at the meeting?

18    A.  Well Adam was pretty well prepared in terms of sort of --

19    he told me about that he had a consulting firm, that he had a

20    lot of clients, including clients that had done infrastructure

21    building that he had helped with.  He mentioned he had even

22    done -- had a client that had done a public private

23    partnership.  He said that he was very interested or excited

24    about our program and what we were offering.  And he said he

25    had a three-year plan to essentially sort of go throughout all

FBU9SKE2                          White - direct

1    of New York State and meet with all the customers starting

2    downstate and moving all the way upstate.  And I told him that

3    sounded very interesting.

4    Q.  Approximately how long did the meeting with Adam Skelos

5    last?

6    A.  Not long.  I would say maybe 20 to 30 minutes.

7    Q.  After the meeting did you discuss it with anyone at AbTech?

8    A.  Yes.  Glenn Rink was eager to hear how it went.  So he was

9    the next person I spoke with regarding that.

10   Q.  What did you tell Glenn Rink about the meeting you had with

11   Adam Skelos?

12   A.  I told him that I was pleasantly surprised that Adam was

13   prepared.  He had a lot of clients, it seemed, in the

14   infrastructure space.  And that he had planned on how to sort

15   of roll out our P3 program, public private partnership program.

16           MR. MASIMORE:  Could we pull up 2934 in evidence,

17   please.

18           If we focus on the top first.

19   Q.  Do you see this is an e-mail from Adam Skelos to his father

20   dated August 29, 2012?

21   A.  Yes.

22           MR. MASIMORE:  And go to page two of Exhibit 2934, the

23   bottom.

24   Q.  Do you recognize what's part of the chain that Adam

25   forwarded to Senator Skelos?

FBU9SKE2                        White - direct

1    A.  Yes.  That is an e-mail from myself to Adam.

2    Q.  In the middle of your e-mail you say, "One good piece of

3    news.  At the state level the legislature passed an act (the

4    infrastructure investment act) in December last year that lasts

5    for three years and permits design-build PPP structures"?

6    A.  Yes.

7    Q.  What were you referring to?

8    A.  Legislation that New York State had for state agencies that

9    authorized P3 structures.

10            MR. MASIMORE:  If we could go up to the e-mail just

11   above that, please, on page two.

12   Q.  Do you see Adam Skelos responded in part, "Is this bill

13   something I should look to try to extend the time limit with

14   the state?  I could be helpful on that front if needed.  Let me

15   know."

16   A.  Yes, I see that.

17   Q.  To your knowledge, did Adam Skelos have the personal

18   ability to modify or extend New York State legislation?

19   A.  No, he did not.

20   Q.  Now at the time did New York state law allow all

21   municipalities to enter into design build contracts?

22   A.  No, it did not.

23   Q.  Could you describe the importance, if any, to AbTech's

24   business model for the state to approve municipalities entering

25   into this type of contract.

FBU9SKE2                          White - direct

1    A.  It would have been very important for the state to

2    authorize that.

3    Q.  Why?

4    A.  Because that would enable the full P3 programs that AbTech

5    wanted to rollout across New York State.

6    Q.  On page one of this exhibit at the very bottom do you see

7    you respond to Adam Skelos in part "That is something we should

8    discuss"?

9    A.  Yes.

10           MR. MASIMORE:  Could we publish 2933 in evidence,

11   please.

12   Q.  Do you see, starting at the top, do you see this is an

13   e-mail from Senator Skelos to Adam Skelos from August 27, 2012?

14   A.  Yes, I do.

15   Q.  And the subject line is New York State?

16   A.  Yes.

17   Q.  And if we go down to the body of the e-mail do you

18   recognize what Adam Skelos had sent to Senator Skelos?

19   A.  He has forwarded the e-mail from me to Adam that we just

20   were referencing.

21   Q.  And in his -- do you see the text at 8:12 a.m. where Adam

22   Skelos wrote, "Heard from Bjornulf.  See below."

23           Do you know what bill he's talking about?

24   A.  Yes.  I see that.

25   Q.  Adam Skelos refers to you by first name.  At this point, in

FBU9SKE2                          White – direct

1    August 2012, had you ever personally spoken to or met with

2    Senator Skelos?

3    A.  No.

4    Q.  And so Adam Skelos asks, "Do you know what bill he's

5    talking about?"  And do you see Senator Skelos responds, "Will

6    have Robert check"?

7    A.  Yes.

8              MR. MASIMORE:  Could we pull up Government Exhibit 12,

9    paragraph 5, which is a stipulation.

10             If I may, your Honor, paragraph five reads "Government

11   Exhibits 2001, 2002, 2003, 2004, and 2005 are true and accurate

12   business records of New York State Senate employee payroll

13   records for the first pay period of January 2011, 2012, 2013,

14   '14, and '15 respectively.  The payroll records accurately

15   reflect the job titles and departments within which the listed

16   Senate employees worked as of the dates of the payroll

17   records."

18             Your Honor, at this time the government offers

19   Government Exhibits 2001 through 2005.

20             THE COURT:  No objection?

21             MR. GAGE:  No objection.

22             THE COURT:  Government Exhibits 2001 through 2005 are

23   received without objection.

24             (Government's Exhibits 2001 through 2005 received in

25   evidence)

1           MR. MASIMORE:  Could we publish, please, Government

2     Exhibit 2002, page 17.  Zoom into the highlighted portion,

3     please.

4     Q.  Do you see, Mr. White, that on the far left there's a name

5     Robert F. Mujica, Jr.?

6     A.  Yes.

7     Q.  It says, "Majority Leader's senior staff, chief of staff,

8     Sec. to SFC Majority."

9           Do you see that?

10    A.  Yes.

11    Q.  Do you recognize the name Robert Mujica?

12    A.  Yes, I do.

13    Q.  How do you recognize that name?

14    A.  It was a name that Adam mentioned later on, maybe a year or

15    two later.

16    Q.  In connection with what?

17    A.  AbTech business.

18          MR. MASIMORE:  Could we pull up Government Exhibit

19    2934, please.  If we could zoom in a bit.  If we could zoom

20    into the very top, please.

21    Q.  Do you see this is an e-mail from Adam Skelos to Senator

22    Skelos from August 29, 2012 with an attachment that's called

23    "Skelos Proposed Engagement Structure."

24          Do you see that?

25    A.  Yes.

FBU9SKE2                         White – direct

1   Q.  Do you recognize what Adam Skelos is forwarding to Senator

2   Skelos?

3   A.  Yes, I do.

4   Q.  What do you recognize it to be?

5   A.  It's the engagement structure that I was asked to put

6   together describing the consulting role and compensation

7   between AbTech and Adam Skelos.

8          MR. MASIMORE:  Could we go to page six of the exhibit,

9   please.

10  Q.  Halfway down in the methodology section the last paragraph,

11  do you see that this proposal says, "Your principal point of

12  contact and the coordinator of your activities would be the EVP

13  of business development (B. White) or as delegated.  AbTech may

14  add other business development support for this effort."

15  A.  Yes, I do.

16  Q.  What were your duties and responsibilities with respect to

17  Adam Skelos for AbTech?

18  A.  Well, because I was the person who would essentially

19  present to municipalities our program, my responsibilities were

20  really, when Adam would identify a customer, to present to

21  those customers; and Glenn asked me to manage the relationship

22  in terms of which customers and such we were going after on a

23  day-to-day basis.

24         MR. MASIMORE:  If we could turn to page seven of the

25  exhibit at the very bottom, going into next page, at the very

FBU9SKE2                    White - direct

1    bottom it says "consulting fee schedule."

2    Q.  And then do you see the top of page eight, very top, it

3    says, "starting fees $4,000 per month"?

4    A.  Yes.

5    Q.  How did AbTech arrive at the number $4,000 per month with

6    respect to the proposal for Adam's Skelos' compensation?

7    A.  Well, Glenn Rink had wanted to start Adam at ten thousand

8    dollars a month and we already were -- had one consultant we

9    were paying at that rate and I didn't really want to have -- I

10   didn't like the consulting model so I pushed back on it.  And

11   Glenn said well eventually why don't we start lower than at

12   four thousand dollars a month.

13   Q.  What, if any, reasons did you have for having one

14   consultant paid more and Adam Skelos paid less at four thousand

15   per month?

16   A.  Well that consultant was a former mayor of a city that had

17   actually done P3s in the energy space, was a former cochair of

18   the U.S. Conference of Mayors Water Council and also had a

19   national scope, so really pursuing opportunities across the

20   country.  So that was just a larger role.

21   Q.  By comparison what, if any, experience did you understand

22   Adam Skelos to have with respect to water projects?

23   A.  I understood him to have no experience with water projects.

24   Q.  And then back to page eight of Government Exhibit 2934 on

25   the screen.  Do you see at the bottom it says example of

1    commission -- should be page eight of the exhibit -- the bottom

2    where it says "example of commission compensation potential."

3            Do you see that?

4    A.  Yes.

5    Q.  Do you see at the bottom it says there's a potential total

6    commission of $4.12 million dollars?

7    A.  Yes.

8    Q.  What was the purpose of providing this information in the

9    context of this proposal?

10   A.  Well Glenn had wanted me to sort of map out a model of what

11   this could mean in terms of commission potential.  And so this

12   is showing just an example of potential commission, you know,

13   assuming those assumptions.

14           MR. MASIMORE:  Could we publish Government Exhibit

15   2938 in evidence, please.

16   Q.  Do you see this is an e-mail from September 5, 2012.  The

17   prior e-mail was from August 29.  Do you see that's from Adam

18   Skelos to Senator Skelos?

19   A.  Yes.

20   Q.  And do you see Adam Skelos writes, "Please print this and

21   review."

22           Do you recognize what Adam Skelos is forwarding to

23   Senator Skelos here?

24   A.  Yes, I do.  It's an e-mail from me to Adam attaching the

25   draft consulting agreement.

FBU9SKE2                         White - direct

1          MR. MASIMORE:   Could we go to page nine of this

2    exhibit, please.

3    Q.   Do you see this is Exhibit A, services and compensation.

4    And in the middle of the page, paragraph two, it says,

5    "Services consultant will render to the company the following

6    services."

7    A.   Yes.

8    Q.   And if we go to page ten, the first bullet point at the

9    top.  It reads "Assist the company with legislative matters in

10   the State of New York and other government relations work

11   designated by the company related to stormwater P3s"?

12   A.   Yes.

13   Q.   Did that bullet point accurately reflect your understanding

14   of what Adam Skelos would be doing for AbTech?

15   A.   One of the duties, yes.

16          MR. MASIMORE:   Could we display 2441 in evidence,

17   please.

18   Q.   Do you see this is an e-mail the same day, September 5,

19   2012 from Adam Skelos to you?

20   A.   Yes, I do.

21   Q.   And Adam writes that "We are set to meet with the Nassau

22   County Deputy Executive Rob Walker on Tuesday September 18 at

23   2 p.m.

24          Do you see that at the top?

25   A.   Yes, I do.

FBU9SKE2                       White - direct

1    Q.  What was going to be the purpose of this meeting with

2    Deputy County Executive Rob Walker?

3    A.  It would be to present to him the AbTech public private

4    partnership program.

5    Q.  And what was to be the purpose of presenting that

6    partnership -- public private partnership program to Nassau

7    County officials?

8    A.  Well it would be to tell them what it was we were offering,

9    why it would be helpful for them, how we would do it, and

10   hopefully convince them that it was something they wanted to

11   explore further.

12   Q.  Was having the opportunity to present that for Nassau

13   County officials of any business importance to AbTech?

14   A.  Yes.  I mean it was very important.  And it was important

15   to talk to senior levels within municipalities because this was

16   such a bigger program.

17   Q.  Did the meeting on September 18 at 2 p.m. take place?

18   A.  No, it did not.

19   Q.  What happened?

20   A.  Adam said he canceled it.

21   Q.  Did he indicate why?

22   A.  Yes, he did.  He canceled it, he said, because he --

23   because the consulting agreement was not finalized.

24   Q.  And the consulting agreement, is that the same as the

25   compensation agreement and proposal we've been looking at?

1  A.  Yes.  Between AbTech and himself.

2          MR. MASIMORE:  We can take that down now.  Thank you.

3  Q.  Directing your attention to the end of October 2012 while

4  the compensation contract is still being negotiated.  What

5  happened in the Northeastern United States?

6  A.  There was a major hurricane, Hurricane Sandy.

7  Q.  What if any significance did Hurricane Sandy have with

8  respect to AbTech's business opportunities in the New York

9  area?

10  A.  Well, it was significant in that it drew a lot of attention

11  to stormwater issues, including both flooding as well as

12  contaminated stormwater.

13          It damaged a lot of infrastructure that needed to be

14  rebuilt and that meant it could be rebuilt with stormwater

15  mitigation incorporated into it.

16          And there was a lot of infrastructure spending from

17  the federal government being allocated to municipalities.  So

18  that provided for an opportunity for AbTech.

19          MR. MASIMORE:  Government Exhibit 2455 in evidence,

20  please.

21  Q.  Do you see at the top this is an e-mail from you to Glenn

22  Rink.  Subject:  Meetings recap and FEMA?

23  A.  Yes.

24  Q.  Directing your attention to the bottom page -- sorry, not

25  page, but paragraph three as you've numbered it.  Under the

FBU9SKE2                        White - direct

1   heading "Hurricane Sandy situation."

2           Do you see you wrote "Adam Skelos major access.  His

3   dad is working closely with the governor on planning"?

4   A.  Yes.

5   Q.  How did you become aware that the Senate majority leader

6   was working closely with the governor on planning?

7   A.  Adam told me.

8   Q.  As best as you can recall what did Adam say to you about

9   that?

10  A.  Just that -- really just that his father was working with

11  the governor and that it definitely seemed like there was going

12  to be a lot of infrastructure spending for the affected

13  communities in Long Island and elsewhere in the Empire State.

14  Q.  This e-mail was from November 2, 2012.

15          Directing your attention to Government Exhibit 2456 in

16  evidence.  Do you see this is an e-mail from Adam Skelos to you

17  dated November 8, 2012?

18  A.  Yes.

19  Q.  And at the bottom you write, "Hi Adam.  We heard that

20  Suffolk and Nassau County are putting their FEMA packages

21  together real time and we have about a three-week window to

22  make something happen on that in terms of getting included in

23  the FEMA requests.  I'm getting pressure to make sure we get

24  into those.  This is ahead of our planned timeline but I wanted

25  to reach out and ask if you think you could assist with this (I

1  assume yes given your contacts) immediately.  The concept is

2  including stormwater controls, water quality treatment devices

3  in the requests such that as they're rebuilding anyway, they

4  include these items."

5       What was the purpose of sending this e-mail to Adam

6  Skelos?

7  A.  Well the purpose was because Glenn had told me to send it

8  out to him because he felt that there was a limited time window

9  or that he was hearing there was a limited time window to speak

10  to officials at the municipalities as to how they were dealing

11  with the aftermath and how they were going to repair.  And so

12  we wanted to be able to go speak to those customers and Glenn

13  asked me to ask Adam to sort of set up those meetings as soon

14  as possible with the municipalities.

15  Q.  Do you see at the top Adam responds to you, "We'll get on

16  this now.  Call you when I hear something"?

17  A.  Yes.

18  Q.  And this is at 2:15:31 p.m.?

19  A.  Yes.

20       MR. MASIMORE:  Could we pull up 2956 in evidence,

21  please.  If we could focus on the top.

22  Q.  Do you see that's an e-mail from Adam Skelos to Senator

23  Skelos.  Same date, November 8, 2012, at 2:15:47 p.m.?

24  A.  Yes.

25  Q.  Do you recognize -- do you recognize what Adam Skelos

FBU9SKE2                        White - direct

1   forwarded to Senator Skelos?

2   A.  He forwarded the e-mail from myself to Adam that we just

3   were referencing.

4           MR. MASIMORE:  And if we could pull out just on 2956,

5   please.  Zooming in on the top of the text.

6   Q.  Do you see Adam writes to Senator Skelos, "What should I

7   do?"

8   A.  Yes.

9   Q.  Did there come a time when you spoke with Adam Skelos again

10  after he had sent you the e-mail that he would get on this now?

11  A.  Yes.

12  Q.  How did you speak with Adam Skelos after that?

13  A.  By phone.

14  Q.  And who was on the phonecall?

15  A.  Well, it was him and then he conferenced in his father.

16  Q.  Was anyone else on the phonecall besides you, Senator

17  Skelos, and Adam Skelos?

18  A.  Not to my knowledge.

19  Q.  And can you explain -- describe for the jury what Senator

20  Skelos said, what Adam Skelos said, and what you said during

21  this three-way conversation.

22  A.  Yeah.  Well, the senator asked me to describe sort of the

23  AbTech solution and how it would be helpful for the affected

24  communities.  And so I sort of gave a brief description of what

25  it was that we were doing.  And then Adam said that we were

1  planning on going to Nassau and Suffolk County first at the

2  county level and then going to various shore-affected

3  communities like Long Beach and Babylon.  And the senator said

4  that sounded like a good idea.  And that there definitely was

5  going to be focus on repairing this infrastructure.

6  Q.  What did you understand the senator to mean by there was

7  going to be a focus on repairing the infrastructure?

8  A.  I understood him to mean that this was going to be

9  something that was going to be a priority for the

10  municipalities and that there would be, by priority that would

11  mean also infrastructure spending and focus of resources.

12  Q.  What was your impression of having the ability to speak

13  directly with the Senate majority leader?

14  A.  I was not --

15          MR. GAGE:  Objection, your Honor.  Your impression.

16          THE COURT:  Sustained.

17  Q.  During the course of your duties and responsibilities at

18  AbTech had you ever had the opportunity before to speak to such

19  a high-level sitting public official?

20  A.  I believe yes before that.

21  Q.  Who was that?

22  A.  We once met with some officials that were part of U.S.

23  Congress just sort of briefing them, yeah.

24  Q.  And aside from the officials from the U.S. Congress have

25  you ever met with an official in such a high position in the

FBU9SKE2                        White - direct

1  State of New York?

2  A.  No.  And the previous meetings were, with U.S. Congress

3  were very sort of formalized and brief.  I had never spoken

4  with someone sort of directly like that or by phone.

5          MR. MASIMORE:  If we could pull up Government Exhibit

6  101 which is in evidence, page 174.

7  Q.  These are the cellphone records.  It says at the top,

8  "detail for Adam Skelos" and it has a 2603 number.

9          Directing your attention to 11/08 2012 at 2:16 p.m.

10  Do you see that there is a call from Adam Skelos to a number

11  that ends in 3888?

12  A.  Yes, I do.

13          MR. MASIMORE:  And if we could pull up Government

14  Exhibit 10 which is in evidence, page two, paragraph nine.

15  Q.  Do you see the stipulation reads, "Government Exhibit 108

16  contains toll records for a cellphone subscribed to by Dean

17  Skelos with the phone number ending in 3888."

18          Do you see that?

19  A.  Yes, I do.

20  Q.  Going back to Exhibit 101, page 174.

21          Do you see after the 2:16 p.m. call with Senator

22  Skelos there's a call number ending in 8443 at 2:19 p.m.?

23  A.  Yes.

24  Q.  Do you recognize that number?

25  A.  Yes.  That's my cellphone.

FBU9SKE2                          White - direct

1   Q.  And then at 2:20 do you see, just below that, do you see at

2   2:20 p.m. there's the senator's number again and it says

3   three-way?

4   A.  Yes.

5   Q.  And that lasts for four minutes?

6   A.  Yes.

7   Q.  Do you recognize this call?

8   A.  Yes, I do.

9   Q.  What do you recognize it to be?

10  A.  That is the call with the senator and Adam that we were

11  just speaking about.

12  Q.  Do you see just below the 2:20 p.m. call, do you see that

13  after the three-way call, at 2:29 p.m. Adam Skelos' cellphone

14  was in contact with Senator Skelos' cellphone for two minutes?

15  A.  Yes.

16  Q.  Aside from the impending negotiations with respect to a

17  compensation agreement, did AbTech and Adam Skelos have any

18  other relationship at this time?

19  A.  No.

20           MR. MASIMORE:  Pull up Government Exhibit 2958 in

21  evidence, please.

22  Q.  Do you see this is an e-mail from Adam Skelos to Senator

23  Skelos.  Same date, November 8, at 2:29 p.m.?

24  A.  Yes.

25  Q.  Do you recognize the information that Adam Skelos sent to

FBU9SKE2                         White - direct

1    Senator Skelos?

2    A.   Yes.   That's my contact information.

3    Q.   After the three-way phone conversation with Adam Skelos and

4    Senator Skelos did there come a time when Adam Skelos discussed

5    Sandy rebuilding information that had been provided by Senator

6    Skelos?

7    A.   I believe at one point I recall Adam saying that the

8    senator had said or reaffirmed that there would be --

9              MR. GAGE:   Your Honor, objection to "I believe."

10             THE COURT:   You can state what you know but not guess

11   at anything, not speculate.

12             THE WITNESS:   Okay.

13             I recall that at one point Adam said that the senator

14   was -- had confirmed that there would be infrastructure dollars

15   going to the communities in Long Island and such.

16   Q.   And do you recall what, if anything, you had discussed with

17   Adam Skelos concerning the involvement of state agencies in

18   administering FEMA funds?

19   A.   Yeah.   Adam had said that he had heard that -- well, this

20   wouldn't be the FEMA funds but the infrastructure funds, if

21   that's what you're referencing.

22   Q.   So what do you recall about the conversation between you

23   and Adam Skelos regarding those infrastructure funds?

24   A.   He said that he had heard that it was going to -- the

25   federal funds were flowing through the states and that in

FBU9SKE2                        White – direct

1    New York, for projects like this, for public works, they were

2    going to flow through the New York Department of

3    Transportation, which he thought was a good thing for AbTech.

4    Q.   And projects like this, what did you understand Adam Skelos

5    was referring to?

6    A.   Infrastructure projects for public works departments

7    including AbTech's stormwater offer.

8    Q.   After the three-way call with Senator Skelos and Adam

9    Skelos and other conversations with Adam Skelos about the

10   aftermath of Hurricane Sandy, did you discuss those with anyone

11   at AbTech?

12   A.   Yes.  I reported it back to Glenn Rink, the management

13   team, and the board.

14   Q.   How, if at all, did AbTech use the information going

15   forward with its business plans?

16              MR. GAGE:  Objection.

17              THE COURT:  Ground.

18              MR. GAGE:  To the extent he knows, your Honor.  The

19   question is about AbTech generally.

20              THE COURT:  All right.  To the extent he knows.

21   Q.   Let me break it down, Mr. White.

22              Based on your duties and responsibilities as the

23   executive vice-president of business development, were you

24   aware of AbTech's business plans as they related to New York

25   State?

FBU9SKE2                         White - direct

1    A.   Yes.

2    Q.   And was part of that awareness that involved understanding

3    what Adam Skelos had told you about what was happening in the

4    New York area?

5    A.   Yes.

6    Q.   And so during discussions, as you said, with Glenn Rink

7    about this what, if anything, did you learn concerning what

8    AbTech's business plan would be as it related to the

9    information that was being provided by Adam Skelos?

10   A.   Well, Glenn told me that the -- that he wanted New York to

11   be -- as well as Tri-State, but especially New York, he wanted

12   it to be a priority area that AbTech was pursuing for

13   stormwater projects.

14          MR. MASIMORE:   Could we pull up Government Exhibit

15   2457 in evidence, please.

16   Q.   You see this is an e-mail from Adam Skelos to you.

17   Subject:  Nassau County.  From Friday, November 9, 2012?

18   A.   Yes.

19   Q.   Is that the day after the three-way call?

20   A.   Yes.

21   Q.   And Adam Skelos says, "We have a conference call set for

22   Monday 11/12/12 at 11 a.m. with Sheila Shah.  Please call me

23   any time before than to discuss what they need from us."

24   A.   Yes.

25   Q.   Who is Sheila Shah?

FBU9SKE2                      White – direct

1    A.  The commissioner of the public works department for Nassau

2    County.

3    Q.  What was going to be the purpose of having a conference

4    call with the commissioner of the department of public works?

5    A.  It would be to brief the commissioner on the AbTech

6    offering and how it could help with their problems post-Sandy.

7    Q.  What was the business purpose for having a call like that.

8    A.  Well the business purpose would be to try to gain business

9    from Nassau County, try to gain them as a customer.

10          MR. MASIMORE:  Could we pull up Government Exhibit

11   2960 in evidence, please.

12   Q.  Do you see this is an e-mail from Adam Skelos to Tom

13   Locascio regarding AbTech from November 9, 2012.  Do you see

14   that?

15   A.  Yes.

16   Q.  Starting from the bottom.  Do you see Tom Locascio says,

17   "Call Sheila Shah," then gives a phone number, then says

18   "commissioner DPW in Nassau"?

19   A.  Yes.

20   Q.  What do you understand DPW to mean?

21   A.  The department of public works.

22   Q.  And then Adam responds, above that Adam Skelos responds,

23   "Any word on Suffolk?"

24          And Tom Locascio replies, "One step at a time haha.

25   Your dad prob needs to make a call."

FBU9SKE2                          White - direct

1  A.  Yes.

2  Q.  Then Adam Skelos responds, "gotya, thanks."

3          What, if any, business interests did AbTech have in

4  Suffolk County around this time period?

5  A.  We had the same business objective as with Nassau County.

6  We wanted to brief the stormwater offering and potentially gain

7  them as a customer.

