FC19SKE1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

             v.                        15 CR 317 (KMW)

DEAN SKELOS and ADAM SKELOS,

             Defendants.

------------------------------x
```

                                        New York, N.Y.
                                        December 1, 2015
                                        10:03 a.m.

Before:

                    HON. KIMBA M. WOOD,

                                        District Judge


                          APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
JASON MASIMORE
TATIANA MARTINS
RAHUL MUKHI
THOMAS McKAY
     Assistant United States Attorneys

GAGE, SPENCER & FLEMING
     Attorneys for Defendant Dean Skelos
G. ROBERT GAGE, JR.
JOSEPH EVANS

ROPES & GRAY
     Attorneys for Defendant Adam Skelos
CHRISTOPHER CONNIFF
JOHN DANIELS

FC19SKE1

1                (In open court; jury not present)

2                MR. CONNIFF:  Sorry, your Honor.  We were outside.  We

3     didn't realize the sentencing was finished.

4                THE COURT:  I see.  That's all right.

5                When counsel are ready, the jury is ready.

6                MR. MASIMORE:  I'm all set.

7                THE COURT:  We can bring the jury in.  Thank you.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC19SKE1

1                   (Jury present)

2        BJORNULF WHITE, resumed.

3                   THE COURT:  I remind you that you're still under oath.

4                   You may proceed.

5                   MR. MASIMORE:  Thank you, your Honor.

6                   At this time, your Honor, the government offers

7        Government Exhibit 1 which is a stipulation.

8                   THE COURT:  All right.  The Court receives Government

9        Exhibit 1 without objection.

10                  (Government's Exhibit 1 received in evidence)

11                  MR. MASIMORE:  Pull that up on the main screen for the

12       jurors, please.

13                  Now publish the main paragraph there.

14                  The stipulation reads, "Paragraph one.  During each

15       year from 2010 through 2015, New York State received at least

16       $10,000 under a federal program involving a grant, contract,

17       subsidy, loan, guarantee, insurance or some other form of

18       federal assistance, excluding legitimate valid bona fide

19       salary, wages, fees or other compensation paid or expenses paid

20       or reimbursed in the ordinary course of business."

21                  It is further stipulated this stipulation may be

22       received in evidence as a government exhibit at trial.

23                  Thank you, your Honor.

24                  (Continued on next page)

25

FC19SKE1                         White - direct

1   DIRECT EXAMINATION

2   BY MR. MASIMORE:

3   Q.  Now, Mr. White, yesterday we had discussed a call that

4   occurred on December 10, 2014 and it was Government Exhibit

5   1414.  Do you recall there was a portion of that conversation

6   that related to fracking?

7   A.  Yes.

8   Q.  Do you recall that from yesterday?

9   A.  Yes.

10          MR. MASIMORE:  What we'll do now, if we could ask for

11  the jury to refer to 1414T again.

12          THE COURT:  Yes.

13          MR. MASIMORE:  Let's focus on for a moment the other

14  portions of this particular call.

15          Government Exhibit 1414, again, was a December 10,

16  2014 call between Adam Skelos and Bjornulf White.  Play from

17  the beginning to page three, line 11.  And then I'll ask you

18  some questions, Mr. White.

19          THE COURT:  I remind you to let the jury know who is

20  speaking.

21          MR. MASIMORE:  To be clear this call, 1414 -- thank

22  you, your Honor -- is between Adam Skelos and Bjornulf White.

23          (Recording played)

24  Q.  Mr. White, what were you and Mr. Adam Skelos discussing in

25  that portion of the call?

FC19SKE1                         White – direct

1   A.  Setting up a call with NCVOA which is the Nassau County

2   Village's association.

3   Q.  What was going to be the purpose of the call with the

4   NCVOA?

5   A.  To brief them on the AbTech stormwater P3 offering.

6            MR. MASIMORE:  And in the next portion of the call, if

7   we could play the portion that begins on page six of the

8   transcript.  I believe we're going to start at page 6, around

9   line 13.

10           (Recording played)

11  Q.  So Mr. White, going back to page 6, lines 13 to 18, you

12  made reference to "shouldn't we be moving on this P3 stuff"?

13  A.  Yes.

14  Q.  What did you mean by that?

15  A.  Well Capitol Group had said that the best time to try to

16  advance stormwater P3 legislation was in conjunction with the

17  infrastructure spending bill.  And so I was saying if that's

18  occurring shouldn't we be trying to set these meetings up now.

19  Q.  Then at line 19 Adam replies, "Well, I kind of got that

20  covered but Nick doesn't have it covered, I got it covered."

21           What did you understand Adam Skelos to mean by that?

22  A.  I came to understand that it meant that he wasn't relying

23  on Capitol Group to set up meetings with the members of the

24  legislature.

25  Q.  Then after that Adam continues, "So we have the long -- the

FC19SKE1                         White - direct

1    Long Island Nine meet and with reference to that."

2              Did you have an understanding of what the "Long Island

3    Nine" is?

4    A.   I didn't at the time but I've come to understand that it's

5    the nine state senators from the districts in Long Island.

6              MR. MASIMORE:  Now if we could play just a portion of

7    1445T.

8              1445 is a January 8, 2015 call between Senator Skelos

9    and Senator Jack Martins.  It's been previously published but

10   if we could play a short excerpt from page one.  So this is

11   1445T, page one.

12             (Recording played)

13   Q.   Mr. White, what if any significance would it have been to

14   AbTech if the state legislature would provide counties with

15   money for stormwater infrastructure projects?

16   A.   It would have increased the potential opportunity for them

17   to do projects that AbTech could bid on.

18             MR. MASIMORE:  If we could direct everyone's attention

19   to 1412 and 1412T, please.

20             This is a call December 9, 2014.  It's between Adam

21   Skelos and Warren Tackenberg.  If we could play the excerpt

22   from page one to the middle of page two, please.

23             (Recording played)

24             MR. MASIMORE:  At this time, your Honor, the

25   government offers Government Exhibit 2014A.

1            MR. GAGE:  No objection.

2            THE COURT:  Government Exhibit 2014A is received

3     without objection.

4            (Government's Exhibit 2014A received in evidence)

5            MR. MASIMORE:  Permission to publish, your Honor.

6            THE COURT:  Yes.

7            MR. MASIMORE:  Page from Senator Skelos' calendar.

8            If we can zoom in, "Monday, December 8, 12 p.m.  Yes.

9     Lunch meeting with the LI members.  Senators Flanagan, LaValle,

10    Marcellino, Hannon (no), Martins, Boyle, Croci, Venditto."

11           If we could return to Government Exhibit 1414 and

12    direct the jury's attention to page four.

13           If we could play the excerpt that begins on line five

14    of page four to the end.

15           (Recording played)

16           MR. MASIMORE:  I'm sorry, Ms. Danzo.  I said about 14.

17    It's actually 1412.  My apologies.  1412 at page four.

18           (Recording played)

19           MR. MASIMORE:  If we could turn to 1415.  1415T,

20    please.  1415 is a call, December 10, 2014 between Adam Skelos

21    and Senator Skelos.

22           (Recording played)

23           MR. MASIMORE:  Move to Government Exhibit 1416, the

24    next tab, 1416T.

25           Before we get to that call.

FC19SKE1                    White - direct

1    Q.  Mr. White, there have been some references to a conference

2    call with the NCVOA?

3    A.  Yes.

4    Q.  Did in come a time when you, in fact, participated in a

5    call with the NCVOA?

6    A.  Yes.

7               MR. MASIMORE:  So 1416, December 10, 2014.  The

8    participants are Adam Skelos, Peter Cavallaro, Mr. Bjornulf

9    White, and Warren Tackenberg.

10              (Recording played)

11   Q.  Mr. White, on the top of page four there was a portion

12   where Adam Skelos mentioned on the call that you were going to

13   explain what P3s were.

14   A.  Yes.

15   Q.  And then the call goes to the next section.  Can you just

16   briefly summarize for the jury what you informed NCVOA during

17   your telephonic presentation?

18   A.  Yes.  It was an overview of how P3 works, what the

19   structure is, and what AbTech's program is, and what our

20   solutions look like.

21   Q.  The next exhibit would be 1431 and 1431T, please.

22              1431 is a call from December 17, 2014.  It's between

23   Adam Skelos and Bjornulf White.

24              (Recording played)

25              (Continued on next page)

FC1TSKE2                       White - direct

1    BY MR. MASIMORE:

2    Q.  Mr. White, a few questions about this particular call.  On

3    page 1 and throughout the call you mention something about the

4    county sitting on this notice to proceed.

5    A.  Yes.

6    Q.  Can you explain to the jury what the notice to proceed

7    issue was that you were discussing with Adam Skelos on this

8    phone call?

9    A.  Yes.  Well, under the contract for AbTech to advance from

10   one phase to another, it need an official notice to proceed.

11   So with respect to the site that the county had said they

12   wanted us to work on, the next step would have been to do the

13   detailed engineering design and potentially installation, and

14   we needed a notice to proceed to do that.  And they said they

15   had to produce that and we weren't receiving it, so we were

16   just in a holding pattern.

17   Q.  On page 2 of the transcript you mentioned something to Adam

18   Skelos about being careful about going direct to Glenn Rink.

19   A.  Yes.

20   Q.  What did you mean by that?

21   A.  Well, Glenn has a tendency to view things through

22   rose-colored lenses, I suppose, and so typically I would couch

23   things with caveats and such to be -- so his messaging to the

24   board would be sort of more complete and accurate.  And so I

25   was a little concerned about just sort of snippets of business

FC1TSKE2                          White - direct

1   development stuff going though Glenn and potentially being

2   overstated.

3   Q.  And then at page 3 of the transcript you discuss $400,000

4   that you say Tim Kelly has in his bank account?

5   A.  Yes.

6   Q.  What were you referring to there?

7   A.  Tim Kelly had emailed our project engineer.  I don't recall

8   if it was forwarded to me or I was on the recipient list, too,

9   but it stated that he had received or been authorized for

10  $400,000 for the Bay Park site.

11          MR. MASIMORE:  If we could pull up for the witness,

12  just the witness and counsel, 2658.  Zoom in there so Mr. White

13  could read it.

14  Q.  Do you recognize this document?

15  A.  Yes, this is an email from Tim Kelly.  It's the one I was

16  just referring to.

17  Q.  Are you a recipient of this email?

18  A.  Yes, I am.

19          MR. MASIMORE:  The government offers Government

20  Exhibit 2658.

21          MR. GAGE:  No objection, your Honor.

22          THE COURT:  Government Exhibit 2658 is received

23  without objection.

24          (Government's Exhibit 2658 received in evidence)

25  Q.  So what's Mr. Kelly explaining to you and others in this

FC1TSKE2                       White - direct

1    email?

2    A.   This is in June 2014 when he's mentioning that he's been

3    authorized for the $400,000 that we just spoke about to proceed

4    with the Bay Park site.

5    Q.   And so your call with Adam Skelos in 1431T is December 17,

6    2014?

7    A.   Exactly.

8    Q.   And so it's about six months to the day after this email?

9    A.   Exactly, yes.

10        MR. MASIMORE:   Back to 1431T, please, page 3 at the

11   top.  And at the very top Adam Skelos says:   And he's right,

12   you know, I had sat -- well, my father sat with Ed two weeks

13   ago.  Ed promised that it would be done and that they would

14   find the funding for it.  I haven't heard anything since that

15   meeting, but I'm going to follow up with it again tomorrow, and

16   hopefully we'll get some news tomorrow on exactly what we can

17   do.

18        Who do you understand Adam to mean by Ed?

19   A.   Ed Mangano, the County Executive of Nassau County.

20        MR. MASIMORE:   At this time, your Honor, the

21   government offers Government Exhibit 2014C.

22        MR. GAGE:   No objection, your Honor.

23        THE COURT:   Government Exhibit 2014C is received

24   without objection.

25        (Government's Exhibit 2014C received in evidence)

FC1TSKE2                         White - direct

1              MR. MASIMORE:  Permission to publish?

2              THE COURT:  Yes.

3              MR. MASIMORE:  Thank you, your Honor.

4              If we could pull up 2014C.

5              This one is not in the computer, but if I may publish

6    it verbally.

7              THE COURT:  Yes.

8              MR. MASIMORE:  There's a calendar entry on 2014C from

9    Tuesday, December 2nd, 2014 at 12:00 p.m. and it reads:  Yes,

10   meeting with Co. Exec. Mangano from Senator Skelos' calendar.

11             The government offers Government Exhibit 2014B, as in

12   boy.

13             MR. GAGE:  No objection.

14             THE COURT:  Government Exhibit 2014B is received

15   without objection.

16             (Government's Exhibit 2014B received in evidence)

17             MR. MASIMORE:  This is another excerpt from 2014,

18   Senator Skelos' calendar.  If we could go to page -- the bottom

19   of page 1 reflects the date is Thursday, December 18, and if we

20   go to page 2, towards the bottom, there's an entry 6:00 p.m. to

21   8:30 p.m. SCLI 9 holiday party on December 18, 2014.

22   BY MR. MASIMORE:

23   Q.  Mr. White, directing your attention to the following day,

24   did there come a time when you had an opportunity to speak with

25   Adam Skelos?

FC1TSKE2                     White - direct

1    A.  I don't recall.

2               MR. MASIMORE:  I want direct everyone's attention to

3    1432 in evidence, please, 1432T.  So this is a call from the

4    next day, December 19, 2014, between Adam Skelos and Bjornulf

5    White.

6               (Audio recording played)

7    BY MR. MASIMORE:

8    Q.  Mr. White, directing your attention to page 2 of the

9    transcript of this call, towards the bottom, lines 19 to 22, do

10   you see Adam Skelos said:  I had a conversation with five of

11   them last night from this area and they're all putting in, you

12   know, requests for exactly what we want, but we have to have a

13   lobbyist put the correct wording in.

14              Do you recall that part of the conversation?

15   A.  Yes.

16   Q.  What did you understand Adam to mean by:  I had a

17   conversation with five of them last night from this area.

18   A.  Five of the state senators from Long Island.

19              MR. MASIMORE:  So that call was from December 19,