8          MR. MASIMORE:  Could we pull up Government Exhibit

9  2002 in evidence, page 14.

10          Focusing in on the prehighlighted section.

11  Q.  Do you see there it lists Thomas J. Locascio to, it says

12  Senator Dean G. Skelos, Rockville Center, Director of District

13  Operations?

14  A.  Yes, I see that.

15  Q.  Had you ever been in personal contact with Tom Locascio

16  Senator Skelos' director of direct operations?

17  A.  No.

18          MR. MASIMORE:  Could we pull up Government Exhibit

19  2459 in evidence, please.

20  Q.  Do you see this is an e-mail from Adam Skelos to you and

21  Charlie Dorego on November 11, 2012.  Adam Skelos says

22  "Interesting."

23          Do you see that?

24  A.  Yes.

25  Q.  Do you see he forwards a link forwarded to him by Senator

FBU9SKE2                         White - direct

1    Skelos and at the bottom, after sent from my iPad, it says,

2    "Important for tomorrow.  Read carefully.  Sponges may stop

3    more pollutants."

4               Do you see that?

5    A.  Yes.

6    Q.  Did a call indeed take place the next day with the

7    department of public works?

8    A.  Yes.

9    Q.  What did you discuss -- who was on that call?

10   A.  Well, as I recall, it was the assistant to the commissioner

11   of public works, Ken Arnold, and then I believe there were a

12   couple of other Nassau County department of public works staff

13   but I don't recall who.

14   Q.  What was discussed during this conference call with the

15   department of public works?

16   A.  Basically what was discussed was their needs, what had

17   happened to their infrastructure, some of the issues that they

18   had experienced from a stormwater perspective and from my end

19   how our offering could help with those issues.

20   Q.  Before the call with the department of public works did you

21   have any communications with Adam Skelos to prepare for that

22   call?

23   A.  Yes.  I had written up a list of the messages that I

24   thought should be communicated in that presentation.

25              MR. MASIMORE:  Can we pull up Government Exhibit 2961

FBU9SKE2                      White - direct

1    in evidence, please.

2    Q.  Do you see this is an e-mail from Adam Skelos to Senator

3    Skelos.  Subject:  Nassau call.  This is from November 12,

4    2012.  Do you see that?

5    A.  Yes.

6    Q.  Is that the same date as the call?

7    A.  Yes, it is.

8    Q.  And do you recognize what Adam Skelos forwards to Senator

9    Skelos?

10   A.  Yes.  He is forwarding the write-up that I had put together

11   and sent to Adam on our messages.

12   Q.  Do you see at the top of the e-mail Adam writes to Senator

13   Skelos "see below"?

14   A.  Yes.

15          MR. MASIMORE:  If we could pull up Government Exhibit

16   101, page 176.  101 in evidence.

17   Q.  Do you see, we'll look at Adam Skelos' cell records.  And

18   if we could focus on November 12 at 11:24 a.m.

19          MR. MASIMORE:  If we could zoom in there, please.  We

20   can go up to the first highlighted portion.

21   Q.  Do you see there's call, 11/12 2012 at 11:24 a.m.

22          Again, do you recognize that 8443 number?

23   A.  Yes.  That's my cellphone.

24   Q.  Do you see it says three-way?

25   A.  Yes.

1  Q.  It shows it's 22 minutes long?

2  A.  Yes.

3  Q.  Do you recognize that call?

4  A.  Yes.  That's the call with the public works department that

5  we just discussed.

6  Q.  And then that's a 22-minute call.  And then at 11:46 a.m.

7  do you see below that -- it's in the unhighlighted portion but

8  it looks like it's highlighted in white -- November 12,

9  11:46 a.m.  And is that the same number?  Is that you?

10 A.  Yes.

11 Q.  And there's a two-minute call after the meeting?

12 A.  Yes.

13 Q.  Then below that do you see a call two minutes later at

14 11:48 a.m. with a number that ends in 3300?

15 A.  Yes.

16 Q.  Sitting here now do you recognize that number?

17 A.  No.

18        MR. MASIMORE:  If you could pull up Government Exhibit

19 10, please, page two, paragraph ten.

20 Q.  Do you see under the stipulation that a cellphone

21 subscribed to by Charles Dorego has the phone number ending in

22 3300?

23 A.  Yes.

24        MR. MASIMORE:  And going back to Government Exhibit

25 101.  Page 176.

1    Q.  Do you see at the bottom of the highlighted portion there

2    at 11:50 a.m., two minutes later, Adam Skelos calls Senator

3    Skelos for eight minutes?

4    A.  Yes.

5    Q.  Were you part of those phonecalls with Charlie Dorego and

6    Senator Skelos?

7    A.  No.  I didn't know they were happening.

8            MR. MASIMORE:  Could we pull up Government Exhibit

9    2966 in evidence, please.  If we could focus on the very top.

10   Q.  Do you see this is an e-mail from Adam Skelos to Senator

11   Skelos.  Subject:  Forwarding Nassau/Suffolk County.  From

12   November 20, 2012.  Do you see that?

13   A.  Yes.

14   Q.  Then it lists some attachments?

15   A.  Yes.

16   Q.  And then going down to the body do you see senator -- Adam

17   Skelos forwards to the senator a message.  Do you recognize the

18   message?

19   A.  Yes.  The message is an e-mail from myself to Adam

20   attaching an updated version of the consulting contract.

21           MR. MASIMORE:  Could we pull up 2463 in evidence,

22   please.

23   Q.  Do you recognize this, Mr. White?

24   A.  Yes.  It's an e-mail from Adam to myself.  I'm sorry --

25   yeah, from Adam to myself where he is attaching the signed

FBU9SKE2                          White - direct

1   consulting contract.

2                MR. MASIMORE:  Then 2467 in evidence, please.

3   Q.  This is on November 27 from you to Adam Skelos?

4   A.  Yes.

5   Q.  What did you send to Adam Skelos on November 27, 2012?

6   A.  Fully executed or signed consulting agreement.

7   Q.  And what do you mean by fully executed?

8   A.  Meaning signed by both parties, AbTech and Adam.

9                MR. MASIMORE:  If we could go to page three of the

10  document at the top.

11  Q.  Do you see it's an agreement by and between AbTech

12  industries together with its subsidiaries, affiliates, and

13  associates?

14  A.  Yes.

15  Q.  And between them and Adam Skelos?

16  A.  Yes.

17               MR. MASIMORE:  Could we go to page four, paragraph

18  four, please.  Page four of the exhibit.  Correct.  And

19  paragraph four in the middle.

20  Q.  Do you see "This agreement will commence on the effective

21  date and will continue for two years, with an automatic

22  one-year extension unless either party terminates in writing

23  prior to such automatic extension.  This agreement may be

24  terminated by either party for breach or upon thirty days prior

25  written notice."

FBU9SKE2                        White – direct

1              Do you see that?

2    A.  Yes.

3    Q.  So is it your understanding that the agreement spanned from

4    November 2012 through, with its automatic extension, November

5    of 2015?

6    A.  Yes.

7    Q.  So, it was a two-year based contract which would take you

8    through 2014, correct?

9    A.  Yes.

10   Q.  And then a one-year automatic extension?

11   A.  Yes.

12   Q.  To 2015?

13   A.  Yes.

14   Q.  Now, directing your attention to page two of this exhibit.

15   Who prepared this spreadsheet?

16   A.  I did.

17   Q.  And why did you prepare this spreadsheet?

18   A.  Well, Adam had said that he was having difficulty

19   understanding the compensation section of the contract itself

20   and asked me to prepare some kind of simpler chart.  So I put

21   this together.

22   Q.  And directing your attention to the bottom of page two

23   which is displayed on the screen.  Do you recognize the

24   signatures?

25   A.  Yes.  I do.

FBU9SKE2                          White - direct

1    Q.   Whose signatures do you recognize?

2    A.   Adam Skelos and myself.

3              MR. MASIMORE:   If we could focus up on the base

4    monthly fee section, please, which is the top.

5    Q.   Can you explain to the jury how this part of the contract,

6    the base monthly fee, worked?

7    A.   Well, so it would start at four thousand dollars a month as

8    soon as the contract was signed.   And then once AbTech won its

9    first contract, and that could be either a P3 or stormwater

10   contract with certain minimum values, once the first contract

11   generated revenue back to AbTech, meaning AbTech could bill for

12   services and receive payment, then it would increase to five

13   thousand dollars a month.   And once AbTech had won six

14   contracts like that, that came from introductions that Adam had

15   made, then once that sixth contract was generating revenue back

16   to AbTech then it would increase to ten thousand dollars a

17   month.

18   Q.   During the time Adam had a business relationship with

19   AbTech did there come a time when AbTech procured six

20   contracts?

21   A.   No.

22   Q.   Under this contract as written and signed did any

23   triggering event take place that triggered a ten thousand

24   dollar per month payment?

25   A.   According to this, no.

FBU9SKE2                         White – direct

1           MR. MASIMORE:  If we could pull up 2969 in evidence,

2     please.

3     Q.  Do you see this is an e-mail from Senator Skelos to Adam

4     Skelos on November 27, 2012.  Do you see that?

5     A.  Yes, I do.

6     Q.  Do you recognize what Adam Skelos forwarded to the senator?

7     A.  Yes.  He is forwarding the e-mail from me to Adam where I'm

8     attaching the fully signed contract, consulting contract.

9     Q.  And Senator Skelos responded "Mazel Tov"?

10    A.  Yes.

11    Q.  Mr. White, I'm going to hand you what's in evidence as

12    2468, 2469, and 2470.  Do you recognize those?

13    A.  Yes, I do.

14    Q.  What do you recognize them to be?

15    A.  They're e-mails from Adam to myself attaching various

16    articles related to water.

17    Q.  And in those three e-mails where did the articles come from

18    that Adam was sending to you?

19    A.  The e-mails are attachments that Senator Skelos is sending

20    to Adam.

21          MR. MASIMORE:  And if we could pull up 2470 in

22    evidence, please.

23    Q.  Is this an example of one of those?

24    A.  Yes, it is.

25    Q.  Do you see at the bottom Senator Skelos writes 20.6 million

FBU9SKE2                          White - direct

1  for sewer and stormwater fund?

2  A.  Yes.

3  Q.  That's from November 30, 2012?

4  A.  Yes.

5  Q.  After Adam signed the agreement with AbTech, the

6  compensation agreement, did AbTech put in a proposal to Nassau

7  County?

8  A.  Yes.

9  Q.  And what was the nature of the proposal that AbTech put in

10  to Nassau County?

11  A.  Well, it was a conceptual proposal describing generally the

12  stormwater offering and how it would apply to the

13  Sandy-affected area and how it would resolve flood mitigation

14  and treat stormwater.

15  Q.  Was the proposal a solicited or unsolicited proposal?

16  A.  At that point it was just unsolicited.

17  Q.  Can you explain what an unsolicited proposal is?

18  A.  So it was a proposal not in response to an actual request

19  for a proposal where they were really hiring a firm but rather

20  just a conceptual proposal describing to the county what we

21  could potentially do if they were interested in it.

22         MR. MASIMORE:  Could we pull up Government Exhibit

23  2464 in evidence, please.

24  Q.  Do you recognize this, Mr. White?

25  A.  Yes.  It's an e-mail from myself to Adam and I'm forwarding

FBU9SKE2                          White - direct

1   our -- the conceptual proposals I just referenced.

2   Q.  So those are the attachments?

3   A.  Yes.  Correct.

4           MR. MASIMORE:  If we could go to page twelve of the

5   exhibit, please.

6   Q.  What do you recognize this particular attachment to be?

7   A.  This is the cover page and that is the proposal that I just

8   referenced.  And that is for the stormwater treatment vaults.

9   Q.  Directing your attention to the top right corner under the

10  AEWS logo.  Do you see the contact information there.

11          MR. MASIMORE:  If we could zoom in, please.

12  Q.  Do you see that?

13  A.  Yes.

14  Q.  Do you recognize that phone number?

15  A.  Yes.

16  Q.  What do you recognize that phone number to be?

17  A.  It's the main office line to the AWS office in Raleigh,

18  North Carolina.

19  Q.  Do you also recognize the phone number that's

20  (919)900-4105?

21  A.  Yes, I do.

22  Q.  What telephone number does that correspond to?

23  A.  I recall that is the direct line to the office manager.

24  Q.  And if we could turn to page 16 of the exhibit.

25          In the first full paragraph under section 1.2, if we

FBU9SKE2                      White - direct

1   could zoom into that, please.

2          Do you see it says, "As we understand from recent news

3   reports, 65 million gallons of partially treated sewage from a

4   plant that serves almost 40 percent of Nassau's residents are

5   flushing each day into a waterway north of Long Beach, the

6   result of damage from Super Storm Sandy that can have

7   far-reaching environmental implications?

8   A.  Yes.

9   Q.  And I says Newsday.com?

10  A.  Yes.

11  Q.  Where did that information come from?

12  A.  From Newsday.

13         MR. MASIMORE:  Pulling up Government Exhibit 2459

14  again, please.

15  Q.  And this we saw before.  Senator Skelos forwarding an

16  article, a link to an article to Adam Skelos, where he wrote,

17  "Read carefully.  Sponges may stop more pollutants."

18         Did you have an opportunity to follow that link?

19  A.  Yes.  I know that link to go to the article that was just

20  being referenced.

21         MR. MASIMORE:  Could we pull up just for the witness,

22  please, Government Exhibit 404 which is not in evidence.

23  Q.  Do you recognize this article?

24  A.  Yes.  That's the article we just spoke about.

25         MR. MASIMORE:  The government offers 404.

FBU9SKE2                          White - direct

1          MR. CONIFF:  No objection pursuant to the limiting

2     instruction that we talked about earlier.

3          THE COURT:  All right.  Government Exhibit 404 is

4     received.

5          (Government's Exhibit 404 received in evidence)

6          THE COURT:  I note -- I take it what you're suggesting

7     is not for the truth of what's in the article.

8          MR. CONIFF:  Correct.

9          MR. MASIMORE:  That is correct.

10         THE COURT:  But for the fact that it was communicated.

11         MR. MASIMORE:  If we could pull up 404 for the jury

12    now that it's in evidence, please.  Page two.  The top right

13    column there.

14    Q.  Do you see there it reads "Sixty-five million gallons of

15    partially treated sewage," etc.?

16    A.  Yes.

17    Q.  Is that the language that made its way into the unsolicited

18    proposal?

19    A.  Yes.

20         MR. MASIMORE:  Could we pull up Government Exhibit

21    2465 in evidence, please.

22    Q.  Do you see this is an e-mail from Adam Skelos to you

23    copying Charlie Dorego?

24    A.  Yes.

25    Q.  And this is from November 26, 2012?

1    A.  Yes.

2    Q.  Is that the same day you had sent the proposals to Adam

3    Skelos?

4    A.  Yes.

5    Q.  And Adam Skelos writes at 5:18 p.m., "I just received word

6    that AbTech will receive an RFP from Nassau County to be

7    included in the FIMA recovery package.  It should get to us

8    within seven to ten business days."

9    A.  Yes.

10   Q.  What do you understand Adam Skelos to be referring to?

11   A.  I understood him to be referring to AbTech receiving a

12   request for a proposal from Nassau County from what I thought

13   he assumed or I assumed he meant FEMA meaning Federal Emergency

14   Management Association for infrastructure funds for stormwater.

15   Q.  And how, if at all, related was that to the proposal that

16   had been just submitted?

17   A.  It would be essentially a response to that or some type of

18   development of a request for a proposal based off of the

19   information being proposed in the conceptual.

20   Q.  You mentioned that FIMA was likely a reference to FEMA.  At

21   the time what, if any, experience did you understand Adam

22   Skelos to have working on FEMA related matters?

23   A.  I understood him to have no experience with that.

24   Q.  So this e-mail is at 5:18 p.m. on November 26, 2012?

25   A.  Yes.

1              MR. MASIMORE:  At this time the government offers

2    Government Exhibit 2012-I.

3              THE COURT:  Any objection?

4              MR. CONIFF:  No, your Honor.

5              MR. GAGE:  No, your Honor.

6              THE COURT:  Government Exhibit 2012-I is received

7    without objection.

8              (Government's Exhibit 2012-I received in evidence)

9              MR. MASIMORE:  Pull up.  This is an excerpt from

10   Senator Skelos' calendar.

11   Q.  Do you see the entry there for November 26, 2012.  Do you

12   see at the bottom or in the middle at 9:30 to 10:30 a.m. it

13   says, "Confirmed meeting with Ed Mangano in Mineola"?

14   A.  Yes.

15   Q.  Who is Ed Mangano?

16   A.  He is the county executive of Nassau County.

17             MR. MASIMORE:  If we could pull up Government Exhibit

18   1803 in evidence.  Fifth line down.

19   Q.  Do you see this calendar reflects a meeting with Senator

20   Skelos on November 26, 2012 in the Mangano calendar?

21   A.  Yes.

22             MR. MASIMORE:  If we could pull up Government Exhibit

23   101, page 183.

24   Q.  This is from Adam Skelos' cell records.  Do you see at

25   November 26 at 4:57 p.m. Adam Skelos calls Senator Skelos?

FBU9SKE2                          White - direct

1   A.  Yes.

2   Q.  And then at 5:02 p.m. Senator Skelos' phone returns a call

3   and it lasts for four minutes?

4   A.  Yes.

5   Q.  And this is at 5:02 p.m. on that same evening?

6   A.  Yes.

7          MR. MASIMORE:  Now if you could pull up 2465 again,

8   please.

9   Q.  Do you see that Adam Skelos indicates that the RFP should,

10  quote, get to us within seven to ten business days?

11  A.  Yes.

12  Q.  So that would have been in about early December?

13  A.  Yes.

14  Q.  Did there come a time when Nassau County publicized the RFP

15  that AbTech had proposed?

16  A.  Yes.

17  Q.  When did that happen?

18  A.  In the very end of February, 2013.

19         MR. MASIMORE:  Your Honor, I am about to go into a

20  different subject.  I'm happy to continue or, if the court

21  would like, to take the break now.

22         THE COURT:  It's a good time for a break.  We'll take

23  a fifteen-minute break.

24             (Jury excused)

25             (Continued on next page)

1         (In open court)

2         THE COURT:  Do counsel wish to raise anything?

3         MR. GAGE:  I do, actually, your Honor.

4         THE COURT:  Let's have a seat.

5         MR. MASIMORE:  May the witness be excused, your Honor?

6         THE COURT:  Yes.

7         (Witness excused)

8         MR. GAGE:  Your Honor my objection is to aspects of

9 the manner in which this is being presented.  I think the

10 witness is able to testify about what he saw and heard to the

11 extent admissible but to call up phonecalls -- call up

12 phonecalls that he, the witness, did not participate in, call

13 up calendar meetings that he, the witness, did not participate

14 in, I don't think it's proper to put that in through this

15 witness.  I presume the government may sum up on that, but I

16 don't think that's proper testimony for this witness to

17 recognize numbers again that -- for calls he wasn't a part of

18 or meetings he wasn't a part of.  I think it's in effect

19 argument, admittedly done in a certain structured kind of way,

20 but what it amounts to is a portion of what I presume will be a

21 closing statement, not testimony from this witness.  So that's

22 my concern.

23         THE COURT:  Mr. Masimore.

24         MR. GAGE:  And I should say, your Honor, pardon me, my

25 objection.

FBU9SKE2                    White - direct

1            MR. MASIMORE:  Your Honor, I believe what we're doing

2     is having testimony be presented and publishing exhibits that

3     are in.  I don't think there's anything different that I'm

4     doing during my direct examination than the court has permitted

5     and allowed throughout the course of the trial as a way to

6     present the evidence in a manner for the jury to digest it and

7     understand it.  I am certainly trying to refrain from any, and

8     I don't think I'm making any argumentative statements.  I think

9     I'm just publishing exhibits that are in evidence so the jury

10    can understand the testimony.  And so I object to the

11    objection.

12            THE COURT:  Your objection is noted.

13            MR. GAGE:  If I may, your Honor, the net effect is

14    plainly argument.

15            THE COURT:  I understand.  I do think that both sides

16    have done some of this.  Perhaps you could curtail the extent

17    to which you do it because it is close to the line.

18            MR. MASIMORE:  Okay.  Your Honor, I'll take a look at

19    what I have.  I will do my best if -- I trust the court will

20    let me know if it feels that I am going across the line.

21            THE COURT:  I'm sure Mr. Gage will let me know.

22            MR. MASIMORE:  Possibly.

23            THE COURT:  Thank you.

24            (Recess)

25            (Continued on next page)

FBUTSKE3                      White – direct

1           (Jury present)

2           THE COURT:  We are ready to resume.

3           MR. MASIMORE:  Thank you, your Honor.

4    BY MR. MASIMORE:

5    Q.  Mr. White, just before the break you were testifying about

6    the fact that the RFP was not publicly issued by Nassau County

7    in December but it came months later.  Do you remember that?

8    A.  Correct, yes.

9    Q.  What, if any, discussions did you have with AbTech CEO

10   Glenn Rink concerning the delays after submitting the proposal

11   but before the RFP came out?

12   A.  Many, many conversations.

13   Q.  And could you explain to the jury the sum and substance of

14   those conversations?  What did Glenn say to you and what did

15   you say to Glenn about those delays?

16   A.  Well, Glenn was extremely frustrated by the delays, and

17   each time would ask me to follow up, and I would say that we

18   were hearing that things were still moving along and just takes

19   a while, but he continued to bring it up constantly.

20   Q.  And you mentioned that Glenn Rink asked you to follow up?

21   A.  Yes.

22   Q.  With whom?

23   A.  With Adam primarily.

24   Q.  During these conversations, what, if anything, did Glenn

25   Rink say about Senator Skelos?

FBUTSKE3                      White - direct

A.   Well, as his frustration grew, I recall at least one time
when he said why don't you ask Adam to ask his father if he
could look into it.

Q.   What did you do after Glenn Rink asked you to ask Adam
what, if anything, Senator Skelos could do?

A.   Well, I brought it up to Adam and said that Glenn wanted
to -- was wondering if he could ask his father to look into it.

Q.   And how did you communicate that to Adam?

A.   By phone.

Q.   What, if anything else, did you discuss with Adam Skelos
concerning the delays in Nassau County issuing the RFP?

A.   I'm not sure I follow the question.

Q.   Let me ask it this way, you mentioned Glenn Rink made
repeated requests to you to follow up with Adam?

A.   Yes.

Q.   During those initial follow ups, what did you speak with
Adam Skelos about?

A.   Oh, well, just whether he could look into it, and Adam
would tell me that he would call Shila Shah or that he would
call Rob Walker, and things were just taking a long time, and
also Ken Arnold, I think.

Q.   After you passed on Glenn Rink's request about Adam
contacting his father, what, if anything, did Adam Skelos
report back to you concerning the status of the RFP?

A.   I recall just generally that Adam said that things just

FBUTSKE3                    White - direct

1    take a long time with municipalities, and that it would happen,

2    it just was going to take a while.

3    Q.  If we could pull up 2472, please, in evidence.

4          And we start at the bottom.  Do you see on December 4,

5    2012 you emailed Adam:  Hey, Adam, will you be hearing from the

6    county when they post RFP?  I haven't heard, seen anything yet.

7    Best, Bjornulf.

8    A.  Yes.

9    Q.  Why did you send this email?

10   A.  To comply with Glenn's request.

11   Q.  And Adam Skelos replies in part:  Yes, seeing the county

12   executive tonight and will follow up on when that will come

13   out.

14          Do you see that?

15   A.  Yes.

16   Q.  Did you have an understanding of where or how Adam Skelos

17   was going to see the county executive that night?

18   A.  Where or how?  No.

19   Q.  With respect to that particular exchange in early December,

20   December 4th, do you recall whether Adam reported back to you

21   the substance of any communications?

22   A.  I don't recall at that time.

23   Q.  If we pull up Government Exhibit 2474, please, in evidence,

24   2474.  You see this is an email from Adam Skelos to you a few

25   days later, December 10, 2012?

FBUTSKE3                          White - direct

1   A.  Yes.

2   Q.  And at the bottom you email Adam Skelos, or actually Adam

3   Skelos emails you, subject Nassau County.  Have you heard

4   anything yet from Nassau County?

5   A.  Yes.

6   Q.  And you responded:  No, nothing.

7        And then Adam Skelos said:  We'll follow up now.

8   A.  Yes.

9   Q.  At that time did you have an understanding of how Adam

10  Skelos was going to go about following up?

11  A.  Yes.

12            MR. GAGE:  Objection, your Honor.

13            THE COURT:  I'll permit it.

14            MR. GAGE:  To the basis for the understanding.

15            THE COURT:  All right.  Please elicit the basis.

16  Q.  Did you have an understanding?

17  A.  Yes.

18  Q.  What was the basis of that understanding about how Adam

19  Skelos would follow up?

20  A.  What Adam would tell me multiple times.

21  Q.  What did Adam tell you?

22  A.  That he would speak with Rob Walker, that was his main

23  contact at the county.

24  Q.  Based on what Adam Skelos told you, how frequently was Adam

25  Skelos able to speak to Rob Walker directly?

FBUTSKE3                         White - direct

1    A.  Very often.  It was his main contact.  He told me he had

2    Rob Walker's cell phone number, he would text and call him.

3    And usually Rob Walker was who Adam would always sort of -- or

4    usually say was his first contact.

5             MR. MASIMORE:  If we could pull up Government

6    Exhibit 101 at page 190.

7    Q.  And just do you see 1:41 p.m. on December 10, there's a

8    call 8443.