20   2014.  If we could direct everyone's attention to Government

21   Exhibit 1435, 1435T.

22              So 1435 is a call, New Year's Eve, December 31, 2014,

23   it's a call between Adam Skelos and Mr. Bjornulf White.

24              (Audio recording played)

25   Q.  A few questions about this exhibit, Government

1    Exhibit 1435.  Do you remember a portion of the call, it's on

2    page 4 of the transcript, where Mr. Adam Skelos mentions Nick

3    and Mike Avella and an issue about being paid?

4    A.  Yes.

5    Q.  Who was Adam Skelos referring to?

6    A.  Nick Barrella and Mike Avella of Capitol Group.

7    Q.  So these were the lobbyists?

8    A.  Yes.

9    Q.  In a couple of portions of the call, do you recall that

10   Adam Skelos and you discussed Charlie Dorego?

11   A.  Yes.

12   Q.  What were you and Adam Skelos discussing about Charlie

13   Dorego?

14   A.  Well, Adam had mentioned to me earlier that he had health

15   issues, but they were private, and to just not mention it to

16   anyone.

17   Q.  On page 5 of the transcript, lines 11 to 15, Adam Skelos

18   says:  I don't know if we get this P3 stuff going though.  I

19   think we can still do that.  I think Dorego and all that could

20   still happen.

21        What did you understand Adam Skelos was referring to

22   about Dorego and all that?

23   A.  Well, Adam had mentioned wanting to talk to -- or I think

24   he might have already talked to Dorego about trying to become

25   the CEO of AbTech, so I believe -- I think it's referring to

FC1TSKE2                          White - direct

1    that.

2                MR. MASIMORE:  And if we could go to page 5, line 21

3    on page 6, and just play that portion of the call again, I

4    think we have an excerpt of that.

5                (Audio recording played)

6    Q.  Mr. White, who did you understand Adam Skelos meant by Ed?

7    A.  Ed Mangano, the County Executive of Nassau County.

8    Q.  Who did you understand Adam Skelos to be indicating Ed

9    Mangano, the county executive, would call for favors related to

10   NIFA or help with labor unions or negotiating contracts?

11               MR. GAGE:  Objection, your Honor.

12               THE COURT:  Did he have a basis for understanding?

13               MR. GAGE:  Yes, your Honor.

14   Q.  Mr. White, were you a participant in this telephone call?

15   A.  Yes.

16   Q.  And based on what Adam Skelos told you in this telephone

17   call, and specifically directing your attention to what he told

18   you in this sentence, did you have an understanding of what

19   Adam meant by Ed Mangano would call and ask for favors for

20   somebody with respect to NIFA, labor unions and negotiating

21   contracts or this and that?

22               MR. GAGE:  Objection, your Honor, same objection, it's

23   just --

24               THE COURT:  Overruled.

25   A.  Yes, I think he was referring to --

1          MR. GAGE:  Objection, I'm sorry to interrupt.

2          THE COURT:  Sustained, if you just think, you

3     shouldn't be speculating.

4     Q.  Did you understand the words that Adam Skelos was using?

5     A.  I understood the words he was using, yes.

6     Q.  And did you develop an understanding of what Adam Skelos

7     meant when he was talking to you?

8     A.  I did.

9          MR. GAGE:  Again, your Honor, I apologize, but

10    understanding the words is not a sufficient foundation.  I

11    object.

12         THE COURT:  I'm overruling.

13    A.  I did develop an understanding, yes.

14    Q.  And can you please tell the jury what the understanding you

15    developed was.

16    A.  The understanding that I developed was that he was

17    referring principally to his father.

18         MR. MASIMORE:  Your Honor, if we could have permission

19    to publish 1466, this is a call from January 26, 2015, so it

20    would be about 28, 29 days later.  This is a call between

21    Senator Skelos and Senator Jack Martins.

22         THE COURT:  Just a moment.

23         MR. MASIMORE:  1466T.  We'll display it on the screen

24    for everybody and we'll make sure it's loud enough so everybody

25    can hear.

FC1TSKE2                         White – direct

1            (Audio recording played)

2            MR. MASIMORE:  Permission to publish 1467, your Honor.

3    1467T I believe is in the binders.  1467T is a call the same

4    day, January 28, 2015, it's a call between Senator Skelos and

5    Senator Carl Marcellino.

6            (Audio recording played)

7            MR. MASIMORE:  Your Honor, one more to publish, with

8    the Court's permission, on this topic, Government Exhibit 1468.

9    1468T should be in the binders.  This is a call January 29,

10   2015, the following day.  It's a call between Senator Skelos

11   and Senator Jack Martins.

12           (Audio recording played)

13           MR. MASIMORE:  The government offers Government

14   Exhibit 2015A.

15           MR. GAGE:  Your Honor, I would like to approach,

16   briefly, if I may.

17           THE COURT:  All right.

18           (Continued on next page)

19

20

21

22

23

24

25

FC1TSKE2                          White - direct

1            (At sidebar)

2            MR. GAGE:  Your Honor, in my view we're getting into

3     the issue that we discussed yesterday morning, which is linking

4     these calendar entries with tapes in a way that is unduly

5     prejudicial.

6            THE COURT:  Why is it prejudicial?

7            MR. GAGE:  Because it doesn't reflect -- the fact

8     there was a meeting doesn't in any way connect.  There's no

9     nexus between this and the tapes.  There's no witness, there's

10    no testimony.  This is, in effect, argument.  The witness may

11    say because there was a scheduled meeting, call Mr. Mangano,

12    for example, that's fine.  Christmas party, the last one, there

13    are hundreds of people at a Christmas party, it doesn't --

14    there has to be some foundation to connect the two.

15            THE COURT:  I overrule.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. MASIMORE:  May I proceed, your Honor?

3              THE COURT:  Yes.

4              MR. MASIMORE:  So the government offers Government

5     Exhibit 2015A.

6              THE COURT:  The Court receives Government

7     Exhibit 2015A over objection.

8              (Government's Exhibit 2015A received in evidence)

9              MR. MASIMORE:  If we direct our attention to bottom

10    half, this is a page from Senator Skelos' calendar, and this is

11    an entry from January 29, 2015.  And at 8:00 a.m. to 10:00 a.m.

12    it states:  Yes, Nassau Co. Exec. Ed Mangano economic update

13    and CEO networking breakfast.  And it has some other

14    information.

15             We can take to that down.

16    BY MR. MASIMORE:

17    Q.  Mr. White, before we publish those calls, there was a

18    conversation with Adam Skelos that you had where Mr. Skelos

19    referred to burning bridges in Nassau County.  Do you recall

20    that?

21    A.  Yes.

22    Q.  After that conversation, did there come a time when you had

23    another conversation with Adam Skelos about funds for the

24    Nassau County project?

25    A.  I know we spoke about funding after that, I don't recall

FC1TSKE2                          White - direct

1    specifically.

2            MR. MASIMORE:  Your Honor, Government Exhibit 1442 in

3    evidence, I ask the jury to turn to 1442T in the binder.

4            1442 is a call from January 5th, 2015, it's between

5    Adam Skelos and Mr. Bjornulf White.

6            (Audio recording played)

7    BY MR. MASIMORE:

8    Q.  Mr. White, a few questions about this call, 1442.

9            Directing your attention to the bottom of page 1 of

10   the transcript, lines 22 to 25, Adam Skelos talks about:  I

11   sent you an article where the paper was saying that Nassau had

12   approved the largest P3 project for takeover of the sewage

13   system, the Bay Park sewer plant.

14   A.  Yes.

15           MR. MASIMORE:  If we could pull up for a moment

16   Government Exhibit 2627 in evidence, please.

17           Your Honor, with the Court's permission, it may be a

18   good time for the morning break while we get the exhibit up on

19   the computer.

20           THE COURT:  That's fine.  Let's take a 15-minute

21   break.

22           (Continued on next page)

23

24

25

FC1TSKE2                          White – direct

1           (Jury not present)

2           THE COURT:  The three male participants in the

3    conversation outside in the hallway on Friday, Mr. Gregorian,

4    Mr. Riley and Mr. Bredderman, will be here at one o'clock.

5    Ms. Buchanan will be here at 12:45, look at the jury, and then

6    she will be here to both look at and, if need be, hear the

7    members of the press to see if she can identify who she heard.

8           Would counsel like to raise anything?

9           MR. MASIMORE:  Not from the government, thank you.

10          MR. GAGE:  No, your Honor.

11          THE COURT:  Thank you.

12          (Recess taken)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  The jury is ready to come in.

2          (Jury present)

3          BJORNULF WHITE, resumed.

4          THE COURT:  We're ready to resume, Mr. Masimore.

5          MR. MASIMORE:  Thank you, your Honor.

6          Pull up Government Exhibit 2627 in evidence, please.

7     DIRECT EXAMINATION CONTINUED

8     Q.  Mr. White, before the break I directed your attention to

9     page one of the transcript where Mr. Adam Skelos had referred

10    to an article.  Do you recall that?

11    A.  Yes.

12         MR. MASIMORE:  If we could zoom in towards the top

13    quarter of this document, please.  2627 in evidence.

14    Q.  Do you recognize this?

15    A.  Yes, I do.  It's an e-mail from Adam to myself.

16    Q.  And who is copied on the e-mail?

17    A.  Nick Barrella and Mike Avella, the lobbyists.

18    Q.  This is dated Saturday, January 3, 2015 at 12:02:56 a.m.?

19    A.  Yes.

20    Q.  What's the sum and substance of what's being recorded in

21    this particular article?

22    A.  A discussion of essentially a public-private partnership

23    that Nassau County had approved for its waste water treatment

24    plant.

25    Q.  Direct your attention to the very bottom of the first page,

FC19SKE3                    White - direct

1    last paragraph.  Do you see where the article refers to it

2    in -- the first few words as the public-private partnership?

3    A.  Yes.

4    Q.  What, if anything, was upsetting about this article?

5    A.  Just that the -- I had heard from Adam about Ed Mangano's

6    statement and heard directly from the county, you know, the

7    comments on the contract delay being because of P3

8    authorization issues, funding issues, and this was exactly a

9    $12 million in savings and P3 authorized.  So it seemed to sort

10   of go against what the county was communicating to us.

11   Q.  If we could direct our attention to -- again we're still on

12   1442T, the transcript of that call.  We'll pull it up on the

13   screen as well.  But page 5 of that.  Lines 8 to 13.

14           Do you recall that Adam Skelos said, "Before we even

15   said any of that he said all the funding that has been approved

16   is going to be -- is signed and approved.  So the second we

17   follow up with Tim Kelly or Sheila Shah regarding the four

18   hundred thousand, that should flow through like today."  Do you

19   see that?

20           What did you understand Adam Skelos to mean.

21   A.  That he was reporting back from the conversation with Ed

22   Mangano, the county executive, that the $400,000 that had been

23   allocated was signed off on.

24   Q.  At the beginning of the call, page one, Adam Skelos made a

25   reference to business getting done at wakes or funerals.  Do

FC19SKE3                        White - direct

1    you recall that?

2    A.  Yes.

3    Q.  And you replied, "I haven't encountered it myself just

4    because I haven't been to very many but I've heard that."

5              What were you referring to in responding to

6    Mr. Skelos?

7    A.  Well --

8              MR. CONNIFF:  Objection.

9              THE COURT:  Your ground.

10             MR. CONNIFF:  Multiple, your Honor.  Relevance.  I

11   think they're potentially hearsay, speculative.

12             THE COURT:  What were you referring to, he's being

13   asked.

14             MR. CONNIFF:  I'm aware of that, your Honor, but it's

15   something out of the context of this communication as far as I

16   understand -- as far as I read.

17             THE COURT:  Mr. Masimore.

18             MR. MASIMORE:  Your Honor, I'm happy to move on.

19   That's fine.

20   Q.  Let's go to the next call.  This is 1438.  1438T should be

21   in the binders.

22             So 1438 is a call a few days earlier, January 3, 2015.

23   And it's a call between Senator Skelos and Ed Mangano.

24             (Recording played)

25             MR. MASIMORE:  Government offers Government Exhibit

1    431.  Pull up that just for the attorneys.

2                MR. GAGE:  Your Honor, no objection subject to the

3    understanding we have about press articles generally.

4                THE COURT:  All right.  Government Exhibit 431 is

5    received without objection.

6                (Government's Exhibit 431 received in evidence)

7                THE COURT:  I note for the jury that press articles

8    are received at this point but -- what is it they are received

9    for?

10               MR. MASIMORE:  Not for the truth, your Honor, but for

11   state of mind.

12               THE COURT:  Not for the truth but for the state of

13   mind of a person reading it.  Go ahead.

14               MR. MASIMORE:  Thank you, your Honor.

15               If we could publish that briefly for the jury, please,

16   431.

17               Now if we could move to the next call, please.

18   Government Exhibit 1439.  And that will be 1439T in the

19   binders.

20               1439T is a call from the same date, January 3, 2015.

21   It's a call between Adam Skelos and Senator Skelos.

22               (Recording played)

23               MR. MASIMORE:  If we could go to the next call please,

24   Government Exhibit 1440 will be the next tab in the binder,

25   1440T.  This is a call from the same date later in the

1    afternoon, January 3, 2015 between Adam Skelos and Senator

2    Skelos.

3                (Recording played)

4                MR. MASIMORE:  The government offers Government

5    Exhibit 2015B.

6                MR. GAGE:  No objection.

7                THE COURT:  Government Exhibit 2015B is received

8    without objection.

9                (Government's Exhibit 2015B received in evidence)

10               MR. MASIMORE:  This is calendar entry excerpt from

11   2015, the senator's calendar.  If we could focus on Sunday,

12   January 4, 2015.  Highlight the 11:00 a.m. entry.

13               If we could turn to the next call, please now,

14   Government Exhibit 1441.  1441T should be the next tab in the

15   binder.  This is a call from January 4, 2015.  It's between

16   Adam Skelos and Senator Skelos.

17               (Recording played)

18               MR. MASIMORE:  If we could go to the next call,