9    A.  Yes.

10   Q.  Do you recognize that number?

11   A.  That's my cell phone.

12   Q.  It's a three-minute call?

13   A.  Yes.

14   Q.  Do you recall this specific call?

15   A.  No.

16             MR. MASIMORE:  Government Exhibit 2477 in evidence,

17   please.  Start at the bottom, please.

18   Q.  Do you see the very bottom you write to Adam Skelos:  Well,

19   seven new opportunities posted at 8:00 a.m. on the solicitation

20   board.  They close December 26, but still not ours.  I hope

21   they have another tranche planned for today.  I will keep

22   monitoring on my end assuming it's going up on that online

23   solicitation board.

24             Do you see that?

25   A.  Yes.

1    Q.   Why were you sending Adam Skelos this email?

2    A.   I recall that he told me that Rob Walker was telling Adam

3    that the stormwater opportunity should be hitting the

4    solicitation board, which is where they posted the RFPs, so

5    Adam said to monitor that.  And so I'm sending this to let him

6    know that I'm monitoring it and I'm not seeing anything yet.

7    Q.   You just testified about several instances where you

8    followed up with Adam Skelos concerning the delay.  Can you

9    explain what, if any, business reason there was for checking up

10   on the status of this RFP?

11   A.   Well, it was important to AbTech as a potential big project

12   and within the stormwater private public partnership area,

13   which is one of the focuses.

14   Q.   And then Adam responds in this email to you:  Will follow

15   up.  Should be today.

16   A.   Yes.

17   Q.   Then you send him a web site.  What was that web site to?

18   A.   That is the Nassau County Solicitation Board where they

19   post RFPs.

20   Q.   And then above that Adam responds to you:  Just heard back

21   from Rob.  He says the bid board told him they won't have it

22   drafted until Monday or Tuesday.  They are, however, working on

23   it as we speak, so should be posted by then.

24   A.   Yes.

25   Q.   Who did you understand Adam Skelos to mean by Rob?

FBUTSKE3                    White - direct

A.  Rob Walker, the Chief Deputy County Executive of Nassau

County.

Q.  And you replied at the end there:  Crossing my fingers.

        And Adam replies:  Hope so.  I'll stay on them.

A.  Yes.

Q.  Who did you understand Adam to mean by "I'll stay on them?"

A.  Nassau County.

Q.  Directing your attention to December 24, 2012, Christmas

Eve, did there come a time when you participated on a

conference call for AbTech?

A.  Yes, I had a conference call with the Department of Public

Works on Christmas Eve.

Q.  Who was on the call?

A.  There were several, as I recall, county officials.  I

recall Ken Arnold being the one who was doing the talking.  But

it was the various folks that were putting together the request

for proposal.

Q.  And who was on the call from AbTech's side besides you, if

anyone?

A.  Just myself.

Q.  Was Adam Skelos on the call?

A.  I don't believe he was, no.

Q.  What was the purpose of the call?

A.  Well, the county had requested it.  They said they wanted

more details and explanation on the financial structure of P3s,

FBUTSKE3                         White - direct

1    the programmatic and legal structure of it, more details on the

2    technology solution.  So they really asked me to get into sort

3    of deep dives into our program structure and said it was for

4    the purpose of drafting the RFP and making sure that they were

5    doing it right.

6            MR. MASIMORE:  If we could pull up 2976 in evidence,

7    email between Adam Skelos and R. Walker.

8    Q.  Do you see that?

9    A.  Yes.

10   Q.  Do you recognize the information at the bottom of this

11   email chain?

12   A.  That is the conference call information that was given to

13   me for the conference call.

14   Q.  And do you see up from that Adam Skelos replies to Rob

15   Walker, who forwarded it to him:  Got it.

16           And then Rob Walker writes to him:  Seems like --

17           MR. CONNIFF:  Objection for the reasons that Mr. Gage

18   stated.

19           THE COURT:  Sustained.

20   Q.  Did Adam Skelos report back to you the conversation he had

21   in this email with Rob Walker about the conference call you

22   were on?

23   A.  No.

24           MR. MASIMORE:  If we pull up 2482 in evidence, please,

25   the top half.

FBUTSKE3                         White – direct

Q.  Do you see there an email from you to Adam, you say:  Just

curious if there is any further update.  I don't see anything

posted on solicitation board yet, and Ken didn't reply to my

email below, so hopefully he's working directly with you.

        Do you see that?

A.  Yes.

Q.  Why did you send that to Adam Skelos on January 25th, 2013?

A.  Because Ken Arnold had asked for Adam's email address, and

so I provided it.  And I wasn't really hearing anything from

the county, so I was wondering if maybe Ken Arnold had told

Adam something.

Q.  Then Adam Skelos writes back to you:  Have two calls into

Ken.  Waiting to hear something.

A.  Yes.

Q.  Who did you understand him to mean by Ken?

A.  Ken Arnold, the assistant to the commissioner of public

works.

Q.  During these requests for follow up to Adam Skelos, what,

if anything, did Adam Skelos tell you about whether his father

was in telephone contact with the county executive?

A.  None at that time.

        MR. MASIMORE:  If we pull up 2484 in evidence, please.

Focus on the top half.

Q.  The last email was from January 25th, this one is

February 1st, correct?

FBUTSKE3                    White - direct

A.  Correct.

Q.  And here you write to Adam:  Got it.  Nassau still not
posted.  Amazing.  Two plus months to draft a simple RFP.  We
were doing calls right around Christmas on this urgently.

          Do you see that?

A.  Yes.

Q.  Why did you send that to Adam Skelos?

A.  Well, I mean this was at the same time that Glenn was
telling me to always be contacting Adam regarding the status,
so it's really just another way of just asking him to check on
the status of the RFP.

Q.  And Adam writes back to you:  Wasn't lying when I told you
how fast New York government moves.  This municipality, by the
way, will probably be faster than all the others we go to.  It
will happen, just takes time.

A.  Yes.

          MR. MASIMORE:  Your Honor, the government offers 2485.
I think we offered it before, your Honor, but it was not
technically received.

          MR. CONNIFF:  No objection.

          THE COURT:  Government Exhibit 2485 is received
without objection.

          (Government's Exhibit 2485 received in evidence)

Q.  Do you see this is email from you to Glenn Rink, correct?

A.  Yes.

FBUTSKE3                          White – direct

1    Q.  And it says subject matter:  Update.

2    A.  Yes.

3    Q.  February 4, 2013.

4    A.  Yes.

5    Q.  And you wrote:  On Nassau, Adam said the county has the RFP

6    ready, they just need final approval from the state before

7    posting.  Adam is pushing.

8    A.  Yes.

9    Q.  What were you referring to when you told Glenn Rink that

10   Adam was pushing?

11   A.  That he was in contact with Rob Walker to make sure that it

12   wasn't -- that attention was still on it.

13   Q.  And where were you getting the information concerning what

14   Adam was doing with respect to the county at this time?

15   A.  Well, directly from Adam.

16            MR. MASIMORE:  If we could pull up 2487 in evidence,

17   please.

18   Q.  Do you see in the middle here a few days later, February 7,

19   2013, Glenn Rink emails you, do you see there's no text but

20   there's a subject:  Any news on Long Island?

21   A.  Yes.

22   Q.  What did you understand him to be asking about?

23   A.  He's asking again about the status of Nassau County.

24   Q.  And on February 7 at 1:39 p.m. you responded:  I'm pushing

25   on Adam daily.

1          What were you referring to?

2    A.   That I'm continuing to follow up with Adam and ask him what

3    the status is.

4    Q.   Then you write:  From last night, his text, Nassau RFP is

5    getting done soon, no exact date, but the county exec had to

6    sign off on something from the DOT and that's done.

7          Do you see that?

8    A.   Yes.

9    Q.   Was that an accurate quotation of a text message you

10   received from Adam?

11   A.   Yes.

12   Q.   Did Adam tell you what the specific source of that

13   particular information was at that time?

14   A.   No.

15   Q.   And again, if we could pull up --

16        MR. MASIMORE:  The government offers 2489.  It was in

17   the binder but not technically received by the Court.

18        MR. CONNIFF:  No objection.

19        THE COURT:  Government Exhibit 2489 is received

20   without objection.

21        (Government's Exhibit 2489 received in evidence)

22   Q.   Did you see this is you to Adam Skelos on Thursday,

23   Valentine's Day, 2013?

24   A.   Yes.

25   Q.   And you say:  Hey, just a quick note to see if you heard

FBUTSKE3                        White - direct

anything from Nassau.  I have been checking the solicitation

board regularly, but nothing is posted yet.

          What are you asking Adam about?

A.  The status of the Nassau County RFP.

Q.  In late February 2013 did there come a time when Nassau

County finally posted the RFP?

A.  Yes.

          MR. MASIMORE:  The government offers Government

Exhibit 2490, also part of the binder but not technically

received.

          MR. CONNIFF:  No objection.

          THE COURT:  The government Exhibit 2490 is received

without objection.

          (Government's Exhibit 2490 received in evidence)

Q.  And what do you recognize this document to be, Mr. White?

A.  It's an email from myself to Adam attaching all various bid

documents.

Q.  And where did these bid documents come from?

A.  Downloaded from the Nassau County solicitation board.

Q.  And that was on February 22nd, 2013?

A.  Yes.

Q.  Turn to page 6 of the exhibit.  The very bottom there you

see it says start date, February 22nd, 2013 at 1:00 p.m.?

A.  Yes.

Q.  And then open date April 4th, 2013?

FBUTSKE3                      White - direct

1   A.  Yes.

2   Q.  Can you describe -- let me ask you this:  What did you do

3   once you received the RFP documents?

4   A.  I set up a full capture team that would work basically

5   every day until the proposal was due.  So for the next little

6   over a month we spent every day working on the proposal.

7   Q.  Did you review the proposals yourself?

8   A.  Yes, of course, every draft daily.

9   Q.  But did you review the RFP?

10  A.  The RFP, yes.

11  Q.  Can you describe the RFP?  What was the request for

12  proposal?  What was being called for?

13  A.  The county was asking for a company or team of companies to

14  submit a proposal whereby they would upgrade a certain amount

15  of sites to include stormwater treatment devices that would

16  treat stormwater.  And it included all the phases, so

17  assessment, technology and solution development, design,

18  construction, and operation and monitoring.

19  Q.  How did the RFP that Nassau County issued compare with the

20  unsolicited proposal that AbTech had put in?

21  A.  Well, it was asking for -- in the context of a design,

22  build, operate contract, it was asking for the type of

23  treatment -- stormwater treatment devices that we had proposed

24  in the conceptual proposal.

25  Q.  Now you mentioned before that after the RFP came out you

1    pulled a capture team together.

2    A.  Yes.

3    Q.  Can you describe for the jury what a capture team is, who

4    is on it and what it does.

5    A.  It's something that we did at Lockheed Martin, too, for

6    providing engineering -- complicated engineering proposals.  So

7    the capture team, essentially led by me, put together an

8    engineering team but also finance program, support staff.  And

9    the team together would develop all of the various documents

10   that go into proposing a complicated infrastructure project.

11   Q.  Can you describe the resources that AbTech put into

12   formulating its bid on this project?

13   A.  Well, quite a bit, because we had probably a dozen people

14   on the capture team working for that whole period of several

15   weeks.  And there was also travel.  We brought on a

16   subcontractor, an engineering firm on Long Island.  And so it

17   was a lot of resources.

18   Q.  How, if at all, important was winning this bid to AbTech's

19   business?

20   A.  It was very important.  It was a big project and a first

21   P3.  So it was important.

22   Q.  And what was the significance of it being a first P3, as

23   you said?

24   A.  Well, AbTech had launched the P3 program basically in the

25   summer of 2012, and so this was -- would be potentially the

FBUTSKE3                     White - direct

```
1    first one, so that was important.

2                MR. MASIMORE:  And if we could pull up just for the

3    witness Government Exhibit 2301A.

4    Q.  Mr. White, do you recognize Government Exhibit 2301A?

5    A.  Yes.

6    Q.  And how do you recognize it?

7    A.  It is the technical proposal that we have just been

8    discussing that we put together.

9                MR. MASIMORE:  The government offers 2301A.

10               MR. CONNIFF:  No objection.

11               THE COURT:  Government Exhibit 2301A is received

12   without objection.

13               (Government's Exhibit 2301A received in evidence)

14               MR. GAGE:  For clarity, I think we may have offered it

15   as a defense exhibit also.

16               MR. MASIMORE:  May I proceed, your Honor?

17               THE COURT:  You may.

18   BY MR. MASIMORE:

19   Q.  How long did it take to prepare the bid document, 2301A,

20   that AbTech submitted to Nassau County?

21   A.  Several hundred person hours in terms of work across the

22   various members of the capture team and myself.

23   Q.  How many person hours did Adam Skelos put into making this

24   document?

25   A.  None.
```

FBUTSKE3                    White - direct

```
 1    Q.  Now have you submitted bids before in connection with
 2    responding to RFPs?
 3    A.  Yes.
 4    Q.  Typically in submitting those bids have you worked with
 5    consultants?
 6    A.  Yes.
 7    Q.  And in those situations, what did consultants do to help
 8    put together the bid papers?
 9            MR. CONNIFF:  Objection.
10            THE COURT:  Ground?
11            MR. CONNIFF:  I'm not sure it's relevant to this
12    circumstance here.
13            THE COURT:  Well, I will permit it.  Go ahead.
14    A.  Typically a consultant would have either subject matter
15    expertise in what was going into the bid or would -- and/or
16    would be a subject matter expert in the customer and their
17    needs.  So it would be really common for the consultant to be
18    essentially part of the capture team reviewing documents,
19    giving insight into how to structure it, what the customer
20    needs, how to present it, and the messaging.
21            MR. MASIMORE:  The government offers 2497, again a
22    binder document but not yet received.
23            MR. CONNIFF:  No objection.
24            THE COURT:  Government Exhibit 2497 is received
25    without objection.
```

FBUTSKE3                        White - direct

1          (Government's Exhibit 2497 received in evidence)

2     Q.  And if we start at the bottom there, do you see you write

3     to Adam Skelos on April 1st, 9:35 a.m.:  If we Fed Ex the

4     proposal to delivery to you by Wednesday morning, would you be

5     able to hand deliver it to Ken Arnold on Wednesday afternoon?

6          Do you see that?

7     A.  Yes.

8     Q.  What arrangements are you making here with Adam Skelos?

9     A.  The proposal needs to be hand delivered with a certain

10    amount of copies, so we're making arrangements for those to be

11    physically delivered to Ken Arnold, who is the point of contact

12    listed for Nassau County.

13    Q.  And above that Adam Skelos provided you with an address?

14    A.  Yes.

15    Q.  And then at 9:16 a.m. on April 2nd you wrote to Adam:

16    Okay, you might want to ask Ken Arnold who else has pulled the

17    RFP, which should be considered public information, so we can

18    guess at competition.

19         What already you referring to there?

20    A.  Well, often after the bid period is closed, or even before,

21    the customer, meaning the county, will let you know which

22    companies have actually pulled or basically downloaded or

23    requested the RFP, and that way you can kind of figure out who

24    your competition is and then gauge how likely it is you're

25    going to win.  So I was asking him to see if he could figure

1    that out or ask Ken if they were releasing that or not.

2    Q.  Now at that point did you have an understanding whether

3    other businesses were potentially planning on submitting bids?

4    A.  Yeah, we believed -- we didn't know how many, but we

5    believed there to be many because there had been a public

6    document that Nassau County put out with questions and answers.

7    The questions were from various potential bidders and the

8    answers were from the county.  So we knew people were asking

9    very specific questions and obviously were interested in the

10   project.

11   Q.  How did you know that those questions were from other

12   potential bidders and not AbTech?

13   A.  Any question like that would have come from me or had to be

14   approved.

15   Q.  So were you familiar with the specific questions AbTech

16   had, if any?

17   A.  Well, sure, yes.  I don't recall that we asked any.

18   Q.  And so in this email, in response to what you wrote, Adam

19   replied to you:  I will, but no competition.

20   A.  Yes.

21   Q.  What did you understand Adam Skelos to mean by:  I will,

22   but no competition?

23   A.  I understood him to think that my question was sort of

24   irrelevant because he didn't think there was any competition.

25   Q.  Now at this point in early April 2013 when Nassau County

FBUTSKE3                    White - direct

1    has issued its RFP and AbTech is submitting its bid -- let me

2    ask it this way first:  Did there come a time when you learned

3    whether the bid was submitted?

4    A.  Yes.

5    Q.  And how did you learn that the bid was submitted?

6    A.  Well, Adam let me know that it had been submitted.

7             MR. MASIMORE:  And if we could pull up Government

8    Exhibit 101, page 253, and go to April 5th calls.

9    Q.  You see April 5th at 5:26 p.m., it's the third one up from

10   the bottom, these are from Adam Skelos' cell records, do you

11   see a call with the 8443 number?

12   A.  Yes.

13   Q.  That's the day after the bid was submitted?

14   A.  Yes.

15   Q.  Do you recognize the 8443 number?

16   A.  Yes, it's my cell phone.

17   Q.  Sitting here now, do you have a specific recollection of

18   this particular phone call?

19   A.  No.

20   Q.  Now at this point, early April 2013, Nassau County has

21   issued an RFP, AbTech has submitted a bid, correct?

22   A.  Yes.

23   Q.  And at this point is AbTech waiting for the response from

24   the county to find out who is going to select -- who they're

25   going to select?

FBUTSKE3                         White - direct

1    A.  Yes.

2    Q.  Now at that point, how much had Adam Skelos been paid each

3    month?

4    A.  4,000 a month.

5              MR. MASIMORE:  So if we could pull up 2673 in

6    evidence.

7    Q.  You see that's an email from Adam Skelos to you?

8    A.  Yes.

9    Q.  Enclosing a December 2012 invoice?

10   A.  Yes.

11   Q.  And turn to second page of the exhibit.

12             You recognize the invoice?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's an invoice from Adam to AbTech for his December 2012

16   pay.

17   Q.  And that was $4,000?

18   A.  Yes.

19             MR. MASIMORE:  If we pull up 2674 in evidence.

20   Q.  Do you recognize this, Mr. White?

21   A.  Yes, it's an email from Adam to me attaching his January

22   2013 invoice.

23   Q.  If we go to the second page, do you recognize the invoice.

24   A.  That was the invoice that I just referenced.

25   Q.  Again, $4,000?

FBUTSKE3                        White – direct

1   A.  Correct.

2   Q.  Again, 2675 in evidence, please.

3          Do you recognize this?

4   A.  Yes, it's an email from Adam to me attaching his

5   February 2013 invoice.

6   Q.  And the second page.

7   A.  That is an invoice for $4,000 from Adam to AbTech for

8   February, 2013 pay.

9   Q.  And then 2676 in evidence.

10          Do you recognize that?

11  A.  Yes, it's an email from Adam to myself attaching his

12  March 2013 invoice.

13  Q.  Go to the next page.

14  A.  And that is the invoice from Adam to AbTech for $4,000 for

15  his March 2013 pay.

16  Q.  Now around this time, around April 5th, 2013, the day after

17  the bid was submitted, how often did you speak to Adam Skelos?

18  A.  Not really very often, other than to follow up on the

19  status of the RFP.  But it had been pretty quiet because we had

20  been focused on putting together the proposal for several

21  weeks.

22  Q.  And during that time period, what, if anything, was the

23  subject matter of the conversations that you had with Adam

24  Skelos, the general subject matter.

25  A.  AbTech business, in particular the opportunities on Long

1    Island.

2    Q.  And during these conversations, up through and including

3    April 5th, 2013, did you discuss anything of substance other

4    than AbTech-related business --

5    A.  No.

6    Q.  -- with Adam Skelos?

7    A.  No.

8    Q.  Now at the beginning of April 2013, based on the events

9    that had occurred, that is, AbTech submitting its bid, under

10   the contract that was in place and signed, how much was Adam

11   Skelos entitled to receive per month?

12   A.  $4,000 a month.

13   Q.  And under the contract that was signed and in place at that

14   time, when, if at all, would that amount increase to 5,000 per

15   month?

16   A.  It would increase to 5,000 once the first contract was from

17   an introduction he had made was won and then started generating

18   payments back to AbTech.

19   Q.  And that would entitle him at that point to 5,000 per

20   month?

21   A.  Yes.

22   Q.  And under the contract that was signed and then existing,

23   what needed to happen for Adam Skelos under that contract to

24   receive $10,000 per month from AbTech?

25   A.  There would have to be six contracts like that from

FBUTSKE3                     White – direct

1    introductions that Adam had made that were all generating

2    payments back to AbTech, so work was being done.

3    Q.  Over time, how many contracts did Adam Skelos generate that

4    paid any sort of revenue to AbTech?

5    A.  Just this one, the Nassau County one that we have been

6    discussing.

7    Q.  Under the terms of contract that was written and signed and

8    in place, did there come a time when Adam Skelos was entitled

9    to $10,000 per month pursuant to that contract?

10   A.  No.

11   Q.  What happened after Adam submitted AbTech's bid to Nassau

12   County?

13   A.  What happened was while we were waiting for the response

14   from Nassau County I received an email from Glenn Rink where he

15   was forwarding an email that Charlie Dorego had sent to him.

16           MR. MASIMORE:  The government offers 2502.  It was in

17   the binder but I don't believe technically received.

18           MR. CONNIFF:  No objection.

19           THE COURT:  Government Exhibit 2502 is received

20   without objection.

21           (Government's Exhibit 2502 received in evidence)

22   Q.  And starting from the bottom, Glenn Rink forwards you an

23   email from Charlie Dorego.  Is that the email you just referred

24   to?

25   A.  Yes, it is.

FBUTSKE3                    White - direct

Q.  And Glenn Rink then writes to you above that:  Call me,

please.

A.  Yes.

          MR. MASIMORE:  And if we zoom in on the top.

Q.  You replied:  Okay.  Will call you in a while.  I can't

believe he's going to try to hold us hostage to renegotiate the

contract.  The engineers are getting paid for labor hours to do

real work.  I think around 5500 man hours.  Unreal.

          At the time you received the email from Charlie Dorego

below, what was your understanding of whether Senator Skelos

could interfere with the project?

          MR. GAGE:  Objection, your Honor.

          THE COURT:  Basis, is that it?

          MR. GAGE:  Yes.

          THE COURT:  Lack of foundation.

Q.  Mr. White, at that time when you received this information

from -- this email from Charlie Dorego, did you have an

understanding of how Senator Skelos might be able to influence

the outcome of the Nassau County bid process?

A.  Yes.

Q.  And what was the basis of your understanding?

A.  My understanding from Adam, and also from things Glenn had

said about how the senator had a close relationship with the

County Executive Mangano.

          MR. GAGE:  Objection, your Honor, move to strike as

1   unresponsive.

2           THE COURT:  Sustained.

3           MR. MASIMORE:  Let's take it step by step.

4           Can we pull up the bottom email from Charlie Dorego.

5   Q.  And do you see part of that email -- and you read this

6   email when you received it, correct?

7   A.  Yes.

8   Q.  Do you actually, sitting here now, recall when you received

9   this email?

10  A.  Yes.

11  Q.  How is it you recall receiving this email?

12  A.  Because it was pretty shocking.

13  Q.  And Charlie Dorego's email says:  He's hesitant -- and his

14  dad called -- to do it with the engineers making more money

15  than him.  And then Charlie Dorego says:  I think they don't

16  think it's worth pushing through.

17          Do you see that?

18  A.  Yes.

19  Q.  What did you understand Charlie Dorego to mean when he

20  said, "I think they don't think it's worth pushing through."

21          MR. GAGE:  Objection, your Honor, foundation.

22          THE COURT:  I'll permit it.

23  A.  Could you repeat the question?

24  Q.  Sure.  What did you understand Charlie Dorego to mean when

25  he said, "I think they don't think it's worth pushing through."

FBUTSKE3                    White - direct

A.  I took it -- I thought he meant that it was basically a

threat to interfere with the process and hurt AbTech's chances.

Q.  And in your email at the top you wrote:  I can't believe

he's going to try to hold us hostage to renegotiate the

contract.

        What did you mean when you wrote to Glenn Rink that

there is somebody trying to hold us hostage?

A.  What I meant was that this was a period where the technical

review committee of Nassau County is supposed to be reviewing

the proposal without any interference, supposed to be like a

stand-down period.  And to make this request and basically say

that there's going to be -- there could be contact, negative

contact --

        MR. GAGE:  Objection, your Honor, unresponsive.

        THE COURT:  Sustained.

Q.  You mentioned a stand-down period just a moment ago.  What

did you mean by a stand-down period?

A.  No contact with the county except for through the person

they authorized questions to go to.

Q.  And based on what you had read in Charlie Dorego's email

and things that Adam Skelos had told you about, what was your

understanding of how AbTech could be held hostage?

        MR. GAGE:  Objection, your Honor.

        THE COURT:  Overruled.

A.  Could you repeat the question?

1    Q.  I will try.  Based on what you had read in Charlie Dorego's

2    email and information provided to you by Adam Skelos, what was

3    your understanding of how AbTech could be held hostage?

4    A.  Through contact between the senator and County Executive

5    Mangano in a way that would be detrimental to AbTech.

6              MR. GAGE:  Objection, your Honor, move to strike.

7              THE COURT:  I'll permit it.

8    Q.  Now in the email from Charlie Dorego at the bottom of 2502,

9    he mentioned something about a four percent commission on a $10

10   million project.  Do you see that?