19   Government Exhibit 1444.  Tab 1444T in the jury binder.  This

20   is a call from -- two days later, January 6, 2015.  It's

21   between Adam Skelos and Dean Skelos.

22               (Recording played)

23   Q.  Mr. White, did there come a time when Adam Skelos

24   communicated to you concerning a trip to Albany?

25   A.  Yes.

FC19SKE3                      White - direct

1  Q.  And when was that and what was the communication?

2  A.  It was around mid January and there were discussions

3  with -- that Adam brought up with Capitol Group and myself.

4  And it was around setting up meetings with state senators and

5  members of the assembly.

6         MR. MASIMORE:  If we could pull up Government Exhibit

7  1404 which is in evidence.  Zoom in the top portion, please.

8  Q.  Do you recognize this, Mr. White?

9  A.  Yes, I do.

10 Q.  What do you recognize this to be?

11 A.  This is a text message sent from Adam Skelos to me.

12 Q.  And this is from January 7, 2015 and it states, "Jan 21

13 there is a fundraiser up in Albany.  Would be good if you could

14 come up."

15 A.  Yes.

16 Q.  If I could direct your attention to Government Exhibit 2631

17 in evidence.  Do you recognize this, Mr. White?

18 A.  Yes.  It's an e-mail from Adam to myself attaching an

19 invitation to the fundraiser he just referenced in the text

20 message.

21 Q.  If we could go to page six of the exhibit, please.  Is this

22 the invitation you received?

23 A.  Yes, it is.

24 Q.  Directing your attention to the middle.  It says,

25 "Subscription one thousand dollars per person."

FC19SKE3                         White - direct

1    A.  Yes.

2    Q.  Was AbTech or AEWS or you going to pay a thousand dollars

3    to attend the event?

4    A.  It was unclear.

5            MR. MASIMORE:  If we could go to Government Exhibit

6    1452.  That would be 1452T in the jury's binders.  1452.

7            This is a call January 15, 2015 between Adam Skelos

8    and Senator Skelos.

9            (Recording played)

10   Q.  Mr. White, on page three of the call Adam mentioned that --

11   in describing you, that you had aligned your company with

12   AbTech and Corvias, he says which is the multibillion dollar

13   corporation that does the P3s.  This is page 3 lines 16 to 18.

14   Do you recall that?

15   A.  Yes.

16   Q.  Was that an accurate statement of your then existing

17   business relationships?

18   A.  No.  Not really.

19   Q.  What was not accurate about it?

20   A.  Well, AWS was an affiliate of AbTech.  And AWS and AbTech

21   were both subsidiaries of the same parent company.  So they

22   were already aligned and under the control of the AbTech board.

23   And those two were aligned with Corvias.

24           MR. MASIMORE:  If we could pull up 2629 in evidence,

25   please.

FC19SKE3                          White - direct

1    Q.  Do you recognize this, Mr. White?

2    A.  Yes.  It's an e-mail from Adam Skelos to myself, Mike

3    Avella and Nick Barrella, the lobbyists.

4    Q.  It says from Mr. Adam Skelos, "Gentlemen, can we jump on a

5    conference call next week to discuss putting a formal proposal

6    together for the NYS Legislature regarding P3s?"

7            Do you see that?

8    A.  Yes.

9    Q.  What was that in reference to?

10   A.  To discuss -- it was reference to a conference call that we

11   were going to have with Capitol Group.

12   Q.  Do you recall whether the following week you engaged in any

13   conference call about it?

14   A.  Yes.  We did have a call regarding it.

15   Q.  As best as you can recall, who was on the call?

16   A.  Nick Barrella, Mike Avella, Adam Skelos, I can't -- I'm

17   almost certain Tim Sheridan was on and I believe Katie Hohman

18   was on it for some of it but I can't recall for sure.

19   Q.  Who are Tim Sheridan and Katie Hohman?

20   A.  Also employees of the Capitol Group.

21   Q.  What was discussed during the conference call?

22   A.  Well Adam mentioned that there was this fundraiser and he

23   was going to be up in Albany.  And there was discussion around

24   setting up first briefings to state senators and potentially

25   members of the assembly at that time the following day.

FC19SKE3                         White - direct

1   Capitol Group mentioned, which, you know, members they thought

2   we ought to go to and meet.  And Mike Avella discussed a bit of

3   the type of messaging and such.  So it was really, I suppose, a

4   strategy session in advance of an Albany trip.

5   Q.  Do you recall who the senators were that you said Capitol

6   Group had mentioned?

7   A.  They were discussing state senators whose districts

8   experienced water issues in particular.  I know that Senator

9   Croci was mentioned.  And I don't recall any of the other

10  names.

11          MR. MASIMORE:  If we could pull up Government Exhibit

12  2633 in evidence, please.  Focus up on the top.  A little

13  lower, please.  Just the top quarter there.  Thank you.

14  Q.  Do you recognize this e-mail, Mr. White?

15  A.  Yes.  It's an e-mail from Adam Skelos to myself, Nick

16  Barrella, and Mike Avella.

17  Q.  What's the subject of the e-mail?

18  A.  Forward Governor Cuomo announces interest-free loans to

19  fund waste water infrastructure projects.

20  Q.  Do you see down there it's a forwarded message?  Down at

21  the bottom of the top portion there?

22  A.  Yes.

23  Q.  Do you see it's forwarded from Senator Skelos on

24  January 15, 2015 at 2:31 p.m. to Adam Skelos?

25  A.  Yes.

1          MR. MASIMORE:  If we could go to Government Exhibit

2   1454 and it will be 1454T in the jury binders.

3          1454 is a call January 15, 2015 at 2:36 p.m. between

4   Adam Skelos and Senator Skelos.

5          (Recording played)

6          MR. MASIMORE:  Pull up Government Exhibit 2634 in

7   evidence, please.  Focus on the top half of the document,

8   please.  Down to where it says begin forwarded message, please.

9   Thank you.

10  Q.  Do you recognize this, Mr. White?

11  A.  Yes.  I do.  It's an e-mail from Michael Avella to Adam

12  Skelos copying me, Nick Barrella, and Tim Sheridan.

13  Q.  Mike Avella, you testified, is one of the lobbyists working

14  with you?

15  A.  Correct.

16  Q.  He says, "We should use this as emphasizing the need for

17  waste water projects but also need to be able to distinguish

18  proposal from this and address why P3s are better.  Also what

19  is the population of our target customer?  Would they avail

20  themselves to this program?  Obviously, those over 300K not

21  eligible, but those under, would they benefit more from P3s

22  than this?  We will need to be able to articulate answers to

23  these and similar questions."

24          What do you understand Mr. Avella was referring to?

25  A.  He's referring to some of the strategy and messaging that

FC19SKE3                    White – direct

1      we should put together for the meetings that we were setting up

2      in Albany.

3               MR. MASIMORE:  If we could pull up side by side

4      Government Exhibit 2633 and 2634.

5      Q.  So I think now we have 2633 on the left half of the screen

6      and 2634 on the right half of the screen.  Do you see that?

7      A.  Yes.

8               MR. MASIMORE:  If we could zoom in to the top half of

9      2633 on the left.

10     Q.  Do you see on the left-hand side, this is 2633.  You

11     received the e-mail from Adam Skelos that contained header

12     information from -- showing on an e-mail from Dean Skelos to

13     Adam Skelos.  Do you see that?

14     A.  Yes.

15     Q.  Let's look at 2634 on the right.  And zoom in on the top to

16     the middle section there.  And Michael Avella is replying to

17     Adam Skelos' January 15, 2:36 p.m. e-mail.  Do you see that?

18     A.  Yes.

19     Q.  And do you notice any difference between the two exhibits?

20     A.  Yes.  He's deleted the forwarded e-mail's contact

21     information, the to/from.

22               MR. MASIMORE:  If we could pull up Government Exhibit

23     2638 in evidence, please.

24     Q.  Do you recognize this, Mr. White?

25     A.  Yes, I do.  It's an e-mail from Nick Barrella to Adam

FC19SKE3                    White - direct

Skelos copying myself, Tim Sheridan, Katie Hohman, Mike Avella.

Q.  I guess if we could start from the bottom please.  You see there's a January 19, 2015 e-mail from Nick Barrella writing about Governor Cuomo previewing his 2015 infrastructure and transportation agenda?

A.  Yes.

Q.  Do you see Adam Skelos replies, CCing you and others, "Will any of that include a push for P3s?  Has anything been presented to his staff yet?  What are we waiting for guys?"

        What did you understand Adam Skelos to be referring to?

A.  He's referring to potentially presenting I believe to the governor or I think to the governor's staff of -- regarding the stormwater P3s.

Q.  And what, if any, significance was it, the governor's potential proposal with respect to spending on infrastructure projects?

A.  The significance to AbTech?

Q.  Yes, sir.

A.  Well the significance there would be that if infrastructure funds would flow, then that would make it more likely that the potential customers, meaning municipalities, could hire AbTech for business.

Q.  If we could direct your attention to 1457.

        MR. MASIMORE:  There may not be a 1457 in the jury

FC19SKE3                        White - direct

1    binder but if there is it would be 1457T.  It's a short call.

2    We can display it on the screen.

3           This is a call January 20, 2015.  It's a call between

4    Senator Skelos and Robert Mujica.

5           (Recording played)

6           MR. MASIMORE:  If we could just publish again 2638,

7    just the very top of that.

8    Q.  This is the e-mail you were just talking about before the

9    call, correct?

10   A.  Yes.

11   Q.  Just to close the loop on it.  Nick Barrella writes, "Just

12   checking to see where we are on having meetings on Tuesday,

13   January 26 in Albany with Venditto and Croci.  As far as Adam

14   Spence from the governor's office is concerned, he usually is

15   in NYC so we may have to meet him there."

16          What did you understand Mr. Barrella was referring to

17   with respect to meetings with Venditto and Croci?

18   A.  Those are two state senators that were on the list of ones

19   that the Capitol Group thought we should meet with.

20          MR. MASIMORE:  If we could go to Government Exhibit

21   1458.  There should be a 1458T in the binder.

22          If we could play an excerpt from page 5, line 19 to

23   the end, please.

24          And this is a call from January 20, 2015.  Between

25   Adam Skelos and Bjornulf White.

FC19SKE3                         White - direct

1            (Recording played)

2    Q.  Mr. White, in that excerpt of the call what were you and

3    Adam discussing the logistics of?

4    A.  The meetings in Albany.

5    Q.  On page six he referenced the fact that you had met Tom

6    Croci before?

7    A.  Yes.

8    Q.  Do you see that?

9            When did you meet Tom Croci before and under what

10   circumstances?

11   A.  He was the town supervisor of Islip, New York.  And we met,

12   meaning myself and Corvias, and Adam Skelos presented the

13   combined team and P3 offering to him as town supervisor.

14           MR. MASIMORE:  Could we direct the jury's attention to

15   Government Exhibit 1459T.  1459T is a call dated January 20,

16   2015.  The participants in the January 20 call are Adam Skelos,

17   somebody named Katie and Nick Barrella.  And if we could play

18   from the beginning up through the end of page four, please.

19           (Recording played)

20           MR. MASIMORE:  Government Exhibit 1460.  Should be

21   1460T in the binder.

22           1460 is a call from the next day, January 21, 2015

23   between Adam Skelos and Senator Skelos.

24           (Recording played)

25           MR. MASIMORE:  Government offers Government Exhibit

1    2139 pursuant to Stipulation 12.

2              THE COURT:  I take it there is no objection.

3              Government Exhibit 2139 is received without objection.

4              (Government's Exhibit 2139 received in evidence)

5              MR. MASIMORE:  Permission to publish, your Honor.

6              THE COURT:  Yes.

7              MR. MASIMORE:  Focus on the top half.

8              As to the top half, just focus on the header and the

9    headline there.  This document case from Kellie Cummings sent

10   on January 16, 2015 to Senator Skelos, copying Robert Mujica.

11   Subject is:  Changes to Funke SOS response you requested in

12   bold for your review.

13             if we could publish the portion on page three, the

14   bottom.  In bold it states, "When it comes to billions in

15   one-time settlement money for New York, Senate Republicans

16   think we should invest it in modernizing the state's

17   infrastructure -- roads and bridges, sewer and water systems --

18   projects that are geared toward real economic development,

19   creating new jobs and putting New Yorkers to work.  The

20   legislature should and will have a role in determining how

21   these monies and other critical economic development funds are

22   spent."

23             Just complete the bolded portion on the next page.

24   "It's essential that every region of this state benefit from

25   the budget so there aren't winners and losers from one region

FC19SKE3                    White - direct

1    to the next.  Five billion dollars presents us with a unique

2    opportunity to boost the entire state.  Let's do it right."

3            We can take that down now.  Thank you.

4

5    Q.  Mr. White, did you ultimately make the trip to Albany that

6    you and Adam Skelos and the others had been discussing?

7    A.  No, I did not.

8            MR. MASIMORE:  If we could pull up 2639 in evidence,

9    please.

10   Q.  Do you recognize 2639?

11   A.  Yes.  It's an e-mail from myself to Adam.

12   Q.  And what were you telling Adam Skelos during this e-mail or

13   in this e-mail?

14   A.  I was telling him reasons why I didn't want to come up to

15   Albany.

16   Q.  Around this time period, January 21 and in or around that

17   date, did there come a time when you learned about someone in

18   Albany being arrested?

19   A.  Yes.

20   Q.  Who?

21   A.  I learned that Assembly Speaker Silver was arrested.

22   Q.  How did you learn that?

23   A.  I recall Nick Barrella forwarding some articles and

24   discussion about it so that caused me to look it up.

25           MR. MASIMORE:  We can take the exhibit down now.

FC19SKE3                         White – direct

1    Thank you.

2    Q.  After that time period did there come a time when you

3    learned of news reports about an investigation of Senator

4    Skelos?

5    A.  Yes, I did.

6    Q.  Was the general nature of the reports related to an

7    investigation concerning public corruption matters?

8    A.  Yes.

9    Q.  How did you find out about these news reports?

10   A.  The news reports related to --

11   Q.  Senator Skelos?

12   A.  It was early one morning Adam had sent me a text saying,

13   "Not sure if you saw the New York papers yet."  So I looked up

14   and saw the article about Senator Skelos being under

15   investigation.

16          MR. MASIMORE:  And if we could pull up Government