11   A.  Yes.

12   Q.  And what is four percent of 10 million?

13   A.  $400,000.

14   Q.  Up until this time, had you been the person who primarily

15   interfaced with Adam Skelos concerning his duties at AbTech?

16   A.  Yes.

17   Q.  Were you aware of Adam Skelos' efforts that he had been

18   making on behalf of AbTech?

19   A.  Was I aware of?

20   Q.  Efforts that Adam Skelos had been making on behalf of

21   AbTech.

22   A.  Yes.

23   Q.  Did Adam Skelos report to anybody else directly at AbTech

24   other than you?

25   A.  No.

FBUTSKE3                    White - direct

Q.  Was the assistance that Adam Skelos had provided in

connection with the Nassau County contract, had that been worth

$400,000 to AbTech?

           MR. CONNIFF:  Objection.

           THE COURT:  Overruled.

A.  I don't believe so.

Q.  Why do you believe that his services were not worth

$400,000?

A.  Because that's an incredibly large amount of money and

large portion of the contract.  And frankly, it starts to rival

probably the amount that AbTech was going to make total in

profit.  I'm not sure of the exact number, but the whole

construction portion of the contract is -- there's no money

made off of it from AbTech, so we're not talking about a lot

that AbTech actually ends up making.  So that could potentially

even have been more, but I mean, very huge number.

Q.  And in your email to Glenn Rink you mention that engineers

are getting paid for labor hours to do real work.  What work

were you referring to?

A.  I was referring to the work that was basically specced into

the proposal that the engineers would do under the contract as

it was being executed, all the various engineering, design

assessment, analysis, basically all the work minus the

construction.

Q.  And you mentioned in the email:  Okay, will call you in a

FBUTSKE3                    White - direct

1   while.

2   A.  Yes.

3   Q.  Did there come a time when you did in fact have an

4   opportunity to have a conversation with Glenn Rink?

5   A.  Yes.

6   Q.  And approximately when was that?

7   A.  Very shortly after this.

8   Q.  So if I could show you --

9           MR. MASIMORE:  The government offers Government

10  Exhibit 118 into evidence.

11          MR. CONNIFF:  No objection.

12          THE COURT:  Government Exhibit 118 is received without

13  objection.

14          (Government's Exhibit 118 received in evidence)

15          MR. MASIMORE:  If we go to page 64 and publish it to

16  the jury, please.

17  Q.  And sir, these are your cell phone records, correct?

18  A.  Yes.

19  Q.  And if we go to April 10, what's listed as 4:18 p.m., do

20  you see a call with a number 480 ending in 4000?

21  A.  Yes.

22  Q.  And it lasts 22 minutes?

23  A.  Yes.

24  Q.  What's that 4000 number?

25  A.  That is the AbTech Industries office in Scottdale, Arizona,

FBUTSKE3                          White – direct

1   the main line.

2   Q.  Do you recall this call?

3   A.  Yes.

4   Q.  Who did you speak with at AbTech's office during that call?

5   A.  Glenn Rink.

6   Q.  And during that call on April 10, 2013, what did Glenn Rink

7   say to you and what did you say to Glenn Rink?

8   A.  What Glenn told me was that at that time he was saying that

9   he thinks the message is coming more from Charlie Dorego.  And

10  I told him that this was outrageous and we should not do it,

11  and he should tell Charlie no, and basically that it was

12  completely inappropriate.  And Glenn was telling me that he's

13  going to look into it, don't worry about it, he's going to talk

14  to Charlie, things to that effect.

15  Q.  During that call, did Glenn Rink or you decide whether to

16  pay Adam Skelos more money?

17  A.  No.

18  Q.  Directing your attention to Government Exhibit 118, which

19  came into evidence, your cell records, page 66, if we zoom in

20  to those two calls, April 22nd at 11:05 a.m. and 3:01 p.m., do

21  you see those?

22  A.  Yes.

23  Q.  Do you see you're in touch with a phone number that ends in

24  6600?

25  A.  Yes.

1    Q.   Do you recognize that number?

2    A.   Yes.

3    Q.   Whose number is that?

4    A.   That's Glenn Rink's cell phone.

5    Q.   And do you see the first call lasted 29 minutes and the

6    second lasted 12 minutes?

7    A.   Yes.

8    Q.   Do you recall these calls?

9    A.   Yes.

10   Q.   And how are you able to recall these specific calls?

11   A.   They were intense phone calls, and my relationship with

12   Glenn Rink was never the same afterwards, so I remember them

13   vividly.

14   Q.   Let's take it step by step.  Can you tell us what Glenn

15   said and what you said during the first of these phone calls?

16   A.   What Glenn said on the first call was that he wanted to

17   increase Adam's pay, and he said that he had spoken to Charlie

18   and he said that it was important to -- he, meaning Charlie,

19   told Glenn it was important to comply with this request, and

20   that I need to think more long term and that this is important.

21   And it was a long call, so a lot of it was back and forth on

22   that, and I told him it was not needed, it was not appropriate,

23   the technical review committee was reviewing the proposal right

24   now, they should just be allowed to do their own review, and we

25   should absolutely not do it.  And he didn't say yes or no, but

1   he said he was going to think about it more and talk to

2   Charlie.

3   Q.  What was the tone of this first conversation with Glenn on

4   April 22nd?

5   A.  It was very heated.  Glenn was very intense, and I was very

6   upset.

7   Q.  What did you do after the first phone call?

8   A.  Well, it was left -- it was left with no resolution.  I

9   couldn't believe that he was not going to go -- not listening

10  to me.  So I took a drive to kind of clear my head and think

11  about it.

12  Q.  What happened next?

13  A.  Later that day he called me and we spoke briefly.

14  Q.  And during that second conversation with Glenn Rink, what

15  did he say to you and what did you say to him?

16  A.  He told me okay, we're not going to increase the

17  commission.  But he had made a decision, he was going to

18  increase Adam's compensation, but later down the road at a time

19  when we would be pursuing all these other municipalities.  And

20  he said:  Isn't it important to pursue these municipalities?

21  And it is.  And he said:  So I would like you to call Adam and

22  tell him that we want to focus on going to Suffolk County, go

23  to other municipalities, and let him know that Glenn Rink was

24  gone to increase his compensation somewhere down the road.

25  Q.  What, if anything, did Glenn Rink say during any of these

FBUTSKE3                         White - direct

conversations with you concerning what would happen if AbTech

did increase Adam's pay?

A.   I don't recall if it was on that call or the one earlier

that day, but he said that Charlie had told him that if AbTech

increases his pay and takes care of Adam, his father will take

care of AbTech.

               (Continued on next page)

1  Q.  Did there come a time after the second April 22 phone call

2  with Glenn Rink to place -- did there come a time after that

3  where you, in fact, spoke with Adam Skelos over the phone?

4  A.  Yes.

5  Q.  As best as you can recall what did you say to him and what

6  did he say to you during that call?

7  A.  I told him that Glenn had asked me to convey to him that

8  his compensation was going to be taken care of and that Glenn

9  really wanted us to focus on getting into Suffolk County,

10  getting into other municipalities, and that Glenn had wanted me

11  to reiterate that there was a limited time with the

12  infrastructure funding and a one sort -- a one-time chance so

13  we really needed to get on that.

14  Q.  What, if anything, did Adam say in response?

15  A.  He said that that's good.  And he -- he said okay we'll

16  meet with -- he'll work on Suffolk, he'll work on some of the

17  other municipalities.

18         But he started saying, you know, I think we ought to

19  wait until we get Nassau County one before we pursue Suffolk

20  County or other municipalities because he said he thought it's

21  better to go to other customers with one that we had already

22  won.

23  Q.  Before that call -- well actually let me --

24         MR. MASIMORE:  If we can pull up Government Exhibit

25  101 in evidence at page 262.

1   Q.  Do you see these are Adam Skelos' cell records?

2            MR. MASIMORE:  If we could focus in on April 23.  The

3   top.

4   Q.  Do you see a 2:22 p.m. Adam Skelos' cellphone is in contact

5   with this 8443 phone number?

6   A.  Yes.

7   Q.  For eleven minutes?

8   A.  Yes.

9   Q.  Do you recognize this call?

10  A.  Yes.

11           MR. GAGE:  Excuse me, your Honor.  Is it the top call

12  or the bottom call?

13           MR. MASIMORE:  I'm sorry.  Let me take it step by

14  step.

15  Q.  Do you see a call at 2:22 p.m.?

16  A.  Yes.

17  Q.  Now below that there's a call at 2:33 p.m.  Do you see

18  that?

19  A.  Yes.

20  Q.  So that's a call between --

21           MR. GAGE:  Your Honor, I'm objecting to anything that

22  doesn't involve calls with this witness, as we discussed.

23           MR. MASIMORE:  I'm just trying to clarify the

24  confusion between the two calls.

25           MR. GAGE:  Your Honor, to be clear, I'm objecting to

1   the second call being introduced at all through this witness.

2             THE COURT:  I understand.  Overruled.  Go ahead.

3   BY MR. MASIMORE:

4   Q.  So just the top of those two phonecalls at 2:22 p.m., do

5   you recognize the number 8443?

6   A.  Yes.  That's my cellphone.

7   Q.  And do you recognize this call?

8   A.  Yes.  This is the one I was just describing.

9   Q.  Up until this point in your relationship with Adam Skelos,

10  after the agreement had been signed in November, late

11  November 2012, up through April 10, 2013 when you had this

12  call, how often did you and Adam Skelos discuss Adam Skelos'

13  compensation?

14  A.  None.  I mean other than when the contract was -- no.  I

15  mean once the contract was signed it never came up again.

16  Q.  In this call on April 10 with Adam Skelos -- sorry -- thank

17  you.

18            On this call on April 23 with Adam Skelos that's still

19  up on the screen, April 23, did Adam Skelos express to you that

20  he was surprised that you were discussing compensation with

21  him?

22  A.  No.

23  Q.  Did he say thank you?

24  A.  No.

25  Q.  At some point did there come a time when you told Adam

1    Skelos specifically that his compensation would be raised to

2    ten thousand dollars per month?

3    A.  Yes.

4    Q.  Do you recall when you told Adam this?

5    A.  No, not exactly.

6    Q.  Did there come a time when his compensation did start being

7    paid out at ten thousand dollars a month?

8    A.  Yes, there did.

9    Q.  Approximately when was that?

10   A.  It was midsummer, July 2013.

11   Q.  Did there come a time before he started being paid ten

12   thousand dollars a month where you had that conversation with

13   him?

14   A.  Yes.

15   Q.  But you don't recall specifically where or when?

16   A.  No.

17        MR. MASIMORE:  At this time government offers 2506

18   which was in the binder though not technically received.

19        MR. CONIFF:  No objection.

20        THE COURT:  Government Exhibit 2506 is received

21   without objection.

22        (Government's Exhibit 2506 received in evidence)

23   Q.  Do you see this is an e-mail exchange from April 25, 2013?

24   A.  Yes.

25   Q.  Do you see Adam writes to you, "Do you have any interest in

FBU9SKE4                          White – direct

1    attending this with me and my dad?"

2    A.  Yes.

3    Q.  If we turn to the second page of the exhibit, do you see

4    it's some sort of groundwater symposium?

5    A.  Yes.

6    Q.  What was this event?

7    A.  It was an event regarding some of the water issues that

8    Long Island was facing.

9              MR. MASIMORE:  Government offers 2507, again a binder

10   exhibit not technically received.

11             MR. CONIFF:  No objection.

12             THE COURT:  Government Exhibit 2507 is received

13   without objection.

14             (Government's Exhibit 2507 received in evidence)

15   Q.  Do you see there's that e-mail again from Adam saying, "Do

16   you have any interest in attending this?"

17             You replied, "Actually, yeah, definitely."  Do you see

18   that?

19   A.  Yes.

20   Q.  And then Adam responds, "Great.  I'll sign you up"?

21   A.  Yes.

22   Q.  What was the purpose for which you were going to go to this

23   symposium with Skelos?

24   A.  First of all, to hear about the issues regarding Long

25   Island water, concerns that they were discussing, and to

1      potentially meet with customers that could be attending the

2      same event.

3              MR. MASIMORE:  At this time the government offers

4      Government Exhibit 2106 pursuant to stipulation, Government

5      Exhibit 12.

6              MR. GAGE:  We object, your Honor.

7              THE COURT:  You object?

8              MR. GAGE:  Yes, your Honor.  It's not -- I don't

9      believe the witness is on the e-mail.  I'm sure he's not.

10             THE COURT:  2106 is part of a stipulation.  It's been

11     agreed to.  And I understand you object to it being introduced

12     through this witness.

13             MR. GAGE:  Yes, your Honor.  That's the nature.

14             THE COURT:  But apart from that there is no objection.

15             Overruled.  2106 is received over objection.

16             (Government's Exhibit 2106 received in evidence)

17             MR. MASIMORE:  Permission to publish, your Honor.

18             THE COURT:  Yes.

19     Q.  Just to publish it, your Honor.  It says "RSVP for the

20     symposium on Friday, May 10.  From Patricia Crotty/Senate to an

21     e-mail address.  It's dated April 26, 2013.  It reads as

22     follows, "Unfortunately Senator Skelos is unable to attend the

23     symposium on Friday, May 10.  However he will be sending Adam

24     Skelos and Bjornulf White.

25             "Thank you, Pat Crotty.

1              "Patricia Crotty.  Administrative Assistant.  Senator

2     Skelos' Office."

3              Mr. White, did you go to the symposium?

4     A.  Yes.

5     Q.  Who attended with you?

6     A.  Adam Skelos.

7     Q.  Did Senator Skelos go?

8     A.  No.

9              MR. MASIMORE:  Government offers 2509.  It's one of

10    the last of the binder exhibits that hasn't been received.

11             MR. CONIFF:  No objection.

12             THE COURT:  Government Exhibit 2509 is received

13    without objection.

14             (Government's Exhibit 2509 received in evidence)

15    Q.  If we could start at the very top please.  Do you see this

16    is not an e-mail from Adam Skelos to you?

17    A.  Yes.

18    Q.  Do you recognize the e-mail?

19    A.  Yes.

20    Q.  It's subject:  Nassau and Suffolk.  Dated Tuesday,

21    April 30, 2013?

22    A.  Yes.

23    Q.  Do you see at the bottom, April 30, you write to Adam

24    Skelos, "Hey.  Just thought I'd check in since it's a new week;

25    i.e., news has died down.  Any update from Nassau on how many

1   bidders and whether they have an expected award date"?

2   A.  Yes.

3   Q.  What were you following up with Adam Skelos on in this

4   e-mail?

5   A.  Just if he heard from -- if he had heard anything

6   regarding, you know, how many people had submitted bids and

7   whether there was any date that they were letting people know

8   about.

9   Q.  And do you see Adam Skelos replied "Left two messages with

10  Sheila Shah.  Haven't heard back from her yet.  Will have my

11  father call Ed this Thursday if I don't hear from her by

12  tomorrow"?

13  A.  Yes.

14  Q.  Who is Sheila Shah again?

15  A.  Commissioner of the public works department for Nassau

16  County.

17  Q.  And Adam says, "Will have my father call Ed this Thursday."

18          Do you understand who Adam Skelos meant by Ed in this

19  e-mail?

20  A.  Yes, I do.

21  Q.  Who did you understand him to mean?

22  A.  County executive Ed Mangano.

23  Q.  Did there come a time when Nassau County selected a winning

24  bidder for it's RFP?

25  A.  Yes.

FBU9SKE4                    White - direct

1    Q.  Who won?

2    A.  AbTech.

3    Q.  How did you come to learn that AbTech had won the bid?

4    A.  As I recall, Ken Arnold called me.

5    Q.  Right after you learned that AbTech had won, did AbTech

6    announce it publicly immediately?

7    A.  No.

8    Q.  Why not?

9    A.  Well, first of all, it would be more sort of typical to

10   wait for something in writing to confirm it so that one can

11   announce it with comfort that it's written.  And also AbTech

12   was debating whether or not to announce an award or not.

13              MR. MASIMORE:  Your Honor, we offer 2513 and 16 which

14   are the last ones that were part of the binder but not

15   technically received.

16              MR. CONIFF:  No objection to 2513.

17              MR. MASIMORE:  16 is the other one.

18              MR. CONIFF:  No objection.

19              THE COURT:  Government Exhibits 2513 and 2516 are

20   received without objection.

21              (Government's Exhibits 2513 and 2516 received in

22   evidence)

23              MR. MASIMORE:  If we could pull up Government Exhibit

24   2513, please.

25   Q.  Do you recognize this, Mr. White?

FBU9SKE4                        White - direct

1  A.  Yes, I do.  It's an e-mail from Adam to myself.

2  Q.  And do you see at the bottom he's replying to something you

3  had written to him?

4  A.  Yes.

5  Q.  So on May 21 you had written to Adam, "Hey, Adam.  I would

6  say something as simple as the below would suffice.  I'm sure

7  shorter is better anyway."  And then there's a paragraph there?

8  A.  Yes.

9  Q.  What was the purpose of this paragraph that you were

10  sending to Adam Skelos?

11  A.  It was basically what sort of in general AbTech would want

12  in writing from Nassau County about having won the award; that

13  Glenn wanted something in writing so he could announce it to

14  the board and to the investment community and such.  So this

15  was just some suggested language.

16  Q.  What was the reason you were sending this to Adam Skelos?

17  A.  In order for him to work with either Sheila Shah or Rob

18  Walker to try to get that -- or to suggest that language to

19  them.  So that AbTech could get some kind of written

20  confirmation.

21  Q.  And Adam responded to you, "Let me try and get Sheila to

22  sign off on it"?

23  A.  Yes.

24  Q.  And that was on May 21, 2013?

25  A.  Yes.

1           MR. MASIMORE:  Now if we pull up 2516 which is in

2    evidence now, please.

3    Q.  Do you recognize this?

4    A.  Yes.  It's an e-mail from Adam to myself.

5    Q.  And do you see at the bottom you wrote an e-mail to Adam

6    that contained no text.  Do you see that?

7    A.  Yes.

8    Q.  What was the subject line of what you wrote to Adam?

9    A.  "Heard anything from Nassau" question mark.

10   Q.  What were you referring to with your question?

11   A.  Whether he had heard back, Sheila signing off on the

12   language.

13   Q.  And Adam replied, "Followed up with the county attorney

14   today.  He said he was working on something and I let him know

15   about the June 3 deadline"?

16   A.  Yes.

17   Q.  What did you understand Adam to be reporting to you?

18   A.  That he discussed the suggested language with the county

19   attorney and that the county attorney was working on something

20   the county was comfortable with.

21           MR. MASIMORE:  Pull up Government Exhibit 2517 in

22   evidence, please.

23   Q.  Do you recognize this, Mr. White?

24   A.  Yes.  It's an e-mail from Adam to myself.

25   Q.  And if you look at the bottom of the first page into the

1    second page.  Do you see that's the bottom of the first page.

2    Do you see that?

3    A.  Yes.

4    Q.  Now the top of the second page?

5    A.  Yes.

6    Q.  Do you recognize this?

7    A.  Yes.  That's the original e-mail with the suggested

8    language.

9    Q.  And if we go back to the first page, up the paper to the

10   next e-mail from Adam Skelos to Pedrone JC.

11         MR. MASIMORE:  Middle of the page down to the bottom

12   please.

13   Q.  Do you see Adam Skelos forwards this to somebody, Padrone

14   JC, at a particular e-mail address?

15   A.  Yes.

16   Q.  And he writes, "John, below is a small letter we drafted

17   acknowledging that AbTech was chosen by Nassau County to be

18   considered by the leg for the work on their stormwater drainage

19   pipes.  We need something like that signed for us to show the

20   company shareholders before the June 3 meeting.  Appreciate

21   anything you can do for that.  Thanks."

22   A.  Yes.

23   Q.  What June 3 meeting was Adam Skelos referring to?

24   A.  It was -- I believe it would have been the annual

25   shareholder meeting.  Otherwise, it was an investor.

FBU9SKE4                         White - direct

1    Q.  What was the reason, if any, that having a letter like this

2    was important to AbTech in advance of a meeting or call like

3    that?

4    A.  Well the letter would confirm in writing the award so it

5    would give the company more comfort announcing it as opposed to

6    doing it just based off of the verbal word of the customer.

7    Q.  And then going back to this exhibit, if we go up the next

8    e-mail in the chain, on page one of 2517.  Do you see there an

9    e-mail from John Ciampoli who is the person at Padrone JC at

10   the e-mail address.  Do you see that?

11   A.  Yes.

12   Q.  And it's to Adam Skelos?

13   A.  Yes.

14   Q.  And he replies "on it"?

15   A.  Yes.

16   Q.  And Adam Skelos forwarded all of this to you?

17   A.  Yes.

18   Q.  Did AbTech ultimately get a letter from the commissioner?

19   A.  Yes.

20   Q.  If we could pull up just for the witness, please, 2301.

21           Do you recognize the document that's on your screen?

22   A.  Yes.  That's the letter from the commissioner that I just

23   referenced.

24           MR. MASIMORE:  The government offers Government

25   Exhibit 2301.

1        MR. CONIFF:  No objection.

2        THE COURT:  Government Exhibit 2301 is received

3   without objection.

4        (Government's Exhibit 2301 received in evidence)

5   Q.  Did there ultimately come a time when Nassau County sent to

6   AbTech a contract to sign?

7   A.  Yes.

8   Q.  Did AbTech, in fact, sign the contract?

9   A.  Yes.

10       MR. MASIMORE:  If we could pull up 2522 which is in

11  evidence, please.

12  Q.  Do you recognize this, Mr. White?

13  A.  Yes.  It's an e-mail from myself to Ken attaching the fully

14  executed contract by -- I'm sorry not fully executed only

15  signed by Glenn at this time and then other documents.

16  Q.  And this is from June 2013?

17  A.  Yes.

18  Q.  So at this point Nassau County has sent a contract and

19  AbTech has executed on their behalf the contract?

20  A.  Yes.

21  Q.  And this is in June 2013?

22  A.  Yes.

23  Q.  Could work begin on the contract now that AbTech had signed

24  it?

25  A.  No.

FBU9SKE4                      White - direct

1    Q.   Why not?

2    A.   Because it hasn't been signed by Nassau County so it's not

3    a binding contract.  It hasn't been started.

4    Q.   Now did there come a time when Nassau County ultimately

5    signed the contract and was bound by it?

6    A.   Yes.

7    Q.   Approximately when was that?

8    A.   October 2013.

9    Q.   Now what, if any, understanding did you have concerning

10   what steps the contract had to go through at the county level

11   before it could be executed?

12   A.   At this time, none.

13   Q.   Did there come a time when you learned of other steps that

14   needed to be followed?

15   A.   Yes.  After this, I learned.

16   Q.   How did you learn?

17   A.   Well Ken Arnold told me.

18   Q.   What did Ken Arnold tell you with respect to the steps that

19   the contract had to proceed through?

20   A.   Well, first, when I spoke to him about this I asked him if

21   it was signed and ready to go.  And he said no, they have to --

22   the County Legislature's Rules Committee needs to pass a rule

23   to authorize the signature.  And so that was the first step

24   that I learned.

25          And then later on I learned of another step.

FBU9SKE4                          White - direct

1   Q.   And how did you learn of the next step?

2   A.   Then Ken Arnold later in the summer told me that it still

3   wasn't ready to be signed because there was something called

4   the Nassau Interim Finance Authority and they had a right to

5   review contracts before the county could actually execute them.

6   Q.   This is Government Exhibit 2522.  When you submitted the

7   contract that was signed by AbTech in June 2013 did you have an

8   understanding that it would take an additional four months for

9   the contract to be executed?

10  A.   No.  Not at all.

11           MR. MASIMORE:  Now if we could go to page seven of the

12  exhibit, please.  2522, page seven of the exhibit.

13           At the bottom in section two, which is entitled

14  Services, Extra Services, and Reimbursable Expenses.

15  Q.   Do you see in the middle of the paragraph where it says,

16  "The county is seeking approval to award this contract as a

17  design build contract"?

18  A.   Yes.

19  Q.   "When such approval is received the county will proceed

20  with the construction"?

21  A.   Yes.

22  Q.   What did you understand this provision of the contract that

23  Nassau County had sent AbTech meant?

24  A.   It meant that the county had an out if the -- if permission

25  was not given to actually include the construction portion

FBU9SKE4                         White - direct

1    within the contract, then they could -- they could -- they

2    could essentially bid that out separately.  So it was saying

3    that they were seeking approval for it but that it didn't exist

4    yet.

5              MR. MASIMORE:  If we can turn to page 23 of the

6    exhibit.  Second paragraph from the bottom.  It's two lines.

7    Q.  Do you see page 23 of the exhibit reads, "In the event the

8    county does not receive state legislative authority for

9    design/build the county will bid these projects utilizing its

10   standard operating process"?

11   A.  Correct.

12   Q.  Can you translate that into English?

13   A.  Yes.  So essentially in the event that Nassau County did

14   not receive state permission to keep the construction portion

15   under the contract, then they reserved the right to take that

16   construction portion and just bid it out separately to a

17   construction firm separate from the contract with AbTech.

18   Q.  How, if at all, would that have affected the revenue that

19   would have flowed through AbTech?

20   A.  Significantly because the construction portion was

21   estimated at the time around 10 million.  So 10 of the 12

22   million represented the construction.  It was the majority.