17   Exhibit 1408 in evidence, please.

18   Q.  Do you recognize this?

19   A.  Yes.  That's the text message I just referred to.

20   Q.  And this is a message on January 30, 2015 at 5:35 in the

21   morning?

22   A.  Yes.

23   Q.  And it states, "Not sure if you saw the NY papers yet"?

24   A.  Yes.

25   Q.  Now, without getting into the specific contents of the news

FC19SKE3                          White - direct

1    articles you reviewed, did any of the news articles you

2    reviewed have to do with AbTech?

3    A.  No.

4             MR. MASIMORE:  We can take the exhibit down now,

5    please.  Thank you.

6    Q.  After the stories came out about this particular

7    investigation that was being reported, did you have an

8    opportunity to speak with the lobbyists again?

9    A.  Yes, I did.

10   Q.  Who did you speak with?

11   A.  I spoke with Nick Barrella.

12   Q.  What did you and Nick Barrella discuss -- let me break it

13   down.  When did you have that discussion?

14   A.  I do remember a call -- a discussion with him around

15   February 2ish.

16   Q.  Do you remember any discussions with Nick Barrella or other

17   lobbyists before February 2?

18   A.  Not that are coming to mind at the moment.

19            MR. MASIMORE:  If we could pull up Government Exhibit

20   1475, please.  And it's 1475T in the jury binders.

21            This is a call from January 30, 2015 at 9:01 p.m. and

22   the participants are Adam Skelos -- this appears not to be in

23   the binder but we'll display it on the screen as we go.

24            THE COURT:  It might be.

25            MR. MASIMORE:  It is in the binder.

FC19SKE3                         White - direct

1                    THE COURT:  It's right behind another transcript.

2                    MR. MASIMORE:  Looks like everybody is there, your

3       Honor.  So 1475T again, January 30, 2015, 9:01 p.m. Adam Skelos

4       and Nick Barrella.

5                    (Recording played)

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC1TSKE4                        White - direct

1   BY MR. MASIMORE:

2   Q.  Mr. White, you mentioned a few moments ago in your

3   testimony remembering having a conversation with Mr. Nick

4   Barrella on or about February 2nd.  Do you recall that?

5   A.  Yes.

6   Q.  Who, if anyone else, participated in the conversation with

7   you and Mr. Nick Barrella?

8   A.  It was just myself and him.

9   Q.  And at that time what did you and Nick Barrella discuss?

10  A.  We discussed the termination letter that he had sent me on

11  Saturday, I believe the 31st, and we discussed how there was --

12  how we thought it was just not a good time to pursue things in

13  Albany.

14  Q.  What was --

15          THE COURT:  Just a moment.

16          The witness needs to have something to eat briefly, so

17  we'll take a brief break.  How long do you need?

18          THE WITNESS:  Two minutes.  I'll be in and out.

19          THE COURT:  Good.  I think the rest of us can stay

20  right here.

21          (Recess taken)

22          MR. MASIMORE:  May I proceed, your Honor?

23          THE COURT:  Yes, you may.

24  BY MR. MASIMORE:

25  Q.  Mr. White, do you have a medical condition at that causes

FC1TSKE4                        White – direct

1    physical effects if you don't eat small amounts of food

2    regularly?

3    A.  Yes, it's a blood sugar disorder.

4    Q.  Are you feelING well enough to listen to questions and

5    provide answers?

6    A.  Yes, I'm okay.

7    Q.  Before the brief break we were discussing a February 2nd,

8    2015 call between yourself and Mr. Nick Barrella.

9    A.  Yes.

10   Q.  And as best as you recall from that conversation, what did

11   you say to Mr. Barrella and what did Mr. Barrella say to you?

12   A.  Well, we were discussing the termination notice that they

13   had sent on January 31st, and Nick had told me that he had

14   talked with his partner, Mike Avella, and that they had decided

15   that now was not a good time to pursue anything in Albany,

16   there were too many reporters around, too much scrutiny.  And I

17   said well, I agree.  And Nick said so let's just let this sit

18   for now and maybe revisit it sometime in the future.

19            MR. MASIMORE:  If we could pull up Government

20   Exhibit 2649 in evidence, please.

21   Q.  And do you recognize this, Mr. White?

22   A.  Yes, I do.  It's an email from myself to Nick, and it's

23   the -- generally it's an email chain setting up the call that I

24   just referenced.

25   Q.  If we start at the bottom of 2649, do you see there's an

FC1TSKE4                          White - direct

1    email on January 31st, 2015 from Nick Barrella to you?

2    A.  Yes.

3    Q.  You see it says:  Bjornulf, I would like to talk to you

4    today about Capitol Group and AEWS mutually agreeing to

5    terminate its lobbying agreement.  I'm sure you understand this

6    request.  I have a document that I will send you for your

7    signature.  Please call me at your earliest convenience.

8              And then it provides a phone number.

9    A.  Yes.

10   Q.  Is this the notice of termination you discussed in relation

11   to the February 2nd phone call?

12   A.  Yes, it is.

13   Q.  And then you respond, February 2nd:  Nick, please do send

14   over the document you had in mind.  We can talk today.

15   A.  Yes.

16             MR. MASIMORE:  If we could pull up, please, Government

17   Exhibit 2651 in evidence.  Maybe focus on the top third,

18   please.

19   Q.  Do you recognize this, Mr. White?

20   A.  Yes, it's an email from myself to Nick, and it's attaching

21   the signed termination agreement.

22   Q.  And if we go to the second page of this document, do you

23   recognize the attachment?

24   A.  Yes, that is the signed termination notice.

25   Q.  And it's dated at the top January 31st, 2015, correct?

FC1TSKE4                          White - direct

1    A.  Yes.

2    Q.  And do you recognize the signature on -- I guess the

3    bottommost signature on the document?

4    A.  Yes, that's my signature.

5    Q.  Who put in the date 2/2/15?

6    A.  I did.

7    Q.  And the document reads:  Please be advised that the

8    consulting agreement dated November 1, 2014 and lobbying

9    authorization dated November 7, 2014 between Capitol Group LLC

10   on behalf of AEWS Engineering LLC has terminated January 31st,

11   2015.

12   A.  Yes.

13           MR. MASIMORE:  If we could direct our attention to

14   1480.  In the jury binders the tab may be hidden behind another

15   tab, but it should be there, 1480T.

16           1480 is a telephone call, February 9, 2015, at

17   2:08 p.m.  The participants are Adam Skelos and Nick Barrella.

18           (Audio recording played)

19   BY MR. MASIMORE:

20   Q.  Mr. White, do you remember the morning of February 5th,

21   2015?

22   A.  Yes, I do.

23   Q.  How is it that you are able to remember that specific

24   morning?

25   A.  Because that morning the FBI came to my house.

FC1TSKE4                          White - direct

1   Q.  Where is your house?

2   A.  In Connecticut.

3   Q.  And what did the FBI want when they came to your house?

4   A.  They wanted to ask questions about Adam and AbTech.

5   Q.  And did you speak to them at that point?

6   A.  Only to say that I would be happy to help, but that wasn't

7   a good time, and let me speak to my counsel first.

8   Q.  And did you then -- without divulging any contents, did you

9   retain and speak to counsel?

10  A.  I already had counsel working for me on other stuff, but

11  yes, I did.

12  Q.  After you spoke to your counsel, what did you do?

13  A.  At that point we set up a meeting with the government.

14  Q.  During the course from that point up until now, how many

15  times have you met with the government?

16  A.  Many times.

17  Q.  And which parts of the government have you met with?

18  A.  U.S. Attorney's Office and FBI.

19  Q.  And have you met with the U.S. Attorney's Office and the

20  FBI together at times?

21  A.  Yes.

22  Q.  And have you met with FBI agents separately without the

23  U.S. Attorney's Office at times?

24  A.  Yes.

25  Q.  During the course the meetings with the government, did the

FC1TSKE4                          White - direct

1    government ask you to do anything?

2    A.  Yes, they did.

3    Q.  What did they ask you to do?

4    A.  They asked me to record calls at their direction with Glenn

5    Rink and Adam Skelos and then to wear recording devices for

6    certain meetings and to answer questions that they had about

7    various matters related to AbTech.

8    Q.  Mr. White, up until this point in your testimony you have

9    been present where we have played a number of calls, a number

10   of recorded calls where you have been a participant, do you

11   recall all of those?

12   A.  Yes.

13   Q.  Up until this point in your testimony has there been a call

14   played where you knew at the time that the call was being

15   intercepted?

16   A.  No.

17           MR. MASIMORE:  If we could pull up for the witness and

18   counsel, please, Government Exhibit 2312.

19   Q.  Mr. White, do you recognize this document?

20   A.  Yes, I do.

21   Q.  What do you recognize it to be?

22   A.  An agreement between the Department of Justice and myself.

23           MR. MASIMORE:  And if we could show the last page of

24   the document.

25   Q.  Do you recognize any signatures?

FC1TSKE4                          White – direct

1   A.  Yes, my signature is there with the date written by me.

2   Q.  What date did you write?

3   A.  April 8, 2015.

4   Q.  Did you sign this agreement?

5   A.  Yes, I did.

6   Q.  What is your understanding of what your obligations are

7   under this agreement?

8   A.  To testify truthfully, to tell the truth generally in terms

9   of questions that the government asks me, and to cooperate with

10  the government when they ask me to do certain things.

11           MR. MASIMORE:  And your Honor, at this time the

12  government offers Government Exhibit 2312.

13           MR. GAGE:  No objection, your Honor.

14           THE COURT:  Government Exhibit 2312 is received

15  without objection.

16           (Government's Exhibit 2312 received in evidence)

17           MR. MASIMORE:  If we could publish the first page.

18  Q.  Now you just mentioned, Mr. White, your understanding of

19  your obligations under the agreement.

20  A.  Yes.

21  Q.  What is your understanding of what will happen if you

22  fulfill those obligations?

23  A.  The government will not charge me with any crimes related

24  to my involvement with working for AbTech with regard to Adam

25  to do certain things.

FC1TSKE4                    White - direct

1    Q.  If we could focus on the bottom of the first paragraph of

2    the document, and do you see at the last sentence it says:

3    White has previously admitted and hereby affirms that White, A,

4    participated in a scheme to pay Adam Skelos as a consultant of

5    AbTech Industries in exchange for official actions by Dean

6    Skelos, and B, understood that this scheme was illegal.

7         Do you see that?

8    A.  Yes.

9    Q.  Can you describe for the jury in your own words what you

10   did in this case that was wrong?

11   A.  Well, in April when we received or I received that email

12   forwarded by Glenn, I became aware that there was something

13   wrong going on, and that continuing to pay Adam from that point

14   forward was something that we shouldn't have done and I really

15   should have just withdrawn and figured out a way to quit my

16   position from AbTech.  But I continued to work on the projects

17   that we were working on, and therefore participated, and that

18   was something that I regret and was wrong.

19   Q.  Did you know at the time that -- did you come to know at

20   the time that it was wrong to do so?

21   A.  Yes.

22   Q.  Now Mr. White, as you understand it under the agreement,

23   2312, what happens if you don't tell the truth during your

24   testimony?

25   A.  Well, then I would be, first of all, committing perjury,

FC1TSKE4                         White - direct

1    and second of all, this agreement would be -- I would be in

2    violation of the agreement.

3    Q.  And what would happen, under your understanding, if you did

4    violate this agreement with the government?

5    A.  I could be charged with my involvement with AbTech for that

6    and as well as perjury.

7    Q.  Now as far as you know, Mr. White, will the outcome of this

8    case have any effect whatsoever on your agreement with the

9    government?

10   A.  It will not.

11               MR. MASIMORE:  Your Honor, I'm about to turn to some

12   more recordings.  I'm happy to push through, or if the Court

13   wants to take a break now.  I know we did have a break, but I

14   leave it up to the Court.

15               THE COURT:  Let's go ahead until 1:00.

16               MR. MASIMORE:  Very good.

17               The government offers Government Exhibit 19, which is

18   a stipulation.

19               THE COURT:  Government Exhibit 19 is received without

20   objection.

21               (Government's Exhibit 19 received in evidence)

22               MR. MASIMORE:  If we could publish that.  We can't,

23   it's not on the computer.  I will read, if the Court permits

24   me, the pertinent portions.

25               Government Exhibit 19, the stipulation reads in part

FC1TSKE4                      White - direct

as follows:

       1.  Government Exhibit 1601T, 1602-A-T and 1604T
through 1617T are true and accurate transcripts of the recorded
conversations contained in Government Exhibits 1601, 1602-A,
and 1604 through 1617 respectively.  The identities of the
participants, voice attributions, dates and times reflected on
Government Exhibit 1601T and 1605T through 1617T are accurate.
The identities of the participants, voice attributions, and
date reflected on Government Exhibits 1602-A-T and 1604T are
accurate.

       2.  Government Exhibit 3308 is a true and accurate
chart summarizing the dates, telephone numbers, and parties to
the consensually recorded telephone calls being introduced into
evidence as Government Exhibit 1601 and 1605 through 1617.

       3.  Government Exhibit 1601, 1602-A and 1604 through
1617, 3308, and this stipulation may be received as government
exhibits at trial in the above referenced manner, subject to
various objections by the defendants under Rules 401, 403 and
801 through 807.

       Government Exhibit 1601T, 1602-A-T and 1604T through
1617T may be received as aids to the jury subject to the same
objections by the defendants.  It's dated today, December 1st,
2015.

       THE COURT:  Any objection?

       MR. GAGE:  No, your Honor.

FC1TSKE4                          White – direct

1          MR. CONNIFF:  No, your Honor.

2          THE COURT:  The Court receives Government

3     Exhibits 1601, 1604 through 1617, 3308, as well as Government

4     Exhibits 1601T and 1602-A-T and 1604T through 1617T are

5     received as aids to the jury.

6          MR. MASIMORE:  I believe one additional, your Honor,

7     1602-A.

8          THE COURT:  1602-A is received without objection.

9     Thank you.

10          (Government's Exhibits 1601, 1602-A, 1604 through