23             MR. MASIMORE:  If we could go to page 27 of Government

24   Exhibit 2522, please.

25             If we could just focus on the top half, tasks one,

1    two, and three.

2    Q.  Can you describe generally what task one was pursuant to

3    the contract that was offered?

4    A.  Yes.  So under task one the county was going to give a list

5    of all of its highest priority sites that ended up being around

6    60-something sites.  And then AbTech and its team was going to

7    analyze all of those sites and prioritize them and identify the

8    first ten that would receive stormwater improvements under this

9    contract.

10   Q.  And once that was completed what was task two under the

11   contract?

12   A.  Once that was completed and approved task two would be

13   developing the general technology and solution for those sites.

14   Q.  Now, do you see the amounts.  In task one, 265,900; in task

15   two 65,725?

16   A.  Yes.

17   Q.  What did you understand with respect to how much the county

18   had allocated for the project?

19   A.  The county had -- I understood that the county had

20   allocated enough at that time to get right into task one and to

21   those amounts combined.

22   Q.  Did you have an understanding at that time of whether the

23   county had allocated additional sources of funds to complete

24   the remainder of the contract?

25   A.  They had not allocated beyond task two at the time.

FBU9SKE4                          White - direct

1    Q.  Where did you understand those funds would come from?

2    A.  The Hurricane Sandy infrastructure funding was the county's

3    top preference and they were also interested in some state

4    funding, grant programs that required a match by the county.

5    Q.  And there are additional tasks through six, correct, as

6    part of the contract?

7    A.  Yes.

8    Q.  We talked about task one and task two.

9            Could you describe for the jury very generally what

10   the remaining tasks would have been in the remainder of this

11   contract.

12   A.  So task three was the biggest engineering portion.  It was

13   all the detailed design of the sites.  And it was also the

14   program, management and construction administration portion.

15   And so task order three would actually overlap into

16   construction which was task order four because it involved the

17   program management.

18           Task four was construction where under this contract

19   AbTech would run a solicitation and with at least three

20   qualified bidders, construction firms, select the lowest priced

21   bidder; and then hire them to do the construction of the sites.

22           And then task order five and six were operation and

23   maintenance and site monitoring.  And those would continue --

24   those would start after the installations were installed and

25   then would continue through the life of the contract.  And they

consisted of making sure that the sites were maintained as well
as doing all the monitoring and developing environmental
compliance reports for the county that the county then could
use with state regulators and federal regulators to show their
compliance.

Q.  Could AbTech perform all of the remaining tasks and
complete the entire contract without state approval of design
build authority?

A.  No.  Not task order four.

MR. MASIMORE:  Your Honor, I'm about to move to a
different topic.  I'm happy to continue or, if the court
wishes, to break for lunch.

THE COURT:  Why don't we break for lunch.  We'll
resume at 2:00.

(Jury excused)

THE COURT:  Mr. White, you may step down.  Thank you.

(Witness excused)

THE COURT:  Do counsel wish to raise anything?

MR. MASIMORE:  No, your Honor.

THE COURT:  I'll see you at two.

(Luncheon recess)

```
 1                        AFTERNOON SESSION

 2                            2:00 p.m.

 3             (In open court; jury not present)

 4             THE COURT:  Good afternoon.  Please have a seat.

 5        The government wishes to raise something?

 6             MR. MASIMORE:  Very briefly, your Honor.  I think

 7   during the first part of the direct examination today the court

 8   had sustained some objections.  I had asked some questions

 9   about Mr. White's state of mind.  I understand that the

10   objection, as I understand it, was to the form, laying the

11   foundation.  I just wanted to articulate the government's

12   theory, under the government's theory of the case.

13             Mr. White is a representative of AbTech.  His state of

14   mind as a victim.  That's the relevancy of that.  But I

15   think -- I just wanted to make sure that it was form-based and

16   I will try and be more careful and not cut corners.

17             THE COURT:  That clarifies it for me.  Thank you.

18             MR. MASIMORE:  Thank you, your Honor.

19             THE COURT:  All right.  I think we're ready to have

20   the jury -- the jury is ready.

21             (Continued on next page)

22

23

24

25
```

1    (In open court)

2    (Jury present)

3    BJORNULF WHITE, resumed.

4    THE COURT:  Mr. Masimore, we're ready.

5    MR. MASIMORE:  Thank you, your Honor.

6  DIRECT EXAMINATION CONTINUED

7  BY MR. MASIMORE:

8  Q.  Mr. White, do you recall before lunch you were testifying

9  about some of the steps through which the contract had to go

10  through before it could be executed by the county executive?

11  Do you recall that testimony?

12  A.  Yes.

13  Q.  And one of the steps you had testified about was the Nassau

14  County legislature approving it?

15  A.  Yes.

16  Q.  Did there come a time when the Nassau County legislature

17  indeed approved of the contract?

18  A.  Yes.

19  Q.  Approximately when was that?

20  A.  In July 2013.

21  Q.  What, if anything, happened to Adam Skelos' monthly

22  payments from AbTech after the Nassau County legislature acted

23  to approve the contract?

24  A.  His pay increased July 2013 to ten thousand dollars a

25  month.

1      MR. MASIMORE:  And if we could pull up 2527 in

2 evidence, please.

3 Q.  Do you recognize this document?

4 A.  Yes, I do.  It's an e-mail from Adam to me attaching his

5 July 2013 invoice.

6      MR. MASIMORE:  If we go to the second page of the

7 exhibit?

8 A.  That is the invoice that was attached for ten thousand

9 dollars for July 2013.

10 Q.  Was this increase to ten thousand dollars consistent with

11 what you had informed Mr. Adam Skelos of after the April 2013

12 conversations with Glenn Rink?

13 A.  Yes.

14 Q.  Now, Mr. White, did you come to have an understanding of

15 whether or not Senator Skelos was going to do anything in

16 exchange for the continued payments to Adam?

17 A.  Yes, I did.

18 Q.  What was the basis for your understanding?

19 A.  Adam's statements to me and Glenn Rink's statements to me

20 about his intent and what he thought was happening.

21 Q.  What did you understand, if anything, Senator Skelos would

22 be doing in exchange for the continued payments to Adam Skelos?

23 A.  Well I came to learn over time that he would be available

24 to help AbTech when it came to things like interactions with Ed

25 Mangano with respect to AbTech's Nassau County contract.  And

1    then later on with respect to certain state legislation that

2    would approve potentially stormwater P3s that was in AbTech's

3    interest, that he would be assisting that.

4    Q.  Now, up until the point where the Nassau County legislature

5    approved of the contract, had AbTech announced to the investing

6    public that Nassau County had awarded it the stormwater

7    contract?

8    A.  Up until which time?

9    Q.  Up until the point where the Nassau County legislature had

10   approved it but before NIFA?

11   A.  No.  It had not.

12   Q.  Directing your attention to the middle of August, 2013.

13   Did there come a time when AbTech Holdings, Incorporated was

14   going to have an investor call?

15   A.  Yes.

16   Q.  What's an investor call?

17   A.  An investor call happens a period of time after the end of

18   each fiscal quarter and it's where the CEO provides an overall

19   business update and the CFO provides a financial update.

20   Q.  What's contained in the CEO's overall business update in an

21   investor call?

22   A.  It's an update on how the company is doing, where its

23   business activities stand, key opportunities that it's working

24   on and then typically what the CEO sees in the coming time

25   period ahead.

FBU9SKE4                    White - direct

1   Q.  What, if any, discussions did you have with Glenn Rink

2   relating to the Nassau County stormwater contract before the

3   investor call?

4   A.  I had calls because he wanted to be able to provide an

5   update to the investment community.  So I spoke with him about

6   that.

7   Q.  What, if anything, did Glenn Rink say to you?

8   A.  He said that he -- he was hoping for the contract to be

9   signed in time so he could announce the signed contract.

10  Q.  And what, if anything, did Glenn Rink ask you to do?

11  A.  He asked me to check with Adam and see if he thought that

12  was possible, where things stood; and then because it looked

13  like the contract was not going to be able to be signed he --

14  he meaning Glenn, wanted to have some kind of indication from

15  NIFA, Nassau Interim Finance Authority, as to where it was

16  going to go, whether it was going to rule yes or no.  So he,

17  you know, had some indication of that.

18  Q.  After Mr. Rink asked you to speak to Adam Skelos, what did

19  you do?

20  A.  I communicated the message to Adam.

21  Q.  And did there come a time after that where you spoke to

22  county officials?

23  A.  Yes.  I believe -- I recall -- I don't know if I recall a

24  direct conversation with them.

25  Q.  Were you able to get a signed contract from the county, the

1  fully executed contract at that time?

2  A.  No.

3  Q.  Why not?

4  A.  Because NIFA had not completed its review of the contract.

5         MR. MASIMORE:  Could we pull up 2532, please, in

6  evidence.

7  Q.  Do you recognize this e-mail, Mr. White?

8  A.  Yes.  It's an e-mail from Adam to me, replying to an e-mail

9  from me.

10 Q.  And your e-mail to Adam says, "Hey.  It looks like from a

11 timing perspective like we just won't get the contract by

12 tomorrow.  Is that your sense too?  Talked internally and a

13 letter from the county giving us notice of the current status

14 (As Rob Walker suggested) would be a good plan B at this point,

15 if they don't mind."

16        What were you referring to?

17 A.  I was referring to discussion with primarily Glenn Rink

18 where he listed the things that you would want to see in a

19 letter from the county regarding where things stood if we

20 couldn't get the contract signed in time.

21 Q.  And below the paragraph I just read, do you see there's a

22 few bullet points under the words, "The key elements we'd ask

23 for"?

24 A.  Yes.

25 Q.  What were you listing there?

1  A.  Those were the elements that Glenn had mentioned that I

2  just referred to.

3  Q.  And what was the purpose of sending this e-mail to Adam

4  Skelos?

5  A.  So he could communicate with Rob Walker regarding, you

6  know, what AbTech's request was.

7  Q.  And then you see he responded on August 12, 2013 at

8  10:15 a.m.  "That's the impression I got.  Will get this done"?

9  A.  Yes.

10           MR. MASIMORE:  If we could publish 2994 in evidence,

11  please.

12  Q.  Do you see at that time top it's an e-mail from Gail Skelos

13  to Adam Skelos?

14  A.  Yes.

15  Q.  And at the bottom of the first page, do you recognize what

16  Adam is forwarding?

17           MR. GAGE:  Your Honor, I object and would ask to

18  approach.

19           THE COURT:  All right.

20           (Continued on next page)

21

22

23

24

25

1        (At the sidebar)

2        MR. GAGE:  I'm concerned, your Honor, maybe I'm wrong,

3   but what's coming is a series of e-mails which this witness is

4   not on, maybe, between Gail Skelos on the e-mail address and

5   Cameron of Cameron Engineering.  And I just -- if the witness

6   is not part of the e-mail chain, I object for the reasons we've

7   discussed.

8        MR. MASIMORE:  Well, your Honor, this particular

9   e-mail, 2994, I'm asking the witness if he recognizes what's

10  being forwarded.  And what's being forwarded is his

11  information.  So I do have some specific questions.

12        And just as a general matter, your Honor.  I

13  understand earlier -- I can understand the point where

14  publishing just phone records in connection with other

15  testimony may be argumentative in the sense that it implies

16  what those phonecalls may be for and that's not contained in

17  the document.  But I do think evidence that has been admitted

18  that on its face contains statements.

19        I would ask permission to be able to publish those:  A

20  because they're in evidence; B I think it will help streamline

21  things.  Otherwise we'd have to publish them at some point with

22  no one on the stand potentially in a manner that the jury

23  wouldn't even understand because the timing wouldn't make any

24  sense.  And I don't intend to make any arguments.

25        MR. GAGE:  This witness had no contact with Senator

FBU9SKE4                    White - direct

1    Skelos, his wife, or this e-mail address.  It's between Adam

2    and Gail.

3                I think what's coming, your Honor, so I want to

4    address it now, is between Gail Skelos' e-mail address and

5    Cameron Engineering.  This witness had no contact with those

6    e-mails.  It creates a certain -- inappropriate stink factor

7    here.  They have to publish it.  It doesn't have anything to do

8    with this witness.  It makes it seem like it is somehow bound

9    up in some ongoing scheme or discussion.  It's not.  It doesn't

10   involve this witness.  I can't cross-examine this witness on it

11   because he wasn't even involved with it.  And there are others.

12   The government has the others too, your Honor.

13               MR. MASIMORE:  With particular reference to this

14   exhibit it's already in.  So we could publish it even with a

15   witness not on the stand.

16               THE COURT:  Yes.  I understand.

17               MR. MASIMORE:   Inability to cross doesn't matter.

18               MR. GAGE:  But, your Honor, if it's presented when

19   this witness is here the impression it creates is that somehow

20   this witness is knowledgeable and part of a discussion that

21   didn't involve him at all.

22               THE COURT:  I overrule.  I think it will be clear that

23   he's not involved.

24               (Continued on next page)

25

1    (In open court)

2    MR. MASIMORE:  May I proceed, your Honor?

3    THE COURT:  Yes.

4    MR. MASIMORE:  So if we can publish Government Exhibit

5    2994 again, please.

6    Q.  Mr. White, I'm sorry.  I'm not sure if you answered the

7    question.  Do you recognize what's being forwarded from Adam

8    Skelos at the bottom to Gail Skelos?

9    A.  Yes.  That's an e-mail from myself to Adam that we were

10   just referring to.

11   Q.  This has the key elements we asked for in the bullet

12   points, correct?

13   A.  Yes.

14   Q.  And do you see Adam sends it to Gail Skelos.  She responds,

15   "What do you want me to do with this?"

16   Adam Skelos replies, "Show you know who."

17   Gail Skelos replies, "Ooo da will do in an hour or so.

18   Not with now."

19   A.  Yes.

20   MR. MASIMORE:  Pull up 2995, please, in evidence.

21   Q.  Do you see, Mr. White, that's an e-mail from Adam Skelos to

22   John Cameron on August 12, 2013?

23   A.  Yes.

24   Q.  Do you recognize what he's forwarding, what Adam Skelos is

25   forwarding to John Cameron?

FBU9SKE4                          White - direct

1    A.  The e-mail from me to Adam with the key elements that we've

2    been referring to.

3    Q.  And Adam Skelos writes, "John see below.  Any help on this

4    would be much appreciated.  Best regards."

5    A.  Yes.

6            MR. MASIMORE:  If we could pull up 2998 please, and

7    publish it.

8            If we can start at the bottom half.  2998.

9    Q.  Do you see that's an e-mail from Adam Skelos to John

10   Cameron?

11           "John, Can county send letter to Bjornulf White via

12   e-mail at, and there's an e-mail address.  Much appreciated.

13   Thanks for the help."

14   A.  Yes.

15   Q.  Do you recognize the e-mail address?

16   A.  Yes.  It's my AbTech e-mail.  It was my AbTech e-mail.

17   Q.  And John Cameron writes, "Okay.  Will advise the county."

18   A.  Yes.

19           MR. MASIMORE:  At this time, your Honor, the

20   government offers Government Exhibit 18 which is a stipulation.

21           THE COURT:  All right.  It is received.

22           (Government's Exhibit 18 received in evidence)

23           MR. MASIMORE:  If we could pull it up Ms. Danzo,

24   please.

25           If we could focus on paragraph one, please.

FBU9SKE4                          White – direct

1          It reads "Government Exhibits 2532A through 2532C and

2     2801 are authentic e-mails that were produced by Cameron

3     Engineering and Associates in response to a subpoena."

4          Your Honor at this time the government offers

5     Government Exhibit 2532A, 2532B, and 2532C.

6          MR. GAGE:  Your Honor I would note at the end of that

7     stipulation there is a right preserved by the defense to object

8     to these exhibits and we do object.

9          THE COURT:  On what ground?

10          MR. GAGE:  Relevance, the fact that this witness, at

11     least as I am recalling these exhibits, is not mentioned as a

12     part of the conversation.

13          MR. MASIMORE:  Your Honor, perhaps if we could address

14     at sidebar.

15          THE COURT:  I'm going to continue with the same ruling

16     I made before so we don't need to address it.  I overrule.

17          MR. MASIMORE:  Thank you, your Honor.

18          THE COURT:  Government Exhibits 2532A through C are

19     received over objection.

20          (Government's Exhibits  2532A through C received in

21     evidence)

22          MR. MASIMORE:  If we could pull up Government Exhibit

23     2532A, please, in evidence.

24     Q.  Do you see that's an e-mail from Gail Skelos to John

25     Cameron, August 12.

1      Do you see that, Mr. White?

2   A.  Yes, I do.

3   Q.  Page two of this exhibit.  Do you recognize what's being

4   forwarded in this e-mail?

5   A.  Yes.  That's my original e-mail to Adam with the elements

6   that AbTech was looking for.

7   Q.  Going to the first page of 2532A Adam Skelos forwards that

8   to Gail Skelos.  Gail Skelos forwards that to John Cameron.

9   And then up at the top of the first page John Cameron writes,

10  "Got the info.  Spoke to Rob.  He's receptive to sending the

11  letter."  And then Gail Skelos responds "Great."

12  A.  Yes.

13  Q.  Did you ultimately get a letter from the county?

14  A.  Yes.

15      MR. MASIMORE:  If we could pull up 2533 which is in

16  evidence, please.

17  Q.  Do you recognize this, Mr. White?

18  A.  Yes.  It's the letter we just referred to.

19  Q.  And do you recognize that particular e-mail address it went

20  to?

21  A.  Yes.  It's my AbTech e-mail.

22  Q.  And it reads from Mr. Rob Walker, "Mr. White, Thank you for

23  your interest in Nassau County.  I am pleased to let you know

24  that the Nassau County legislature unanimously approved the

25  contract on July 1, 2013 (copy attached) and has been approved

1    by the county comptroller on July 29, 2013 copy also attached.

2    In addition, late Monday I received your question concerning

3    NIFA."

4    A.  Yes.

5            MR. MASIMORE:  Could you turn to page two of the

6    exhibit.

7    Q.  Do you see page two of this attachment is an e-mail

8    exchange between Rob Walker and Jeremy Wise?

9    A.  Yes.

10   Q.  Do you see that?

11   A.  Yes.

12   Q.  If we can look at the last paragraph there where it says,

13   "Please note."

14           Do you see Mr. Wise writes to Mr. Walker, "Please note

15   that this accommodation was made because of your representation

16   that time was of the essence.  In the future, we will continue

17   our analysis of contracts in the normal course pursuant to our

18   prescribed procedures."

19   A.  Yes.

20   Q.  Mr. White, at this time in mid-August 2013 what, if any,

21   business purpose was there to obtaining this particular letter

22   and set of documents?

23   A.  The purpose I have referred to before where Glenn Rink was

24   wanting an indication as to where NIFA would go in advance of

25   the investor call that AbTech had.

1           MR. MASIMORE:  If we can pull up 2532 -- actually just

2    note -- so this comes to you on August 13 -- sorry.  If we

3    could pull up 2533, first page.  Just very top there.  The

4    header information.

5    Q.  Do you see Rob Walker sends that to you on August 13 at

6    7:13 p.m.?

7    A.  Yes.

8           MR. MASIMORE:  If we could pull up 2532B in evidence,

9    please.

10          So let's start from the bottom.  Do you see -- if we

11   just focus on the very bottom.

12   Q.  Do you see on 2532B John Cameron e-mails Rob Walker at

13   1:49 p.m. on August 12, 2013?

14   A.  Yes.

15   Q.  And John Cameron writes, "Rob, a letter from the county to

16   AbTech would be much appreciated while NIFA deliberates on

17   their contract."

18   A.  Yes.

19   Q.  It has the statement, "The key elements in the letter could

20   include," and then there's some bullet points?

21   A.  Yes.

22   Q.  Do you recognize the information that's listed here by

23   Mr. Cameron?

24   A.  Yes, I do.  Those are the bullets that I had put in the

25   original e-mail.

1  Q.  And then at the bottom it says, "The letter should be

2  e-mailed to Bjornulf White," and it gives an e-mail address?

3  A.  Yes.

4  Q.  Again, do you recognize that?

5  A.  Yes.  My AbTech e-mail.

6          MR. MASIMORE:  Let's go up the document, please.  The

7  top half.

8  Q.  Do you see that John Cameron writes to Senator Skelos,

9  "This is what I sent to Robbie yesterday after he and I spoke.

10 I imparted the urgency to him on the phone.  I was careful of

11 what I put in the e-mail as you never know where it could wind

12 up.  Glad it finally got done.  John."

13          Do you see that?

14 A.  Yes.

15 Q.  And then Senator Skelos responds at 8:28 p.m. on August 13,

16 "All happy"?

17 A.  Yes.

18 Q.  Mr. White, why did you not send the bullet points yourself

19 directly to Rob Walker?

20 A.  Because I didn't really have a relationship with him.

21 Q.  What, if any, relationship did you understand Adam Skelos

22 to have with Rob Walker?

23 A.  A direct one.  He was -- or he said he was in contact with

24 him all the time.  So he was someone he knew well.

25 Q.  Do you have an understanding of why Adam Skelos didn't

FBU9SKE4                         White – direct

1      forward this request directly himself to Rob Walker?

2                  MR. GAGE:  Objection.

3                  THE COURT:  Does he have a basis for testifying to

4      this?

5      BY MR. MASIMORE:

6      Q.  Did Adam Skelos ever speak to you about how the request was

7      communicated to the county?

8      A.  No.

9      Q.  Okay.

10                 MR. MASIMORE:  If we could pull up 2539 which is in

11     evidence.  If we can focus on the top there, the header.

12     Q.  Do you recognize this?

13     A.  Yes.

14     Q.  What do you recognize it to be?

15                 MR. MASIMORE:  I guess we can pull up maybe just a

16     little bit to show some of the e-mail.

17     A.  It's an e-mail from Adam showing various news articles

18     related to water.

19     Q.  Do you see it's sent from Adam Skelos to you, John Cameron,

20     and Senator Skelos?

21     A.  Yes.

22     Q.  Did Adam Skelos explain to you why he copied you, John

23     Cameron, and Senator Skelos on this particular e-mail?

24     A.  No.

25     Q.  Who is John Cameron?

A.  John Cameron is the president of Cameron Engineering which

was the main engineering subcontractor to AbTech for this

projector -- or going to be.

Q.  You said "going to be."  As of August 2013 was there a

contract in place between AbTech and Cameron Engineering?

A.  No.

Q.  Did there come a time when the Nassau County contract with

AbTech was fully approved by the Nassau County legislature and

by NIFA?

A.  Yes.

Q.  And did there come a time when it was signed and executed

by county officials?

A.  Yes.  In October 2013.

        MR. MASIMORE:  If we could pull up 2546 in evidence,

please.

Q.  Do you recognize this?

A.  Yes.  It's an e-mail from Adam to myself.

Q.  You see you write, "Hey, will you be able to fax tonight,"

and then you provide a fax number.  "We have to have to make

filings and such hence getting the contract so our legal plus

finance can work on it is key.  Thanks.  This is great news"?

A.  Yes.

Q.  And then Adam responds, "On my way to my dad's house now to

fax.  I also overnighted the original copy to you.  Took a

while but glad we got it done.  Much more success to come"?

FBU9SKE4                      White - direct

1    A.  Yes.

2    Q.  Did there come a time when you did receive the contract?

3    A.  Yes.

4           MR. MASIMORE:  If we could pull up, please, Government

5    Exhibit 2548A.  If we could just zoom out, please.

6    Q.  Do you recognize this?

7    A.  Yes.  It's an e-mail from myself to Glenn Rink, Jonathan

8    Thatcher, attaching the first part of the Nassau County

9    contract file.

10          MR. MASIMORE:  If we go to the second page of the

11   document.

12   Q.  Do you recognize it?

13   A.  Yes.  This is that attachment that it references.

14   Q.  The attachment is what?

15   A.  The Nassau County contract.

16   Q.  Now, directing your attention to this same time period in

17   early fall 2013.  Did there come a time when Adam Skelos and

18   AbTech had discussed other types of business opportunities in

19   New York?

20   A.  Yes.  Around this time Adam started asking about our

21   fracking water treatment solution.

22          MR. MASIMORE:  We can take down the exhibit.  Thank

23   you.

24   Q.  How did it come up between Adam and you with respect to

25   fracking?

1  A.  He had read AbTech's website and a little bit about the

2  offering and I think some of the announcements and so he was

3  interested in learning more about that.

4  Q.  And what did you say to him about fracking at that time

5  period when it first came up?

6  A.  Well, towards the beginning I was -- I didn't say very

7  much.  I was -- sort of tried to keep things focused on

8  stormwater.  But over time I shared a bit more about what the

9  solution was and how we were working with customers in other

10 parts of the country on that.

11 Q.  When you say "we were working" and "the solution," what are

12 you referring to?

13 A.  AbTech's water treatment solution for the oil and gas

14 industry.

15         MR. MASIMORE:  If we could pull up 2534 in evidence,

16 please.

17 Q.  Do you recognize this?

18 A.  Yes.  It's an e-mail from Adam to me regarding fracking.

19 Q.  Now, at the time in August 2013 did you have an

20 understanding of whether Adam Skelos had experience related to

21 fracking?

22 A.  Yes.  I had an understanding.

23 Q.  What was the basis of your understanding?

24 A.  Things Adam told me.

25 Q.  Based on what Adam told you, had he had experience related

FBU9SKE4                      White - direct

1   to fracking?

2   A.  He had not.

3            MR. MASIMORE:  If we could publish 3001, please, in

4   evidence.