11     1617, 3308, 1601T and 1602-A-T and 1604T through 1617T received

12     in evidence)

13     BY MR. MASIMORE:

14     Q.  Mr. White, do you recall placing a call to Adam Skelos on

15     February 9, 2015?

16     A.  Yes, I do.

17     Q.  And do you remember where you were when this call took

18     place?

19     A.  Yes, it was actually -- I was in the U.S. Attorney's

20     Office.

21     Q.  And what, if any, instruction had you received from the FBI

22     concerning how physically to place this call?

23     A.  They provided me with instructions on how to use their

24     recording system to be able to record the call.

25     Q.  And generally speaking, at that time were you able to

FC1TSKE4                         White - direct

1    record a call that came in to you or did you have to place a

2    call to make it recordable?

3    A.  At that time I had to place a call to make it recordable.

4            MR. MASIMORE:  If we could direct the jury's attention

5    to Government Exhibit 1601T.

6    Q.  And Mr. White, do you recognize 1601T to be the call that

7    you placed on that date?

8    A.  Yes, I do.

9            MR. MASIMORE:  Your Honor, the call lasts about 15

10   minutes.  I'm happy to press play and we can stop at 1:00 and

11   then resume or --

12           THE COURT:  Perhaps we should stop now.

13           We'll stop now and resume at 2 o'clock.  Thank you.

14           (Continued on next page)

1          (Jury not present)

2          THE COURT:  Ms. Buchanan, thank you for coming.

3     You've had an opportunity to view the jurors.  Did you

4     recognize any of them as people you saw in the hallway last

5     Friday?

6          MS. BUCHANAN:  I'm pleased to report that I don't

7     recognize any of them.  In fact, the people -- the last few

8     people that I saw were a lot younger, and I don't recall seeing

9     that many women.

10          THE COURT:  All right.  Could I ask those who were

11     part of the conversation to come forward, perhaps into the jury

12     box.  I apologize for this, but we need to do this.

13          My question for you now would be:  Do you recognize

14     any of these people?

15          MS. BUCHANAN:  Actually, yes, the man in the leather

16     coat.

17          THE COURT:  Your name.

18          MR. BREDDERMAN:  William Bredderman, New York

19     Observer.

20          THE COURT:  Is he one of the ones that you saw in the

21     hallway?

22          MS. BUCHANAN:  I believe so.

23          THE COURT:  If you heard the voices of each of these

24     individuals, do you think you would recognize whether they were

25     the speakers you heard in the hallway?

FC1TSKE4                         White - direct

1           MS. BUCHANAN:  I don't think so, your Honor.

2           THE COURT:  All right.  Counsel, defense counsel in

3     particular, do you want to ask any questions?

4           MR. GAGE:  I don't believe so, your Honor, but if I

5     could have just a moment.

6           THE COURT:  Certainly.

7           MR. CONNIFF:  I don't think we have anything.

8           MR. GAGE:  We don't have anything, your Honor.

9           THE COURT:  No questions.  Thank you for putting up

10    with this, I appreciate it.  Thank you so much.

11          Is there anything between now and 2?

12          MR. MASIMORE:  Not from the government.

13          MR. GAGE:  No, your Honor.

14          THE COURT:  Thank you.  I'll see you at 2.

15          And again, Ms. Buchanan, thank you very much.

16          (Luncheon recess taken)

17          (Continued on next page)

18                          AFTERNOON SESSION

19                              (2:00 p.m.)

20          (Jury not present)

21          MR. McKAY:  Your Honor, very briefly, before we start

22    we wanted to see if this was the right time to close the loop

23    on the Buchanan/juror issue.  I think what you heard today and

24    what we put forth in our letter from Sunday, the clear

25    inference is that she heard journalists talking, not jurors.

FC1TSKE4                        White - direct

1        THE COURT:  All right.  Do defense counsel wish to

2    contend that Ms. Buchanan heard jurors?

3        MR. MASIMORE:  Your Honor, may we excuse the witness

4    briefly?

5        THE COURT:  Yes.

6        (Pause)

7        MR. GAGE:  No, your Honor, and we appreciate the

8    Court's very thorough investigation.

9        THE COURT:  Thank you.  So there will be no contention

10   that there was juror misconduct based on conversations in the

11   hallway this past Friday.

12       MR. GAGE:  That's correct, your Honor.

13       MR. CONNIFF:  That's right.

14       THE COURT:  Thank you.

15       The jury is ready.

16       (Continued on next page)

17

18

19

20

21

22

23

24

25

FC1TSKE4                              White - direct

 1              (Jury present)

 2    BY MR. MASIMORE:

 3    Q.  Mr. White, before the break we were about to publish a

 4    telephone call from February 9, 2015.  Do you recall that?

 5    A.  Yes.

 6    Q.  And this was a call that you had placed from inside the

 7    U.S. Attorney's Office pursuant to the instructions of the FBI?

 8    A.  Yes.

 9              MR. MASIMORE:  Mr. White, if could you pull your chair

10    a bit closer the microphone.

11              Thank you, sir.

12              So this is 1601, Government Exhibit 1601, and tab

13    1601T in the binder.  And if we could -- before we play the

14    call, Government Exhibit 3308 is in evidence, so why don't we

15    pull that up briefly.

16              So there at the top, 1601, this chart that's in

17    reflects the date, February 9, 2015, participants, from

18    Bjornulf White to Adam Skelos, and lists the phone number that

19    Adam Skelos used in connection with this call.

20              Now we can proceed to 1601.  Thank you.

21              (Audio recording played)

22    BY MR. MASIMORE:

23    Q.  Mr. White, a few questions.  Directing your attention to

24    page 2, do you see in the middle of the page, line 7, you say

25    you think that's why Charlie didn't come to the meeting.  And

1    then Adam replies, in part, on line 11, 12:  I want to talk to

2    my dad about it.  He was like, you know, probably best to lay

3    low away from him for a while.

4              Do you see that?

5    A.  Yes.

6    Q.  Who was the Charlie that you and Adam were discussing?

7    A.  Charlie Dorego.

8    Q.  Page 5, lines 2 to 4, Adam said:  If you're doing the calls

9    and I behind the scenes or there behind the scenes saying hey,

10   you know, this is what our agenda is and he's with us kind of

11   situation.

12             What did you understand Adam Skelos to mean?

13   A.  That he and/or Capitol Group, meaning Nick Barrella and

14   Mike Avella, would separately speak to the elected officials.

15   Q.  Page 6, lines 10, 13 and 19, there's some discussion

16   between you and Adam Skelos concerning white pages or white

17   papers.  Do you remember that?

18   A.  Yes.

19   Q.  What were these white pages and white papers that you and

20   Adam Skelos were discussing?

21   A.  Papers that would describe the overall proposal, sort of

22   technical background policy issues that Capitol Group had been

23   asking me to put together.

24   Q.  Page 9, halfway down the page, between lines 12 and 16, you

25   were discussing with Adam Skelos a notice to proceed and

1    $50,000 versus 400,000.

2    A.   Yes.

3    Q.   What was the issue that you and Adam Skelos were discussing

4    relating to those facts?

5    A.   That the notice to proceed for the Bay Park site was only

6    the first portion, only the first $50,000, the initial design,

7    not the full go ahead to actually go install it.

8    Q.   And last for this call, on pages 10 and 11, do you recall a

9    conversation about the New York Times checking AbTech's web

10   site?

11   A.   Yes.

12   Q.   And can you describe for the jury what this service was

13   that AbTech had that allowed it to see what or who was looking

14   at its website?

15   A.   Yes, AbTech had a service called LeadLander that monitored

16   who was looking at the site, how long, what pages they were

17   looking at, and where they were looking at it from.  And it

18   would generate reports and send them to Glenn.

19        MR. MASIMORE:  If we could direct our attention to

20   Government Exhibit 1485, and there's a 1485T that should be in

21   the binder.

22        And this call is from February 11, 2015, the

23   participants are Adam Skelos and Senator Tom Croci.

24   Q.   Mr. White, you're not on this call, correct?

25   A.   Correct.

FC1TSKE4                          White – direct

1            (Audio recording played)

2     BY MR. MASIMORE:

3     Q.  Now at line 17 Adam Skelos tells the senator:  I'm not

4     involved.

5     A.  Yes.

6     Q.  Was that an accurate statement?

7     A.  No.

8            MR. CONNIFF:  Objection.

9            THE COURT:  Sustained.

10    Q.  What, if anything, was your understanding concerning what

11    Adam Skelos said his involvement was going to be with respect

12    to the senators?

13           MR. CONNIFF:  Objection.

14    A.  He told me he would be behind the scenes.

15           THE COURT:  I'll permit it.

16           MR. MASIMORE:  If we could turn to Government

17    Exhibit 1490, it's 1490T in the binder.  And this is a

18    February 11, 2015 call.  The participants are Adam Skelos and

19    Bjornulf White.

20    Q.  Now before we play the call, Mr. White, from the time

21    period you began meeting with the FBI and the government up

22    through the present, did you have any contacts with Adam Skelos

23    that were not at the direction of the FBI?

24    A.  No.

25    Q.  And did you have any conversations with Adam Skelos that

FC1TSKE4                          White - direct

1    were not captured on some sort of recording?

2    A.   No.

3    Q.   So were you aware that this February 11, 2015 phone call

4    was being recorded?

5    A.   Yes.

6                (Audio recording played)

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC19SKEL5                        White - direct

1    Q.  So that call was from February 11, 2015, correct?

2    A.  Yes.

3    Q.  Directing your attention to February 13, 2015.  Did there

4    come a time when you met with Adam Skelos in person?

5    A.  Yes, I did, in Manhattan.

6    Q.  And were you assisting the FBI at this point?

7    A.  Yes.

8    Q.  And before the meeting what, if anything, did you do to

9    prepare?

10   A.  I met with the FBI and received recording devices to wear.

11   Q.  And what, if any, instructions did you receive from the FBI

12   about the meeting?

13   A.  They gave me is some general instructions on topics they

14   wanted to have come up.

15   Q.  Do you recall the topics?

16   A.  Some of them included Rob Walker, the situation with the

17   $400,000, the notice to proceed, and some instructions also I

18   believe regarding generally sort of what was going on with the

19   media and just to bring that up too.

20   Q.  And with respect to the recording equipment you

21   mentioned --

22   A.  Yes.

23   Q.  Were you provided instructions on how to operate it?

24   A.  Well, there is nothing for me to do in terms of operating

25   them.  The FBI turns them on and then, you know, I place them

1    on me.

2    Q.  And then did you turn them off at any point during the

3    meeting?

4    A.  No.  The FBI turns them on -- turns them off afterwards.

5    Q.  After the meeting what did you do with the recording

6    devices?

7    A.  Then I met with the FBI and they took the recording

8    devices.

9    Q.  You mentioned the meeting was in Manhattan, where?

10   A.  It was at the W Hotel in midtown Manhattan where I

11   originally met with Adam.

12   Q.  Who attended the meeting?

13   A.  Just Adam and myself.

14           MR. MASIMORE:  A moment to confer, your Honor?

15           (Pause)

16           MR. MASIMORE:  If we could direct the jury's attention

17   to 1602-A-T.  It should be in the jury binder.  What we'll do

18   is we'll publish the recording 1602-A.

19           This is a recording of a consensual meeting

20   February 13, 2015.  The participants are Adam Skelos and

21   Bjornulf White.

22           Because this is a meeting, the volume is down a bit.

23   I'm going to turn it up as high as it goes.

24           (Recording played)

25           THE COURT:  Mr. Masimore, I think the copy in the

FC19SKEL5                         White – direct

1    notebooks may be missing pages 1 to 2.

2              MR. MASIMORE:  Very well.  If we can start again and

3    we'll display them on the screen.  Thank you.

4              THE COURT:  Okay.

5              MR. MASIMORE:  Ms. Danzo, perhaps we can zoom in to

6    the top half so it's a little easier to read since it's hard to

7    hear.

8              (Recording played).

9    Q.  Mr. White, a few questions about the meeting.

10             Page one and two there's a discussion about someone

11   named Charlie.  At line two Adam Skelos says, "Charlie is

12   really under a lot of investigative, you know, eyes right now."

13             And then at line twelve, page one he says, "Charlie

14   being the one who got me involved in AbTech."  And there's more

15   discussion about Charlie.

16             Who did you understand the Charlie was that Adam

17   Skelos was referring to?

18   A.  Charlie Dorego.

19   Q.  What was the basis for your understanding that he meant

20   Charlie Dorego?

21   A.  The only Charlie we've ever spoken about is Charlie Dorego.

22   Q.  Now, on page two, lines 14 to 16 Adam Skelos said that

23   "when I heard about it I was like, well, I literally know

24   nothing about water or, you know, any of that stuff."

25             Do you recall him saying that?

FC19SKEL5                    White - direct

1    A.  Yes.

2    Q.  When you first started working with Adam Skelos did you

3    have an opportunity to observe and learn about the experience

4    he had had?

5    A.  Yes.

6    Q.  And did he have experience in the water business?

7    A.  No.

8    Q.  Page seven of the meeting transcript, line 20 to page

9    eight, line 6.  Adam said to you in substance that he says,

10   "Well, listen, after -- here's -- after you've seen Tom

11   Croci -- that night I'm going to his fundraiser, I bought a

12   table at his fundraiser.  So that's all I'm going to talk to

13   him about.  But I'm not on the books at your meeting."

14   A.  Yes.

15   Q.  What did you understand Adam Skelos to mean by that?

16   A.  That the scheduler hadn't actually listed his name as an

17   attendee at the meeting.

18   Q.  Lastly, with respect to this meeting, on page ten, line 8.

19   Do you recall you asked Adam towards the end of this -- the

20   portion of the recording that we have here, you say, "Yeah.  Is

21   there like a, like a safe number I can call you on?"

22   A.  Yes.

23   Q.  What was the reason that you asked Adam that?

24   A.  I was trying to determine if he might be using a different

25   number.

FC19SKEL5                    White - direct

1    Q.  And in response what did he tell you?

2    A.  He provided a different number.

3              MR. MASIMORE:  Now if we could go to Government

4    Exhibit 1495, please.  And 1495T will be in the jury binder.