5            Just to publish, your Honor.  This is an e-mail from

6   Dean Skelos to Adam dated September 21, 2013 with a link and a

7   subject line.  It says:  As other states move ahead New York

8   remains still on fracking.

9            If we could publish 3002, please, which is in

10  evidence.  Zoom into the top quarter there, please.

11           Just, again, to publish.  This is an e-mail from Adam

12  Skelos to Senator Skelos.  Subject:  Forward list of fracking

13  opposition groups.  Dated Sunday, September 22, 2013.

14           Government Exhibit 3003.  Look at the top quarter.

15  Again, to publish.  It's an e-mail from Adam Skelos to Senator

16  Skelos.  Subject line:  Forward members.  New Yorkers against

17  fracking.  From Sunday, September 22, 2013.

18           To publish, Government Exhibit 3004.  It's an e-mail

19  from Adam Skelos to Senator Skelos.  Subject:  Forward fracking

20  info.  Date:  Sunday, September 22, 2013.

21           And the last in this sequence, Government Exhibit 3005

22  to publish.  An e-mail from Senator Skelos to Adam Skelos.

23  Subject:  Editorial fracking decision needs a timeframe.  Dated

24  September 24, 2013.

25  Q.  Now at this stage, Mr. White, how important of a priority

FBU9SKE4                      White – direct

1   was fracking to AbTech as a company?

2   A.   It was an important priority.

3   Q.   What was important about it to the company?

4   A.   You mean fracking in general?  Or in New York?

5   Q.   Well let me restate the question.  With respect to

6   opportunities in New York, how if at all was that a priority of

7   the company?

8   A.   Well, in New York at first fracking was not really a

9   priority for AbTech.  It was really not on the radar screen.

10  But then Glenn did communicate to me that he had spoken with

11  some board members and he did feel that it should be something

12  that we should focus on.  So I would say the priority sort of

13  shifted around this time period and it became one.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

FBUTSKE5                        White - direct

1   BY MR. MASIMORE:

2   Q.  And Mr. White, with the Court's permission I will hand you

3   a packet of documents in evidence, 2541, 2555, 2563, 2586,

4   2587, 2589, 2590, 2598 and 2134.

5          Mr. White, if you could flip through those, please.

6   Do you recognize those?

7   A.  Yes, I do.

8   Q.  In general, what are those?

9   A.  Emails to me from Adam showing various links to various

10  articles relating to fracking water treatment and some of the

11  political issues in New York regarding it.

12         MR. MASIMORE:  If we could publish 2541 briefly.

13  Q.  You see that's an email from Adam to you, correct?

14  A.  Yes.

15  Q.  And it forwards a message from Senator Skelos to Adam

16  Skelos forwarding a link?

17  A.  Yes.

18  Q.  Showing you 2586.  Do you see that's an email from Adam

19  Skelos to Senator Skelos and subject line:  Capital

20  confidential, petroleum institute plans new campaign to boost

21  development?

22  A.  Yes.

23  Q.  2587.  Email from Adam Skelos to you and Senator Skelos,

24  correct?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FBUTSKE5                         White - direct

1   Q.  And the subject is:  Caution on fracking wise, the

2   observation deck.

3   A.  Yes.

4   Q.  This is from April 18, 2014?

5   A.  Yes.

6            MR. MASIMORE:  Pull up 2590, please.

7   Q.  And this is from May 12, 2014 from Adam Skelos to you and

8   Senator Skelos, correct?

9   A.  Yes.

10  Q.  And says -- the subject line is:  Fed gov failed to inspect

11  higher risk oil wells?

12  A.  Yes.

13  Q.  2598, please, in evidence.  Email from Adam Skelos to

14  Senator Skelos, Ann Marie Skelos and you, correct?

15  A.  Yes.

16  Q.  And the subject is:  How fracking flows are killing New

17  York jobs?

18  A.  Yes.

19  Q.  Did you ever discuss fracking with Ann Marie Skelos?

20  A.  No.

21           MR. MASIMORE:  If we could pull up 2555 in evidence,

22  please.

23  Q.  So there Adam writes to you on November 20, 2013:  Any word

24  yet on my contract?

25  A.  Yes.

FBUTSKE5                    White - direct

1   Q.   What did you understand Adam Skelos to be talking about

2   when he referred to "my contract?"

3   A.   At that time what he's referring to is he had asked me to

4   speak to Glenn about a contract for him to be a sales agent

5   essentially of AbTech products for treatment for frack water

6   for New York State, and so he's asking if I have heard anything

7   back from Glenn or the board.

8   Q.   Did you participate in any negotiations concerning a

9   contract for Adam Skelos to be paid with respect to fracking?

10  A.   Yes.

11  Q.   And who did you negotiate with?

12  A.   With Adam Skelos.

13  Q.   With the Court's permission, I'm handing you what is in

14  evidence as Government Exhibits 2544, 2545, 2553, 2554, 2562,

15  2582A, 2582B and 2582C.

16            Do you have those in front of you, Mr. White?

17  A.   Yes, I do.

18  Q.   Do you recognize these documents?

19  A.   Yes, I do.

20  Q.   What do you recognize him to be?

21  A.   They are emails from Adam to me, and from myself to Adam

22  relating -- or where he's attaching his proposed contract

23  between his consulting firm and AbTech to promote AbTech

24  products in New York for oil and gas.

25            MR. MASIMORE:   And could we please pull up for the

1   jury Government Exhibit 2545 in evidence.

2   Q.  Is this one of those documents?

3   A.  Yes, it is.

4   Q.  Turn to page 2, please, the top left paragraph.

5          You see it's a draft agreement dated as of October

6   blank, 2013, between Rockville Strategy LLC and AbTech

7   Industries?

8   A.  Yes.

9   Q.  What was Rockville Strategy LLC?

10  A.  Adam's consulting firm.

11  Q.  How do you know that?

12  A.  He told me.  It was the first thing he told me when I first

13  met him.

14  Q.  And page 6 of this exhibit, you see there's an Annex A

15  regarding products, territory and compensation?

16  A.  Yes.

17  Q.  And what is this portion of the draft agreement?

18  A.  It's a portion that contains basically a list of the

19  products he would promote, what the territory is and what the

20  commission -- sales commission would be.

21  Q.  And here the sales commission proposed is a dollar per

22  barrel fracked and/or hydrofracked?

23  A.  Yes.

24          MR. MASIMORE:  If we could pull up 2582A in evidence,

25  please.

FBUTSKE5                    White - direct

1    Q.  Is this another one of the documents?

2    A.  Yes, it is.

3    Q.  And this is dated -- if we go to the header information,

4    this is from you to Adam Skelos on February 24th, 2014?

5    A.  Yes.

6    Q.  And what was this attachment?

7    A.  It's an attachment of an amendment to his existing

8    consulting agreement that was basically what AbTech wanted to

9    do instead of a whole new contract.

10   Q.  If we go to page 4 of the document, what does that chart in

11   the middle reflect?

12   A.  It reflects the counter proposal, I suppose, in terms of

13   the commission structure for Adam Skelos.

14        MR. MASIMORE:  And if we could pull up 2582C in

15   evidence as well, please.

16   Q.  Do you recognize this?

17   A.  Yes, it's an email from Adam to myself.

18   Q.  And the subject is:  Revised contracts, see you soon.

19   A.  Yes.

20        MR. MASIMORE:  Turn to page 4, focus on the chart.

21   Q.  And how, if at all, is this chart different than the

22   previous proposal?

23   A.  This includes a percentage in the scenario where the price

24   per barrel is a dollar less.  Previously it was zero percent,

25   and in this case it's five percent of profit.

FBUTSKE5                    White - direct

1   Q.  Did there come a time when AbTech and Adam Skelos agreed on

2   he compensation related to fracking?

3   A.  Yes.

4        MR. MASIMORE:  Your Honor, permission to publish

5   Government Exhibit 2809 in evidence.

6        THE COURT:  Yes.

7        MR. MASIMORE:  If we could focus from the top down to

8   last part highlighted.  Just for publishing purposes, the

9   bottom part is an email from Scott Stevens to Senator Skelos,

10  and part of it says -- in the second paragraph it says:  Tom

11  and I took a closer look at the poll.

12       May I have a moment, your Honor?

13       THE COURT:  Yes.

14       (Pause)

15       MR. MASIMORE:  And the second full paragraph of the

16  middle email says:  Tom and I took a closer look at the poll on

17  the issue of fracking.  Question 36 in the survey reads Adam

18  Haber owns multiple out-of-state oil and natural gas companies

19  that use the controversial hydrofracking extraction process

20  that some believe is responsible for contaminating drinking

21  water supplies.  And then it reports that among independents

22  the much less likely is 48, while among soft Democrats the much

23  less likely is 58.  That would be the target of this mailing,

24  so it's probably good the way it is.

25       And then Senator Skelos responds:  This one okay.

FBUTSKE5                         White - direct

BY MR. MASIMORE:

Q.  Mr. White, earlier today you testified about a three-way
call you participated in with Senator Skelos and Adam Skelos
after Hurricane Sandy.  Do you recall that?

A.  Yes.

Q.  Have you ever met Senator Skelos in person?

A.  One time, yes.

Q.  When did you meet Senator Skelos in person?

A.  It was actually October 31st, 2013.

Q.  How is it that you are able to remember the specific date
that you met with Senator Skelos?

A.  Because we had the kick-off meeting with Nassau County on
that day to start the contract execution.  And that's the day I
was going to met with Adam, and I happened to meet the senator
that day, too, after the kick-off meeting.

Q.  So how did it come to be that you met Senator Skelos?

A.  Well, after our engineering kick off with the county I was
going to meet with Adam a bit and discuss how things were
going.  And he said he was at his father's district office, and
so if I could meet him there and we would go from there.  And
when I got there he asked me if I wanted to meet his father
because his father was in the office.

Q.  Had you ever been to district office of Senator Skelos
before?

A.  No.

1  Q.  How did you know how to get there?

2  A.  Adam gave me the address and directions.

3  Q.  What happened when you arrived at Senator Skelos' district

4  office?

5  A.  Well, when I arrived I parked, I walked in.  Adam came out

6  to lobby.  I said:  Are you ready to go?  He said:  Actually my

7  father is here, would you like to meet him?  I said:  Sure.  We

8  went back to a conference room where the senator was with an

9  aid, and then that's where I met him.

10 Q.  What happened after you entered the conference room with

11 Senator Skelos, his aid, and Adam Skelos?

12 A.  The senator said to the aid that he doesn't need to be

13 there, and so the aid left.  And then senator said:  So tell me

14 about your fracking solution.

15 Q.  And what did you tell the senator?

16 A.  I told him about the solution AbTech had and why it was

17 useful, beneficial, unique.  I told him about how we had been

18 working with various oil and gas companies and teaming

19 partners.  So that's basically what I told him.

20 Q.  And what, if anything, did Senator Skelos say in reply?

21 A.  He said that sounds good, and he said that he thinks the

22 fracking moratorium in New York has got to be lifted.  And he

23 said that the Democrats have to give something to -- or sorry,

24 the governor has to give something to upstate New York in terms

25 of some kind of economic boom, and that this would be it.

FBUTSKE5                          White - direct

1              MR. MASIMORE:  The government offers Government

2       Exhibit 2182 pursuant to stipulation Government Exhibit 12.

3              THE COURT:  Government Exhibit 2182 is received

4       without objection.

5              (Government's Exhibit 2182 received in evidence)

6              MR. MASIMORE:  Permission to publish, your Honor?

7              THE COURT:  Yes.

8              MR. MASIMORE:  Starting from the bottom half, to

9       publish, your Honor, it's an email from EA Interns, email

10      address at cany.org, April 17, 2014 to Leslie King, subject

11      fracking lobby day appointment request.

12             It states:  Hi, Leslie, my name is Patrick with

13      Environmental Advocates of New York.  We are planning a

14      fracking lobby day on behalf of New York citizens for Monday,

15      May 12.  We are requesting a half hour appointment with the

16      senator for some time between 11 and 2:30 with preference for

17      the afternoon, if possible.

18             The email continues, and if we go to top, the middle

19      part there:  Leslie King/Senate sends to Robert Mujica and

20      Elizabeth Garvey on April 17, and she writes for your

21      recommendation, and then at the top, Robert Mujica responds --

22             MR. GAGE:  Your Honor, I will note my objection.

23             THE COURT:  Overruled.

24             MR. MASIMORE:  Robert Mujica writes:  DGS no,

25      counsels.

FBUTSKE5                         White - direct

1    BY MR. MASIMORE:

2    Q.  Mr. White, approximately how long did you meet with Senator

3    Skelos on October 31st?

4    A.  Maybe like 10, 15 minutes.

5            MR. MASIMORE:  If we could pull up 2302 for the

6    witness, please.

7    Q.  Do you recognize this?

8    A.  Yes, I do.

9    Q.  What do you recognize it to be?

10   A.  It is a presentation given to the New York Department of

11   Health on AbTech's water treatment solution for oil and gas.

12   Q.  How do you know that?

13   A.  Because I was one of the presenters.

14           MR. MASIMORE:  The government offers Government

15   Exhibit 2302.

16           MR. GAGE:  No objection.

17           THE COURT:  Government Exhibit 2302 is received

18   without objection.

19           (Government's Exhibit 2302 received in evidence)

20           MR. MASIMORE:  If we could pull up the first page,

21   please.

22   Q.  Mr. White, what was the purpose of your meeting with the

23   department of health?

24   A.  Well, the department of health was meeting with different

25   companies that had technical solutions and engineering

1    solutions for water management, and we wanted to be one of

2    them.  And by doing so, ultimately AbTech's hope would be that

3    the department of health would be convinced there --

4           MR. GAGE:  Objection, your Honor.  It's not

5    responsive.

6           THE COURT:  Ask another question.

7    Q.  Let's break it down, Mr. White.  First of all, what was the

8    business purpose of AbTech for scheduling a meeting with the

9    department of health?

10          MR. GAGE:  Sorry, your Honor, I object again.

11          THE COURT:  If he knows.

12   Q.  Mr. White, were you present at the meeting?

13   A.  Yes.

14   Q.  Are you familiar with how the meeting got scheduled?

15   A.  Yes.

16   Q.  And how did the meeting get scheduled?

17   A.  Adam had spoken to Rob Mujica, who had given him I believe

18   a contact at DOH, and ultimately someone from the senate

19   emailed me and said that -- and gave me the person to contact

20   at DOH to set up one of these meetings.

21          MR. MASIMORE:  The government offers 2128 pursuant to

22   Stipulation 12.

23          THE COURT:  I take it there's no objection.

24          MR. GAGE:  No, your Honor.

25          THE COURT:  Government Exhibit 2128 is received

FBUTSKE5                      White – direct

1   without objection.

2                (Government's Exhibit 2128 received in evidence)

3                MR. MASIMORE:  If we could publish for the jury,

4   please.

5   Q.  Do you see at the top it says:  DOH meeting from Elizabeth

6   Garvey/Senate and two, do you recognize the email address?

7   A.  Yes, it's my AbTech email.

8   Q.  And Ms. Garvey writes:  Mr. White, Robert Mujica gave me

9   your contact information.  In order to arrange the meeting,

10  please contact Jim Clancy, he's awaiting your call.

11  A.  Yes.

12  Q.  What did you do after you received this email from Beth

13  Garvey?

14  A.  At some point after that I called Jim Clancy.

15  Q.  And why did you call Jim Clancy?

16  A.  To arrange a meeting.

17               MR. MASIMORE:  The government offers 2131 pursuant to

18  Stipulation 12.

19               THE COURT:  Government Exhibit 2131 is received

20  without objection.

21               (Government's Exhibit 2131 received in evidence)

22  Q.  You see, Mr. White, at the top it says:  Email from

23  Elizabeth Garvey to you?

24  A.  Yes.

25  Q.  Do you recall the email?

FBUTSKE5                          White - direct

1    A.  Yes.

2    Q.  And at the bottom, the email chain starts Friday, March 7,

3    2014 at 7:57 a.m. Ms. Garvey wrote:  Mr. White, just following

4    up, did you ever make contact with Jim Clancy?  Please let me

5    know.

6    A.  Yes.

7    Q.  And you responded:  Hi, thanks for following up.  Yes, I

8    did this week, and we're working on scheduling.  I tried him

9    last week but he was out all week with the flu.  Hence, the

10   delay.  Thanks for arranging.

11   A.  Yes.

12   Q.  What were you referring to?

13   A.  Calling Jim Clancy to arrange the meeting.

14   Q.  And then Ms. Garvey responds:  Perfect.  Let us know how we

15   can be helpful going forward.

16   A.  Yes.

17   Q.  Now did there come a time when you did meet with the

18   department of health?

19   A.  Yes.

20   Q.  And what was the reason that you set up the meeting with

21   the department of health?

22   A.  To brief them on AbTech's water treatment solution for the

23   oil and gas industry.

24   Q.  What, if any, business purpose did you have in briefing the

25   DOH about that issue?

1            MR. GAGE:  Objection, your Honor.

2            THE COURT:  I'll permit it.

3    A.   The hope for AbTech was to persuade or be part of the

4    companies that persuade DOH there's a responsible way to treat

5    water so that they would recommend that the moratorium can be

6    for fracking can be lifted provided that water is treated

7    responsibly.

8            MR. MASIMORE:  If we could pull up, just for the

9    witness and counsel, please, Government Exhibit 3216.

10   BY MR. MASIMORE:

11   Q.   Mr. White, do you recognize this exhibit?

12   A.   Yes, I do.  It's the form they gave me at DOH at the

13   beginning of the meeting.

14   Q.   And there's some handwriting on this form.  Do you

15   recognize the handwriting?

16   A.   Yes, it's my handwriting.

17           MR. MASIMORE:  The government offers Government

18   Exhibit 3216.

19           MR. GAGE:  No objection, your Honor.

20           THE COURT:  Government Exhibit 3216 is received

21   without objection.

22           (Government's Exhibit 3216 received in evidence)

23           MR. MASIMORE:  Your Honor, pursuant to stipulation the

24   government offers 2177, 2111, 2116, and 2124.

25           THE COURT:  No objection?

FBUTSKE5                    White – direct

1            MR. GAGE:  If I could take a quick look.

2            (Pause)

3            MR. GAGE:  No objection, your Honor.

4            THE COURT:  Government Exhibits 2177, 2111, 2116 and

5    2124 are received without objection.

6            (Government's Exhibits 2177, 2111, 2116 and 2124

7    received in evidence)

8            MR. MASIMORE:  Permission to publish, your Honor?

9            THE COURT:  Yes.

10            MR. MASIMORE:  2177, for publishing, email from Adam

11    Skelos to Robert Mujica at a particular email address,

12    January 24th, 2014, subject, oil and gas water management, and

13    there's a link.

14    BY MR. MASIMORE:

15    Q.  Mr. White, do you recognize the link that's provided in

16    this particular email?

17    A.  Yes, I do, it's AbTech's web page giving an overview of the

18    oil and gas water treatment solution.

19    Q.  And how are you familiar with that particular web page?

20    A.  Because I wrote it.

21    Q.  Government Exhibit 2111 for publishing.  This is a

22    January 28, 2014 email, Robert Mujica to Elizabeth Garvey, and

23    do you recognize the link here?

24    A.  Yes, it's that same link we just discussed.

25            MR. MASIMORE:  And if we could publish 2116, please.

1   Q.  We have an email, January 29, 2014, from Elizabeth Garvey

2   to James M. Clancy.  And do you recognize the link that's being

3   provided?

4   A.  Yes, it's that same link.

5           MR. MASIMORE:  And lastly for publishing, 2124, and if

6   we could start at the bottom February 19, 2014, at 9:46 a.m.,

7   it's an email from Elizabeth Garvey writing:  Is there a

8   contact here?  DOH is now willing to set up the meeting.

9           And then above that, February 21st, 2014 at 7:37 p.m.,

10  Robert Mujica wrote office, and then gives a 480-4000 number,

11  that's the number that DOH should call and ask for Bjornulf.

12  BY MR. MASIMORE:

13  Q.  Do recognize the number that Mr. Mujica is giving

14  Ms. Garvey?

15  A.  Yes, AbTech's main office number.

16          MR. MASIMORE:  And then up the next email from that,

17  February 21st, 2014, 7:39 p.m., Elizabeth Garvey wrote:  I left

18  message for him today, asked him to call Clancy.  If you would

19  like, I can have Clancy call Bjornulf.

20          Next email up the chain, February 21, 2014, 7:41 p.m.,

21  Robert Mujica wrote:  Either way is fine, I just want to make

22  sure they connect.

23          Then lastly at the top, it's a February 21, 2014

24  email, 7:46 p.m. from Elizabeth Garvey to Robert Mujica:  Yes,

25  will do.

FBUTSKE5                    White - direct

BY MR. MASIMORE:

Q.  Who was at the meeting where you made the presentation to department of health?

A.  I was there, a technical consultant for AbTech was there, Jim Clancy was there, and then the MD who was a DOH employee who was heading up the study on solutions for water treatment was there.

Q.  Approximately how long did the meeting last?

A.  I would say an hour and a half, perhaps, something like that.  It was pretty long.

Q.  So we spent some time discussing fracking from fall 2013 to May 2014, correct?

A.  Yes.

Q.  And we talked about the stormwater contract that was finalized in October 2013, correct?

A.  Yes.

Q.  Going back to stormwater contract and going back to October 2013, did the contract proceed smoothly after Nassau County fully executed it?

A.  No, it did not.

Q.  In the early stages of the contract through July 2014, what were the main types of problems AbTech was having with respect to the stormwater contract?

A.  AbTech was having delays just in executing the project because it was just sort of -- each step required certain

1    things from the county in terms of meetings or approvals, and

2    those were just not happening very quickly.  So for that entire

3    amount of time AbTech was sort of stuck in task order one,

4    which it could have done in a matter of a few weeks.

5    Q.  And what effect, if any, did it have on AbTech's business?

6    A.  Well, I mean from the perspective of billing, AbTech was

7    not able to bill beyond task order one, but it also slowed just

8    overall execution of the contract.

9              MR. MASIMORE:  If we could pull up 2577A, which is in

10   evidence, please.

11   Q.  From October 2013 through July 2014, had AbTech been

12   engaged in some work and incurring some expenses with respect

13   to the stormwater contract?

14   A.  Yes.

15   Q.  And do you recognize this exhibit, 2577A?

16   A.  Yes, I do.

17   Q.  What do you recognize it to be?

18   A.  It's an email from Lane Castleton, the CFO of AbTech,

19   attaching the first invoice and sending it to Nassau County.

20   Q.  This is January 2014?

21   A.  Yes.

22   Q.  Turn to the second page of the exhibit.

23              In that second column from the right, it's called

24   hours?

25   A.  Yes.

FBUTSKE5                    White – direct

Q.  What does that reflect on this particular invoice, what
type of information?

A.  It reflects the amount of hours that each person has
worked, the rate, and then the total amount that's due.

          MR. MASIMORE:  If we could pull up 2594 in evidence,
please.

Q.  Do you recognize this document?

A.  Yes, I do.

Q.  What do you recognize it to be?

A.  It's an email from Lane Castleton to Glenn Rink, myself,
Jonathan Thatcher, describing the first payment from Nassau
County has been received by AbTech.

Q.  And this is from June 11, 2014?

A.  Yes.

Q.  How much was the first payment that AbTech got from Nassau
County?

A.  Well, AbTech received $54,602.

Q.  Directing your attention to July 2014, did there come a
time when Nassau County held a press conference related to the
stormwater contract?

A.  Yes.

Q.  How did that come -- well, how, if at all, were you
involved in that press conference coming to be?

A.  I was involved by -- well, Glenn Rink set a media strategy
and asked me to help in terms of making certain parts occur.

FBUTSKE5                   White - direct

1    Q.  What, if anything, did you do in response to Mr. Rink's

2    instructions?

3    A.  Well, at first Glenn wanted to have just a site out in

4    Nassau County where he could have film crews go and film, and

5    he had arranged with The Weather Channel to interview him in

6    New York, and then to go out and film a site.  So he asked me

7    to work with Adam and see if we could work with the county on

8    finding a site that the film crew could go and film a

9    representative site.

10   Q.  What did you do after Mr. Rink asked you to work with Adam

11   on that task?

12   A.  I told Adam about Glenn's idea, and that we were trying to

13   find a site that we could film.

14   Q.  When was the press conference?

15   A.  It was in July 2014, I don't remember the exact date.

16   Q.  And who participated, to best of your recollection?

17   A.  It was county executive Ed Mangano, Shila Shah, Ken Arnold,

18   myself, and then there were two or three people that I didn't

19   know.

20   Q.  And who, if anyone, gave prepared remarks during the press

21   conference?

22   A.  Ed Mangano.

23   Q.  What, if any, role did you have in preparing Ed Mangano's

24   remarks as delivered at the press conference?

25   A.  Well, his communications director asked me for background

FBUTSKE5                      White - direct

1    on the project, so I wrote up a background in bullet form on

2    the project and sent it to the communications director who used

3    it for the prepared remarks.

4              MR. MASIMORE:  And if we could pull up for the witness

5    and counsel, please, Government Exhibit 4830.

6    Q.  Do you recognize what is depicted in that photograph?

7    A.  Yes, I do, it's the press conference we just mentioned.

8    Q.  How are you able to recognize that as the press conference?

9    A.  Because I attended and was there and I am in the

10   photograph.