5              1495 is a call February 20, 2015.  The participants

6    are Adam Skelos and Bjornulf White.

7    Q.  Mr. White, did you know that this call was being recorded?

8    A.  Yes.

9    Q.  And what, if any, instructions did you receive from the FBI

10   before participating in this call?

11   A.  I was instructed as to the general topics to hit.

12   Q.  And what were the general topics?

13   A.  I don't recall until I see the -- until I hear the call to

14   refresh my memory.

15   Q.  Very well.  Let's play 1495.

16             (Recording played)

17   Q.  Mr. White, did you hear during the call Adam Skelos mention

18   an article that he had sent to you?

19   A.  Yes.

20             MR. MASIMORE:  If we could pull up Government Exhibit

21   2652 in evidence, please.

22   Q.  Mr. White do you recognize this?

23   A.  Yes.  That's an e-mail from Adam to me attaching the

24   article we just referenced.

25             MR. MASIMORE:  If we could turn to page two.  Publish

FC19SKEL5                    White - direct

1    the article.

2            If we could just zoom into the top so we can read the

3    headline.

4    Q.  Do you see it says "PEF makes defeat of design-build top

5    priority for session"?

6    A.  Yes.

7    Q.  Now, directing your attention to February 23, 2015.

8    A.  Yes.

9    Q.  Did you have an opportunity to meet with Adam Skelos?

10   A.  Yes.

11   Q.  And sitting here now, Mr. White, do you recognize Mr. Adam

12   Skelos?

13   A.  Yes.

14   Q.  If you could identify him by indicating where he is and

15   identify an article of clothing he's wearing.

16   A.  Standing wearing a silver and black tie.

17           THE COURT:  Indicating Adam Skelos.

18   Q.  Mr. White, I believe yesterday you had testified about a

19   meeting you participated in with Senator Skelos?

20   A.  Yes.

21   Q.  Do you recognize Senator Skelos in the courtroom today?

22   A.  Yes.

23   Q.  Could you identify him, where he's seated and an article of

24   his clothing?

25   A.  Sitting at the table with a red tie.

1    THE COURT:  Indicating Senator Skelos.

2  Q.  Did you receive instructions prior to meeting with Adam

3  Skelos on February 23, 2015?

4  A.  Yes.

5  Q.  From whom?

6  A.  From the FBI.

7  Q.  And what were your instructions regarding the meeting?

8  A.  To discuss and get his thoughts on the meeting that was

9  about to occur with Senator Croci and what his approach was and

10  sort of how he wanted me to handle it.

11  Q.  What, if any, recording equipment were you provided with?

12  A.  I was provided with recording devices to wear.

13  Q.  And did you receive instructions on how to operate them or

14  were they operable in the same manner you described before?

15  A.  The same manner as before.

16  Q.  And did you have those recording devices with you when you

17  met with Adam Skelos?

18  A.  Yes.

19  Q.  And what did you do with them after the meeting?

20  A.  I continued to wear them until I had met with Senator Croci

21  and then returned to the FBI where they retrieved them.

22  Q.  At any point during the time when had you the recording

23  devices did you turn them off?

24  A.  No.

25    MR. MASIMORE:  If we could pull up Government Exhibit

FC19SKEL5                    White – direct

1    1604T, 1604.

2          1604 is a consensual recording dated February 23,

3    2015.  The participants are Adam Skelos and Bjornulf White.

4          (Recording played).

5    Q.  Mr. White, where did this meeting take place?

6    A.  It took place in a car in a parking lot outside of the

7    state office building that Senator Tom Croci has an office in.

8    Q.  What did you do after the conclusion of this meeting?

9    A.  The meeting with Adam Skelos you mean?

10   Q.  Yes.

11   A.  Then I walked into the state office building and had my

12   meeting with Senator Croci.

13   Q.  And did you receive any instructions on further

14   conversations to have with Adam Skelos after you met with

15   Senator Croci?

16   A.  Yes.  When I met with the FBI afterwards to have them

17   retrieve the recording devices, at some point thereafter, I

18   don't remember exactly when, they asked me to call them again

19   as a follow-up.

20   Q.  In substance what were the instructions you were provided

21   concerning what to discuss with Adam Skelos?

22   A.  Well the FBI told me that I should call him and tell him

23   that Senator Croci was actually expressing reservations about

24   proceeding forward because he had doubts as to where the

25   leadership stood on it.

FC19SKEL5                    White - direct

1          MR. MASIMORE:  If we could direct the jury's attention

2     to 1605T in the binder.  This is Government Exhibit 1605.

3     Before we pull it up on the screen, if we could pull up 3308 in

4     evidence.  That's the summary chart.

5          And there, the second line, 1605, it reflects that

6     it's a call on February 23, 2015.  Participants are Bjornulf

7     White and Adam Skelos.  And then Adam is using a phone number

8     that ends in 9100 for this particular call.

9          We can go ahead now and play 1605, please.

10          (Recording played).

11     Q.  Mr. White, at page two of the transcript of this recording

12     Adam references setting up a meeting potentially with Senator

13     Venditto.  Do you recall that?

14     A.  Yes.

15          MR. MASIMORE:  If we could publish Government Exhibit

16     1498.  This will be 1498T in the jury's binder.

17          1498 is a call on February 23, 2015.  It's at

18     1:40 p.m.  And the participants are Adam Skelos, Senator

19     Venditto's office, someone named Allison, and John Banville.

20          (Recording played)

21          MR. MASIMORE:  If we could publish 1499 which would be

22     the next exhibit, 1499T.  This is a call dated February 23,

23     2015.  This was at 1:53 p.m. and it's between Adam Skelos and

24     Dean Skelos.

25          (Recording played).

FC19SKEL5                    White - direct

1    Q.  Mr. White, did there come a time later in the day on

2    February 23 when you had the opportunity to speak to Adam

3    Skelos again?

4    A.  Yes.

5            MR. MASIMORE:  If we could go to Government Exhibit

6    1500.  There will be 1500T in the binder.

7            This is a recorded call between Adam Skelos and

8    Bjornulf White on February 23, 2015 at 2:06 p.m.

9    Q.  Mr. White, did you know that this call was being recorded

10   at the time you had the conversation with Mr. Skelos?

11   A.  Yes, I did.

12   Q.  Were you acting at the direction of the FBI in

13   participating in this call?

14   A.  Yes, I was.

15           (Recording played)

16           MR. MASIMORE:  If we could go to Exhibit 1501.  Should

17   be the next tab in the binder, 1501.

18           1501 is a call the same day, February 23, 2015.  It's

19   at 2:21 p.m.  The participants in this call are Adam Skelos and

20   Senator Venditto.

21           (Recording played)

22           MR. MASIMORE:  If we could go to Government Exhibit

23   1502, please.  1502T should be the next tab in the binder.

24           1502 is a call, same date, February 23, 2015,

25   5:16 p.m.  The participants are Adam Skelos and Senator Skelos.

FC19SKEL5                          White - direct

1              (Recording played)

2              MR. MASIMORE:  Your Honor, I'm about to switch to

3    another topic.  I'm happy to continue or it's almost 3:30.

4              THE COURT:  It is a good time for a break.

5              Let's take a fifteen-minute break.

6              (Jury excused)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC19SKEL5                     White - direct

1                  (In open court)

2                  THE COURT:  Unless counsel want to raise something

3       with me on the break for fifteen minutes.

4                  MR. CONNIFF:  Just one housekeeping issue with 1602T.

5       There was some confusion when it was recorded.  The one that's

6       in the binder that I got from the government still has that

7       previous section which we agreed to take out.

8                  MR. MASIMORE:  Just to be clear it wasn't played

9       though, correct?

10                 MR. CONNIFF:  No, it was not.  But I'm wondering if

11      it's in the jurors' binders.

12                 MR. MASIMORE:  It shouldn't be.  With the Court's

13      permission, we'll check during the break.  It should be have

14      been replaced with 1602-A-T which was the amalgamation of the

15      parties' agreement.

16                 MR. CONNIFF:  Just as long as it's not inadvertently

17      with that section.

18                 THE COURT:  Okay.  I think it's been replaced.

19                 MR. MASIMORE:  May we have permission to grab one of

20      the jurors binder and check?

21                 THE COURT:  Of course.

22                 You may step down.

23                 THE WITNESS:  Thank you.

24                 (Witness excused)

25                 (Recess)

FC1TSKE6                          White - direct

1              (Jury not present)

2              MR. MASIMORE:  Your Honor, my colleague reminds me to

3    put on the record we removed the Tab 1602-A-T from the binder.

4    We will replace that with the appropriate transcript.

5              THE COURT:  Thank you.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC1TSKE6                           White - direct

1           (Jury present)

2           THE COURT:  Mr. Masimore.

3           MR. MASIMORE:  Thank you, your Honor.

4   BY MR. MASIMORE:

5   Q.  Mr. White, before the break do you recall we had been

6   discussing a potential meeting with Senator Venditto that was

7   being set up?

8   A.  Yes.

9   Q.  Who was going to go to meeting with Senator Venditto?

10  A.  I was going to.

11  Q.  Did there come a time when you personally did meet with

12  Senator Venditto?

13  A.  No.

14  Q.  What happened?

15  A.  It was canceled by his office.

16  Q.  How did you find out it was canceled by his office?

17  A.  Speaking with one of the schedulers in his office.

18  Q.  And what did you do right after you found out that the

19  meeting was canceled?

20  A.  Spoke with the FBI.

21  Q.  And what, if any, instructions were you given at that time?

22  A.  To call Adam and let him know that the office had canceled

23  it.

24          MR. MASIMORE:  Your Honor, if we could publish,

25  please, 2819 in evidence.

FC1TSKE6                         White - direct

1          And we'll zoom in on the top there, 2819 in evidence,

2     it's an email from Leslie E. King to Senator Skelos, subject

3     MSG, the date is Tuesday, February 24th, 2015, 2:32 p.m.  And

4     it reads:  David Lewis would like you to call him on his cell.

5          Your Honor, permission to publish Government

6     Exhibit 2005, page 15, please.

7     BY MR. MASIMORE:

8     Q.  Do you see, as indicated there, it's being highlighted now,

9     there's a listing for David Lewis, and the middle part says

10    Senator Dean G. Skelos, and then on the right-hand side it says

11    counsel to the majority leader.

12         Do you see that?

13    A.  Yes.

14         MR. MASIMORE:  If we could now go to Government

15    Exhibit 1504 in evidence.  And this will be Tab 1504T in the

16    jury's binders.  And 1504 is a call dated February 24th, 2015,

17    it's at 3:59 p.m.  And it's between -- the participants are

18    Adam Skelos and Senator Venditto's office.

19         (Audio recording played)

20         MR. MASIMORE:  And if we could go to Government

21    Exhibit 1505, should be the next tab in the binder, 1505T is

22    the transcript.  This is a call from the same date,

23    February 24, 2015 and the time is 4:03 p.m.  And the

24    participants are Adam Skelos and Senator Skelos' office.

25         (Audio recording played)

FC1TSKE6                        White – direct

1         MR. MASIMORE:  If we could go to the next exhibit,

2    please, Government Exhibit 1506 in evidence, the transcript

3    should be the next one in the binder at 1506T.  This is a call

4    from the same day, 4:09 p.m.  The participants are Adam Skelos

5    and Dean Skelos.

6              (Audio recording played)

7         MR. MASIMORE:  Could we go to Government Exhibit 1507,

8    that would be the next tab in the binder, 1507T.  And this is a

9    call, same date, February 24th, 2015, the time of the call is

10   4:11 p.m.  And the participants are Adam Skelos and Senator

11   Skelos.

12             (Audio recording played)

13   BY MR. MASIMORE:

14   Q.  And Mr. White, did you have an opportunity to speak with

15   Adam Skelos again after you had the conversation with him about

16   the meeting being canceled.

17   A.  Yes, I did.

18             MR. MASIMORE:  If we go to Government Exhibit 1508,

19   1508T should be in the binder, next tab.  And this call is same

20   date, February 24, 2015, call time is 4:13 p.m.  The

21   participants are Adam Skelos and Bjornulf White.

22   Q.  And Mr. White, did you know that the call was being

23   recorded at the time?

24   A.  Yes, I did.

25             (Audio recording played)

FC1TSKE6                          White - direct

1          MR. MASIMORE:  If we could pull up Government

2    Exhibit 3308 in evidence, please.

3    Q.  Do you see there the third listed consensual call is

4    Government Exhibit 1606 dated February 26, 2015, and the

5    participants are Bjornulf White and Adam Skelos at a number

6    that ends in 8155.  Do you see that?

7    A.  Yes, I do.

8    Q.  Did you participate in a call with Adam Skelos where you

9    used a phone number ending in 8155?

10   A.  Yes.

11         MR. MASIMORE:  So let's go to Government Exhibit 1606,

12   and that would be 1606T in the binder.  This is a call again

13   February 26, 2015, Adam Skelos and Bjornulf White.

14         (Audio recording played)

15   Q.  Mr. White, directing your attention to page 1 --

16         MR. CONNIFF:  Your Honor, could we be heard at

17   sidebar?

18         THE COURT:  Yes.

19         (At sidebar)

20         (Continued on next page)

21

22

23

24

25

FC1TSKE6                      White - direct

1          MR. CONNIFF:  Your Honor, for the record, we had this

2     discussion I think last week or -- the days are flying by, but

3     I asked for this section to be put in.  The government asked

4     that this sentence also be included to put everything in, which

5     we agreed to, but unfortunately I think in the recording when

6     it got edited it just got edited to here, so we just lost --

7          THE COURT:  You lost what we agreed you would have in

8     this.

9          MR. CONNIFF:  Yes.

10         MR. MASIMORE:  We should have the rest.  It was

11    inadvertent.  There has been a lot of back and forth in

12    negotiations.

13         THE COURT:  The jurors have it in their notebooks.

14         MR. MASIMORE:  I'm not sure.

15         THE COURT:  I do.

16         MR. CONNIFF:  I do.

17         MR. MUKHI:  Then they should.

18         THE COURT:  Would you like to read it out loud?

19         MR. MUKHI:  We have the audio.

20         THE COURT:  Okay.

21         MR. MUKHI:  I'll just play it.

22         THE COURT:  Good.

23              (Continued on next page)

24

25

FC1TSKE6                         White - direct