11             MR. MASIMORE:  The government offers Government

12   Exhibit 4830.

13             MR. GAGE:  No objection, your Honor.

14             THE COURT:  Government Exhibit 4830 is received

15   without objection.

16             (Government's Exhibit 4830 received in evidence)

17             MR. MASIMORE:  If we could publish that, please.

18   Q.  On the right side of the photograph, I guess going from

19   left to right, to the extent you know, can you identify the

20   individuals, starting with the gentleman I believe in a blue

21   shirt to the left of the photograph within the photograph?

22   A.  Sure.  Well, the first gentleman I don't know.  The second

23   I don't know.  Then it's me.  Then it's County Executive Ed

24   Mangano.  The two blurred gentlemen I don't know.  And then

25   Commissioner Shaw is standing to the left of Ed Mangano, and

1    all the way to right of the photograph is Ken Arnold, the

2    assistant to commissioner.

3    Q.   And where did this press conference take place?

4    A.   It took place in one of the county buildings in Long Island

5    in Nassau County.

6              MR. MASIMORE:   If we could zoom out from this

7    photograph to see the whole exhibit.

8    Q.   Focusing on the left side there, do you recognize the

9    individual seated there?

10   A.   Yes, that's Adam Skelos.

11   Q.   Did you have an understanding of AbTech's business purpose

12   for having the press conference?

13   A.   Yes.

14   Q.   What was the basis for your understanding?

15   A.   Glenn's statements to me about why he wanted to do it.

16   Q.   And what did you learn about the reasons for doing the

17   press conference?

18   A.   Twofold.  He wanted to bring attention to the project, and

19   he also wanted to use it to help move things along by sort of

20   bringing more profile and attention to the project in hopes

21   that Nassau County would expedite the installation process.

22   Q.   Did the press conference work as planned?

23   A.   No, it did not.

24   Q.   What happened?

25   A.   Well, after the press conference the county became very

1    focused on doing one installation in particular at the Bay Park

2    site, one of the stormwater outflow pipes there, which was the

3    site that was filmed.  And so, if anything, it drew more

4    attention to one site as opposed to moving along with the whole

5    contract.

6    Q.  And was doing the work on one site first consistent with

7    the terms of the contract with the county?

8    A.  No.

9    Q.  And how, if at all, was that going to impact AbTech's

10   business to focus on one site versus proceeding as planned with

11   the contract?

12   A.  Well, if the county were in fact to proceed just with the

13   one site and that would -- if that were to delay the overall

14   contract, then that would actually impact AbTech in that

15   perhaps one site would get installed quicker but less revenue

16   would come to AbTech in the immediate term because it's one

17   site versus ten.

18   Q.  After the press conference, did you have an opportunity to

19   speak with Chief Deputy County Executive Rob Walker?

20   A.  Yes.

21   Q.  And how were you able to speak with him?  Was it by phone,

22   was it in person?

23   A.  I met with him.  It was the first time I met him, the only

24   time.

25   Q.  Where was that?

FBUTSKE5                    White – direct

1   A.  It was his office building in Nassau County.

2   Q.  Approximately when did you meet with Rob Walker?

3   A.  August 2014.

4   Q.  And who was at the meeting?

5   A.  It was Rob Walker, Commissioner Shaw, Assistant to

6   Commissioner Ken Arnold, Adam Skelos, and myself.

7   Q.  And what was discussed at the meeting?

8   A.  Well, we discussed -- Rob Walker discussed that he wanted

9   to proceed with this first site.  In particular, he said that

10  the county had submitted for funding for all of the sites, but

11  that the county wanted in particular to get moving on this one

12  site, and that he had allocated county funds to be able to move

13  forward with that single site in the amount of $400,000.

14  Q.  What, if anything, did Rob Walker say about where the

15  $400,000 came from?

16  A.  He didn't say anything about where it came from.

17  Q.  And what, if anything, did you say in response to Rob

18  Walker's statements about the 400,000?

19  A.  I told him I don't know where $400,000 is coming from.  We

20  haven't even done engineering, scoping or pricing, so I have no

21  idea whether that's an amount we can commit to or if that will

22  actually cover the cost.  So I said I'm not comfortable with

23  this random number.

24  Q.  You just mentioned engineering, scoping and pricing in

25  relation to it.

FBUTSKE5                        White - direct

1   A.  Yes.

2   Q.  Can you explain to the jury what you meant by that, and why

3   that had anything to do with the proposal on the 400,000?

4   A.  Well, typically the order would be that the company,

5   meaning AbTech, would analyze the site, estimate what is

6   needed, do an engineering design, and do a costing, and that

7   would lead to a dollar amount.  And then they would propose

8   that and the county could decide if they were going to approve

9   it or not.  But this was sort of backwards, they were just

10  throwing a number out and there, and I had no idea if that

11  would cover what they wanted us to do.

12  Q.  What, if anything, was discussed at the meeting concerning

13  design build?

14  A.  Well, at one point while I was discussing the 400,000 we

15  discussed the main contract as well and how we would proceed,

16  and in general, as we were talking about sort of next steps,

17  that's when Ken Arnold brought up that we still don't have

18  design build authorization on this contract.

19  Q.  And what did you say in response to that?

20  A.  I said just generally well, yes, but we haven't gotten to

21  point where we need to submit for approval for that.

22          MR. MASIMORE:  If we could pull up 2605, which is in

23  evidence, please.

24  Q.  And do you recognize this as an email from Adam Skelos to

25  you from July 14, 2014?

FBUTSKE5                           White - direct

A.  Yes, I do.

Q.  And if we could focus on sort of the bottom half your email
to Adam, in the second full paragraph it starts:  We're running
into some serious problems with the county, and I'm not really
sure who to go to on this.

        What did you mean by that?

A.  That we -- there were some discussions where there was
disagreement.  Essentially AbTech wanted to proceed with the
full contract, all the sites at the time and not be distracted
by a single site, whereas Nassau County was wanting to really
be focused on the single site.

Q.  The next paragraph beginning, "Brian said he doesn't think
money will every show up, so we might as well do a small pipe
with the 400K," what did you mean by that?

A.  Brian was an engineer, I believe, or program manager within
the public works department, and apparently he had said to Matt
Jones, who was our project engineer, that as one argument for
proceeding with the first site, who knows what will happen with
the rest of the funding so let's at least proceed with this
first one.

Q.  And lastly, the fourth paragraph from the bottom, two
lines, you write:  They should be doing things like preparing
design build authorization materials and putting the package
from the county side to get money.

A.  Yes.

1    Q.   What were you referring to?

2    A.   Nassau County, based on the contract, what kind of things

3    they should be doing under the contract.

4    Q.   Are you familiar with a company called Corvias Solutions?

5    A.   Yes, I am.

6    Q.   How are you familiar with Corvias Solutions?

7    A.   They are a company that I set up a teaming relationship

8    with AbTech.

9    Q.   And can you explain to the jury what you mean by a teaming

10   relationship?

11   A.   Yes, Corvias Solutions was a larger company that does large

12   infrastructure projects.  They do public private partnerships.

13   They do things like building military housing.  And so AbTech

14   and AEWS Engineering and Corvias Solutions were basically going

15   to form a team, define their roles, then go after stormwater P3

16   opportunities as a team together.

17   Q.   When did you start participating in putting that teaming

18   agreement together with Corvias, AbTech and AEWS?

19   A.   Around June 2014.

20   Q.   And when was it finalized, if ever?

21   A.   In August 2014.

22   Q.   What was the purpose of having this agreement between those

23   three companies?

24   A.   Well, Corvias was much larger, deep experience in financing

25   P3s, had deployed several billion dollars in debt, meaning that

1    it had built several billion dollars worth of infrastructure

2    projects on a P3 basis.  So having Corvias in place, we really

3    sort of answered the how do we privately finance this

4    infrastructure question.  So it was a much stronger team

5    collectively.

6    Q.  What effect, if any, did the Corvias teaming agreement have

7    and the ability of AbTech and AEWS to participate in P3

8    stormwater projects?

9    A.  It expanded the ability, because now there was a defined

10   and experienced private financing partner.

11   Q.  What efforts, if any, did AEWS, AbTech and Corvias make to

12   pursue P3 projects in New York after the teaming agreement was

13   negotiated, signed, and beyond?

14   A.  We made many efforts.  We planned strategy, we looked at

15   the market, we met with several -- we met with two

16   municipalities and planned on meeting with others, and then

17   eventually started discussing advocating for stormwater P3

18   legislation for New York after we had met with some of these

19   municipalities.

20   Q.  What role, if any, did Adam Skelos have in that effort?

21   A.  Well, in respect to -- or with respect to the meetings with

22   municipalities, including setting ones up in the future, he was

23   the one setting those up and attending.

24   Q.  And did Adam Skelos perform those duties pursuant to his

25   consulting agreement with AbTech and AEWS?

FBUTSKE5                        White - direct

A.   Yes.

Q.   Now what was the response from municipalities to AbTech,

AEWS, Corvias' presentations related to these P3s?

A.   Very positive.   The combined team was well received.   The

municipalities liked that we had a private financing solution.

They said they wanted to move forward.   The concern they had

was that stormwater -- sorry, P3s generally and design, build,

operate contracts were not generally allowed in New York at the

municipal level, and they didn't want to really pursue one off

approvals.   So they expressed concern there and wanted to see

legislation broadly.

Q.   What was the issue related to the approval of P3 as it

related to these presentations?

A.   Well, the issue was that with respect to the customers we

were meeting with, potential customers, meaning cities, they

were not authorized under New York State law to enter into a

stormwater P3 without some kind of specific approval.

Q.   So what was necessary for these projects to move forward?

A.   We would need that legislative approval or state approval.

          MR. MASIMORE:   Your Honor, I'm about to go into

another topic area.   I'm happy to continue as long as the Court

likes, or if this is a good time for a break.

          THE COURT:   Either is fine.   Why don't we take a

15-minute break.

          (Continued on next page)

FBUTSKE5                        White - direct

1              (Jury not present)

2              THE COURT:  If counsel have nothing, we're on a break

3     until 3:30.

4              MR. MASIMORE:  Your Honor, with the Court's

5     permission, we may be getting to some recordings soon.  May we

6     have our paralegals distribute binders?

7              THE COURT:  Yes.

8              MR. MASIMORE:  Thank you.

9              (Recess taken)

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MR. MASIMORE:  Your Honor, may I bring in the witness?

3          THE COURT:  Yes, please.

4          We are ready for the jury.

5          (Jury present)

6          BJORNULF WHITE, resumed.

7          THE COURT:  Members of the Jury, you'll see transcript

8    notebooks at your seats.  I remind you that you should turn

9    only to the transcript that's mentioned to you by counsel.

10         Please have a seat.

11         You may proceed.

12         MR. MASIMORE:  Thank you, your Honor.

13   BY MR. MASIMORE:

14   Q.  Mr. White, do you recall before the break you had testified

15   about the teaming agreement with Corvias and sort of what you

16   had testified was a perceived need for some sort of approval

17   related to P3s.

18   A.  Yes.

19   Q.  You also recall before the break testifying about fracking

20   and having a meeting with the Department of Health?

21   A.  Yes.

22   Q.  And was AbTech, after that meeting with the Department of

23   Health, sort of in a wait-and-see mode with respect to whether

24   the state would approve fracking?

25   A.  Yes.

1   Q.  Directing your attention to the fall of 2014.  Did there

2   come a time when AbTech and its partners sought to work with

3   lobbyists?

4   A.  Yes.

5   Q.  And who raised the issue with respect to using lobbyists?

6   A.  Adam did, first.

7   Q.  And how did it come up?

8   A.  He mentioned that if we, meaning AbTech and Corvias, wanted

9   to pursue state legislation in Albany that we needed to bring

10  or ought to bring a lobbying group on board to help us with

11  that.

12  Q.  And from your conversations with Adam Skelos did you

13  develop an initial understanding of what the purpose of using

14  lobbyists was going to be?

15  A.  Yes, I did.

16  Q.  And from those conversations what was your initial

17  understanding of the purpose?

18  A.  That they were going to help us with crafting the

19  messaging, crafting what the language that we would ask for

20  looked like, identifying which members we should meet with,

21  helping set up meetings with those members.

22  Q.  Did there come a time when your understanding of the

23  purpose of using the lobbyists changed?

24  A.  Yes.

25  Q.  And what formed the basis for your change in understanding?

FBU9SKE7                      White - direct

1    A.  Well, statements from Adam as well as over time my

2    understanding of sort of the structure of how things work in

3    New York State.

4    Q.  And what did you come to understand then was the purpose of

5    using lobbyists?

6    A.  That it was more almost like a front to legitimize the

7    process that was going to be pursued.

8    Q.  When you say --

9          MR. GAGE:  Your Honor, I'd object and move to strike

10   that.

11         THE COURT:  Just a moment.

12         I'll strike that and ask you to ask a more pointed

13   question.

14   Q.  You testified, Mr. White, that you had an initial

15   understanding of the purpose of using lobbyists, correct?

16   A.  Yes.

17   Q.  And that was based on conversations you had with Adam

18   Skelos?

19   A.  Yes.  And with the lobbying group also.

20   Q.  As time went on did you have an opportunity to participate

21   in meetings and discussions with lobbyists?

22   A.  Yes.

23   Q.  And as time went on did you have an opportunity to

24   participate in discussions with Adam Skelos?

25   A.  Yes.

FBU9SKE7                          White - direct

1    Q.  And did those discussions relate in any way to lobbying

2    activities and what was happening with respect to that?

3    A.  Yes.

4    Q.  And on the basis of those discussions you had personally

5    with Adam Skelos, did your understanding of what the purpose of

6    the lobbyists was change?

7    A.  Yes.

8    Q.  And how did it change?

9    A.  It changed such that I did not think that the -- there had

10   been the need for the lobbyists that had been stated to me

11   previously.

12   Q.  What do you mean by that?

13   A.  That the things that we had presumably hired the lobbyists

14   for were things that Adam was going to do himself.

15               MR. GAGE:  Your Honor, again, I object and move to

16   strike.

17               THE COURT:  On what ground?

18               MR. GAGE:  It's not responsive.  If he asks what the

19   lobbyists said to him and he said to the lobbyists, we get the

20   dialogue.

21               MR. MASIMORE:  Your Honor, I laid the foundation with

22   respect -- these are based on statements from Adam Skelos.

23               MR. GAGE:  As opposed to a conclusionary statement,

24   your Honor.

25               MR. MASIMORE:  Perhaps we could approach.

1    THE COURT:  I think you can break it down.

2    BY MR. MASIMORE:

3    Q.  Mr. White, during the time that you were working with

4    lobbyists with respect to AbTech AEWS and Corvias business?

5    A.  Yes.

6    Q.  Did you perform that work?

7    A.  Yes.

8    Q.  And who did you do it with?

9    A.  Which lobbying group?

10   Q.  Which individuals?

11   A.  Adam Skelos and the lobbying group that we eventually

12   hired.

13   Q.  And did you have conversations with Adam Skelos about what

14   the lobbyists were doing?

15   A.  Yes.

16   Q.  And during the course of having those conversations -- did

17   those conversations occur over a period of time?

18   A.  Yes.

19   Q.  And did you form an understanding of what the lobbyists

20   were doing and what their purpose was from what Adam Skelos was

21   telling you?

22   A.  Yes.

23   Q.  And what was that understanding that you formed?

24        MR. GAGE:  Your Honor, again, objection.  What did

25   they say?

1          THE COURT:  I overrule.

2          THE WITNESS:  I understood the functions of the

3    lobbying group were not needed because Adam said that even

4    after the lobbying group stopped working for us that he could

5    do those things himself, and I believe he said something to the

6    effect of that he was planning on that anyway.  And I learned

7    from things he said to me that he was assisting in setting up

8    meetings behind the scenes and such so, you know, a lot of what

9    I thought the lobbying group was for, to set up these meetings,

10   Adam said that he was arranging them.

11   Q.  And what, if anything, did Adam Skelos tell you about

12   conversations he had had with his father?

13   A.  He -- I'm not sure I understand.  Just in general?

14   Q.  Let me break it down.

15          With respect to the lobbying -- with respect to the

16   lobbying that went on with -- in 2014 on with respect to P3

17   legislation and/or fracking.  Do you recall that time period?

18   A.  Yes.

19   Q.  During that time period did Adam Skelos have any

20   conversations with you in which he mentioned conversations he

21   had been having with his father?

22   A.  Yes.  There were various references to his father.

23   Q.  And what did you understand from Adam's reports of what he

24   had been discussing with his father?

25          MR. GAGE:  Again, your Honor, I object.  What did he

1    say would be --

2              MR. CONIFF:  I object for the reasons we discussed

3    this morning, your Honor.

4              THE COURT:  Well I'll permit you to go ahead.

5              THE WITNESS:  What should I specifically answer?

6    Q.  With respect to the information Adam Skelos had reported to

7    you concerning conversations he had had with Senator Skelos,

8    what was your understanding of what Adam was telling you?

9    A.  I guess it depends on the timeframe.  Initially I

10   understood that he was -- Senator Skelos was sort of advising.

11   And -- but eventually I would learn that Adam was discussing

12   with his father sort of, I guess, strategy on who to meet with.

13             MR. GAGE:  Your Honor, objection to "I guess."

14             THE COURT:  If you're merely speculating, don't give

15   us that answer.

16             THE WITNESS:  I'm sorry.  I was just -- figure of

17   speech.

18             Generally that he was discussing strategy, who to meet

19   with, and how to gain support for this.

20   Q.  Okay.  So let's go sort of chronologically at this point.

21             Did there come a time when Adam Skelos first mentioned

22   a particular lobbyist?

23   A.  Yes.

24   Q.  And what lobbyist did Adam Skelos mention first?

25   A.  He mentioned Park Strategies.

1    Q.  And approximately when was this?

2    A.  It would have been or it was at some point in September of

3    2014.  I'm not sure exactly when.

4    Q.  And to the best of your recollection what, if anything, did

5    Adam Skelos tell you about Park Strategies?

6    A.  He said that they were a great firm, that we should -- that

7    he recommended, that they were probably the premier firm for

8    lobbying in Albany and that it was headed by a former senator.

9    Q.  What, if anything, did Adam Skelos say concerning whether

10   he had met with representatives of Park Strategies?

11   A.  He described one meeting that he had with the senator who

12   was sort of the principal with that firm and perhaps some of

13   his colleagues.

14   Q.  And what did Adam Skelos tell you about that meeting?

15   A.  He said it had not gone that well, that he had doubts about

16   Park Strategies and how focused they would be on AbTech and how

17   effective they would be but, not to worry, he would ask around

18   and try to find another firm.  And he thought that there might

19   be something that was equally effective.

20   Q.  What happened after Adam Skelos told you about the meeting

21   with Park Strategies?

22   A.  Well, a while later he told me that he had found a firm and

23   that he asked around and they were equally effective, if not

24   perhaps more effective than Park Strategies, and that he wanted

25   to set up a meeting with one of their partners.

FBU9SKE7                          White - direct

1    Q.  What was the name of that firm?

2    A.  That was called Capitol Group.

3    Q.  What happened after Adam Skelos mentioned Capitol Group and

4    mentioned wanting to set up a meeting with one of its

5    principals?

6    A.  He went ahead and set up a meeting and I met with one of

7    the partners of Capitol Group.

8    Q.  Approximately when was the meeting with Capitol Group?

9    A.  Toward the end of September of 2014.

10   Q.  Where did the meeting take place?

11   A.  It took place at the -- the partner from Capitol Group, a

12   club that he was a member of called -- something like Top of

13   the Sixes at the top of a building in Manhattan.

14   Q.  Who was at the meeting?

15   A.  It was a partner by name of Nick Barrella, Adam Skelos, and

16   myself.

17   Q.  What did you discuss at the meeting with Nick Barrella and

18   Adam Skelos?

19   A.  We discussed the stormwater program, P3s.  In this case

20   Barrella had prepared a folder of materials where he discussed

21   his clients, some of the high-profile clients he had, various

22   articles he had found about stormwater and P3s, reading

23   material he had about me and AWS Engineering and in general I

24   would say it was sort of like a pitch from Capitol Group.

25   Q.  How long did the meeting last?

1  A.  I would say it lasted for maybe around two hours, something

2  like that.  It was a dinner meeting.

3  Q.  Did you stay at the table for the entire time during the

4  two-hour dinner meeting?

5  A.  No.  I probably -- well I think two times left to use the

6  restroom.

7  Q.  You said probably.  Do you recall?

8  A.  It was twice.

9  Q.  After the meeting with Nick Barrella did there come a time

10  when you entered into an agreement with Capitol Group?

11  A.  Yes.  We entered into an agreement.

12  Q.  You say "we."  Who do you mean?

13  A.  Capitol Group and AEW Engineering on behalf of AbTech.

14       MR. MASIMORE:  If we could pull up Government Exhibit

15  2615, please.  In evidence.

16  Q.  Do you recognize this Mr. White?

17  A.  This is an e-mail from me to Nick Barrella I just discussed

18  and it's attaching the signed contract I just referenced as

19  well as a lobbying authorization form.

20  Q.  If we turn to page three of the document, do you recognize

21  the signature in the lower left corner?

22  A.  Yes.  That's my signature.

23       MR. MASIMORE:  And if we zoom in to the text of the

24  letter, Government Exhibit 2615.

25  Q.  Do you see that the retainer for the period of November 1,

1   2014 through September 30, 2015 for a fee of $11,000 per month?

2   A.  Yes.

3   Q.  Do you see that?

4           Is that how much AEWS was going to be paying Capitol

5   Group for lobbying services?

6   A.  Correct.

7   Q.  Did you have an understanding of where AEWS was going to

8   get the funds to pay the $11,000 a month retainer to the

9   lobbyists?

10  A.  Yes.  AEWS was funded by AbTech as a subsidiary.

11          MR. MASIMORE:  Your Honor, at this time if we could

12  ask the jury to turn to page 1417.

13          THE COURT:  Yes.  Please turn to 1417.

14          Should the witness turn to it as well?

15          MR. MASIMORE:  The witness can or the witness can

16  follow along.

17  Q.  Mr. White, do you have a transcript binder?

18  A.  I believe this is it.

19          MR. MASIMORE:  Okay.  Thank you, Judge.

20  Q.  So it looks like everybody is on 1417 now so if we can --

21  speaker is on?

22          THE COURT:  It's between?  Do you want to say who it's

23  between?

24          MR. MASIMORE:  Thank you, your Honor.

25          This is a call dated December 12, 2014.  The

1   participants are Adam Skelos and the voice mail of Lane

2   Castleton.

3   Q.  Before we play the call.  Mr. White, who is Lane Castleton?

4   A.  He is this chief financial officer of AbTech.

5        (Recording played)

6   Q.  So, Mr. White, at this time in the late fall of 2014 after

7   this agreement was entered into with Capitol Group, AbTech was

8   paying, between Adam Skelos and the lobbyists, $21,000 per

9   month?

10  A.  Yes.  That's correct.

11  Q.  Now if we go back to 2615 in evidence, page three.  The

12  text of the main paragraph.  And it notes that the

13  representation involves issues related to civil and

14  environmental engineering and public private partnerships.  Do

15  you see that?

16  A.  Yes.

17  Q.  Did there come a time when Capitol Group and the lobbyists

18  were going to do some lobbying activities related to fracking?

19  A.  Yes.  Later that fall.

20  Q.  And what was your understanding of the lobbying plan with

21  respect to fracking?

22  A.  It was essentially that Capitol Group was going to try to

23  set up a meeting with the Department of Environmental

24  Conservation.

25  Q.  And what was going to be the purpose of AbTech meeting with

1    the Department of Environmental Conservation or the DEC?

2    A.   The same purpose as why we met with Department of Health,

3    to describe our, meaning AbTech's water treatment solution and

4    to try to persuade them that there was a way to responsibly

5    treat water if fracking was permitted.

6             MR. MASIMORE:   If we could publish what's in evidence,

7    3046, please.

8    Q.   Here's an e-mail from Adam Skelos to Dean Skelos forwarding

9    a link.

10            At the bottom on July 6, 2014 Senator Skelos forwards

11   a link and Adam Skelos replies on July 16, 2014, "We need to

12   meet with DEC."

13            MR. MASIMORE:   If we could pull up 2599 in evidence,

14   please.

15   Q.   Do you recognize this, Mr. White?

16   A.   Yes, I do.   It's an e-mail from Adam to myself.

17   Q.   It's forwarding a link to you, correct?

18   A.   Yes.

19   Q.   And it says, Adam says, "Let's reach out to DOH regarding

20   setting up a meeting with DEC after our shoot this week"?

21   A.   Yes.

22   Q.   What was Adam referring to when he said "our shoot this

23   week"?

24   A.   That was the film group filming the site out in Nassau

25   County.

1  Q.  This e-mail is from July 2014?

2  A.  Yes.

3        MR. MASIMORE:  If we could pull up 3082, please, and

4  publish it.  It's in evidence.

5  Q.  It's at the bottom on September 16, 2014, Senator Skelos

6  forwards a link.  The subject of the e-mail is Landmark

7  Fracking Study Finds No Water Pollution.

8        And then Adam Skelos replies on September 16, 2014,

9  "Need to move on meeting."

10        MR. MASIMORE:  If we could pull up 2622 in evidence,

11  please.  Zoom in on the header information.

12  Q.  Mr. White, do you recognize this?

13  A.  Yes, I do.  It's an e-mail from Adam Skelos that I

14  received.