```
 1              (In open court)
 2              MR. MASIMORE:  There's an additional portion of the
 3    call that is being included.  Once that is queued up we'll back
 4    it up and play it until the end of that.
 5              (Audio recording played)
 6    BY MR. MASIMORE:
 7    Q.  Mr. White, at the beginning of that call on page 1 you had
 8    mentioned that you knew that Adam was calling from a different
 9    number.
10    A.  Yes.
11    Q.  What were you referring to?
12    A.  Well, the way the recording system worked, what I was
13    instructed by the FBI, if he called from a different number,
14    then I should try to not answer it or pick it up quickly and
15    call back.  So I was referring to the fact that I saw a number
16    that I didn't know and I was calling back in order to be able
17    to record it.
18    Q.  And there's a portion where Adam talks about texting about
19    a girlfriend really bothering me.  What did you understand Adam
20    Skelos to be communicating to you?
21    A.  That was the code that he wanted to use if he wanted to use
22    his other numbers.
23    Q.  Now before this time period when you had been interacting
24    with Adam Skelos before the FBI had come to your door in
25    February 2015 --
```

FC1TSKE6                         White - direct

1    A.  Yes.

2    Q.  -- had Adam Skelos ever used any sort of safe phones with

3    you?

4    A.  No, not at all.

5           MR. MASIMORE:  If we could go to Government

6    Exhibit 1533, please.  Just to publish, this should be 1533T in

7    the binder.  And this is a call actually from March 28, 2015,

8    at 5:19 p.m., and the participants on this particular call are

9    Adam Skelos and Dean Skelos.

10          (Audio recording played)

11          MR. MASIMORE:  If we could bring up what is in

12   evidence as Government Exhibit 2312, and just page 3 there, and

13   just after the very truly yours, can we focus in on that part.

14   Q.  There it says Preet Bharara, United States Attorney.  Do

15   you see that, Mr. White?

16   A.  Yes, I do.

17   Q.  Now leading up to before the time where you had

18   conversations with the FBI, did there ever come a time when

19   Adam Skelos had a conversation with you regarding something

20   called FaceTime?

21   A.  Yes, he had mentioned it previously.

22   Q.  And to the best of your recollection, what had he mentioned

23   about FaceTime?

24   A.  That he used it sometimes because then it wouldn't show the

25   call on his phone bill.

1          MR. MASIMORE:  If we could go to Government

2    Exhibit 1479 in evidence, please.

3          Now this is a recorded call from February 4th, 2015,

4    the participants are Adam Skelos and Bjornulf White.

5    Q.  And Mr. White, February 4th, 2015 had the FBI contacted you

6    yet?

7    A.  No, they had not.

8    Q.  And so during this phone conversation, were you aware that

9    the conversation was being recorded?

10   A.  No, I was not.

11         (Audio recording played)

12         MR. MASIMORE:  If we could go to Government

13   Exhibit 1482, please, and 1482T in the binder.  And 1482 is a

14   call dated February 10, 2015 at 4:16 p.m.  And the participants

15   on the call are Adam Skelos and Dean Skelos.

16         (Audio recording played)

17   BY MR. MASIMORE:

18   Q.  Mr. White, we discussed the February 26 phone call that was

19   Government Exhibit 1606.  Do you recall that this was again the

20   February 26 conversation, and directing your attention to the

21   top of page 3, lines 4 to 7, 1606T in the jury binder, maybe we

22   can pull it up on the screen, do you see Adam Skelos says:

23   It's probably important that you get the paper, you know what

24   exactly it is, the proposal is going to P3 stormwater specific,

25   and I can take that and I can actually give that to Ed Mangano.

1    Do you see that?

2    A.  Yes.

3    Q.  What did you understand that Adam Skelos was referring to

4    about this proposal?

5    A.  The proposal was something that he was suggesting that I

6    put together that basically had background on stormwater P3,

7    P3s generally, and what the legislation that we would be

8    looking for was.

9    Q.  And then after that, starting line 8, do you see Adam

10   states that:  Secretly Ed Mangano has been pushing for P3s with

11   Cuomo and apparently he's been doing it pretty heavily.

12   A.  Yes.

13   Q.  Then you asked:  Did you know that Ed was pushing for P3?

14        And Adam Skelos said:  No, I found -- I had to wait to

15   talk to my dad.

16   A.  Yes.

17        MR. MASIMORE:  If we could publish Government

18   Exhibit 1494, please, 1494T in the binder.  1494 is a call

19   dated February 20, 2015, and the participants are Senator

20   Skelos and Tom Locascio.

21        (Audio recording played)

22        MR. MASIMORE:  If we could pull up Government

23   Exhibit 3308 again in evidence, this is the summary chart.

24   We'll go to the fourth entry there.  It refers to Government

25   Exhibit 1607, indicates February 27, 2015 consensual call

FC1TSKE6                    White – direct

1   involving Bjornulf White and Adam Skelos at that 8155 number.

2   Q.  Do you see that, Mr. White?

3   A.  Yes, I do.

4          MR. MASIMORE:  Let's go to 1607 and 1607T, please.

5   And this, as we said, February 27 call, Adam Skelos and

6   Bjornulf White.

7          (Audio recording played)

8   BY MR. MASIMORE:

9   Q.  Mr. White, what were the talking points that you and Adam

10  Skelos were discussing?

11  A.  The stormwater P3 write-up that I referenced earlier.

12         MR. MASIMORE:  If we could go to Government

13  Exhibit 1609.  Before we do that, 3308 up on the screen,

14  summary chart.

15  Q.  If we go down there, Government Exhibit 1609, it shows it's

16  a March 4, 2015 consensual call between Bjornulf White and Adam

17  Skelos again at the 8155 number.

18  A.  Yes.

19         (Audio recording played)

20  Q.  If we go back to 3308 again, the summary chart reflects

21  that Government Exhibit 1610 is from March 5, 2015, the next

22  day, a consensual call between Bjornulf White and Adam Skelos,

23  the 8155 number.

24  A.  Yes.

25  Q.  Mr. White, we'll play this call, and I will ask you a

1    couple of questions about it, 1610 and 1610T in the binder.

2             (Audio recording played)

3    Q.  Mr. White, before engaging in this phone call, the phone

4    conversation with Adam Skelos, had you received instructions

5    from the FBI?

6    A.  Yes.

7    Q.  And in sum and substance, what were the instructions

8    provided to you?

9    A.  They had sent me an article link and asked me to read it

10   and then to call Adam and ask him if he knew anything about it.

11   The article pertained to $800 million, and it's what I'm

12   referring to in the call.

13            MR. MASIMORE:  So if we could pull up 3308, the

14   summary chart again, I think now we're on Exhibit 1611, and

15   that's March 6, this is the next day, a consensual call between

16   Bjornulf White and Adam Skelos again on the 8155 number.  If we

17   could publish Government Exhibit 1611, please.

18            (Audio recording played)

19            (Continued on next page)

20

21

22

23

24

25

1   Q.  Mr. White, did there come a time when you did, in fact,

2   prepare a document to send to Adam Skelos?

3   A.  Yes, I did.

4   Q.  And what, if any, direction from federal investigators did

5   you receive related to the preparation of the document?

6   A.  None with respect to the content of it.

7   Q.  What about the fact of it?

8   A.  To go ahead and prepare it and mail it to Adam Skelos and

9   also to e-mail it to Senator Croci.

10          MR. MASIMORE:  If we could bring up just for the

11  witness and counsel, please, Government Exhibit 2309.

12  Q.  Mr. White do you recognize 2309?

13  A.  Yes.  This is the document that I just referenced.

14  Q.  This is the points that you prepared?

15  A.  Correct.

16          MR. MASIMORE:  The government offers Government

17  Exhibit 2309.

18          MR. CONNIFF:  No objection.

19          THE COURT:  Government Exhibit 2309 is received

20  without objection.

21          (Government's Exhibit 2309 received in evidence)

22  Q.  Do you see that there's page one.

23          MR. MASIMORE:  If we just flip to page two.

24  Q.  Now you mentioned that you had mailed this to Adam Skelos?

25  A.  Yes.

FC19SKE7                    White – direct

1   Q.  After you mailed Government Exhibit or a copy of Government

2   Exhibit 2309 to Adam Skelos did you have an opportunity to

3   speak with him about it?

4   A.  Yes, I did.

5          MR. MASIMORE:  Could we pull up, please, Government

6   Exhibit 3308, again, the summary chart.

7   Q.  Now we're up to 1612.  This reflects a March 10, 2015 call

8   between Bjornulf White and Adam Skelos at the 8155 number

9   again?

10  A.  Yes.

11         MR. MASIMORE:  If we could now publish Government

12  Exhibit 1612 and ask the jury to turn to 1612T in the binders.

13            (Recording played)

14         MR. MASIMORE:  Could we go to Government Exhibit 1513.

15  And ask the jury to turn to 1513T in the binders, please.

16            This is a call dated March 12, 2015 at 1:17 p.m.  And

17  the participants are Adam Skelos and Ed Mangano's office and

18  someone named Doreen.

19            (Recording played)

20         MR. MASIMORE:  Back to Government Exhibit 3308,

21  please, the summary chart.

22            So now we're the second to the last on the chart.

23  1613 is a March 13, 2015 consensual call between Bjornulf White

24  and Adam Skelos again using the 8155 number.

25            If we could go to Government Exhibit 1613, please, and

FC19SKE7                      White - direct

1   ask the jury to turn to 1613T in the binders.

2            (Recording played).

3            MR. MASIMORE:  If we could go to Government Exhibit

4   1515, please, and ask the jury to turn to 1515T.

5            Now, this is a call dated March 17, 2015 at 2:19 p.m.

6   The participants are Adam Skelos and Bjornulf White.

7   Q.  Mr. White, were you aware that this phonecall was being

8   recorded?

9   A.  Yes, I was.

10  Q.  At the time you participated in this call were you acting

11  at the direction of the FBI?

12  A.  Yes.

13           (Recording played)

14           MR. MASIMORE:  Pause just a second.

15           (Pause)

16           (Recording played).

17  Q.  Mr. White, at the beginning of the call Adam had told you,

18  page one, lines four and five, "I wanted to tell you about the

19  thing we talked about last week."

20  A.  Yes.

21  Q.  Did you understand what Mr. Skelos was referring to?

22  A.  The stormwater P3 legislation.

23           MR. MASIMORE:  Could we go to Government Exhibit 1520,

24  please, and ask the jury to turn to 1520T in the binder.

25           1520 is call between Adam Skelos and Bjornulf White

FC19SKE7                          White - direct

1    dated March 23, 2015.

2    Q.  Again, Mr. White, did you know that this call was being

3    recorded at the time?

4    A.  Yes, I did.

5    Q.  Were you acting at the direction of the FBI in

6    participating in the call?

7    A.  Yes, I was.

8              (Recording played)

9    Q.  Mr. White, Adam mentioned to you something that had, as he

10   said in line seven, "kind of been gone to rest."

11   A.  Yes.

12   Q.  What did you understand Adam Skelos to be referring to?

13   A.  The scrutiny, the investigation that was referenced back in

14   January, that stuff.

15             MR. MASIMORE:  Could we go to Government Exhibit 1522,

16   please.  And ask to jury to turn to 1522T in the binders

17   please.

18             1522T is a call dated March 24, 2015 between Adam

19   Skelos and Bjornulf White.

20   Q.  Mr. White, again, at this time did you understand the calls

21   were being recorded and were you working at the behest of the

22   FBI?

23   A.  Yes.

24             (Recording played)

25             MR. MASIMORE:  Could we go now please to Government

1    Exhibit 1523 and ask the jury to turn to 1523T in the binders,

2    please.

3              1523 is a call, same date, March 24, 2015 at 3:36 p.m.

4    The participants are Adam Skelos and Senator Skelos.

5              (Recording played)

6              MR. MASIMORE:  Government Exhibit 1525.  Ask the jury

7    to turn to 1525T, please.

8              This is a call the next day, March 25, 2015.  It's at

9    3:09 p.m.  The call is between Adam Skelos and Senator Skelos.

10             (Recording played)

11   Q.  Mr. White, did there come a time when you asked Adam Skelos

12   about the status of design build legislation at the direction

13   of the FBI?

14   A.  Yes.

15             MR. MASIMORE:  If we can go to Government Exhibit

16   3308, please.  Page 2.  And the top refers to Government

17   Exhibit 1615, March 25, 2015, a consensual call between

18   Bjornulf White and Adam Skelos and the 8155 number.

19             If we could go to Government Exhibit 1615, please, and

20   ask the jury, please, to turn to 1615T.

21             (Recording played)

22             MR. MASIMORE:  Your Honor, I see my time for the day

23   has expired.

24             THE COURT:  Okay.  Members of the Jury, you've been

25   very punctual.  I want to note that and thank you for it and

FC19SKE7                         White - direct

1    thank you for your patience.

2              I remind you not to talk about the case, not to read

3    about it, not to listen to anything about it.

4              Have a good evening.  See you at ten.

5              (Jury excused)

6              THE COURT:  You may step down.

7              (Witness excused)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Please have a seat.

3           My understanding is that you wanted to take up 1545

4    and 1516; is that right?

5           MR. MUKHI:  1517 your Honor.  1517 as well, your

6    Honor, if I can hand it up.

7           THE COURT:  Please do.

8           I'm rereading it with the transcript of the trial so

9    far in mind.

10          Now, one thing I'd like to hear from counsel on is can

11   this be redacted to avoid anything that is largely irrelevant

12   and sensational and keep in anything that relates, for example,

13   to the budget?

14          I know that the government has offered, I think it's

15   about four arguments -- four different arguments in favor of

16   admissibility and the budget is just one.  The fact that there

17   are detailed conversations about Senate strategy between Adam

18   and Dean Skelos, I think, is already clearly established in the

19   record.  I'm not sure that this is probative of anything in

20   addition.

21          MR. MUKHI:  Your Honor, if I might?

22          THE COURT:  Yes.

23          MR. MUKHI:  I think we can go back to the record but I

24   think that the majority of the discussion about the senator and

25   Adam Skelos strategizing on the budget are during phonecalls

1    between Adam Skelos and Mr. White as opposed to direct