15  Q.  And it's from Adam Skelos to Nick Barrella, correct?

16  A.  Correct.

17  Q.  Tim Sheridan?

18  A.  Correct.

19  Q.  Kathryn Hohman?

20  A.  Correct.

21  Q.  And Mike Avella?

22  A.  Correct.

23  Q.  And then your bcc'ed?

24  A.  Correct.

25  Q.  Who is Mike Avella?

1    A.  He was one of the partners working with Nick Barrella on

2    this.

3    Q.  When you say "this," what do you mean?

4    A.  The engagement that Capitol Group had with AWS.

5    Q.  An engagement for what?

6    A.  For lobbying in Albany.

7    Q.  And if we go down -- if we start from the bottom please.

8    December 9 Nick Barrella wrote, and he forwards a link.  And

9    the subject is health department anticipates fracking review by

10   end of month.

11          Do you see Adam replies:  Where is our meeting with

12   the DEC?

13          And then Mr. Barrella replies:  Good question.

14          And then at the very top Adam writes:  If moratorium

15   is lifted prior to DEC recommendation to reuse one hundred

16   percent of water on fracking sites, AbTech's chances of having

17   that regulation implemented into state policy drastically

18   decrease.  We need to meet with DEC.

19          What did you understand Adam to mean by this e-mail?

20   A.  Adam believed that the opportunity to persuade DEC that

21   water reuse and recycling should be mandated had to occur

22   before the moratorium was lifted.  So he wanted to have that

23   meeting occur.

24   Q.  What, if any, significance would it have been to AbTech if

25   there had been mandated water reuse and recycling?

1   A.  It would have -- New York would have become a potential

2   market for AbTech's products for water treatment.

3            MR. MASIMORE:  At this time, your Honor, if the jury

4   could turn to 1414.

5            Ms. Danzo we're going to play an excerpt.

6            If we could, with respect to this call, direct

7   everyone's attention to page three, line 14.

8            And 1414 is a call between Adam Skelos and Mr. White

9   dated December 10, 2014.

10           (Recording played)

11           MR. MASIMORE:  I'm sorry, your Honor.  Technical

12  difficulty.  Again, this is page three, as printed in the

13  transcript, starting around line 14.

14           (Recording played)

15  Q.  So that ends that portion we'll listen to right now.

16           Mr. White, first question.  Did you understand at the

17  time you were having this conversation with Adam Skelos that

18  calls were being recorded?

19  A.  No.

20  Q.  What's the general subject matter that Adam was discussing

21  with you in this call -- in this portion of the call?

22  A.  He's discussing getting the DEC meeting set up and that

23  he's hearing that the moratorium might be lifted around

24  Christmastime.

25  Q.  And he mentioned at the beginning of the excerpt we

FBU9SKE7                         White - direct

1    listened to somebody named Nick?

2    A.   Correct.

3    Q.   Did you understand who he was referring to?

4    A.   Yes, Nick Barrella of Capitol Group.

5            MR. MASIMORE:  Your Honor permission to publish 1419

6    and ask the jury to turn to 1419T.

7            THE COURT:  Yes.

8            MR. MASIMORE:  Now 1419T is a call two days later,

9    December 12, 2014.  It's a call between Adam Skelos and Nick

10   Barrella.

11           (Recording played)

12           MR. MASIMORE:  Permission to publish 1420, your Honor.

13           THE COURT:  Yes.

14           MR. MASIMORE:  1420T, ladies and gentlemen.

15           1420T is a call December 12, 2014 between Adam Skelos

16   and Mike Michael Avella.

17           (Recording played)

18           MR. MASIMORE:  Permission to publish 1422, your Honor.

19           THE COURT:  Yes.

20           MR. MASIMORE:  1422T, please.

21           1422T and 1422 is a call December 16, 2014.  It's a

22   call between Adam Skelos and Nick Barrella.

23           (Recording played)

24           MR. MASIMORE:  Government offers Government Exhibit

25   2183.

1            THE COURT:  Any objection?

2            MR. GAGE:  I'm sorry, your Honor.  Just a moment.

3            (Pause)

4            MR. GAGE:  Your Honor, this goes back to the earlier

5    discussions we had.  I do object.  I can explain more if the

6    Court would like.

7            MR. MASIMORE:  Your Honor, I can set this aside for

8    now and come back another time.

9            THE COURT:  Good.

10           MR. MASIMORE:  Permission to publish 1423, your Honor.

11           THE COURT:  Yes.

12           MR. MASIMORE:  So 1423T, please.

13           1423 is a telephone call December 16, 2014 between

14    Adam Skelos and Mr. Bjornulf White.

15           (Recording played)

16    BY MR. MASIMORE:

17    Q.  Mr. White, directing your attention to the first page of

18    that transcript, page one, lines 14 to 21.

19           Adam Skelos said, "They're reaching out to -- so

20    here's what happened.  The DEC reached out to a few of the

21    senators that are -- that's districts running the Marcellus

22    Shale and they want to make sure that there's not going to be

23    any -- any blowback when they lift the moratorium.  So we're

24    using those senators to push the regulations of -- of reusing

25    water on-site."

1          Mr. White, what was your understanding of what the

2    plan was with respect to using the senators?

3    A.   That the plan was to reach out to the senators and ask them

4    to say that they would want to have assurances that there would

5    be a mandate for water recycling and reuse.

6          MR. MASIMORE:   If we could publish 1424.

7          So now we're on 1424T, please.   We're just going to do

8    an excerpt, the beginning to the third page.   Once we're all

9    there.   So it's 1424T.

10          And this is a call on December 16, 2014 between Adam

11    Skelos and Nick Barrella.

12          We're beginning at the very beginning, page one, and

13    we're going to go through page three, line seven.   So we'll

14    just stop it when we get there.

15          (Recording played)

16          MR. MASIMORE:   We'll stop there.

17    Q.   Mr. White, there was a reference in this call to a

18    conversation you had with the lobbyists about fracking?

19    A.   Right.

20    Q.   Do you recall that conversation?

21    A.   Generally.

22    Q.   And generally what do you recall was discussed during that

23    conversation with the lobbyists?

24    A.   They just asked me to run through AbTech's water treatment

25    solution and generally water treatment for oil and gas and how

FBU9SKE7                          White – direct

1    it works, and I provided that to them.

2             MR. MASIMORE:  If we could pull up Government Exhibit

3    10 in evidence, paragraph six.

4             With the Court's permission I would like to read a

5    paragraph from the stipulation and offer an exhibit but not

6    publish this particular exhibit at this time.

7             Paragraph six of Government Exhibit 10 reads,

8    "Government Exhibit 105 contains toll records for a cellphone

9    subscribed to by Michael A. Avella" with a particular phone

10   number listed there.

11            Your Honor, at this time the government offers

12   Government Exhibit 105.

13            MR. GAGE:  No objection.

14            THE COURT:  Government Exhibit 105 is received without

15   objection.

16            (Government's Exhibit 105 received in evidence)

17            MR. MASIMORE:  If we could go to Government Exhibit

18   1425 which is 1425T in the binders.

19            We'll just do the first page of this.  This is a

20   December 16, 2014 call between Adam Skelos and Mr. Bjornulf

21   White.

22            MR. CONIFF:  Your Honor, I'm sorry to interrupt.  Can

23   we be heard at sidebar for just a moment?

24            THE COURT:  Yes.

25            (Continued on next page)

1        (At the sidebar)

2        MR. CONIFF:  I'm just a little concerned, your Honor.

3    I don't mind for efficiency that we're doing it this way, but

4    playing portion of the call -- and obviously we went through,

5    with some effort, to make sure they were all contextual and

6    everything was included.  And I'm trying, as we go through, to

7    read what's, you know, being left out.  And I don't know if

8    Mr. Masimore may be going back to some of these and playing

9    them again later which is fine too.  But to the extent we're

10   not I feel a little --

11       THE COURT:  Rushed.

12       MR. CONIFF:  -- disadvantaged to now have them cut

13   like that.

14       MR. MASIMORE:  I'm sorry.  So not my intent.

15       MR. CONIFF:  I know.

16       MR. MASIMORE:  On 1414 I intend to go back because

17   there's a portion of the conversation about fracking, and then

18   a portion about P3.

19       With respect to the other ones, my intent was just to

20   cut them down now for time.  I'm happy to play the full

21   recording but the only reason I'm excerpting them is just to

22   keep it moving faster because while the other calls are in

23   evidence and certainly before the jury that's the reason I'm

24   not publishing them now.

25       MR. CONIFF:  I guess I'm all for efficiency.  I guess

FBU9SKE7                      White - direct

1    all I would say is that, you know, I mean to the extent we

2    believe contextually it needs to be played that we would

3    probably offer it on cross-examination or something which, you

4    know, I just want you to be on notice that we would be putting

5    in another portion of the tape later on.  I'm not saying we're

6    going to do it or not but I can't keep up with what we're

7    taking out.

8              MR. MASIMORE:  Might I propose if sitting there now if

9    there's something --

10             MR. CONIFF:  I will.

11             MR. MASIMORE:  Just let me know.  I'll be happy to

12   play it.

13             MR. CONIFF:  I will raise it if I see it.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2                MR. MASIMORE:  May I proceed, your Honor?

3                THE COURT:  Yes.

4                MR. MASIMORE:  I think we were on Government Exhibit

5      1425, 1425T and we were going to listen to the first page for

6      now.

7                (Recording played)

8      Q.  Mr. White, what were you responding to at the beginning of

9      this call where Adam said he was just texting you and you

10     replied that was too soon, no time to maneuver?

11     A.  Adam had texted me something to the effect of they're

12     lifting the moratorium and so I was referring to there would be

13     no opportunity to meet with DEC.

14               MR. MASIMORE:  If we could publish 1426 and go to

15     1426T.

16               1426 is a call December 16, 2014.  It's between Adam

17     Skelos and Michael Avella.

18               (Recording played)

19               (Continued on next page)

20

21

22

23

24

25

1          MR. MASIMORE:  If we could publish 1427.  Now going to

2    1427T, this is a call the same date, December 16, 2014, between

3    Adam Skelos and Nick Barrella.

4          (Audio recording played)

5          MR. MASIMORE:  If we could pull up Government

6    Exhibit 2625 in evidence, and just focus on the top there.

7    BY MR. MASIMORE:

8    Q.  Do you recognize this, Mr. White?

9    A.  Yes, it's an email from Nick Barrella to Adam Skelos and a

10   copy to me.

11   Q.  And the subject is:  Solving stormwater challenges in the

12   Town of Hempstead, and it's to Mike Avella, Kathryn Hohman, Tim

13   Sheridan and you?

14   A.  Yes.

15   Q.  Do you know who Kathryn Hohman and Tim Sheridan are?

16   A.  They both work for Capitol Group.

17   Q.  And Nick Barrella writes:  Rumors are hot that the governor

18   will talk about fracking at the 11:15 a.m. cabinet meeting.

19   Here is the link.

20   A.  Yes.

21   Q.  What did you do after receiving the link to the cabinet

22   meeting?

23   A.  I watched it.

24         MR. MASIMORE:  If we could pull up for the witness and

25   counsel, please, Government Exhibit 4820.

FBUTSKE7                    White – direct

1   Q.  Do you recognize what is depicted in that photograph?

2   A.  Yes, that's a picture of the news conference where the

3   governor announced the decision on fracking.

4   Q.  How are you able to recognize it?

5   A.  I recall watching parts of it and recognizing the room.

6            MR. MASIMORE:  The government offers 4820.

7            MR. GAGE:  No objection, your Honor.

8            THE COURT:  Government Exhibit 4820 is received

9   without objection.

10           (Government's Exhibit 4820 received in evidence)

11  Q.  What happened during the meeting with respect to fracking?

12  A.  The governor announced that the moratorium was not going to

13  be lifted, and he announced that after reports by the

14  regulators on their findings.

15  Q.  While you were watching the meeting, did you communicate

16  with anyone?

17  A.  Yes, I had some text message exchanges with Adam Skelos.

18           MR. MASIMORE:  If we could bring up Government

19  Exhibit 1402, which is in evidence.  Focus on the top of this

20  page 1.

21  Q.  Do you recognize this?

22  A.  Yes.

23  Q.  And this is -- what do you recognize it to be?

24  A.  It's a text message I believe from -- I recall from myself

25  to Adam.

FBUTSKE7                         White - direct

1           MR. MASIMORE:  If we pull out to the header

2     information.

3     Q.  You see the date is December 17, 2014, and the time is

4     12:28.

5     A.  Yes.

6     Q.  What was going on when you sent this text to Adam?

7     A.  The DOH was reporting on their findings, and it was

8     becoming evident that they were not going to recommend that the

9     moratorium be lifted.

10          MR. MASIMORE:  If we go to page 2 of 1402, please.

11    Q.  Do you recognize this?

12    A.  Yes.

13    Q.  What is it?

14    A.  It's a text message from myself to Adam saying that the DOH

15    is recommending against it.

16    Q.  And this is three minutes later?

17    A.  Yes.

18    Q.  We'll go to the next page, page 3 of this exhibit.

19          Do you recognize this as well?

20    A.  Yes, that's a text message from myself to Adam saying that

21    the DEC is also saying that they are not supporting it.

22    Q.  And then lastly, last page of Government Exhibit 1402, from

23    December 17, 2014 at 12:38.

24    A.  That's a message from myself to Adam saying that the

25    moratorium is not going to be lifted.

FBUTSKE7                      White – direct

1  Q.  And if we pull up Government Exhibit 1403 in evidence, do

2  you recognize this?

3  A.  That's a text message I received from Adam Skelos.

4           MR. MASIMORE:  And if we could go to Government

5  Exhibit 1428, it's already been published to the jury, but if

6  we could just play one excerpt so I may ask a question about

7  it.  1420T.  And the portion I would like to play is on page 2,

8  lines 18 to 22.

9           (Audio recording played)

10          MR. MASIMORE:  And from the first page of 1428T,

11 that's a call December 17, 2014 at 12:39 p.m. between Adam

12 Skelos and Dean Skelos.

13 BY MR. MASIMORE:

14 Q.  Mr. White, besides fracking, what, if anything else, was

15 Mike Avella working with you and Adam Skelos on?

16 A.  The stormwater P3 legislation.

17          MR. MASIMORE:  And if we could publish Government

18 Exhibit 1430, so 1430T.  This is a call December 17, 2014, same

19 day, at 2:43 p.m. between Adam Skelos and Dean Skelos.

20          (Audio recording played)

21 Q.  Now after the governor put the stop to fracking, what, if

22 anything, did you and Adam Skelos focus on next?

23 A.  The stormwater P3 legislation and setting up meetings with

24 potential customers on Long Island.

25          MR. MASIMORE:  If we could pull up Government

FBUTSKE7                         White – direct

Exhibit 2613 in evidence, please.

Q.  Do you recognize this?

A.  Yes, it's an email from Adam Skelos to myself forwarding an article.

Q.  And it's from back on October 31, 2014?

A.  Yes.

Q.  And do you see at the bottom, the email that Adam sent to you, he sent an email to Senator Skelos, and he says:  Where is this going?  And then he posts a link to a news article.  And the subject line says:  New York announces 40 million for water quality projects.

A.  Yes.

Q.  Then Adam writes to you:  We'll go over this next time we talk.  Don't mention it to anyone.

A.  Yes.

Q.  Do you recall having a conversation with Adam Skelos about this issue?

A.  Not in particular.

Q.  At the end of October 2014 going into November 2014, do you recall generally having conversations with Adam Skelos?

A.  Yes.

Q.  And generally during that time period what did you and Adam Skelos discuss?

A.  Basically which municipalities we should meet with.  And at that time we were talking about beginning to plan for the

stormwater P3 legislation advocacy.  So that was generally it.

Q.  Did there come a time in the late fall 2014 when you

learned about a potential pot of money that could potentially

be used?

A.  Yes.  At the end of the year I learned that there was a

surplus that the state was planning to use for infrastructure

grants.

Q.  Do you recall how you learned about the surplus?

A.  I recall both Nick Barrella of Capitol Group and Adam

Skelos mentioning it.

        MR. MASIMORE:  And if we could pull up Government

Exhibit 2617 in evidence, please.  Focus on the top part there,

the top email.

Q.  Do you recognize this, Mr. White?

A.  Yes, that's an email from Nick Barrella to myself and Adam

Skelos copying his colleagues.

Q.  And one of the colleagues is Mike Avella?

A.  Yes.

Q.  And that's from November 19, 2014?

A.  Yes.

Q.  Let's start towards the bottom of the first page.  Do you

see that Nick Barrella is sending you an article entitled:

Silver, Keep One Shot Infrastructure Investment Out of the

Budget?

A.  Yes.

Q.  If we turn to the next page of the exhibit, the top

portion, bolded and underlined, what does that refer to?

A.  The infrastructure funding that would come from the surplus

that I just referenced.

Q.  And if we go back to page 1, on the bottom half, this email

you received, do you see Adam Skelos on November 19, 2014

emailed Nick Barrella stating:  Need to leverage P3 model with

this push for infrastructure investment.  Also need to push for

to stormwater drainage updates and improvements on Long Island.

     What did you understand Adam Skelos referring to by

leveraging the P3 model with the push for infrastructure

investment?

A.  When the infrastructure surplus was referenced to me, they

discussed how this was an opportunity for infrastructure

grants.  And I suggested that if there was going to be

infrastructure grants that a municipality wanted to use for

stormwater, a good solution would be for them to invest that

into their own P3s and then private financing would sort of act

as a multiplier on that so that it would become a very big

project.  And so he is referencing, when he says leverage P3

model, that investment into a municipality's own P3.

Q.  And do you recall at the very top Nick Barrella saying:  I

strongly recommend that we have a call tomorrow at a time

convenient for all to discuss our strategies on P3s and

stormwater management?

1  A.  Yes.

2  Q.  Do you recall participating in a call?

3  A.  Yes, I do.

4  Q.  And as best you can recall, what did you and the others

5  discuss?

6  A.  They asked me to, again, go through how that would be

7  structured in terms of a municipality receiving a grant and

8  then being able to invest in their own P3, and then private

9  financing would come in on top of that and give sort of more

10  infrastructure to the municipality.  So I walked through that,

11  and they said that this was the infrastructure surplus or

12  infrastructure funding priority for the surplus that was being

13  talked about was a good opportunity for pushing the stormwater

14  P3 legislation.

15  Q.  And you mentioned "they," I failed to ask you, who

16  participated in the call with you?

17  A.  It was Nick Barrella, Mike Avella, Adam Skelos, Katie

18  Hohman, and I believe Tim Sheridan was on the call, but I can't

19  be certain.

20            MR. MASIMORE:  If we could pull up Government

21  Exhibit 2619 in evidence.  Focus on the top half there.

22  Q.  Do you recognize this?

23  A.  Yes, that's an email from myself to Adam.

24  Q.  And if we start at the bottom of the page, do you see the

25  initial email is from Michael Avella to Nick Barrella and

FBUTSKE7

1    forwards an article entitled Nassau County Pledges $12 million

2    Towards New Sewers in Glen Cove.

3    A.  Yes.

4    Q.  And then Nick Barrella forwarded that to Adam Skelos and

5    you?

6    A.  Yes.

7    Q.  And then you replied at the top:  This infuriates me.

8    Let's discuss.

9    A.  Yes.

10   Q.  What was it about what was contained in the article,

11   Government Exhibit 2619, that infuriated you?

12   A.  Well, at this point it was probably 14 months of the

13   contract being in force with Nassau County and AbTech.  And the

14   county cited funding issues and concerns and such.  And in this

15   case the article was announcing an allocation of the same exact

16   amount of funding, 12 million, for a similar type project, just

17   not the one that was they already were in contract with AbTech

18   for.

19              MR. MASIMORE:  Your Honor, I'm about to return to some

20   calls.  I can get into them now, but I think our time is going

21   to go past 5:00 if I start playing the calls.

22              THE COURT:  We can stop for the evening now.  I remind

23   you, as I must, please don't read about the case, don't talk

24   about the case with anyone, don't listen to anything about the

25   case.  Have a good evening.  See you tomorrow at 10.

FBUTSKE7

1           (Jury not present)

2           THE COURT:  Did you want to take up 2183 now?

3           MR. MASIMORE:  No, your Honor.  I think we can

4    probably speak to counsel offline and figure it out without

5    troubling the Court.

6           THE COURT:  Would anyone like to raise anything else?

7           MR. GAGE:  No, your Honor.

8           MS. MARTINS:  Briefly, your Honor, the government

9    wanted to alert the Court that at the current pace we expect to

10   close sometime -- not close, but rest sometime next week.

11          To that end, we, over the weekend, asked defense

12   counsel to provide us with a list of their witnesses.  If the

13   Court recalls, we provided our witnesses to the defense

14   approximately a month before trial and then further refined

15   that list over a week before trial and have been giving them,

16   on a rolling basis, the exact witness order and exhibits, as we

17   discussed with your Honor.

18          We would like the same courtesy.  We haven't yet heard

19   from defense on our request that we sent over the weekend.  So

20   we wanted to sort of put that on the record and ask that we can

21   have the courtesy of being prepared to streamline our crosses

22   as well.

23          THE COURT:  I understand.  I think there was roughly

24   an agreement to that effect.  Is that right, Mr. Gage,

25   Mr. Conniff?

FBUTSKE7

1          MR. CONNIFF:  Yes, your Honor, there was an agreement

2     that we would give it a week before.  So if the government

3     tells us -- certainly we got their email over the weekend, and

4     everything is in a little flux as we think about those things.

5     If they know when they're going to rest, it would be helpful to

6     us.  We're happy to provide the list a week before that.

7          THE COURT:  I guess if you know how long you're going

8     to cross each witness you will both know all you need to know.

9     I guess you will just need to do your best.

10         I heard you last week saying you might close around

11     the 7th of December, is that right?

12         MS. MARTINS:  Your Honor, if there's no defense case,

13     that would be --

14         THE COURT:  Rest.

15         MS. MARTINS:  Sorry, yes, rest.  Depending on the

16     cross, we could rest as early as Monday a week from today.  And

17     depending on the cross in particular of a lengthy witness like

18     Mr. White, it could be a day or two after that.  I meant to add

19     we also had made a request for the equivalent of 3500 material

20     as well for the witnesses.

21         MR. CONNIFF:  That was our agreement, your Honor.

22         THE COURT:  So I think it would be fair to assume that

23     no sooner than tomorrow evening but no later than about half a

24     day after that it would be fair to have reciprocal discovery.

25     You can let me know if you disagree.

FBUTSKE7

1              MR. CONNIFF:  Yes, your Honor.

2              THE COURT:  Have a good evening.  I have a 9:30

3     sentencing.  If you want to be heard before 10, let me know.

4              MS. MARTINS:  Thank you, your Honor.

5              (Adjourned to December 1, 2015 at 10:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                        Page

 3    BJORNULF WHITE

 4    Direct By Mr. Masimore . . . . . . . . . . .1232

 5                     GOVERNMENT EXHIBITS

 6    Exhibit No.                          Received

 7     4804    . . . . . . . . . . . . . . . . .1238

 8     2131, 2428, 2441, 2443, 2456, 2457, . . . . .1244

 9             2459, 2463 through 2465, 2468,

10             2470, 2472, 2474, 2477, 2482,

11             2484, 2485, 2489, 2490, 2497,

12             2502, 2506, 2507, 2509, 2513,

13             2516, 2517, 2522, 2523, 2532

14             through 2534, 2539, 2541, 2544

15             through 2547, 2548A through

16             2548C, 2553 through 2555,

17             2562, 2563, 2577A, 2582A

18             through 2582C, 2586, 2587,

19             2589, 2590, 2598, 2599, 2605,

20             2613, 2515, 2617, 2619, 2622,

21             2625, 2627, 2629, 2631, 2633,

22             2634, 2638, 2639, 2652, 2673

23             through 2679

24     2001 through 2005   . . . . . . . . . . . .1252

25     404    . . . . . . . . . . . . . . . . . .1282
```

 1  2012-I   . . . . . . . . . . . . . . . .1284

 2  2485    . . . . . . . . . . . . . . . . .1297

 3  2489    . . . . . . . . . . . . . . . . .1299

 4  2490    . . . . . . . . . . . . . . . . .1300

 5  2301A   . . . . . . . . . . . . . . . . .1303

 6  2497    . . . . . . . . . . . . . . . . .1305

 7  2502    . . . . . . . . . . . . . . . . .1311

 8  118   . . . . . . . . . . . . . . . . . .1317

 9  2506    . . . . . . . . . . . . . . . . .1325

10  2507    . . . . . . . . . . . . . . . . .1326

11  2106    . . . . . . . . . . . . . . . . .1327

12  2509    . . . . . . . . . . . . . . . . .1328

13  2513 and 2516   . . . . . . . . . . . . .1330

14  2301    . . . . . . . . . . . . . . . . .1335

15  18    . . . . . . . . . . . . . . . . . .1352

16   2532A through C   . . . . . . . . . . .1353

17  2182    . . . . . . . . . . . . . . . . .1372

18  2302    . . . . . . . . . . . . . . . . .1373

19  2128    . . . . . . . . . . . . . . . . .1375

20  2131    . . . . . . . . . . . . . . . . .1375

21  3216    . . . . . . . . . . . . . . . . .1377

22  2177, 2111, 2116 and 2124   . . . . . . .1378

23  4830    . . . . . . . . . . . . . . . . .1384

24  105   . . . . . . . . . . . . . . . . . .1413

25  4820    . . . . . . . . . . . . . . . . .1418