2    conversations.  Among other things, one of the transcripts we

3    heard 1611 is one that defense counsel, in part, is going to

4    argue are exaggerations by Adam Skelos in one part.  In another

5    part Adam Skelos is saying that he heard from his dad that this

6    is a strategy they're going to use with the governor to get the

7    P3 legislation passed.

8            So I think the call between the senator and Adam

9    Skelos directly speaking about budget strategy is necessary to

10   rebut, among other things, the argument that when Adam speaks

11   to Mr. White he's exaggerating because he is, in fact,

12   strategizing with the senator.

13           THE COURT:  I agree with you on the budget point.  So

14   the question is really all of the rest.

15           I'll be glad to hear from defense counsel.  That was

16   the tentative agreement.

17           MR. MUKHI:  Your Honor, if we're looking at 1545.

18           THE COURT:  Yes.

19           MR. MUKHI:  Your Honor, propose that we would include

20   from page one, lines 17 through 25.

21           THE COURT:  I was actually thinking of 14 through 25.

22           MR. MUKHI:  Right.  Fourteen is the lead-in.

23           THE COURT:  Right.

24           MR. MUKHI:  And then on I guess redacting the rest

25   until page two, line -- I'm sorry.  Continuing through page

1    two, line four, since the leaders meeting, page two.

2              THE COURT:  Yes.

3              MR. MUKHI:  Then redacting line 5 through 18.

4              THE COURT:  Yes.

5              MR. MUKHI:  And then I guess just ending at line 25.

6    Page three I think would be out of context of that.

7              THE COURT:  That's right.

8              May I hear from defense counsel on that proposal.

9              MR. GAGE:  As the Court knows we've repeatedly

10   objected and we preserve our objection.  If I could just ask to

11   see the redactions -- it's difficult follow along with the

12   court -- just review it overnight and in the morning perhaps or

13   at the first morning break react more specifically.  I do

14   appreciate the Court is seeking to keep out, and we strongly

15   agree, some of the more inflammatory language.  And I

16   appreciate that.  But I just want to make certain that there's

17   a context here that from our point of view makes sense.  It's

18   difficult to see on the screen your Honor and make certain --

19             THE COURT:  Now we can -- I appreciate if everyone is

20   too tired to deal with it tonight and if you want time to think

21   about it.  But it would be pretty easy for you to see the

22   redactions if the government just strikes through what's being

23   redacted.

24             Ms. Martins is about to show you a copy.

25             MR. MUKHI:  Your Honor, our only issue with timing is

1    we expect to play this call tomorrow with the witness and so it

2    takes time to redact and copy it.

3              THE COURT:  That's right.  I think it would be far

4    better to resolve it tonight.

5              MR. MUKHI:  At this time we're not going to offer

6    1516.

7              THE COURT:  And 1517.

8              MR. MUKHI:  I'll wait for Mr. Gates and Mr. Conniff.

9              (Pause)

10             MR. GAGE:  Appreciate the Court's patience.  Just if I

11   may --

12             THE COURT:  Take your time.

13             (Pause)

14             MR. MUKHI:  Your Honor, may I hand up one other

15   exhibit?

16             THE COURT:  Yes.  Thank you.

17             MR. GAGE:  Well, your Honor, I'll say this.  It's

18   certainly better.  My one concern, as it is with some of the

19   other tapes, is the context of it.  But I think -- I think for

20   now we're prepared to agree.  I've said that.  I do want to

21   read it one more time.  The paper copy was definitely helpful.

22   So the government can move forward unless something occurs to

23   us that isn't right now we would agree or not object, I should

24   say.

25             THE COURT:  Thank you.  Then we've taken care of 1545

FC19SKE7                        White - direct

1    and the government is, at least for the moment, withdrawing

2    1516.

3                 That takes us to 1517 which I guess should be

4    considered along with Government Exhibit 3066.

5                 (Pause)

6                 THE COURT:  I'm waiting to hear from defense counsel.

7    I'm sorry.  I'm looking at --

8                 MR. GAGE:  I apologize.  I thought your Honor was

9    reviewing.

10                THE COURT:  That's okay.

11                MR. GAGE:  We maintain our objection.  It's a wholly

12   separate situation.  Certainly is entitled -- I mean capable,

13   we believe, of confusion with the jury.

14                THE COURT:  I accept the government's argument on

15   relevance.  I do think that -- consider, please, on 1517

16   keeping lines 1 through 8 and then 13.

17                MR. MUKHI:  That's fine with the government, your

18   Honor.  Just to be clear we would include the last word of line

19   12, what begins, "So we've killed that bill."  But not --

20                THE COURT:  I don't have a view on that.  I thought

21   that in a way there is no predicate for the "so" once we've

22   taken out lines 9 through 12, other than "so."

23                MR. MUKHI:  I think we can do that.  We'll do that.

24   The audio may be tricky to redact out.

25                THE COURT:  I don't think it's essential.  I just

1    think it will sound like a bit like a non sequitur.

2           MR. MUKHI:  We agree.  So we can clip it that way.

3           MR. GAGE:  So, your Honor, pardon me.

4           THE COURT:  The proposal would be to keep lines 1

5    through 8 and line 13 on Government Exhibit 1517.

6           MR. GAGE:  And lines 14 and 15 be struck?

7           THE COURT:  Yes.

8           MR. GAGE:  16?

9           THE COURT:  Yes.

10          MR. GAGE:  Well, as always, we -- it's certainly

11   better than it was, your Honor.  No question about that.  But I

12   think on relevance grounds for the reasons we've argued before,

13   we do object.  And because it is a wholly separate situation I

14   do think it's capable of causing confusion, undue confusion

15   and, as a result, prejudice.

16          THE COURT:  Well, I think that relevance is, I think,

17   clear, that this shows consciousness of what is and is not

18   permitted by law.  I understand your point on it being a

19   separate situation.  But I think you can take care of that by

20   argument to the jury.  I'll think about that more overnight.

21          MR. GAGE:  Thank you, your Honor.

22          THE COURT:  But my tentative ruling would be to keep

23   it in.

24          With respect to 3066, again, what would the government

25   think of redacting everything up to, "You remember, period, he

1  was getting paid."  So you would keep the rest of it which

2  begins with Adam Skelos sending an article, Cuomo's daughter

3  lobbies Tkaczyk farmworkers bill.  Thanks.  So because she's a

4  Kennedy she's allowed to lobby.  Didn't show Bruno's kid the

5  same leniency with the law.  You remember he was getting paid."

6         MR. MUKHI:  Your Honor with one caveat.  I think we

7  can redact "always a double standard when it comes to the

8  Kennedys."  I think the next reply by Adam Skelos, "Well there

9  should be an investigation to see if her, I think referring to

10 the governor's daughter, and her mother is getting paid.

11        THE COURT:  I understand that.  I would accept that

12 view.

13        MR. MUKHI:  And Dean -- Senator Skelos' response that

14 "we'll check."

15        THE COURT:  Yes.  I agree.

16        MR. GAGE:  Your Honor --

17        THE COURT:  So the only thing being redacted would be

18 "always double standard when it comes to the Kennedys."

19        MR. GAGE:  I just think, your Honor, for example, the

20 line, "So because she's a Kennedy she's allowed to lobby"

21 doesn't advance anything that your Honor is tentatively

22 permitting on the taped conversation and it really is

23 potentially inflammatory for someone who feels fondness, and

24 there are many in this community, fondness towards the Kennedys

25 and for that reason I think is highly prejudicial to us.

FC19SKE7                         White - direct

1          THE COURT:  Well I think that's a good point.  And I

2    think that the government's -- the government's point is made

3    adequately through admission of 1517.  I don't think that 3066

4    adds much, if anything.

5          MR. MUKHI:  Your Honor the one thing it adds, which I

6    think is significant, is it's six months before or almost a

7    year before the next conversation, before 1517.  And so I think

8    it is significant that there was this knowledge in May of 2014

9    and then it's discussed again later.

10          THE COURT:  I had not noted the dates.  Let me

11    consider that.

12          MR. GAGE:  Because it is so disconnected in time it's

13    far less relevant.  It borders on stray remarks here.

14          MR. MUKHI:  Your Honor, we could propose that we could

15    redact in that sentence so she -- "So because she's a Kennedy."

16    We could just start it with, "She's allowed to lobby?"  Which

17    would get rid of the reference to the Kennedy family.  Which I

18    think is fine too because there is no -- I don't know if it's

19    common knowledge that the governor's daughter is a Kennedy.

20          THE COURT:  That certainly takes away all the

21    prejudice that I see.

22          What about is the government proposing to keep in

23    "Well there should be an investigation to see if her or her

24    mother is getting paid"?

25          MR. MUKHI:  Yes, your Honor.

1          MR. GAGE:  I really do think the context of this,

2     fairly viewed, is a stray, for lack of a better way to put it

3     at a late hour, conversation.  It probably is in part because

4     that family's name is coming up it's caught someone's eye.

5     This isn't a serious discussion about understanding of the law

6     and, of course, Adam Skelos is not a lawyer.  It really -- and

7     it is divorced in time, substantially separated in time from

8     the events the government is arguing.  And it's -- apparently

9     it's a volunteer effort.  When you get to the bottom of it,

10    there's nothing here.

11         MR. MUKHI:  Your Honor, just to be clear, it is during

12    the course of the conspiracy.  It's May 2014, the conspiracy

13    that we've alleged.  And it's related to the same individual

14    and the same issue.

15         THE COURT:  But it's not in furtherance.

16         MR. MUKHI:  Correct.  It's not furtherance.  It goes

17    to state of mind.

18              (Continued on next page)

19

20

21

22

23

24

25

FC1TSKE8

1          THE COURT:  Whose state of mind, Adam?

2          MR. MUKHI:  Both.  There's this discussion that if a

3     relative of the governor was being paid to lobby, there should

4     be an investigation.  Our allegation is essentially that's what

5     Adam Skelos was doing for AbTech for three years, including

6     during the time period of both these communications.

7          MR. GAGE:  I don't think it's the lobbying laws that

8     are at issue here.

9          MR. MUKHI:  That's certainly true.  But there's been

10    discussion of lobbyists on the recordings.  Mr. Skelos has

11    referred to fact that it would be an issue for him to meet with

12    senators because he's not a lobbyist and it would be a conflict

13    of interest.

14          The other portions of the recording that were included

15    under your Honor's ruling, he does make statements:  I believe

16    what we have done is above board.  Well, this email I think

17    contradicts that as to state of mind.  And some of those

18    statements are in the context of discussions about lobbyists.

19    So while lobbying laws we agree are not at issue, the

20    defendant's state of mind is.

21          MR. CONNIFF:  Your Honor, the only thing I add to that

22    is, in light of state of mind, there's been evidence, I think

23    even today which Mr. Mukhi just referred to, where Adam Skelos

24    is recorded saying:  If we're going to the state, I can't

25    lobby.

FC1TSKE8

1          This is a completely separate, personal conversation

2    that they have clearly arising out of an article, this link

3    that is at the bottom.  They're making commentary about what

4    they see as kind of a double standard around this lobbying.  In

5    fact, Senator Skelos points out that she's not a paid lobbyist,

6    she's a volunteer, and that's a distinguishing factor.

7          So it's a personal conversation between the two of

8    them about something that is clearly indicated at the bottom is

9    kind of a news story of the day.  And I think there's ample

10   evidence that both sides will argue about in terms of what Adam

11   Skelos knew about the lobbying laws and his responsibilities

12   and what the government will say he was doing.  But there's

13   just so much potential taint and prejudice arising out of this,

14   and its relevance is really fairly small, I would say, in light

15   of all the evidence.  We had two days of recordings and

16   hundreds of emails.  This seems unnecessary, and the prejudice

17   therefore outweighs it.

18          THE COURT:  On balance, my view is that it is far more

19   unfairly prejudicial than probative.  I don't think it's

20   sufficiently probative of any issue in the case.  And I do

21   think that the government -- well, let me just leave it that I

22   think that it would be error to allow it in.

23          MR. MUKHI:  Thank you, your Honor.

24          THE COURT:  Have a good evening.  I think we should

25   probably get together at 9:45 to iron this out to make sure

FC1TSKE8

1    it's clear what is coming in.

2              MR. MASIMORE:  Thank you, your Honor.

3              (Adjourned to December 2, 2015 at 9:45 a.m.)

```
1                        INDEX OF EXAMINATION

2   Examination of:                              Page

3    BJORNULF WHITE

4   Direct By Mr. Masimore . . . . . . . . . . .1435

5                      GOVERNMENT EXHIBITS

6   Exhibit No.                               Received

7   1   . . . . . . . . . . . . . . . . . . . .1434

8   2014A   . . . . . . . . . . . . . . . . . .1438

9   2658   . . . . . . . . . . . . . . . . . .1441

10  2014C   . . . . . . . . . . . . . . . . . .1442

11  2014B   . . . . . . . . . . . . . . . . . .1443

12  2015A   . . . . . . . . . . . . . . . . . .1450

13  431   . . . . . . . . . . . . . . . . . . .1456

14  2015B   . . . . . . . . . . . . . . . . . .1457

15  2139   . . . . . . . . . . . . . . . . . .1467

16  2312   . . . . . . . . . . . . . . . . . .1478

17  19   . . . . . . . . . . . . . . . . . . .1480

18  1601, 1602-A, 1604 through 1617, 3308,  . .1482

19          1601T and 1602-A-T and 1604T

20          through 1617T

21  2309   . . . . . . . . . . . . . . . . . .1516

22

23

24

25
```