FC2TSKE1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        15 CR 317 (KMW)

5   DEAN SKELOS and ADAM SKELOS,

6              Defendants.

7   ------------------------------x

8                                  New York, N.Y.
                                   December 2, 2015
9                                  9:45 a.m.

10  Before:

11              HON. KIMBA M. WOOD,

12                                      District Judge

13

                        APPEARANCES
14
    PREET BHARARA
15       United States Attorney for the
         Southern District of New York
16  JASON MASIMORE
    TATIANA MARTINS
17  RAHUL MUKHI
    THOMAS McKAY
18       Assistant United States Attorneys

19  GAGE, SPENCER & FLEMING
         Attorneys for Defendant Dean Skelos
20  G. ROBERT GAGE, JR.
    JOSEPH EVANS
21
    ROPES & GRAY
22       Attorneys for Defendant Adam Skelos
    CHRISTOPHER CONNIFF
23  JOHN DANIELS

24

25

FC1TSKE1

1          (In open court, jury not present)

2          THE COURT:  Good morning, please have a seat.

3          The government had one thing to raise?

4          MR. MUKHI:  Yes, your Honor, it may be somewhat

5    related to the second issue.

6          We received from Senator Skelos last night a list of

7    potential witnesses.  It's, in our view, not a real potential

8    list.  It's 29 witnesses long.  Among other reasons we don't

9    believe it's a real list is there is a former state senator on

10   the list, Owen Johnson, who passed away in 2014.  And so I

11   think we would like a real list.  I think that was the

12   understanding.  We didn't get any 26.2 material.

13         There are a number of issues raised, but I think we

14   can probably address most of them once we get a real list and

15   know who is real and who is not, but at the top of the list is

16   David Lewis, who was Senator Skelos' counsel, both as majority

17   leader and later as his criminal defense counsel in the

18   investigation.

19         So that raises a number of issues.  One, we asked in

20   August whether any advice of counsel defense would be raised.

21   We never received a response.  I don't think any predicate has

22   been established for such a defense.  We would want to brief

23   that.

24         Number two -- and defense counsel is aware of this --

25   during the course of wiretap we were aware that Mr. Lewis was

FC1TSKE1

1    Senator Skelos' counsel.  So those calls were auto minimized.

2    During the course of the wiretap, David Lewis started having

3    communications with Adam Skelos.  We do not believe they were

4    privileged.  Nevertheless, in an abundance of caution, we

5    sequestered at least one call between Mr. Lewis and Adam Skelos

6    from the trial team.  We have not listened to it.  We put it to

7    the side in an abundance of caution.

8           If Mr. Lewis is going to be a witness, I think we

9    would have an application to the Court for a ruling that that

10   call was not privileged because there was no attorney/client

11   relationship between Mr. Lewis and Adam Skelos.  We would want

12   to make that application forthwith because we would want to

13   listen to call, potentially transcribe it and introduce it in

14   our case in chief.

15          Number two, we have got a no factual proffer as to

16   what Mr. Lewis would testify to.  So even if there was any

17   privilege that attached, the privilege could be waived.  They

18   can't use the privilege as a sword and shield with respect to

19   specifics as to what was discussed in that phone call that we

20   have not listened to.

21          There are a number of other issues.  There are

22   multiple witnesses on the list that defense counsel is aware

23   would assert the Fifth Amendment if called to testify.  And we

24   would just, I think, appreciate -- at this point a defense

25   case, if it were to happen, would be next week, and we would

FC1TSKE1

1    like the opportunity to get a real list so we can prepare.

2              THE COURT:  All right.  Assuming for the moment that

3    defense counsel will not concede that the list they gave is not

4    a real list, perhaps you could give a list of the first few

5    witnesses you intend to call.  That is certainly within the

6    spirit of the agreement.

7              MR. GAGE:  What your Honor sees is my thinking about

8    it and trying to determine what is in the spirit of the

9    agreement.  And I acknowledge the agreement, your Honor.

10             Part of the difficulty is -- if I could think out loud

11   a bit, I will be brief about it because we have a jury and want

12   to start at ten.  With so many government witnesses yet to

13   come, eight to ten, I don't think we yet have a full sense of

14   the scope.  So there may be testimony that comes in, for

15   example, this afternoon or tomorrow that makes it unnecessary

16   to call certain people or heightens the need to call certain

17   people.  And that's frankly what I'm struggling with.  It is a

18   longer list.  I said this morning to the government there

19   certainly are some on those whose statements or obviously

20   presence is less likely to highly unlikely.

21             THE COURT:  Particularly the one who is deceased.

22             MR. GAGE:  Yes.  But my office tried to be

23   comprehensive in all the Long Island Nine, including

24   statements, your Honor, which have been introduced through

25   others.  But that said, yes.

FC1TSKE1

1        But it's difficult to -- back to your Honor's

2   question, it's difficult to say with certainty who they would

3   be.

4        THE COURT:  Why don't we do this, let's take it up at

5   lunch.  I'll ask you and the government to confer at one

6   o'clock and then we'll take it up then.  And right now let's

7   just take up the admissibility of the two exhibits we were

8   looking at last night.  I think you have all been given a copy

9   of my tentative amended ruling.

10       MR. MUKHI:  And your Honor, the reason why the two

11  issues relate is David Lewis.  The government's view, and I

12  don't know if we crystallized it as clearly yesterday, but the

13  reason why we would think the call and the email, the relevance

14  would vastly outweigh any unfair prejudice is particularly if

15  either defense counsel is going to make an argument that either

16  the senator or Adam Skelos believed that they were acting in

17  good faith because they were trying to comply with lobbying

18  laws or practices and therefore did not believe that their

19  conduct violated the laws at issue in this case.

20       If such an argument is going to be made, then we think

21  we will offer the two exhibits, and that the relevance vastly

22  outweighs any unfair prejudice.  If that argument is not going

23  to be suggested or made, I think at this time the Court doesn't

24  have to issue a final ruling because we may not introduce

25  either the call or the email.

FC1TSKE1

1          So I think that we would ask if we could get a sense

2     from defense counsel whether that suggestion is going to be

3     made, I think frankly in summation, because we will get a sense

4     during cross-examination, but there were references in the

5     calls that Adam Skelos was saying he had discussions with

6     Mr. Lewis, there was a reference to that, and that as long as

7     he separated himself in a certain fashion, everything was above

8     board, I think he said.  So I think we want to understand that,

9     and it relates to the David Lewis issue as well.

10          THE COURT:  All right.  May I hear from counsel.

11          MR. CONNIFF:  I will begin since I think it relates to

12    Adam Skelos in terms of the lobbying efforts, et cetera.  I

13    think we argued this yesterday afternoon.  I think your Honor

14    understands my position at least.

15          I think in terms of the government's argument this

16    morning, no one is making the argument this is a case about

17    whether Adam Skelos lobbied or not, because he's not charged

18    with violating the lobbying laws, he's charged with aiding and

19    abetting extortion and bribery laws.  There's been evidence

20    already introduced, both Adam Skelos asserting what he can --

21    believes he can and cannot do in connection with the state, and

22    I believe doing certain of those things in a covert way in

23    order to conceal that he was doing some lobbying and setting up

24    meetings and things like that.  That evidence came in

25    yesterday, and we're not really disputing that because that's

FC1TSKE1

1    not really the issue in the case.  I don't intend to stand up

2    in summation and say well, Adam Skelos didn't violate the

3    lobbying laws here or on advice of counsel he thought he was

4    complying with the lobbying laws, because that's not what the

5    case is about.

6              THE COURT:  Will he be asserting any advice of counsel

7    defense?

8              MR. CONNIFF:  No, your Honor.

9              THE COURT:  Was he ever represented by David Lewis?

10             MR. CONNIFF:  Your Honor, I think at a transitional

11   point as the case unfolded Mr. Lewis may have advised both

12   Senator Skelos and Adam Skelos.  I don't have full details of

13   that because I wasn't involved at that time.  But just to speak

14   to issue of the advice of counsel and Mr. Lewis as a witness, I

15   represent Adam Skelos, and I communicated to the government

16   that we don't anticipate calling witnesses.  And if Mr. Lewis

17   is going to be called, I would have an objection to calls being

18   introduced between he and Adam Skelos on some waiver theory,

19   because we're not asserting that issue at all for Adam Skelos.

20             THE COURT:  I will hear you at the time on that.

21             MR. CONNIFF:  So to get back to issue we're discussing

22   now, I don't really see a difference between last evening and

23   this morning, I guess, your Honor, in terms of the irrelevance,

24   the kind of topical nature of this.  I will not repeat myself

25   because I know your Honor was listening last night.  I don't

FC1TSKE1

1    really see a difference.  If the government's issue is whether

2    we're going to argue this or not, I'm not going to argue an

3    advice of counsel defense.

4                THE COURT:  Not advice of counsel, but will you be

5    arguing that Adam Skelos did not have an understanding of the

6    unlawful nature of the conspiracy?

7                MR. CONNIFF:  Well, your Honor, there are two

8    different things in my mind.  One is that's a defense to the

9    charges.  Will I be arguing that Adam Skelos knew what --

10   understood that he was acting in compliance with the lobbying

11   laws when he was calling senators to set up appointments and

12   things?  No, I'm not going to be arguing that.  I will be

13   arguing --

14               THE COURT:  We're not dealing only with lobbying.

15               MR. CONNIFF:  That's what we're dealing with in

16   connection with these exhibits.  These two exhibits relate

17   directly to a niece.

18               THE COURT:  That's right, they relate to lobbying, one

19   of many activities that a relative can help another one with.

20               All right.  Now may I hear from Mr. Gage answering

21   what Mr. Mukhi said.  Will there be an advice of counsel

22   defense?

23               MR. GAGE:  Not from Senator Skelos, no.

24               Could I say briefly, your Honor, there is a lot of

25   material for everyone in this courtroom to digest, and yes, we

FC1TSKE1

1    made an error and included a name we shouldn't have on the

2    list.  We apologize to the Court.  I'm sorry, occasionally

3    mistakes do happen.

4         Mr. Lewis is on the list because certain material came

5    up yesterday and it occurred to us that perhaps we should

6    consider whether or not there could be a very cabined testimony

7    on certain issues.  I haven't had time to fully think that

8    through.  And that's why he's on the list because I didn't want

9    there to be surprises.  I'm digesting what I am hearing this

10   morning.

11        But to answer your Honor's question directly, no,

12   we're not going to assert an advice of counsel defense.  And

13   perhaps, from what I'm hearing, it doesn't make sense for

14   Mr. Lewis to be on the list, but I want to digest it a bit and

15   address it further at lunch.

16        THE COURT:  Mr. Mukhi, does that tell you what you

17   need to know going forward?

18        MR. MUKHI:  I don't think so, your Honor.  With

19   respect to Senator Skelos, I think the question is whether

20   there's going to be any argument that he didn't appreciate that

21   he was violating federal law.  And I think the same question, I

22   think Mr. Conniff is parsing it very I think legalistically,

23   he's not going to argue lobbying laws.  But on those calls

24   they're discussing lobbying, and Adam Skelos says I think it's

25   above board, and then we have calls and an email where they're

FC1TSKE1

```
 1   aware if a relative lobbies and is paid for it, they think it's
 2   inappropriate and potentially subject to investigation.
 3          So I think, in our view, Mr. Conniff parsed it too
 4   finely to really give the Court a representation that an
 5   argument is not going to be raised that would open the door to
 6   both these issues, both these exhibits.
 7          THE COURT:  I didn't really follow you.  His argument
 8   is that these relate to lobbying and that he's not going to
 9   make a lobbying argument.
10          MR. MUKHI:  I think it's a larger intent and knowledge
11   issue.  The emails themselves also don't refer to lobbying
12   laws, they just talk about lobbying.  And so it's a larger
13   intent issue.  I think the issue is this was just -- I think
14   the statement was made that Senator Skelos is allowed to be a
15   father and a senator at the same time, so it's about the
16   relationship of the work of a relative when another member of
17   the family is a public figure.  And that argument is going to
18   be made that they didn't think they were doing anything wrong,
19   and the fact that there are emails about other family members
20   and public officials, and the relationship between the work
21   that they think is improper because they're getting paid to do
22   it I think is relevant hearing Mr. Conniff's answer, and I
23   don't think that we heard Mr. Gage's answer yet.
24          THE COURT:  Well, I think it's relevant for the same
25   reason, that is, looking at it more broadly than mere lobbying.
```

FC1TSKE1

1          Now the seed was sewn for the father son argument in

2    Mr. Gage's opening.

3          MR. MUKHI:  That's correct.

4          THE COURT:  So it seems to me there's enough -- you

5    already need to anticipate that.

6          MR. MUKHI:  I think so.  I think that's why -- before

7    the case we also sought to admit these.  I think there's been a

8    more precise issue that made it into the trial with regards to

9    calls that were played yesterday.

10         THE COURT:  So do you need a statement from Mr. Gage

11   that he's not going to make an argument that his client didn't

12   know the law, the federal law?

13         MR. MUKHI:  No, I don't think so.  That's why we have

14   sought admission of these exhibits from the onset, but we were

15   honing our arguments to recent testimony that made it even more

16   clear.

17         THE COURT:  That's right.

18         All right.  My ruling on Government Exhibits 1517 and

19   3066 is that their probative value outweighs any possible

20   prejudice.  The only prejudice I see is possible confusion,

21   which the defense argued last night, and I don't think the jury

22   will be confused by this.  And I think that this evidence shows

23   that the defendants were aware of application of the law to

24   relatives of politicians who were getting paid in connection

25   with the politician's commitment to favor those who were paying

FC2TSKE1                    White - direct

1    the son.  And I have removed the prejudicial language about the

2    Kennedys from Government Exhibit 3880.

3              All right.  I think we're ready for the jury.

4              DEPUTY MARSHAL:  We're waiting on one.

5              THE COURT:  I should note that, for counsel, that the

6    ruling with respect to Exhibit 3066 extends to the entire email

7    chain, not to the shortened version of it that we talked about

8    last night.

9              MR. MUKHI:  Thank you, your Honor.  And one point of

10   clarification, I believe your Honor referred to transcript as

11   3808, which is a session number, we marked the exhibit as 1517.

12             THE COURT:  Okay, thank you.  I stand corrected.

13             MR. MUKHI:  Thank you, your Honor.

14             MR. CONNIFF:  Your Honor, would it be okay, if the

15   jury is not here, if Mr. Skelos walks quickly to the washroom?

16             THE COURT:  Sure.  Anyone else who would like to may

17   do so.

18             (Pause)

19             THE COURT:  We have the jury.

20             (Continued on next page)

21

22

23

24

25

FC2TSKE1                        White - direct

1           (Jury present)

2           THE COURT:  Good morning, ladies and gentlemen.

3           We are ready to proceed, Mr. Masimore.

4           MR. MASIMORE:  Thank you, your Honor.

5    BJORNULF WHITE,      (Continued)

6        called as a witness by the Government,

7        having been previously sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. MASIMORE:

10   Q.  Mr. White, do you recall where we left off at the end of

11   the day yesterday is we listened to the call that was

12   Government Exhibit 1615, it was a March 25th, 2015 call

13   between --

14           MR. MASIMORE:  Just a moment, your Honor, the jurors

15   are passing their binders around.

16           THE COURT:  Yes.

17   Q.  Mr. White, yesterday when we left off we discussed

18   Government Exhibit 1615, which was a call between you and Adam

19   Skelos, on March 25th, 2015.

20   A.  Yes, I recall.

21   Q.  And do you recall testifying in sum and substance that you

22   had been asked to have a discussion with Adam Skelos to inquire

23   about the status of design build legislation?

24   A.  Yes.

25   Q.  Do you recall at the end of the conversation Adam Skelos

1    had indicated that he was going to check with Senator Skelos?

2    A.  Yes.

3             MR. MASIMORE:  And maybe we should bring it up, 1615T.

4    We can do it on the screen or the jury certainly is free to --

5    may we ask the jury, if they wish, to turn to 1615T?

6             THE COURT:  Yes.

7    Q.  And the last page, page 5 of the exhibit, you see there at

8    the top Mr. Skelos said:  He'll be home Thursday.  I'm going to

9    be -- I have a thing in the city Thursday night, so Friday

10   morning I'm going to meet him at his district office in

11   Rockville Centre.

12   A.  Yes, I recall.

13            MR. MASIMORE:  If we could pull up, please, Government

14   Exhibit 3038 in evidence.  That should be the summary chart.

15   3308, the summary chart.

16   Q.  If we go to second page of 3308, do you see Exhibit 1615

17   was from March 25th, and if we look at the first page of 1615T,

18   it indicates that call was at 5:59 p.m.

19   A.  Yes.

20            MR. MASIMORE:  If we could publish Government

21   Exhibit 1527 at this time.  1526 first.  That would be 1526T in

22   the jury's binders.  And 1526 is a call same date, March 25th,

23   2015, it's at 6:07 p.m. and the participants are Adam Skelos

24   and the senator's office and someone named Pat.

25            (Audio recording played).

FC2TSKE1                       White - cross

 1             MR. MASIMORE:  Could we go to Government Exhibit 1527

 2    in evidence, and that will be 1527T, the next tab in the jury

 3    binder.  1527 is a call same date, March 25th, 2015.  It

 4    occurred at 6:23 p.m.  The participants in the call are Adam

 5    Skelos and Frank Alleva.

 6             (Audio recording played)

 7             MR. MASIMORE:  Permission to publish Government

 8    Exhibit 2005, page 1.

 9             THE COURT:  Yes.

10             MR. MASIMORE:  Page 1 of Government Exhibit 2005 in

11    evidence, in the middle we highlighted an entry for Francis P.

12    Alleva, and it says majority counsel/program office assistant

13    counsel.

14             Directing everyone's attention to Government

15    Exhibit 1447, there's no tab in the binder for this one, so

16    we'll display it on the screen.  1447 is a call dated back in

17    January, January 12, 2015, it was at 10:18 a.m.  And the

18    participants are Adam Skelos and Frank Alleva.

19             (Audio recording played)

20             MR. MASIMORE:  If we could pull up Government

21    Exhibit 3308 again, please.  And we'll go back to page 1.  At

22    the very bottom it refers to Exhibit Number 1614.  It's a

23    consensual call, March 25th, 2015.  The participants are

24    Bjornulf White and Adam Skelos at a number that ends in 2001.

25    And that would be at 1614T in the jury's binder.

FC2TSKE1                     White - cross

1              (Audio recording played)

2              MR. MASIMORE:  Nothing further, your Honor.

3              THE COURT:  Cross-examination.

4              Mr. Gage, go ahead.

5              MR. GAGE:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. GAGE:

8    Q.  Good morning, Mr. White.

9    A.  Good morning.

10   Q.  This contract between AbTech and Nassau County that we have

11   been talking about --

12   A.  Yes.

13   Q.  -- ultimately only approximately $150,000 was paid under

14   that contract, correct?

15   A.  Correct.

16   Q.  Nothing more?

17   A.  Nothing more was paid to AbTech, you're asking?

18   Q.  I'm asking the total amount paid to AbTech.  And we'll talk

19   about how it was split up, but the total amount paid to AbTech

20   under the contract was 150,000?

21   A.  To my knowledge, yes.

22   Q.  No more funds provided, correct?

23   A.  To my knowledge, that's correct.

24   Q.  No 400,000, for example, correct?

25   A.  That's correct.

FC2TSKE1                          White - cross

1    Q.  No other funds pushed through, right?

2    A.  That's correct.

3    Q.  And of that 150,000, approximately 50,000 went to a company

4    called Cameron Engineering, is that right?

5    A.  Yes, I believe so.

6    Q.  And Cameron Engineering was an engineering firm that

7    specialized in, among other things, infrastructure projects in

8    Nassau County, right?

9    A.  Yes.

10   Q.  And they worked kind of hand in hand with AbTech and AEWS,

11   your engineering subsidiary, in implementing phases one and

12   two, correct?

13   A.  They worked in hand in hand -- it was AbTech's subsidiary,

14   not mine.

15   Q.  To be clear AEWS, is an engineering subsidiary?

16   A.  Correct.

17   Q.  They were going to perform engineering work?

18   A.  Design consulting, but Cameron was the principal

19   engineering design firm.

20   Q.  But AEWS, its focus was engineering, correct?

21   A.  Yes.

22   Q.  And you were the head of it?

23   A.  Yes.

24   Q.  And so 150,000, 54,000 approximately to Cameron.

25            On the legislation that we have been hearing about for

FC2TSKE1                     White - cross

```
 1   the last day or so, no design build legislation passed that

 2   benefited AbTech under the contract, correct?

 3   A.  That's correct.

 4   Q.  And no stormwater P3 legislation passed that benefited

 5   AbTech under the contract, correct?

 6   A.  That's correct.

 7   Q.  So we heard Adam Skelos say I'm going to get my dad to do

 8   that, but in fact none of the legislation passed, correct?

 9   A.  The legislation did not pass, correct.

10   Q.  Let's go back to October 31st, 2013, which is the day I

11   believe you were out commencing the engineering work in Nassau

12   County.

13   A.  It was the overall project kickoff, yes.

14   Q.  The overall kickoff.

15           And you were going to pick up Adam Skelos, correct?

16   A.  I don't recall that we were going to pick up, but he said

17   he wanted to meet in Rockville Centre.

18   Q.  Meet in Rockville Centre.

19           And he said can you come by my dad's office, right?

20   A.  He said he was there, could I stop by there and we would go

21   from there.

22   Q.  He wanted to introduce you to his father, right?

23   A.  Yes.

24   Q.  And he's proud of his father, correct?

25   A.  Probably, yeah.
```

FC2TSKE1                      White - cross

1   Q.  It's a son introducing his father to the boss, right?

2   A.  Well, Glenn would be the ultimate boss, but sure, I

3   understand what you're saying.

4   Q.  You were Mr. Skelos' boss, right?

5   A.  I was day-to-day supervisor.

6   Q.  And so he introduced you to his dad, right?

7   A.  Yes.

8   Q.  And his dad said tell me about your work, right?

9   A.  Well, on fracking specifically, the solution, yeah.

10  Q.  And tell me what your company does.  Do you recall that?

11  A.  Well, he only wanted to hear about fracking, but yes, what

12  the company's solution for frack water treatment was.

13  Q.  And the point was the conversation, again, tell me

14  something about your company with regards to fracking, correct?

15  A.  Correct.

16  Q.  And you also mentioned, since you kicked off the

17  engineering project, what was happening there, correct?

18  A.  No, I don't recall speaking about that.

19  Q.  Even though it was the kickoff date, the commencement, no

20  mention at all what you were doing out there that day?

21  A.  Not that I recall.

22  Q.  Not that you recall.

23          And let's go back to the three-way phone call.  You

24  were actually with Adam Skelos, his dad, and yourself?

25  A.  Okay.

FC2TSKE1                        White - cross

1    Q.  You were driving in your car, right?

2    A.  Yes.

3    Q.  And Adam Skelos calls you, right?

4    A.  I believe that was the order.

5    Q.  And he plugged in his dad, right?

6    A.  Right.

7    Q.  It was a four-minute call, right?

8    A.  It was very brief.  I don't remember the exact amount of

9    minutes.

10   Q.  And November 2nd, right after Hurricane Sandy struck,

11   right?

12   A.  Yeah.

13   Q.  And the senator said infrastructure and repair of

14   infrastructure is going to be a major issue for Long Island and

15   New York, correct?

16   A.  That's correct.

17   Q.  Not exactly a surprise, correct?

18   A.  Not a surprise, no.

19   Q.  Okay.  And that meeting, by the way, with Senator Skelos

20   when Adam introduced him, that wasn't prearranged either, that

21   was spontaneous also, correct?

22   A.  Correct, yeah.

23   Q.  And you understood -- now back to November 2nd, right after

24   Sandy had struck, you understand generally where Senator

25   Skelos' district is, correct?

FC2TSKE1                          White - cross

1   A.   Generally, Nassau County area, yeah.

2   Q.   And you understand it includes the part of the southern

3   shore of Long Island, correct?

4   A.   Yeah.

5   Q.   The Jones Beach, Long Beach area?

6   A.   Yeah.

7   Q.   Among the worst impacts of Hurricane Sandy, correct?

8   A.   Yeah.  To be honest with you, I don't know all the

9   geography that well, but I know the area included the area

10  impacted by Sandy.

11  Q.   And the shores were hard hit.  That's pretty much common

12  knowledge.

13  A.   Yes.

14          THE COURT:  I will ask you not to interrupt.

15  Q.   Prior to this brief conversation that we're talking about,

16  your company was very aware that as a result of the storm,

17  infrastructure repair, including stormwater repair, might be

18  necessary, correct?

19          MR. MASIMORE:  Objection, your Honor, "your company."

20          THE COURT:  Sustained.

21  Q.   Pardon me.  AbTech was aware that infrastructure repair and

22  stormwater repair would be necessary?

23  A.   Yes, AbTech was.

24  Q.   And you -- AbTech in fact hired a number of lobbyists,

25  people with specialized knowledge in Washington D.C., to help

FC2TSKE1                        White - cross

1   them study how they could be most productive in this area,

2   correct?

3   A.  The lobbying group was already retained, but yes, their

4   focused area became on the Sandy issues.

5   Q.  And how to get FEMA money, correct?

6   A.  Well, and it wasn't FEMA money, but the funding associated

7   with the appropriation for infrastructure planning.

8   Q.  But certainly those companies -- some of the lobbyists were

9   hired out of Washington D.C., correct?

10  A.  Yes.

11  Q.  And their focus was how to get federal funding, correct?

12  A.  Yes.

13  Q.  And let's go back to when you first were introduced to Adam

14  Skelos.  Do you recall it was -- Mr. Dorego was pumping up Adam

15  Skelos?

16          MR. MASIMORE:  Objection, characterization.

17          THE COURT:  Sustained.  I think it's not clear.

18  Q.  Do you recall that Mr. Dorego was saying the Skelos name

19  could be a benefit to the company?

20  A.  No, I never had contact with Charlie Dorego, only with

21  Glenn Rink.

22          MR. GAGE:  If we could put Government Exhibit 2404 on

23  the screen, please.

24  Q.  Can you see your screen, Mr. White?

25  A.  Yes, I can.

FC2TSKE1                    White - cross

1  Q.  And at the top you see this is an email from Glenn Rink to

2  you?

3  A.  Yes.

4  Q.  And it says FYI?

5  A.  Yes.

6          MR. GAGE:  Now if we could blow up a bit the bottom

7  there.

8  Q.  So just to remind you, his contacts are very, very high

9  level.  His dad is Dean Skelos, New York Senate Majority

10 Leader.  I expect that you and I can work out some kind of

11 override for handing him over to you.

12          And do you see that's the email that was forwarded to

13 you?

14 A.  Yes.

15 Q.  So you can see -- you saw early on based on the email

16 Mr. Rink forwarded to you that Charlie Dorego was trying to

17 tout, if you will, the use of Senator Skelos' name.  Do you see

18 that now?

19 A.  That's not how Glenn explained it to me exactly in terms of

20 touting the name.

21 Q.  Well, you can see his contacts are very high level,

22 correct?

23 A.  I see that those were the words, yeah.

24 Q.  And the identification of who his father is, correct?

25 A.  I see the identification, yes.

FC2TSKE1                        White - cross

1   Q.  And that fit with the overall business model AbTech was

2   employing, correct?

3   A.  I'm not sure what you mean.

4   Q.  Well, AbTech was in the process of hiring consultants who

5   could open doors to municipalities, correct?

6   A.  Yes.

7   Q.  For example, former Governor Rendell of Pennsylvania was

8   hired?

9   A.  Yes.

10  Q.  Former governor of Maryland was hired?

11  A.  Yes.

12  Q.  Former Congressmen were hired?

13  A.  Yes, they already -- he already was.

14  Q.  A person who contact with the defense department --

15          THE COURT:  Don't interrupt the witness.

16  Q.  A person who had contact with the defense department were

17  hired?

18  A.  Yes.

19  Q.  And let's talk about this override.  Were you aware that

20  Mr. Dorego was asking for an override?

21  A.  Yes.

22  Q.  What did you understand that override to be?

23  A.  That Charlie Dorego was going to get some kind of

24  percentage of whatever was paid to Adam, at least in the

25  commission portion.

FC2TSKE1                      White - cross

1   Q.  And did you participate -- did you discuss that override

2   with Mr. Rink?

3   A.  Yes.

4   Q.  Was that the first time, to your knowledge, Mr. Dorego

5   asked for an override?

6   A.  That I don't know.  I don't recall.

7   Q.  In fact, Mr. Dorego did get some type of award during the

8   August 2012 period.  Do you recall that?

9   A.  I have a vague recollection related to a different project,

10  legacy project.

11  Q.  The Babylon project and Sag Harbor project?

12  A.  Yeah.

13  Q.  Do you recall that he got approximately 40,000 warrants?

14  A.  I never was aware of what was actually granted to him.  I

15  only saw an interim document that Glenn forwarded me, so I

16  don't know if that actually occurred.

17         MR. GAGE:  If we could introduce Defense Exhibit HH,

18  please.  And I will show it to the witness.

19  Q.  Mr. White, do you recognize that's a document related to

20  AbTech?

21  A.  I do recognize it.  I haven't seen it before, but yes.

22  Q.  But that is consistent with the form of an AbTech awarded

23  options?

24  A.  I have actually never seen a AbTech warrant award, so I

25  don't know.

FC2TSKE1                         White - cross

1   Q.  Would you agree that appears to be a business document of

2   AbTech's?

3   A.  Yes.

4           MR. GAGE:  We offer it, your Honor.

5           MR. MASIMORE:  Objection on foundation, your Honor.

6           THE COURT:  Sustained.

7   Q.  Well, to your recollection, was Mr. Dorego awarded 40,000

8   warrants?

9   A.  I have no idea.

10          THE COURT:  He answered that.

11  Q.  Do you recall other compensation Mr. Dorego was receiving

12  from AbTech?

13  A.  No.

14  Q.  Are you aware Mr. Dorego was a shareholder of AbTech's?

15  A.  Individually I don't know if he was.

16  Q.  And going back to this time period, August 2012, if someone

17  received warrants, that wasn't considered worthless, correct?

18  A.  Correct.

19  Q.  We talked about the business model of hiring consultants,

20  but let's talk about another aspect of AbTech's business.  It

21  wasn't a charity, correct?

22  A.  No, AbTech was not a charity.

23  Q.  The goal was to increase its value so it could be sold to a

24  larger company and perhaps an IPO, correct?

25  A.  No, that was never a stated goal.

FC2TSKE1                         White - cross

1    Q.  Well, how would -- how much was invested in AbTech by

2    investors during the time you were there?

3    A.  During the time I was there, I don't actually know what the

4    number.  I wasn't that involved with that type of stuff, so I

5    am not sure.

6              MR. GAGE:  If I could approach, your Honor.

7              THE COURT:  Yes.  Could you show the government what

8    you're approaching with.

9              MR. GAGE:  Yes.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC29SKE2                        White - cross

1   Q.  Mr. White, let me show you what's been marked as

2   Defendants' Exhibit LL?

3   A.  Okay.

4   Q.  Is that an e-mail that you received or sent?

5   A.  Yes.

6   Q.  And from who was it received or sent?

7   A.  It's from Anthony Reed who is Glenn's executive assistant.

8   Q.  To whom?

9   A.  To me.

10          MR. GAGE:  Your Honor, we would offer Defendants'

11  Exhibit LL.

12          THE COURT:  Defendants' Exhibit LL is received without

13  objection.

14          (Defendants' Exhibit LL received in evidence)

15          MR. GAGE:  If we could look at the first line.

16  Q.  "Bjornulf, please see the updated pending activities report

17  from Glenn and a draft of Charlie Dorego's compensation plan."

18          Do you see that?

19  A.  Yes.

20          MR. GAGE:  Could we go to the last page of the

21  document.

22          If we could blow that up just a bit.

23  Q.  So this is the proposed compensation plan for Charlie

24  Dorego, correct?

25  A.  At that time, yes.

FC29SKE2                         White - cross

1    Q.  And this is what you received?

2    A.  Yes.

3    Q.  And so we're looking at two things right now.  "Charlie

4    Dorego Adviser Compensation Babylon Project and Sag Harbor,

5    20,000 Options Per Year for Two Years for a Total of 40,000."

6           Do you see that?

7    A.  Yes.

8    Q.  And then the second heading "For New Hire Adam Skelos

9    Compensation."

10          Do you see that?

11   A.  Yes.

12   Q.  "Charlie would receive 2.5 percent of gross margin

13   commission on all sales through Adam's direct efforts for 18

14   months as long as Adam continues to work for the company for

15   the entire 18 months."

16          Do you see that?

17   A.  Yes.

18   Q.  And also during this time are you aware that Mr. Dorego was

19   in effect managing investment or overseeing investment of the

20   Litwin family, correct?

21   A.  I don't know if it was formal management but I know he was

22   the -- he was the representative that I think Glenn had more

23   contact with than Steven Swarzman.

24   Q.  Are you aware that that investment was approximately $2

25   million, correct?

FC29SKE2                           White - cross

1    A.  No.  I never knew the amount.  I knew it was just a large

2    individual shareholder or one of the first large shareholders.

3    Q.  Going back to the purpose.  How are people going to, to say

4    it simply, going to make money on their investment through

5    AbTech?

6    A.  Do you mean before or after it went public?

7    Q.  Well at the time of this proposed compensation plan to

8    Mr. Dorego.  So, August 2012.

9    A.  At that time it was publicly traded.  So an increase in the

10   value of the shares of AbTech would increase someone's value if

11   they owned shares so they could sell them for a profit.

12   Q.  And prior to this period you had been there for how long?

13   A.  Well I started in -- as a consultant in June 2010 and I had

14   been an employee since January 1, 2012.

15   Q.  And you were aware that AbTech had been doing work with

16   Waste Management in the prior year, correct?

17   A.  Yes.

18   Q.  And there was a possibility of acquisition by Waste

19   Management, correct?

20   A.  I don't believe that was part of the discussions.

21   Q.  But even if a company is publicly traded one way that it

22   can increase its value is if it's acquired by a larger company,

23   correct?

24   A.  I would not assume increase its value because they can be

25   acquired, you know, as an exit that ends up decreasing

FC29SKE2                         White - cross

1    shareholder value in the long run.  So I can't really say that

2    it's always correlated with increasing value.

3    Q.  Bottomline.  The goal of AbTech, as of August 2012, was to

4    make money, correct?

5    A.  Yes.

6    Q.  So let's go back -- let's stay in August 2012.  Your first

7    contact was Adam Skelos was when approximately?

8    A.  My first contact was a conference call that Glenn arranged

9    where I was part of the second part of it.

10   Q.  And Mr. Adam Skelos' contract was not formalized until the

11   end of November, correct?

12   A.  Yes.

13   Q.  And prior to that you had made contact with Nassau County,

14   correct?

15   A.  Yes.

16   Q.  And, again, just in terms of approach.  Counties are not in

17   the business, or municipalities, of developing technology,

18   correct?

19   A.  No, they're not.

20   Q.  That's something that a company like AbTech would do?

21   A.  Correct.

22   Q.  And then you approach the county or the municipality,

23   correct?

24   A.  Correct.

25   Q.  That's not at all uncommon?

FC29SKE2                          White - cross

1    A.  No.  Not uncommon at all.

2    Q.  And, in fact, taking the initiative, so to speak, to

3    approach the county is not at all uncommon, correct?

4    A.  Not uncommon.

5    Q.  And on November 21 you actually submitted a proposal, an

6    unsolicited proposal to Nassau County, correct?

7    A.  Correct.

8    Q.  Who drafted that?

9    A.  Myself and various staff members.

10   Q.  And how was that delivered to Nassau County?

11   A.  We sent it electronically, as I recall, to Adam who -- who

12   then provided it to the county.

13          MR. GAGE:  And if we could call up the unsolicited

14   proposal.

15          We'll look for that.

16   Q.  During that same time period do you recall Adam Skelos

17   telling you that he anticipated -- let me step back.

18          MR. GAGE:  Pardon me, your Honor.

19   Q.  The goal of the unsolicited proposal was to try to get the

20   county to proceed with an RFP, correct?

21   A.  I would say at that point it's to develop their interest.

22   RFP would be one way for them to express their interest.

23   Sometimes they -- I mean it's generally just to develop their

24   interest.

25   Q.  Do you recall during that period Adam Skelos said to you

FC29SKE2                          White - cross

1    you can anticipate an RFP within seven to ten days?

2    A.   Yeah.

3    Q.   But that didn't happen, correct?

4    A.   No.  It took longer.

5    Q.   And it described -- you talked with the county right before

6    Christmas to be asked further questions, correct?

7    A.   On Christmas Eve, yeah, there was a conference call.  There

8    were other contacts too.

9    Q.   And the county's professional engineers were part of that

10   call?

11   A.   I don't know if they were engineers but I believe there

12   were analysts and such.  They may have been engineers.  I just

13   don't recall.

14   Q.   Was Ms. Shah on the call?

15   A.   I don't believe so but Ken Arnold was.  He may be an

16   engineer.

17   Q.   But he had the engineering expertise for the county,

18   correct?

19   A.   That I'm not entirely sure.  He might have just been more

20   management, which would be common to sort of hire outside

21   consulting engineers and not have internal engineers.

22   Q.   His questions were based about technical issues regarding

23   your product, correct?

24   A.   Yes.

25   Q.   They wanted to understand the technical capability of your

FC29SKE2                         White - cross

1    product, right?

2    A.  That was one of the big categories, yeah.

3    Q.  You talked to them again between Christmas and New Year's,

4    correct?

5    A.  I can't confirm a hundred percent but I think that's true.

6    Q.  And you were at that point having regular conversation with

7    them as they had questions, correct?

8    A.  Yeah.  I do recall there was multiple contacts.

9    Q.  You had open accessibility to them, correct?

10   A.  Not really.  I mean they -- without -- without Adam they

11   didn't seem really that interested in talking to me directly.

12   Q.  That really doesn't answer my question.  You could call

13   them up without --

14            MR. MASIMORE:  Objection, your Honor.

15            THE COURT:  Sustained.

16   Q.  I'll rephrase it.  On that December 21st conversation --

17   24th conversation was Mr. Skelos on the line?

18   A.  No, he was not.

19   Q.  And the conversation between Christmas and New Year's, was

20   Mr. Skelos on the line?

21   A.  No, I don't think so.

22   Q.  You had a number of phonecalls with them when Mr. Skelos

23   was not on the line, correct?

24   A.  He wasn't on the line but he arranged them or helped

25   arrange them.

FC29SKE2                        White - cross

1   Q.  But the technical discussion was between you and the people

2   at Nassau County, correct?

3   A.  Yes.

4   Q.  And then on January 21 the county asked for more technical

5   information, correct?

6   A.  I don't remember the exact date but -- it's possible.

7           MR. GAGE:  If we could put up Government Exhibit 2481.

8   It's in evidence, I believe.

9   Q.  Do you see, communicating with Mr. Arnold, "Pleasure

10  speaking with you last week.  Per your request here is the

11  municipal program offering description"?

12  A.  Yes.

13          MR. GAGE:  Then if we could turn to the first page of

14  the document.

15  Q.  So this is an additional submission by you about the nature

16  of AbTech's proposed work for the county, correct?

17  A.  Yeah.

18          MR. MASIMORE:  Your Honor, sorry to interrupt.  We

19  don't object to the admission of this.  Our records indicate

20  this one is not in.  But we don't object to the court receiving

21  2481.

22          THE COURT:  Do you offer it?

23          MR. GAGE:  I offer it.

24          THE COURT:  All right.  Government Exhibit 2481 is

25  received without objection.

FC29SKE2                        White - cross

           (Government Exhibit 2481 received in evidence)

Q.  So what's happening here generally, Mr. White, is that you

made a substantial unsolicited proposal.  And how many person

hours would have gone into that proposal, approximately?

A.  At least several dozen.

Q.  You had conversations with county officials?

A.  Yes.

Q.  And now you made a January 21 submission, correct?

A.  Yes.

Q.  What's in effect happened is the county is very carefully

vetting the quality of your product, correct?

A.  Yes.

Q.  And its capability, correct?

A.  Yes.

Q.  And also around this time period you're checking the

message board frequently to see whether or not an RFP is going

to be issued?

A.  Yes.

Q.  You were hopeful an RFP would be issued, correct?

A.  Yes.

Q.  And Mr. Rink is calling you, pressuring you and saying

where is the RFP, correct?

A.  Correct.

Q.  But there is no RFP, correct?

A.  Correct.

FC29SKE2                          White - cross

1    Q.  The county is taking its time and carefully reviewing

2    AbTech's proposed product, correct?

3              MR. MASIMORE:  Objection.  If the witness knows.

4              THE COURT:  Do you know the answer?

5              THE WITNESS:  To whether they were specific -- whether

6    they were carefully checking our qualifications?

7    Q.  Based on your conversations with them, your submissions,

8    you were aware there was a very careful vetting of AbTech's

9    product, correct?

10   A.  The product but also the program offering, the capability,

11   the structure, the approach.

12   Q.  So AbTech's entire proposal was being very carefully

13   vetted, correct?

14   A.  Yes.

15   Q.  And you've testified about a bit on your direct

16   examination, and then on April 4 an RFP was submitted, correct?

17   A.  Yes.

18   Q.  And extensive?

19   A.  Yes.

20   Q.  You talked about a capture team?

21   A.  Yes.

22   Q.  And the goal was to exhaustively and thoroughly describe

23   AbTech's capabilities, correct?

24   A.  Yes.  Capabilities but also the whole program, structure,

25   the schedule, how we would execute.

FC29SKE2                      White - cross

1    Q.  And running up to that you had further discussions with the

2    county about your capabilities, AbTech's capabilities, correct?

3    A.  No contacts once the RFP was --

4    Q.  Before the RFP --

5             THE COURT:  Let him finish.

6             MR. GAGE:  Sorry.

7             THE WITNESS:  There were no contacts between the

8    period the RFP was posted and when we submitted.

9    Q.  But pre-RFP there were ongoing contacts, correct?

10   A.  Yes.

11   Q.  And who would you speak to at the county?

12   A.  The person who was asking all these, you know, I guess

13   spearheading sort of the collection of information was Ken

14   Arnold.

15   Q.  Ultimately the contract was approved; is that correct?

16   A.  Yes.

17   Q.  And there was competition for the contract, correct?

18   A.  Yes.

19   Q.  And there came a time when the county actually forwarded

20   you the backup for the approval.  Do you recall that?

21   A.  Yeah.  The -- I'm not sure -- by backup, the technical

22   scoring criteria, all that stuff?

23   Q.  Exactly.  They sent along to you the analysis they had

24   done, correct?

25   A.  Yes.

FC29SKE2                      White - cross

1    Q.  Which reflected the three bidders that participated in the

2    process, right?

3    A.  Correct.

4            MR. GAGE:  I believe it's in evidence as Government

5    Exhibit 2548A.

6    Q.  The first page, Mr. White, is an e-mail from you to Glenn

7    Rink, who we talked about; Lane Castleton, who is the chief

8    financial officer?

9    A.  Yes.

10   Q.  And Jonathan Thatcher, correct?

11   A.  Yes.

12   Q.  Who is Jonathan Thatcher?

13   A.  He is the chief operations officer, COO, and board member.

14           MR. GAGE:  If we could turn to the second page.

15           And if we could blow up the bottom.

16   Q.  So part of what was sent to you was the approvals that were

17   necessary within the county, correct?

18   A.  Yes.

19   Q.  I'm not going to go through each and every title but you

20   can see, for example, DPW, department of public works.  Do you

21   see it there, the first line?

22   A.  Yes.

23   Q.  Capital fund approval.  So the financial capability had to

24   be approved, correct?

25   A.  Yes.

FC29SKE2                         White - cross

1   Q.  And county attorneys had to approve it, correct?

2   A.  Yes.

3   Q.  And somebody from legislative affairs had to approve it,

4   correct?

5   A.  Yes.

6   Q.  And comptroller had to approve it; is that right?

7   A.  Yes.

8   Q.  And the county executive had to approve it, correct?

9   A.  Yes.

10          MR. GAGE:  And if we could go to the next page,

11   please.  And blow up what's the middle -- right down the last

12   box, please.

13   Q.  Can you see the second line, Mr. White?

14   A.  Yes, I can.

15   Q.  So effectively the only money the county was making

16   available was for $331,000, correct?

17   A.  Well at the time of awarding, yeah.

18   Q.  Right.  But at the time of awarding, which is what we're

19   talking about, the amount of money available was 331,000,

20   correct?

21   A.  Allocated, as I understood it.

22          MR. GAGE:  If we could move to the May 30 memo, page

23   ten.  If we could blow up from the box score, so to speak, down

24   the two columns.

25          MR. MASIMORE:  I'm sorry, your Honor.  What exhibit

FC29SKE2                         White - cross

number is this?

Q.  This is all material that was provided to you by the

county, correct, Mr. White?

A.  Correct.  In conjunction with the contract.

Q.  And that you in turn forwarded to Mr. Rink and your other

colleagues, correct?

A.  Yes.

Q.  And do you see then there's the technical score?

A.  Yes.

Q.  And so AbTech was ranked against it's two competitors,

Newport Engineering and Premiere Construction Management?

A.  Yes.

Q.  And do you see that AbTech's score was significantly higher

than the other two?

A.  Yes.

Q.  If we could go to the last sentence.  "In our professional

judgment, the proposal submitted by AbTech industries, having

received the highest technical rating and proposing a

reasonable cost for the services, represents the best value to

the county."

        Do you see that?

A.  Yes.

        MR. GAGE:  If we could go to the next page of the

document, please.  And down to the signature line, please.

Q.  You see that.

FC29SKE2                           White - cross

1      MR. GAGE:  The entire document is available to the

2  jury.

3  Q.  But you see the portion now we read from.  This document is

4  signed by Sheila Shah?

5  A.  Yes.

6  Q.  She's the commissioner of public works at Nassau County?

7  A.  Correct.

8  Q.  You see Ken Arnold, the gentleman that you dealt with?

9  A.  Yes.

10  Q.  And you see two analysts listed there from Nassau County?

11  A.  Yes.

12  Q.  And you see Richard Walker who is the chief deputy county

13  executive?

14  A.  Yes.

15  Q.  So all these people signed off on the contract, correct?

16  A.  Yes.

17  Q.  And analyzed the contract, correct?

18      MR. MASIMORE:  Objection.

19      THE COURT:  Sustained.

20  Q.  Now, after this -- the contract was approved you understood

21  it had to be also approved by the Nassau County legislature,

22  correct?

23  A.  At the time I received the contract?

24  Q.  During the process you came to understand that the

25  Nassau --

FC29SKE2                         White - cross

1   A.  I came to understand but when I received the contract I

2   didn't know that there was that stuff.

3   Q.  But ultimately you did come to understand that, correct?

4   A.  Yes.

5   Q.  And it was approved unanimously by the Nassau County

6   legislature, correct?

7   A.  Yes.

8   Q.  And the next step was to be approved by NIFA?

9   A.  Yes.

10  Q.  National Interim Financial Authority, right?

11  A.  Approved -- well at least they had an opportunity to

12  review.  I'm not sure if they had to formally approve.

13  Q.  Right.  And so they had 60 days, do you recall, to approve?

14  A.  I don't recall a time limit, no.  But I know they were --

15  Q.  And during this period --

16          THE COURT:  Wait.  You're not letting him finish.

17          THE WITNESS:  But I know there was a period of time

18  where they have an opportunity to review and decide whether or

19  not they are going to have time left.

20  Q.  During this period Mr. Rink was very anxious to somehow

21  make contact with NIFA, correct?

22  A.  He was -- I don't know about making contact with NIFA.  He

23  was anxious to get the contract signed and if the contract

24  couldn't get signed he was hoping for some kind of indication

25  as to how likely it was to get through the NIFA process.

FC29SKE2                         White - cross

1    Q.  I want to focus on the NIFA process.

2    A.  Yeah.

3    Q.  What in effect happened was there's a 60-day period.  Do

4    you generally recall that?

5    A.  I just don't recall the 60-day clock aspect of it.

6    Q.  Do you recall that NIFA did not approve it in the original

7    60 days?

8               MR. MASIMORE:  Objection, your Honor.

9               THE COURT:  Sustained.

10   Q.  Do you recall that NIFA asked for more time to review the

11   contract?

12   A.  No.

13   Q.  Do you recall that ultimately NIFA just simply didn't act

14   on it?

15   A.  Yes.  Correct.  They is said they were declining their

16   opportunity to review, something like that.

17   Q.  And do you recall during this period of time that Mr. Rink

18   engaged Robert Kennedy, Jr. to speak to NIFA?

19   A.  I don't know if the person who Robert Kennedy, Jr. was

20   speaking to was formally part of NIFA at that time but, yes,

21   Glenn was having Robert Kennedy, Jr. speak to someone who

22   ultimately became the head of NIFA.  I don't know the exact

23   timeframe.

24   Q.  Nothing inappropriate about that, correct?

25   A.  I can't really comment on that.  I don't know.

FC29SKE2                          White - cross

1   Q.  And others were in contact with the county during this time

2   period.  Do you recall that?

3   A.  Others?

4   Q.  Do you recall Mr. Cameron being in contact with NIFA?

5   A.  No.

6   Q.  Mr. Cameron was the engineer on the project, correct, with

7   you?

8   A.  He had participated or his firm had participated in putting

9   a proposal together but they were not a formal subcontractor at

10  that time.

11  Q.  But they were a formal part of the submission to Nassau

12  County, correct?

13  A.  (No response).

14  Q.  They were in the RFP?

15  A.  They were built into our program documents.

16  Q.  And they were part of the executive summary of the RFP?  Do

17  you recall that?

18  A.  Yes.

19  Q.  Their resume was presented in the RFP?

20  A.  Yes.

21  Q.  So they were presented to Nassau County as an integral part

22  of --

23  A.  Yes.

24  Q.  -- the project?

25  A.  As part of the team, yes.

FC29SKE2                        White - cross

1   Q.  You were asked earlier whether or not the contract had been

2   signed.  A formal contract hadn't been signed, correct?

3   A.  A formal contract with -- subcontract with Cameron had not

4   been signed yet, right.

5   Q.  But it was clear they were going to be part of the project?

6   A.  Yeah.

7   Q.  Okay.  And you understood that Cameron Engineering was a

8   local firm, correct?

9   A.  Correct.

10  Q.  And they also had a relationship with the county, correct?

11  A.  Correct.

12  Q.  And like yourself they on occasion would reach out and

13  speak to Nassau County about the contract, correct?

14  A.  Yes, they were.

15  Q.  Yes, they did speak to Nassau --

16  A.  Yes, they did.  Sorry.

17  Q.  And there was no secret about that, by the way?  Right?

18  You were speaking to Nassau County?

19          Let's start with you.  When you spoke to Nassau

20  County, you described, there was no secret about that, right?

21  A.  No.

22  Q.  Okay.  When Mr. Cameron spoke to Nassau County there was no

23  secret about that, right?

24          MR. MASIMORE:  Objection, your Honor.

25          THE COURT:  Do you know one way or the other?

FC29SKE2                        White - cross

1              THE WITNESS:  I don't know.

2    Q.  Well were you aware of any attempts by Mr. Cameron's firm

3    to conceal their contact with Nassau County?

4    A.  No, I was not.

5    Q.  Let's go back to Mr. Dorego and back to August/September of

6    2012.  You became concerned about the relationship between

7    Mr. Dorego and Mr. Rink, correct?

8    A.  In August/September 2012.  I'm not sure what you mean.

9    Q.  Well did you become -- you wondered what is the nature of

10   the relationship between Mr. Rink and Mr. Dorego?

11   A.  In general I always felt that Charlie Dorego was aggressive

12   and I knew he had significant influence over Glenn Rink so I

13   would say I was always, always concerned about Charlie Dorego's

14   contact with the company and with Glenn Rink.

15   Q.  And you actually did some research on that, correct?

16   A.  (No response).

17   Q.  Some internet research?

18   A.  Some internet research?

19   Q.  Yes.

20   A.  On what?  I'm not sure.

21   Q.  On the relationship between Mr. Rink and Mr. Dorego?

22   A.  Oh, I don't recall when but I certainly looked up who he

23   was and, yes, I did come to learn that he was -- that they knew

24   each other through other types of public events and things

25   including the Waterkeeper Alliance.

FC29SKE2                         White - cross

1    Q.   What's the Waterkeeper Alliance?

2    A.   The Waterkeeper Alliance is a nonprofit organization

3    consisting of many 501c3s who are all under an umbrella called

4    The Waterkeepers that Robert F. Kennedy, Jr. is the head of and

5    Glenn Rink is the chair of the board of trustees.  And I

6    believe Charlie Dorego is also one of the trustees, some kind

7    of high level within it.

8    Q.   And also during the course of this internet research you

9    found a picture of them together at one of these society

10   events, correct?

11   A.   Yeah, one of these galas or something like that, yeah.

12             MR. GAGE:  If I may approach, your Honor?

13             THE COURT:  Show the government.

14             MR. MASIMORE:  No objection.

15   Q.   Do you recognize the photograph, Mr. White?

16   A.   Yes.  That's the -- the picture that I just referred to

17   that I saw online.

18             MR. GAGE:  We would offer Government Exhibit DS D.

19             MR. MASIMORE:  No objection, your Honor.

20             THE COURT:  Government Exhibit DS D is received

21   without objection -- Defendants' Exhibit DSD.

22             (Defendants' Exhibit DS D received in evidence)

23   Q.   That's Mr. Dorego to the left, Mr. White?

24   A.   Yes.

25   Q.   Mr. Rink to the right?

FC29SKE2                      White - cross

1    A.  Correct.

2            MR. GAGE:  Thank you.  You can take it down now.

3    Q.  Now you talked about a meeting with the Department of

4    Health, correct?

5    A.  With New York Department of Health, yeah.

6    Q.  Yes.  And you had said that you understood that a number of

7    other companies were meeting with the Department of Health,

8    correct?

9    A.  Yes.

10   Q.  The Department of Health was in the process of creating an

11   analysis relating to fracking, correct?

12   A.  That's correct.

13   Q.  And their goal, as you understood it, was to collect as

14   much information as possible about the process and various

15   byproducts of the process, correct?

16   A.  Yes.

17   Q.  And that was the reason for your meeting with DOH, correct?

18   A.  Yes.  We were one of the technical briefers, yeah.

19   Q.  And present for your meeting was a Dr. Daniel Graber?

20   A.  That sounds like the name I remember.  I know he was an MD

21   and heading the study.

22   Q.  And that's who you met with, correct?

23   A.  Well, Jim Clancy was also there who I believe was deputy

24   commissioner at the time.  I can't confirm it was -- if it was

25   Graber but I know it was the MD who was heading up the study.

FC29SKE2                        White - cross

1   Q.  And when you met with DOH you certainly didn't ask for a

2   contract, correct?

3   A.  No.

4   Q.  The whole point was, you say, to make a technical

5   presentation, correct?

6   A.  Correct.

7   Q.  And, in fact, you generally understand from your work in

8   the area that DOH doesn't issue permits relating to fracking,

9   correct?

10  A.  Correct.

11  Q.  Only the DEC can do that, correct?

12  A.  I actually never really even looked into the permitting

13  process so I don't really know who issues the permits.

14  Q.  But the bottomline is you certainly knew that the

15  Department of Health did not?

16  A.  I know it was not the DOH.

17  Q.  And there came a time when AbTech was interested in getting

18  a meeting with the DEC.  Do you recall that?

19  A.  Yes.

20  Q.  We looked at an e-mail where Adam is e-mailing his father

21  about a meeting with the DEC.  Do you recall that?

22  A.  Yes.

23  Q.  But that never happened, right?

24  A.  No, it did not.

25  Q.  But others did get meetings with the DEC.  Do you recall

FC29SKE2                         White - cross

1   that?

2           MR. MASIMORE:  Objection.  If the witness knows.

3           THE COURT:  If you know.

4           THE WITNESS:  I don't know.  Or I don't recall at

5   least.

6           MR. GAGE:  If I could approach, your Honor?

7           THE COURT:  Yes.  But show the government.

8   Q.  Do you recognize the e-mail?

9   A.  Yes, I do.

10          MR. GAGE:  Your Honor, we would offer DS C.

11          MR. MASIMORE:  No objection, your Honor.

12          THE COURT:  Defendants' Exhibit DS C is received

13  without objection.

14          (Defendants' Exhibit  DS C received in evidence)

15          MR. GAGE:  If I could approach again, your Honor.

16          If we could blow up the text, please.

17  Q.  Can you see, Mr. White?  You have to look on the screen.

18          MR. GAGE:  Is it possible to blow it up just a bit

19  more.

20  Q.  Do you see this is an e-mail from Nick Barrella, correct?

21  A.  Yes.

22  Q.  And that's one of the lobbyists that AEWS had hired,

23  correct?

24  A.  Yes.

25  Q.  And AEWS again is a subsidiary of AbTech?

FC29SKE2                         White - cross

1   A.  Correct.

2   Q.  And Mr. Barrella is writing to you and Adam Skelos and some

3   others, correct?

4   A.  Yes.

5   Q.  And he's saying -- and the date of this is October 14,

6   2014?

7   A.  Yes.

8   Q.  He said, "My partner, Tim, has calls into DOH.  However,

9   Tim did find out through his sources that a company named Sabre

10  Environmental Services LLC, located in the Albany area, has met

11  with DEC and the governor's office about their water treatment

12  process."

13          Do you see -- he then includes their website?

14  A.  Yes.

15  Q.  "We were told they were impressive."

16          Do you see that?

17  A.  Yes.

18  Q.  And to be clear AbTech never got a meeting with DEC?

19  A.  No.

20  Q.  Or the governor's office?

21  A.  No.

22          MR. GAGE:  If we could pull up the April 10 letter,

23  please.  Our exhibit is 1337.

24  Q.  We've looked at this before.  Do you see the second line?

25          "I'm told he's about 45 days away from producing the

FC29SKE2                        White - cross

1    legislation and the RFP to do up to ten million project with

2    you."

3              Do you see that?

4    A.  Yes.

5    Q.  "He's hesitant (and his dad called)."

6              "He's hesitant (and his dad called) to do it with the

7    engineer's making more money than him.  If he doesn't get like

8    a four percent commission I think they don't think it's worth

9    pushing through."

10             Do you see that?

11   A.  Yes.

12   Q.  And let's go to, if we could highlight it, "and his dad

13   called."

14             Now when you read this e-mail, you thought that

15   Senator Skelos had called, right?

16   A.  Yeah.

17   Q.  It's clear on its face, correct, the language?

18   A.  Yeah.

19   Q.  But, in fact, did anyone ever tell that you Senator Skelos

20   did not call Mr. Dorego?

21             MR. MASIMORE:  Objection.

22             THE COURT:  I'll permit it.

23   A.  Did anyone tell me that he did not call him?

24   Q.  Correct.

25   A.  No.

FC29SKE2                         White - cross

1    Q.  So no one told you that Senator Skelos did not, in fact,

2    call?

3               THE COURT:  That's twice.  Don't answer.

4               MR. GAGE:  I just want to, your Honor --

5    Q.  Mr. Rink didn't tell you?

6               THE COURT:  If you -- did Mr. Rink tell you?

7    A.  Did Mr. Rink tell me?

8    Q.  That his dad did not call?

9    A.  No.  He didn't say that.

10              MR. GAGE:  You can take that down now.

11   Q.  By the way, as you described it, Mr. Rink was talking to

12   Mr. Dorego during this time period, correct?

13   A.  Yes.

14   Q.  And Mr. Rink's information all came from Mr. Dorego,

15   correct?

16   A.  Yes.

17              MR. GAGE:  Pardon me for one second, your Honor.

18   Q.  Now there came a time when AbTech began to invoice the

19   county for work performed, correct?

20   A.  Yes.

21   Q.  Let's go back to that.  The $150,000 we've talked about,

22   that money was all for services provided, correct?

23   A.  Yes.

24   Q.  A great deal of work, actually, correct?

25   A.  Yes.

FC29SKE2                         White - cross

1   Q.  You had to identify the outfall pipes that would be most

2   likely to be beneficial to the county?

3   A.  Yes.

4   Q.  And then specifically identify amongst the original group

5   twelve that would be most beneficial to helping the county?

6   A.  It was 10 and then the county increased it to 14.

7   Q.  But the bottomline is a great deal of engineering analysis

8   went in to finding the best locations to initiate the project,

9   correct?

10  A.  Yes.

11  Q.  And so the initial invoices went out in approximately May

12  of 2014, do you recall?

13  A.  No, I don't recall.  I think it was earlier than that.  I

14  didn't prepare the invoices.

15  Q.  But there came a time when the county made very, very clear

16  that this contract was not for 12 million but, in fact, for

17  331,000, correct?

18  A.  No.

19          MR. GAGE:  If I may approach, your Honor?

20  Q.  Mr. White, I'm just going to show you what I marked as

21  DS OOOOO.  Do you see it?

22  A.  Yes.

23  Q.  Is that an e-mail involving you on which you are copied?

24  A.  Yes.  I don't recall it though.

25          MR. GAGE:  Defense offers DS OOOOO.

FC29SKE2                          White - cross

1              MR. MASIMORE:  No objection.

2              THE COURT:  Defendants' Exhibit DS OOOOO is received

3       without objection.

4              (Defendants' Exhibit DS OOOOO received in evidence)

5       Q.  Now this is an e-mail from Timothy Kelly.  Do you recognize

6       Mr. Kelly's name?

7       A.  Yes.

8       Q.  Someone in the Nassau public works department?

9       A.  Yes.

10      Q.  And to Lane Castleton who is the chief financial officer?

11      A.  Correct.

12      Q.  And to yourself?

13      A.  Yes.

14      Q.  And some others at Cameron Engineering?

15      A.  Brian Schneider is with the county.  Mark Wagner is with

16      Cameron Engineering.

17      Q.  It reads, "Lane..." so, again, this is from someone in

18      Nassau County to Mr. Castleton "...I have revised the invoice

19      and we are almost there.  I still need a wage rate schedule for

20      all AbTech and AEWS employees that will be working on the

21      project, with an hourly rate for each individual.  If the

22      comptroller's office doesn't have an approved schedule they

23      will not process the claim."

24              So fair to say the county was being very meticulous in

25      the monies that were being paid, correct?

FC29SKE2                          White - cross

1    A.  They were being very meticulous in terms of how the

2    invoicing process was made, yeah.  It was a very particular

3    invoicing process.

4    Q.  And a thorough one, correct?

5    A.  Thorough in terms of that it had to fit a certain formula

6    and appearance.

7    Q.  Also they wanted to account for the hours worked, right?

8    A.  Right.

9    Q.  And the rate of the people working the hours?

10   A.  Right.

11   Q.  They wanted to keep track of that, correct?

12   A.  Right.

13   Q.  And now next sentence, the second paragraph, "The original

14   contract amount is 331,625 not 12 million."

15           Do you see that?

16   A.  Yes.

17   Q.  Mr. Kelly says, "I will make the change on the claim and

18   initial so you don't have to send another one."  Do you see

19   that?

20   A.  Yes.

21   Q.  "The rest of the funding will still have to come from

22   grants; we only put in enough money to do the site selection."

23           Do you see that?

24   A.  Yes.

25   Q.  So the original contract did not, from the county, it's

FC29SKE2                    White - cross

1    clear after this, is 331,000, correct?

2    A.  I disagree.

3    Q.  Does it not say the original contract amount is 331,625,

4    not 12 million?

5    A.  It does.  This is coming from a hydrogeologist who also

6    misspoke when he says that they only put in enough money to do

7    the site selection.  The 331 also includes task order two.  So

8    I would not go by his read of the contract as a legal document.

9    Q.  Do you recall the notes that he will make the change on the

10   claim and send it to you?

11   A.  Yes.  He was involved in making sure the form was prepared

12   to the satisfaction of the comptroller's office.

13   Q.  Do you recall the claim where he struck out 12 million and

14   put in 331,000?

15   A.  I don't -- I didn't really track the invoice so I don't

16   recall how he did it.  But I see it says it on there.

17   Q.  But rather dramatic, right, to strike out 12 million and

18   put in 331?

19           MR. MASIMORE:  Objection, your Honor.

20           THE COURT:  Sustained.

21   Q.  You don't recall seeing the underlying invoice?

22   A.  No.  I know I was copied but Lane Castleton was in charge

23   of that so I didn't really even open it or check his work.

24           MR. GAGE:  I'd still like to approach, your Honor, if

25   I may.

1        THE COURT:  Show the government.

2   Q.  Having seen the document you've just looked at, does that

3   refresh your recollection that was what was attached to the

4   e-mail?

5   A.  No.

6   Q.  By the way, would it be fair to say, Mr. White, that there

7   is no way that 95 percent of the $12 million was going to be

8   spent in the first year of the contract?

9        MR. MASIMORE:  Objection to form.

10       MR. GAGE:  I'll rephrase it.

11  Q.  Was 95 percent of the $12 million mentioned spent in the

12  first year of the contract?

13  A.  I don't recall the 95 percent but I can say that the way

14  that the project documents laid out the schedule called for

15  everything through phase four which meant construction and

16  installation to be completed.  So that number probably -- I

17  mean it was a substantial majority.  I just can't confirm

18  95 percent.

19  Q.  Let's go back.  We began our discussion today with your

20  acknowledging that 150,000 was the total amount paid to AbTech,

21  correct?

22  A.  That had been invoiced by AbTech and paid so far but I

23  also -- I resigned my position in September 2014 so I didn't

24  have insight into things that were happening necessarily from a

25  billing perspective after that.

FC29SKE2                         White - cross

```
 1    Q.  So up to the date of your resignation was what, the date of
 2    your resignation?
 3    A.  September 15, 2014.
 4    Q.  And the contract was authorized on October 9, 2013?
 5    A.  Around then.  I don't recall the date.
 6    Q.  So in that first year, just that first year, year and one
 7    month, 95 percent -- 95 percent of $12 million was not spent,
 8    correct?
 9    A.  Correct.  It was delayed.  Yeah.
10    Q.  And so if there is a submission in a press release that
11    95 percent of 12 million is going to be spent, that would be
12    inaccurate, correct?
13              MR. MASIMORE:  Object to form.  Specifically date.
14              THE COURT:  Sustained.
15              MR. GAGE:  Your Honor, if we could call up Defendants'
16    Exhibit DS it's MMMMM.  It was admitted through Mr. Rink.  And
17    I will show the government.
18              If we could go to page four of the document --
19    actually, I'm sorry.  If we could stay on page one.
20    Q.  This is a submission to the Securities and Exchange
21    Commission, correct?
22    A.  It appears to be, yes.
23    Q.  And you're generally familiar with submissions to the --
24    what's called the SEC, the Securities and Exchange Commission?
25    A.  That was not part of my job responsibility so I mean I know
```

FC29SKE2                        White - cross

1   generally that AbTech had to make filings but --

2           MR. GAGE:  If we could go to page two.

3   Q.  By the way, generally you understand that the reason a

4   company has to make filings is to provide accurate information

5   with the investing public, correct?

6   A.  Yes.

7           MR. GAGE:  If we could go to the bottom of page two

8   you see a signature, an electronic signature.

9   Q.  So this document has been signed by Mr. Rink.  Do you see

10  that?

11  A.  Yes, I do.

12  Q.  And we're going to come to it.

13          MR. GAGE:  Page four, please.

14          The prior page.  I'm sorry.

15  Q.  Can you see that the filing also included a press release

16  from AbTech?

17  A.  Yes.

18  Q.  And it says, the headline "AbTech Industries Executes

19  Contract for 12 Million Stormwater Systems Project in Nassau

20  County, New York."

21          Do you see that?

22  A.  Yes.

23  Q.  And then the last sentence of the second paragraph,

24  "Approximately 95 percent of the contract amount will be paid

25  in the first year of the contract."

FC29SKE2                          White - cross

1          Do you see that?

2    A.   Yes.

3    Q.   That did not happen, correct?

4    A.   It did not occur.  No.

5    Q.   To your knowledge was that statement to the SEC ever

6    corrected?

7              MR. MASIMORE:  Objection, your Honor.

8              MR. GAGE:  To his knowledge, your Honor.

9              THE COURT:  Do you have any knowledge of that?

10             MR. MASIMORE:  Objection to form.  It's not a

11   knowledge objection.

12             THE COURT:  Sustained.

13   Q.   Now, you came to distrust Mr. Rink, correct?

14   A.   I wouldn't put it that way.  I wouldn't say distrust is a

15   correct characterization.

16   Q.   Well, for example, you were in a car with him when an

17   investor called in and he took an order for a thousand shares

18   of AbTech stock at a certain price.  Do you recall that?

19   A.   I don't know who was on the other line.  But it didn't --

20   it seemed like a strange thing to be going on.

21   Q.   Because he was suggesting a price to get AbTech to a

22   certain level.  Do you recall generally that was the situation?

23   A.   He was saying -- no.  He was saying -- he was asking for an

24   order for something.  I don't know what shares it would be.

25   But for a certain amount of shares at a certain price, yeah.

FC29SKE2                         White - cross

1   And I believe it was a thousand shares.

2   Q.  Bottomline is he turned to you and said, "You didn't hear

3   this call," right?

4   A.  What?

5   Q.  He turned to you after that call and said, "You didn't hear

6   this"?

7   A.  Something to that effect, yeah.

8   Q.  Do you recall him saying "You didn't hear this," correct?

9   A.  I don't recall direct him saying those words, but.

10  Q.  In substance that was his point?

11  A.  I got -- I got into the car and heard that part of it and

12  he said something to the effect of like that I hadn't -- that I

13  didn't hear it or something like that, yeah.

14  Q.  And you were aware of investor calls to the company,

15  correct?

16  A.  Sure.  Yeah.

17  Q.  And you expressed your view on occasion that Mr. Rink was

18  exaggerating the earnings of AbTech?

19  A.  No, I did not.

20  Q.  You expressed your view that Mr. Rink was exaggerating

21  where AbTech stood vis-a-vis certain projects, correct?

22  A.  To who?

23  Q.  To others at the company and to him.

24  A.  I would -- I would not necessarily say exaggerate.

25  However, I would say that he was not entirely accurate and

FC29SKE2                         White - cross

1    fulsome in sort of giving a characterization of things.

2    Q.  And to whom was he not entirely accurate and fulsome in

3    giving a description of things?

4    A.  To the board and, you know, certainly when he was talking

5    to the management team -- I mean those were the -- where I had

6    contacts with him and heard those things, so.

7    Q.  You told him you felt he wasn't being, to use your words,

8    fully accurate and fulsome, correct?

9    A.  Throughout the entire relationship I would correct his

10   statements, yes.

11   Q.  And explain to him that you weren't comfortable with his

12   statements, correct?

13   A.  I would say -- I would correct his statements.

14   Q.  Because --

15   A.  He would -- when I corrected them he would say, you know,

16   thank you.  Okay.  Got it.

17   Q.  Except that --

18            THE COURT:  Look, let him finish.

19            THE WITNESS:  So I don't know that I ever said the

20   words, "I'm uncomfortable with your statements," but when he

21   said things that were incorrect then -- then I would correct

22   them and make sure that I corrected them.

23   Q.  But then Mr. Rink didn't come back and correct them with

24   the board?

25   A.  Well I was not part of all of his conversations with the

FC29SKE2                         White - cross

1    board, of course.  I was just invited as a guest to some board

2    meetings.  But I was -- I think it's fair to say I was

3    generally uncomfortable with the way he would describe certain

4    things, provide some details but not others.

5                MR. GAGE:  Just a moment, your Honor.

6                (Pause)

7    Q.  I'd like to go back to some of these calls that have been

8    played over the course of the last few days.

9                THE COURT:  If this is a good stopping point, we

10   should take a morning break.

11               MR. GAGE:  I'm sorry.  Yes, your Honor.

12               THE COURT:  We'll take a fifteen-minute break.

13               (Jury excused)

14               THE COURT:  You may step down.

15               THE WITNESS:  Thank you.

16               (Witness excused)

17               THE COURT:  Do counsel wish to raise anything?

18               MR. MASIMORE:  Not from the government, your Honor.

19               MR. GAGE:  No, your Honor.

20               THE COURT:  Okay.  We're on a fifteen-minute break.

21               (Recess)

22               THE COURT:  Please have a seat.  I don't think the

23   jury is ready yet.

24               (Continued on next page)

25

FC2TSKE3                         White - cross

1           (Jury present)

2           THE COURT:  Mr. Gage.

3    BY MR. GAGE:

4    Q.  Before the break, Mr. White, we were talking about

5    occasions in which Mr. Rink was not fully accurate and you

6    sought to correct him.

7    A.  Yes.

8    Q.  And in fact, one of those occasions related to the AbTech

9    Nassau contract.  Do you recall that?

10   A.  I don't know which specific instance you're referring to.

11   Q.  Let me ask you, do you recall Mr. Rink saying the contract

12   was worth $12 million and you corrected him?

13   A.  I know that I corrected him with including not to exceed 12

14   million, if that's what you're referring to.

15   Q.  Would it be fair to say that was a situation, in describing

16   the Nassau contract, Mr. Rink was not fully accurate?

17           MR. MASIMORE:  Object to form.

18           THE COURT:  Sustained.

19   Q.  Mr. Rink was not fully accurate in describing the Nassau

20   contract to -- during management calls, correct?

21   A.  That is correct.

22   Q.  He wasn't fully accurate in describing to the board of

23   directors, correct?

24   A.  I don't -- no, I can't say that, I can only confirm for

25   management meetings.

FC2TSKE3                       White - cross

1    Q.   Who would be present at the management meetings?

2    A.   Myself, Lane Castleton, Jonathan Thatcher and Glenn Rink

3    and sometimes Glenn's assistant.

4    Q.   Mr. Castleton, again, is the chief financial officer,

5    correct?

6    A.   Yes.

7    Q.   Now with regard to some of the calls we listened to, if I

8    could ask the jury to turn to 1432T, and specifically in the

9    middle of the page after the initial greetings it says:

10            Adam Skelos:  Well, it's -- it's good and it's

11   annoying.  Nassau County is -- Ed says he's going to get the

12   400,000 out, which is the good news, but then he started

13   talking about well, Adam it's not -- it's design build, we

14   can't do that until the P3s are passed in Albany.

15            So the $400,000 -- but you see Ed you understand to be

16   Mr. Adam Skelos referring to Ed Mangano?

17   A.   Yes, I do.

18   Q.   The Nassau County Executive?

19   A.   Yes.

20   Q.   But the 400,000 never got out, correct?

21   A.   I was never clear.  Tim Kelly said that it was in his

22   account, but yet it seemed to be held up, so I'm not exactly

23   sure what really happened to it, the status of it.

24   Q.   To your knowledge, it never got paid, correct?

25   A.   Well, AbTech never invoiced for it, and when the notice to

FC2TSKE3                    White - cross

1  proceed was received authorizing I believe around $56,000, it's

2  unclear to me if that was coming from 400,000 or from the

3  previously allocated amount, so I'm not sure.

4  Q.  To use the language of the conversation, $400,000 never got

5  out to AbTech, correct?

6  A.  Total amount of 400,000 did not get out to AbTech.

7  Q.  And if we could turn to 1442T, page 5.  And Mr. Adam Skelos

8  speaking says:  Yeah, yeah, but the second paragraph, anyway,

9  so there's the conversation I came away with Ed.

10         Ed again referring to Mr. Mangano?

11  A.  Yes.

12  Q.  But first, before we even said any of that, he said all

13  funding that has been approved is going to be -- is signed and

14  approved.  So the second we follow up with Tim Kelly to Shila

15  Shah regarding the 400,000, that should flow through like

16  today.

17         Do you see that?

18  A.  Yes.

19  Q.  But again, 400,000 did not flow through that day or any

20  other day?

21  A.  No.

22  Q.  Going back, you recall when Mr. Adam Skelos said to you the

23  RFP would arrive in approximately seven to ten days?

24  A.  Yes, I do.

25  Q.  So that's way back in November 2012, correct?

FC2TSKE3                     White - cross

1    A.  Correct.

2    Q.  And now looking at late 2014, early 2015 with these two

3    tapes?

4    A.  Yes, correct.

5    Q.  So you came to understand over time that Mr. Adam Skelos

6    was on occasion prone to exaggeration, correct?

7    A.  No, I don't know that he was exaggerating with these

8    statements.  I believed it to be true.

9    Q.  Seven to ten days was not accurate, correct?

10   A.  I'm sure the county told him that.  I believe that to be

11   true, but they experienced delays.

12            MR. GAGE:  Move to strike.

13            MR. MASIMORE:  Objection.

14            THE COURT:  No, I won't strike it.  Go ahead.

15   Q.  Seven to ten days never happened, correct, didn't come

16   through in seven to ten days, yes or no?

17   A.  No.

18   Q.  And the $400,000 did not come through, yes or no?

19   A.  No.

20            THE COURT:  That is so many times.

21   Q.  And do you recall Mr. Adam Skelos had dinner with Senator

22   Marcellino?

23   A.  I'm sorry?

24            MR. MASIMORE:  Objection to form.  Foundation.

25            THE COURT:  Do you recall whether?

FC2TSKE3                    White - cross

1   Q.  Do you recall whether?

2   A.  Whether?

3   Q.  Do you recall whether Mr. Adam Skelos said to you that he

4   had dinner with Carl Marcellino?

5   A.  Not that he had, he said he was coming over for dinner.

6   Q.  Do you know if in fact he had dinner with Senator

7   Marcellino?

8   A.  I don't know.

9   Q.  Do you recall Adam Skelos talking about funerals he

10  attended?

11  A.  Yes.

12  Q.  Did you come to know in fact Adam Skelos didn't attend

13  those funerals?

14  A.  Yes.

15  Q.  Do you recall the statement that somehow Senator Skelos was

16  going to disadvantage Nassau County?

17  A.  Yes.

18  Q.  Are you aware that during the allocation of the surplus

19  funds the initial proposal by the governor was $150,000 for

20  Nassau and Suffolk County?

21        MR. MASIMORE:  Objection, your Honor.

22        THE COURT:  Sustained.

23  Q.  Do you have any knowledge of Senator Skelos' efforts to

24  obtain money for Nassau County during the budget process 2015?

25  A.  No.

1           MR. GAGE:  If we could pull up the cooperation

2      agreement, please.

3           If we could focus on the first paragraph.

4      Q.  Now you have acknowledged what you believe to be

5      participating in certain crimes, is that correct?

6      A.  Correct.

7      Q.  What would be the penalty, as you understand it, if you had

8      been prosecuted for those crimes?

9      A.  I'm sorry, what would be?

10     Q.  If you had been prosecuted for the crimes you say you

11     committed, what would be the penalty, as you understand it?

12     A.  I'm not sure what the penalty is for them.

13     Q.  You have a general sense of what it would involve?

14     A.  Being charged.

15     Q.  Yes, if you -- yes, being charged, and if you admitted to

16     the crimes that you say you committed, what would the penalty

17     be?

18     A.  To be charged with those crimes.

19     Q.  Yes, if you're convicted of those crimes, what would the

20     penalty be?

21     A.  I'm not sure beyond -- I'm not sure what the penalties are

22     called for.

23     Q.  You're aware that it could involve potential imprisonment?

24     A.  Yes, generally.

25     Q.  For a significant length of time?

FC2TSKE3                     White - cross

A.   I don't know.

Q.   Didn't you review that -- I'm not asking for conversations,
you didn't review that with your lawyers?

         MR. MASIMORE:  Objection, your Honor.

         THE COURT:  Sustained.

Q.   And it would -- among the penalties would be that you --

         MR. MASIMORE:  Objection.

         THE COURT:  Counsel, you're not testifying.

Q.   Do you recall any other penalties that would involve with
regard to your being able to participate in public
corporations?

A.   No.

Q.   Do you understand that you would be barred from
participating?

         THE COURT:  Counsel, don't testify.

Q.   Do you have any further understanding of the penalties?

A.   No.

Q.   Now before you signed this agreement, if we could go to the
date, you had six meetings with the U.S. Attorney's Office.  Do
you recall that?

A.   Not the exact amount, but I know there were several
meetings, yes.

Q.   Great length, some of these debriefings?

A.   Yes.

Q.   And you recorded all the conversations that we have heard

FC2TSKE3                      White - cross

1     over the last few days?

2     A.  Yes.

3     Q.  And you did wear the body wires that we talked about?

4     A.  Yes.  Well, they weren't wires, but yes.

5     Q.  Body recorders?

6     A.  Yes.

7     Q.  And so only after all that did you get your non-prosecution

8     agreement, correct?

9     A.  Yes, this occurred after that, but I continued to meet with

10    the government afterwards, too.

11    Q.  We'll come to that.

12          And the language in that non-prosecution agreement,

13    that's not your language, correct?

14    A.  No, I did not write it.

15    Q.  It's written by lawyers, correct?

16    A.  I don't know who actually wrote it.  It came from the U.S.

17    Attorney's Office.

18    Q.  And throughout these briefings, a significant amount of

19    time was spent on Adam Skelos and Dean Skelos, correct?

20          That was the focus of the discussion?

21    A.  That and AbTech.

22    Q.  And you understood that you had to agree to the language in

23    the prosecution agreement to get the non-prosecution agreement,

24    correct?

25    A.  No, I did not know anything about the language that would

FC2TSKE3                      White - cross

```
 1   be in the agreement.  I didn't even know whether it would --
 2   Q.  Well, you signed --
 3           THE COURT:  You're interrupting.
 4   A.  I'm not sure I understand the question.
 5   Q.  You signed the agreement, correct?
 6   A.  Yes.
 7   Q.  And you read it before you signed it?
 8   A.  Yes.
 9   Q.  And you understood that the government insisted upon that
10   language in paragraph one for you to get your agreement,
11   correct?
12   A.  They -- the whole agreement, the language was insisted on,
13   I suppose.  I'm not sure what I'm -- I'm not sure what you're
14   asking.
15   Q.  I'm asking that to get the agreement, the non-prosecution
16   agreement, you had to agree to the language drafted by, as you
17   said, the U.S. Attorney's Office?
18   A.  Yes, I had to agree to this language.
19   Q.  And since that time, over the course of preparation for
20   this trial, you met with the U.S. Attorney's Office 20 times?
21   A.  Possibly.
22   Q.  You've gone over your testimony again and again and again?
23   A.  Not really.  Well, they continued to ask questions, a lot
24   of them that they said would be questions that they would be
25   asking or similar questions when I testified.  So they
```

1    continued to ask questions, some repeatedly, some new ones, all

2    the way up until the last meeting.

3    Q.  And you understand that the non-prosecution agreement, if

4    the prosecutors decide that you lied, you don't get the

5    prosecution -- non-prosecution agreement, correct?

6    A.  No, that's not my understanding.

7    Q.  Who decides -- is your understanding of who will decide

8    whether or not you told the truth?

9    A.  I just know that I have to tell the truth under this

10   agreement.

11              THE COURT:  You're interrupting.

12              MR. GAGE:  I apologize, your Honor.

13   Q.  Somebody has to decide, right?

14   A.  I am going to testify and am testifying truthfully under

15   this agreement, and because I'm sworn in.  I don't know what

16   more to say about that.

17              MR. GAGE:  Your Honor, I'm going to ask one more time.

18   Q.  The prosecutors decide whether or not you have told the

19   truth, they're the ones who decide?

20              THE COURT:  He's answered that question.

21              MR. GAGE:  If I may have a moment, your Honor.

22              (Pause)

23   Q.  Just a few more questions, Mr. White.  So after the

24   contract was awarded, I take it you stayed in touch with Nassau

25   County?

FC2TSKE3                    White - cross

```
 1   A.  After the Nassau County contract was awarded, yes.

 2   Q.  And are you aware that they actually applied -- sought to

 3   apply for FEMA funding for the AbTech contract?

 4   A.  No, I'm not aware of FEMA with the applications.

 5   Q.  You're not aware that the county missed the deadline to

 6   apply for FEMA funding for AbTech?

 7   A.  No.

 8          MR. GAGE:  Nothing further, your Honor.

 9          THE COURT:  Mr. Conniff.

10          MR. CONNIFF:  Thank you, your Honor.

11   CROSS-EXAMINATION

12   BY MR. CONNIFF:

13   Q.  Mr. White, I would like to take you back to when you were

14   recruited to join AbTech.  Okay?

15   A.  Yes.

16   Q.  And I think you said that was in June of 2010.  Do I have

17   that right?

18   A.  Around then is when I joined, but I had discussions a

19   little earlier than that spring with Glenn.

20   Q.  And before at that time you were working at Lockheed

21   Martin, is that right?

22   A.  Correct.

23   Q.  And was that your first job out of school?

24   A.  My Lockheed Martin position?

25   Q.  Yes.
```

FC2TSKE3                        White - cross

A.  No.

Q.  What jobs did you have before that?

A.  How far would you like?

Q.  Post graduate school, post law school.

A.  Post law school I worked for a law firm in the Affiliated
Consulting Firm in Washington DC.

Q.  And then to Lockheed Martin?

A.  Correct.

Q.  And what did you do at Lockheed Martin exactly?

A.  I was within the business development organization,
although I was given responsibilities that also fell into the
program management category.  I was asked to develop and
identify new technologies, build new program areas, built the
engineering teams around them, provide new service offerings
for the U.S. military, various commercial customers.  I was
asked to help develop a new line of business by which Lockheed
Martin could go after new areas of technology development and
new commercial enterprises.

        Is that sufficient?

Q.  That's great.

        So correct me if I'm wrong, but it sounds like you
were principally involved in the area of program development
and business development for Lockheed Martin, is that generally
fair to say?

A.  Yes.

1  Q.  And Lockheed Martin is a defense contractor?

2  A.  Global security company.

3  Q.  So a lot of military-type contracts, Defense Department

4  contracts?

5  A.  Lockheed -- yes, it's the world's largest, or at least the

6  United States' largest defense contractor.

7  Q.  And you came to AbTech from there, correct?

8  A.  Yes.

9  Q.  At the time you joined AbTech you had a lot of skills from

10  Lockheed Martin but you hadn't worked in stormwater, had you?

11  A.  I had not worked in stormwater.

12  Q.  Had you worked in any water processing or stormwater

13  related activities for Lockheed Martin?

14  A.  We were involved in certain advanced stand-up technology

15  fabrication of carbon nanotubes that could be applied to water

16  filtration.  So I gained quite a bit of understanding of how

17  water filtration works; not for stormwater applications

18  particularly, though.

19  Q.  And you didn't know anything about the Smart Water Sponge

20  until you got involved with AbTech, correct?

21  A.  No, incorrect.  We actually -- Lockheed was looking at

22  AbTech's technology.  I had an engineering due diligence team

23  from Lockheed look at the technology.  There was also a

24  separate organization called Lux Research that had done some

25  independent review of water filtration technologies, including

FC2TSKE3                        White - cross

1   AbTech's.  That was all part of the mix, so I had several

2   months of experience before that.

3          And also Lockheed was working with AbTech in deploying

4   the technology -- the Smart Sponge technology for military

5   bases, and we actually even visited at least one or two and

6   affirmed interest from the operations generals that were base

7   commanders, deputy base commanders.  So I had a pretty good

8   understanding of the technology.

9   Q.  Is that interaction what led you to join AbTech?

10  A.  I mean I was working with them regularly, yes, so it was in

11  that context that I became very interested in the AbTech

12  technology.

13  Q.  And you first joined as a consultant, is that right?

14  A.  Correct.

15  Q.  And your compensation was 10,000 per month?

16  A.  Correct.

17  Q.  And who came up with that number?

18  A.  Glenn did.

19  Q.  And that was when you joined in 2010, correct?

20  A.  Correct.

21  Q.  Two years prior to when Mr. Skelos joined the company in

22  2012, correct?

23  A.  Yes.

24  Q.  Then you said you became an AbTech employee a bit later,

25  correct?

FC2TSKE3                         White - cross

```
1    A.  Yes, correct.
2    Q.  And then you went from getting the consulting fees to a
3    regular W-2 salary, correct?
4    A.  Correct.
5    Q.  And I think -- correct me if I'm wrong, but I think you
6    said it was about $180,000?
7    A.  183, as I recall.
8    Q.  So I think you said -- so when did you start receiving
9    $183,000 a year, what point?
10   A.  As a salary I believe January 1, 2012.
11   Q.  And you worked all of 2012, correct, all of 2013?
12   A.  Yes.
13   Q.  And then through a good bit of 2014?
14   A.  Yes.
15   Q.  So you made upwards of $400,000, is that fair to say, over
16   that full period?
17   A.  Yes.
18   Q.  And I think you said on direct examination that you first
19   became concerned about your activities and the activities of
20   AbTech in April of 2013, correct, when Mr. Skelos got his
21   increase in money?
22   A.  Well, that was the first indicator I had that there were
23   things that they were doing that I was -- including Glen
24   principally, and Charlie, that I was not comfortable with.
25   Q.  Well, you told the government when you met them that that's
```

FC2TSKE3                    White - cross

1    when you realized you had done something wrong, correct?

2    A.   That's when I realized that I was involved with something

3    and they were doing something wrong.

4    Q.   You were involved in something that you recognized was

5    wrong, correct, that's what you told the government when you

6    met with them?

7    A.   Right.

8    Q.   And that was in April of 2013, correct?

9    A.   That I first -- yeah, when we received that email and I

10   became aware of it.

11   Q.   And you worked from them from April 2013 to April 2014,

12   correct?

13   A.   A little later in 2014.

14   Q.   You worked during that full year period, correct?

15   A.   For that period, yes.

16   Q.   And you made $180,000 roughly, correct?

17   A.   Yes.

18   Q.   And you actually worked for a number of additional months

19   after that, correct?

20   A.   Yes.

21   Q.   And made more money during that time, correct?

22   A.   Yes.

23   Q.   So it's fair to say you made approximately 150 to $170,000

24   after you claim you realized you were doing something wrong,

25   correct?

FC2TSKE3                      White - cross

1    A.  I received -- that salary continued from AbTech, and that

2    point in April 2013 was when I first became aware of there

3    being something that was not right going on.

4    Q.  And you're aware Mr. Skelos, for the first period of his

5    time at AbTech, made about $4,000 a month, right?

6    A.  Yes, I am.

7    Q.  And that in the summer of 2013 it was increased to 10,000

8    per month, correct?

9    A.  Yes.

10   Q.  So he roughly made the same amount that you did during this

11   period of time, correct?

12   A.  Yes.

13   Q.  You made roughly $170,000 after you claim you knew that you

14   were doing something illegal.  He probably made less than that,

15   in fact, correct?

16   A.  My salary was for all of my duties at AbTech, of which this

17   was just one part.

18   Q.  And then when you go to meet the government after being

19   part of what you say has been a criminal scheme that you

20   participated in for well over a year, correct?

21   A.  Sorry?

22           THE COURT:  It's not intelligible.  You need to

23   rephrase.

24   Q.  You go to the government and start speaking to them,

25   correct?

FC2TSKE3                        White - cross

1   A.  Yes.

2   Q.  And you tell them that you participated in a crime since

3   April of 2013, correct?

4   A.  I said that I knew what they were doing was wrong, and I

5   continued to work on those matters and continued to be employed

6   by AbTech, and I should have withdrawn.

7   Q.  And the fact is that the government agreed not to charge

8   you with anything, correct?

9   A.  That's correct.

10  Q.  Provided that you cooperate against Senator Skelos and Adam

11  Skelos, correct?

12  A.  No, they asked me to continue to tell them the truth

13  whenever they asked a question, and they asked me to cooperate

14  and record certain calls.  That was what they asked me to do.

15  And eventually to testify.

16  Q.  They asked you to do these things, is that your testimony?

17  A.  I'm sorry?

18  Q.  They asked you to do them and you agreed, is that your

19  testimony?

20  A.  I'm not sure I understand.

21  Q.  Let me rephrase it.  They told you this is what you needed

22  to do, correct?

23  A.  Well, you always have to tell the truth when the government

24  is asking you what the question is, the FBI, it's the law.

25  Q.  When did the FBI show up at your house?

FC2TSKE3                        White - cross

1    A.  February 5th.

2    Q.  What time?

3    A.  7:30 in the morning.

4    Q.  How many agents came?

5    A.  There were -- well, there was one FBI agent, one U.S. DOJ

6    criminal investigator, and one local FBI agent.

7    Q.  And this was 7:30 in the morning?

8    A.  Correct.

9    Q.  They came to your home?

10   A.  Yes.

11   Q.  Who else was at the house?

12   A.  My dog.

13   Q.  Just yourself then, correct?

14   A.  Yes.

15   Q.  And they told you at 7:30 in the morning that you were

16   going to be charged with a crime, correct, if you didn't help

17   them?

18   A.  No.

19   Q.  They didn't?

20   A.  No, they just said they had some questions regarding Adam

21   and AbTech.

22   Q.  They had some questions regarding Adam Skelos, correct?

23   A.  They said we have some questions regarding Adam and AbTech.

24   Q.  And it was after that point that you went to see a lawyer,

25   right?

FC2TSKE3                          White - cross

1    A.   I called an attorney that morning, yeah, to discuss what

2    had happened.

3    Q.   Did they tell you you should get a lawyer?

4              MR. MASIMORE:   Object to form.

5              THE COURT:   Sustained.

6    Q.   Did the agents or investigator tell you that you should get

7    a lawyer?

8    A.   They did not.

9    Q.   But ultimately, what you learned was that if you cooperated

10   with the government, if you made these recordings, that you

11   would not be charged, correct?

12   A.   No, I didn't know what was going to happen, but I was asked

13   to do it and I wanted to help.

14   Q.   Were you told you would be charged if you didn't cooperate?

15   A.   I wasn't told anything.

16   Q.   Let's go back then to Mr. Dorego for a few minutes.

17             You said you had never spoken to Charlie Dorego,

18   correct?

19   A.   Not that I recall ever, no.

20   Q.   But I think you said on direct examination that he had a

21   lot of -- that he was aggressive, I think you said, during

22   cross-examination, correct?

23   A.   Yes, based on those emails.

24   Q.   And that he had significant influence over Mr. Rink,

25   correct?

1   A.  Yes.

2   Q.  And that you were always concerned about Mr. Rink's

3   involvement with Mr. Dorego, correct?

4   A.  I wouldn't characterize it as concerned, but I didn't like

5   the fact that Charlie had such great influence over Glenn.

6   Q.  Pretty much --

7   A.  Sure, I was concerned that any advisor, but in particular

8   him, had any such great influence, yes, didn't seem

9   appropriate.

10  Q.  Were there other advisers who had, in your view, as much or

11  more influence over Mr. Rink than Mr. Dorego?

12  A.  I would say Robert Kennedy, Jr. was someone like that.

13  Q.  Is it fair to say that in your view, in your experience,

14  that if Mr. Dorego made a request of Mr. Rink that it would be

15  done?

16  A.  No, not necessarily, but -- no.

17  Q.  Well, Mr. Dorego recommended the hiring of Adam Skelos,

18  right?

19  A.  Yes.

20  Q.  And that was done, correct?

21  A.  Yes.

22  Q.  And as far as you understand, we looked at the email a

23  little earlier, Mr. Dorego recommended that Mr. Skelos' salary

24  be increased, correct?

25  A.  I would not say it was just a recommendation.

FC2TSKE3                      White - cross

1   Q.   It was a demand, correct?

2   A.   Correct.

3   Q.   That was a demand from Mr. Dorego, correct?

4   A.   Correct.

5   Q.   As a result of that demand, Mr. Adam Skelos' salary was

6   increased, correct?

7   A.   Eventually Glenn increased it, yeah.

8   Q.   And Mr. Dorego, he remained involved in -- was he involved

9   in AbTech when you first became involved with the company?

10  A.   I think he was, because I believe he goes back to the early

11  part of the company's history.  But I only started hearing the

12  name here and there over time.

13  Q.   When do you think the first time you heard the name was, if

14  you can recall?

15  A.   Probably -- I mean I can only say generally sometime in the

16  2011 time frame.

17  Q.   It was well before Adam Skelos was hired, correct?

18  A.   Yes.

19  Q.   And he remained involved in the company's activities

20  through 2013, correct?

21  A.   Yeah.  Well, at least until then.  He might have longer, I

22  don't know.

23  Q.   He may have continued longer, but for my context and the

24  timeline, through 2013 he remained, in your view, actively

25  involved in the activities of AbTech, correct?

FC2TSKE3                    White - cross

1   A.  Well, talking to Glenn, yes, involved in that way, yes.  I

2   don't know of any other involvement.

3   Q.  Essentially as kind of an adviser to Mr. Rink in some

4   respects?

5   A.  Yes, but also -- Glenn would say he really was sort of like

6   the representative of one of the larger initial shareholders of

7   AbTech.

8   Q.  So talking about Mr. Swarzman?

9   A.  Yes.

10  Q.  Correct?

11          And his family?

12  A.  Yes.

13  Q.  The Litwin family?

14  A.  Yeah, so I never completely understood the relationship,

15  but I believed it to be something like Charlie being the

16  attorney and sort of speaking on behalf of the investment.

17  Q.  In fact, you came to learn that while Mr. Swarzman had the

18  kind of the financial backing, that in many ways it was

19  Mr. Dorego who was the decision maker for that group, is that

20  fair to say?

21  A.  No, I don't know that I knew he was a decision maker, but I

22  knew he was a lawyer and was sort of the representative, but I

23  don't know that he could actually -- I don't know if he had

24  direct decision-making authority.

25  Q.  Well, let me show you what's marked as 359704 for

FC2TSKE3                          White - cross

1    identification and see if that refreshes your recollection.

2             MR. CONNIFF:  May I approach, your Honor?

3             THE COURT:  Yes.  Show it to the government.

4             MR. CONNIFF:  I think I may have misspoke, your Honor.

5    If I could have a moment, your Honor, I apologize.

6             THE COURT:  Sure.

7             (Pause)

8             MR. CONNIFF:  May I approach, your Honor?

9             THE COURT:  Yes.

10   Q.  Sorry, Mr. White, I gave you the wrong document.  Page 6 of

11   that document, if you would.

12            THE COURT:  Could you identify what you have shown the

13   witness?

14            MR. CONNIFF:  Yes, 359708 for identification, your

15   Honor.

16   Q.  Does that refresh your memory?

17   A.  The bottom part of it?

18   Q.  Yes.  Without reading it, tell me if it refreshes your

19   memory, if you would.

20   A.  No.  I mean I remember saying these things.

21   Q.  It's fair to say that it was your sense that Mr. Dorego was

22   the spokesman for the Litwin group, the investor group?

23   A.  Not spokesman, representative.  I mean I believed it was

24   sort of like an attorney relationship, representative

25   relationship.

FC2TSKE3                          White - cross

1    Q.  Well, doing things like recommending Adam Skelos is not

2    really an attorney job, is it?

3    A.  Attorneys make recommendations all the time, I mean as they

4    get involved.

5    Q.  So you think he was acting in his legal capacity when he

6    did that?

7    A.  I mean he -- I believed he was acting in the interest of

8    the investment, or I would say he was recommending it for the

9    benefit of the company that would therefore benefit the

10   investors he was representing.

11   Q.  Well, it's fair to say you never got along with Mr. Dorego,

12   is that right?

13   A.  I never had direct dealings with him.

14   Q.  You didn't like him, is that fair to say?

15   A.  I never met him.

16   Q.  And you expressed that through --

17              THE COURT:  You're interrupting.

18   Q.  You expressed that to Mr. Rink, didn't you?

19   A.  I did not express that I didn't like him, I expressed that

20   he was aggressive and bullying and I didn't think he was

21   playing an appropriate role in the company's affairs.

22              MR. CONNIFF:  May I approach, your Honor?

23              THE COURT:  Yes.

24   Q.  Do you have 359704 in front of you right now?

25   A.  No, sir.

1    Q.  You met with the government a number of times, correct?

2    A.  Yes.

3    Q.  And it was important that you be honest with them, correct?

4    A.  Yes.

5    Q.  Tell them everything that you knew?

6    A.  Answer any questions they asked.

7    Q.  And isn't it a fact that you told them on February 9, 2015,

8    that you and Mr. Dorego did not -- never liked each other?

9    A.  Should I refer to a page here?

10   Q.  You can look at paragraph 3 on page 2, if you would.

11   A.  I did not write this document.

12   Q.  So you never told the government that?

13   A.  What I told the government, which perhaps this is a summary

14   of, is that I believed that his manner of working with or

15   influencing Glenn was not appropriate, and I didn't like it.

16   And because I would push back and because Charlie came to see

17   me as someone who would push back and develop arguments that

18   made sense to push back on him, I grew to sense that he didn't

19   like me either -- or that he didn't like me.  So I can't -- you

20   asked me about whether I liked him personally, I don't know,

21   but I didn't like the way he was interacting with the company,

22   and I did tell the government that.

23   Q.  That you thought he was -- you had problems with the way he

24   was interacting with the company, correct?

25   A.  Absolutely.

FC2TSKE3                         White - cross

1    Q.  And his level of involvement in the company, correct?

2    A.  Correct, the way he would approach Glenn, yes, the manner,

3    the substance, yes.

4    Q.  And his level of influence over Mr. Rink, you weren't

5    comfortable with that either, correct?

6    A.  That's right.

7    Q.  Let's shift gears a little bit to the kind of AbTech

8    business philosophy.  You touched a little bit on this on

9    direct examination, but it's fair to say that in 2012 AbTech

10   had a model that involved using business consultants, correct?

11   A.  Yes.

12   Q.  And these were going to be politically connected people who

13   would be able to, one, know the processes in various

14   localities, is that fair to say?

15   A.  Yes.

16   Q.  They're familiar with the way municipal governments work,

17   correct?

18   A.  Yes.

19   Q.  And really on a local level is what you in large part focus

20   on, right?

21   A.  That AbTech focused on.

22   Q.  That AbTech focused on.

23        Trying to get people who know the systems and

24   processes in a particular area to help open up doors for you,

25   correct?

FC2TSKE3                        White - cross

1    A.   And that -- yes, that's correct, but principally that had

2    relationships.   Glenn's desire was for the consultants to have

3    direct relationships with the potential customers, meaning

4    municipalities.

5    Q.   The closer the ties were to people -- to the decision

6    makers, the happier Mr. Rink would be about that, right?

7    A.   Correct.

8    Q.   Because he felt that if you hired someone who knew the

9    customers, as you call them, they would be more apt to get

10   their phone calls returned, correct?

11   A.   Yes.

12   Q.   And more apt to be able to set up meetings, correct?

13   A.   Correct.

14   Q.   And that's what happened in the case of Adam Skelos, right?

15   A.   That he was able to set up meetings directly with the

16   municipalities?

17   Q.   Yes.

18   A.   That's what I observed, yes.

19   Q.   And you observed and participated in, correct?

20   A.   Yes.

21   Q.   And he was able to get phone calls returned to him from

22   people inside the Department of Public Works.   You mentioned

23   that I think just this morning.

24   A.   Yes.

25   Q.   And this was the whole purpose in hiring him, right?

FC2TSKE3                         White - cross

1    A.  Yes, that's what Glenn stated.

2    Q.  And that was Mr. Rink's philosophy for the company at that

3    point, right?

4    A.  Yes.

5    Q.  And there were other people, higher profile people, I think

6    we touched on already, but people like Mr. Kennedy you

7    mentioned was on the board?

8    A.  He was on the advisory board.

9    Q.  And Governor Rendell as well?

10   A.  On the advisory board.

11   Q.  And those people would provide access at times to various

12   officials that they might know, correct?

13   A.  Yes.

14   Q.  And typically is it fair to say that AbTech, at the point

15   when Adam joined, was a company with some great ideas but not a

16   lot of revenue yet, is that fair to say?

17   A.  Yes.

18   Q.  And so oftentimes with companies like that, compensation

19   would be awarded in stock options or direct awards of stock,

20   correct?

21   A.  Yes.

22   Q.  And you got stock, correct?

23   A.  Stock options.

24   Q.  How many stock options did you get in connection with your

25   role at AbTech?

FC2TSKE3                    White - cross

1   A.   There was an initial grant of 10,000 when I joined as a

2   consultant, and then when I became an employee there was a

3   larger amount where it was both time-based vesting and

4   performance-based vesting.  I'm not sure of the exact amount.

5        MR. CONNIFF:  Maybe we can look at what has been

6   marked Government Exhibit 2310.  It may not be in evidence.  I

7   don't think the government introduced it.

8        We'll introduce is it as 2310, which I offer, your

9   Honor, without objection.

10        MR. MASIMORE:  No objection.

11        THE COURT:  All right.  Defense Exhibit 2310 is

12   received without objection.

13        (Defendant's Exhibit 2310 received in evidence)

14        MR. CONNIFF:  If we could blow up the top half of that

15   document.

16   BY MR. CONNIFF:

17   Q.   And you see, Mr. White, that this is it from September 30,

18   2013, up on the upper left?

19   A.   Yes.

20   Q.   And do you recognize the document?

21   A.   No.

22   Q.   Do you see your name on it?

23   A.   Yes, I do, two lines.

24   Q.   And what does that represent, as far as you know?

25   A.   That represents the stock options.  One is a four-year

1    time-based vesting and the other is a purely performance-based

2    vesting after it hits a certain mark.

3    Q.  When did you receive those options, do you recall?

4    A.  The option form, not having vested, they were received at

5    some point in 2011 pursuant to a board approval, I'm not sure

6    exactly.  But in terms of vesting, which means they actually

7    are owned, the second line never did, and the first line I was

8    an employee for basically two years.  So they vested in

9    tranches.

10   Q.  But you were certainly hopeful when you received these

11   options that the stock price would go up and you would benefit,

12   correct?

13   A.  Yes.  Also, of course, I hoped for AbTech's share price to

14   go up for everyone's sake.

15   Q.  Sure.  And the other folks on here, to stick on the

16   advisors, you see Mr. Kennedy is on here, correct, on the

17   second line?

18   A.  Yes, I do.

19   Q.  320,000 options granted to him?

20   A.  Yes.

21   Q.  And then do you know who Mr. Willingham is?

22   A.  Yes, it's Mr. Kennedy's business manager or assistant, I'm

23   not sure of the title.

24   Q.  He assisted in the work of AbTech?

25   A.  Yes, he -- well, he was a business manager for Kennedy, who

FC2TSKE3                        White - cross

1    was often one of the people that Glenn would bring up that he

2    was having contact with.  So he was like an adviser.

3    Q.  And then you see down at the second line to the bottom, you

4    see Mr. Rendell also received options for his work on the

5    advisory board, correct?

6    A.  Yes.

7    Q.  About 150,000, correct?

8    A.  Yes.

9    Q.  So is it fair to say that one resource that Mr. Rink had in

10   recruiting advisors and employees to the company was to provide

11   them with options, correct?

12   A.  Yes.

13   Q.  And are you familiar with someone named Jennifer Hosterman?

14   A.  Yes, I am.

15   Q.  She's also a consultant that was hired by Mr. Rink,

16   correct?

17   A.  Correct, yes.

18   Q.  And you worked on her consulting contract, is that fair to

19   say?

20   A.  Yes.

21   Q.  And she was a former mayor from a city out in California,

22   is that right?

23   A.  Yes.

24   Q.  And she was referred by Mr. Kennedy, are you aware of that?

25   A.  Yes.

FC2TSKE3                        White - cross

```
1    Q.  And she was hired right around the same time as Adam

2    Skelos, correct?

3    A.  Yes.

4    Q.  And the government asked you on direct examination a little

5    bit about the differences between Ms. Hosterman's role and Adam

6    Skelos' role.  Do you recall that?

7    A.  Yes.

8    Q.  I think you said that she had a national coverage area,

9    correct?

10   A.  Correct, plus I referenced her background.

11   Q.  She had some experience on water issues, previous

12   experience?

13   A.  Yeah, she was the co-chair -- former co-chair of the U.S.

14   Conference of Mayors Water Council.

15   Q.  So you felt she justified a higher monthly compensation

16   rate than Adam at that point when the contracts were being

17   created, right?

18   A.  Yes.  However, I would say, to be completely accurate, I

19   was not a proponent of the consultant sort of model, so I may

20   have opposed those consulting fees, too.  But in terms of the

21   difference, yes, I believe that there was some justification

22   for the difference.

23   Q.  It's fair to say just a fundamental disagreement with

24   Mr. Rink about the approach?

25   A.  Yes.
```

FC2TSKE3                      White - cross

1   Q.  But Mr. Rink's the CEO of the company, right?

2   A.  Right.

3   Q.  So his approach won out, is that fair to say?

4   A.  Right.

5   Q.  And you complied and started working with creating the

6   agreements?

7   A.  Correct.

8   Q.  And what did you model the agreements on?

9   A.  Well, the structure was given to me in terms of

10  compensation from Glenn.  I'm not sure I'm -- Glenn would have

11  calls with me and would lay out what he wanted, and I would

12  write it down and then put it into the document.

13  Q.  And so she got $10,000 from the start, correct?

14  A.  Yes.

15  Q.  And Adam started out at 4,000, correct?

16  A.  Correct.

17  Q.  But in fact, Mr. Rink at the time wanted to pay Adam 10,000

18  per month, right?

19  A.  Yes.

20  Q.  His initial plan was to have them both paid at $10,000 per

21  month, right?

22  A.  Yes.

23  Q.  And you pushed back on that?

24  A.  Yes.

25  Q.  You felt that it was, for the reasons you just described,

1    more appropriate for Ms. Hosterman to get more, correct?

2    A.  Yes.

3    Q.  So at the time that Adam's contract was created, you

4    understood that Mr. Rink anticipated that once Adam got

5    traction he would be moved up to 10,000 as well, correct?

6    A.  I understood that Glenn's intent was to bring it up to

7    10,000, yes, and he used the words:  Let's start him at 4,000.

8    Q.  And ultimately that's what happened, correct, he was moved

9    up to 10,000?

10   A.  He was moved up to 10,000 in mid 2013.

11   Q.  At Mr. Rink's direction?

12   A.  Correct.

13   Q.  And at the time that he was moved up to that $10,000 a

14   month, or the agreement was made to move it up, because correct

15   me if I'm wrong, but the agreement came in around April and

16   then ultimately in the summer he was increased to 10,000,

17   correct?

18   A.  Correct.

19   Q.  So there was a few months' gap between the time that the

20   agreement was made and his compensation went up, correct?

21   A.  Correct.

22   Q.  And that had to do with the Nassau County contract being

23   preliminarily awarded to AbTech, correct?

24   A.  The increase -- what Glenn told me was we were going to

25   increase his compensation at some point down the road and to

1    tell Adam that.  And at some point I learned it was going to go

2    up to 10,000, and I communicated that.  And it was going to be

3    when we expanded our efforts, so then Glenn -- then it was

4    increased in the summer of 2013.

5    Q.  But the fact is in the time just prior to that increase,

6    you, being AbTech, were well on your way to receiving what at

7    that time turned out to be a very, very large contract for the

8    company, right?

9    A.  Yeah.

10   Q.  This would have been one of the largest, if not the largest

11   contract that AbTech had obtained, correct?

12   A.  That's correct.

13   Q.  And Ms. Hosterman, on the other hand, who would have been

14   working for some time already, had not -- her work had not

15   resulted in any contracts, correct?

16   A.  That's correct.

17   Q.  And at the time, this 2013 spring and summer time period,

18   that's what I would like you to focus on, you believed, as did

19   others at AbTech, this was an enormous opportunity for the

20   company, correct?

21   A.  Yes.

22   Q.  Not only because of the revenue that would be generated

23   from this single contract, but because the model that you had

24   devised was actually starting to take hold?

25   A.  Yes.

FC2TSKE3                    White - cross

1    Q.  So it would be an enormous push just for the whole company

2    if this were to be seen through, correct?

3    A.  Yes.

4    Q.  We'll get to it.  Unfortunately it didn't work out quite as

5    well as people hoped in the spring of 2013, is that fair to

6    say?

7    A.  I'm not sure what you mean.

8    Q.  Well --

9    A.  The spring of 2013?

10   Q.  I say it didn't work out quite as well as people had hoped

11   in the spring of 2013 that it would, is that fair to say?

12   A.  Correct, there were delays that were unanticipated.

13   Q.  There were enormous delays that were quite frustrating to

14   you, correct?

15   A.  Frustrating to the company.  I was only channeling Glenn's

16   frustration at his request.

17   Q.  So you weren't frustrated yourself?

18   A.  There were times I was frustrated with the delays in the

19   process, but compared to Glenn, it was not the same level.

20   Q.  Glenn was really angry, really frustrated?

21   A.  Yes, he was.

22   Q.  And you were a bit frustrated but probably also a bit

23   troubled by the fact that your boss is pushing you to get

24   something done, correct?

25   A.  Yes.  And there's only so much you can do when your

FC2TSKE3                      White - cross

1   customer is moving along a certain process.

2   Q.  And I just want to talk to you briefly about the initial

3   meeting that you had with Adam.

4   A.  Yes.

5   Q.  Sometime after you were introduced by email by Mr. Rink, is

6   that correct?

7   A.  Yes.

8   Q.  And I believe I recall you saying on direct examination

9   that you were impressed by Adam at the meeting, is that fair to

10  say?

11  A.  He was well prepared, yeah.  I was not expecting that level

12  of preparation.

13  Q.  He actually knew about the company, correct?

14  A.  Yes.

15  Q.  And he had put together a plan to kind of go out throughout

16  New York State, not only Long Island but throughout New York

17  State, to try to get AbTech implemented in municipalities,

18  right?

19  A.  Yes.

20  Q.  And you thought after that meeting that Adam actually would

21  add value to the company, correct?

22  A.  I believed he could.

23  Q.  And during that initial meeting he never mentioned his

24  father to you, did he?

25  A.  No.

FC2TSKE3                     White - cross

1   Q.  He never mentioned anything that his father was going to do

2   around this work, right?

3   A.  No.

4   Q.  He was pushing himself, correct?

5   A.  Correct.

6   Q.  He was making a pitch for his efforts in connection with

7   AbTech, right?

8   A.  Correct.

9   Q.  I just want to talk to you a little bit about the contract

10  that you drafted for Adam.  You drafted that contract and then

11  you circulated it internally to folks at AbTech, correct?

12  A.  I don't recall who I circulated it to.  I was mostly in

13  contact with Glenn regarding it, and then he would be the one

14  who would then speak to various folks, including board members.

15  Q.  Well, let me show you Government Exhibit 2437.

16          MR. CONNIFF:  We'll call this Defense 2437 because I

17  don't believe it's yet in evidence, and we can show it to the

18  witness.

19  Q.  Mr. White, do you recognize that?

20  A.  Yes, I do.

21  Q.  What is it?

22  A.  It's an email from myself to Glenn.

23          MR. CONNIFF:  Your Honor, the government offers 2437.

24          THE COURT:  The defense offers.  Yes, Defense

25  Exhibit 2437 is received without objection.

1      (Defendant's Exhibit 2437 received in evidence)

2      MR. CONNIFF:  If we could publish that to the jury.

3   Q.  You see in the middle there, Mr. White, Glenn Rink emails

4   you and says:  Where do we stand on working on agreement

5   together?  Do you want JT to help?

6   A.  Right.

7   Q.  Who is JT?

8   A.  Jonathan Thatcher.

9   Q.  What agreement is Mr. Rink referring to there?

10  A.  The consulting agreement with Adam.

11  Q.  And then if we look just above, you respond to him with the

12  following, you say:  I detailed proposed terms last week.  He

13  accepted.

14      So did you have a conversation with Mr. Adam Skelos

15  about the terms generally?

16  A.  I don't recall.

17  Q.  You say here that he accepted all, correct?

18  A.  I say that, yeah.

19  Q.  But you don't recall whether he did or not?

20  A.  Yeah, I apologize, I don't recall that.

21  Q.  Would you have written this information in email to your

22  boss if at the time it wasn't correct?

23  A.  No.

24  Q.  You then say:  Documents will be finalized this week.

25      And that's the consulting agreement?

FC2TSKE3                       White - cross

1  A.  Correct.

2  Q.  And then you go on to say:  Targeting a day or two of

3  meetings -- Sorry:  He has already started work targeting a day

4  or two of meetings.

5       What did you mean by that?

6  A.  That he was setting up initial customer meetings with

7  various municipalities on Long Island to start.

8  Q.  The fact is that Adam jumped right into the mix, correct?

9  A.  Yeah, in terms of setting up meetings, yes.

10 Q.  He got going right off the bat to try to get introductions?

11 A.  Yes.

12 Q.  And he had some success in doing it?

13 A.  Yes.

14      MR. CONNIFF:  We can take that one off the screen, if

15 you would, please.

16      And then just move to 2440, which I believe is in

17 evidence.

18 Q.  And what's happening here, Mr. White?

19 A.  Well, Glenn is putting a lot of pressure on moving things

20 forward, and so I was -- he asked me -- he would ask me to do

21 things like this to send it to the whole management team, and

22 to Jonathan sometimes.  So I am emailing about how we've got

23 the attached consulting agreements.  Glenn wanted them done

24 quickly.  He was talking about a board meeting.  And we were

25 setting up meetings already, and I was in contact with

FC2TSKE3                    White - cross

1    Hosterman, too, about meetings being set up.  So that's

2    generally what is going on.

3    Q.  In the third paragraph there you said:  I will need

4    comments ASAP, as this is all moving on a very fast timeline.

5    A.  Right.

6    Q.  That's you telling Mr. Rink that it's moving on a fast

7    timeline, right?

8    A.  Right.  Well, I was speaking with him on the phone, too, so

9    he already knew that.

10   Q.  And that meetings are happening in real time this week.

11   The first one already occurred this AM in New York.  Correct?

12   A.  Yes.

13   Q.  What meeting was that?

14   A.  I don't recall.

15   Q.  You wouldn't have written that if it wasn't accurate at the

16   time, right?

17   A.  No, I would only right accurate stuff, I just don't

18   remember what the meeting was.

19   Q.  But your point is there's an urgency to this because

20   Mr. Skelos -- things are under way here in Long Island and we

21   need to get him a contract, right?

22   A.  Well, it's a little bit more nuanced than that.

23           If I may.

24   Q.  Go right ahead.

25   A.  What Glenn would want me to do if I expressed something to

FC2TSKE3                    White - cross

1    him on the phone, he would ask me to then write it out and

2    perhaps write it to him and someone else so it seemed like it

3    was coming de novo from me as a way to sort of make people feel

4    involved.  So this is -- a lot of it is Glenn saying we need to

5    do this, we need to do this, and then me complying with his

6    request to email to him back with Jonathan and state what I

7    just told him.

8    Q.  What was your role at AbTech at this point?

9    A.  I was in charge of business development and corporate

10   strategy.

11   Q.  And you had a law degree, correct?

12   A.  Yes.

13   Q.  And you make decisions, correct, in your job?

14   A.  Some day to day, sure.

15   Q.  That's what you are getting paid for, right?

16   A.  I'm getting -- well, no, I am getting -- I was getting paid

17   for developing strategies, programs, customer offerings,

18   messaging, and then being the one who would go present to

19   customers what we were offering and overseeing that pursuit.

20   Q.  You weren't getting $180,000 a year to write emails that

21   Glenn Rink had already dictated to you, correct?

22   A.  That would only be one of my job responsibilities, correct.

23   Q.  You don't recall writing:  First one already occurred this

24   AM in New York.  Correct?

25   A.  I don't recall that.

FC2TSKE3                    White - cross

Q.  But you have a vivid recollection that Mr. Rink told you

this and you were just dictating for him, right?

A.  I have a vivid recollection of him telling me in general

that he wanted to move forward with -- and putting a lot of

pressure on the process with Jennifer Hosterman and Adam Skelos

and using that consultant model to get to customers.  I'm not

saying -- I do not say that I remember him saying something

like writing:  This first one occurred this AM in New York.

          He might have, I don't recall though.

          MR. CONNIFF:  Your Honor, would now be a good time for

a break?

          THE COURT:  Yes, it would, let's break until

2 o'clock.

          (Continued on next page)

FC2TSKE3                           White – cross

1                    (Jury not present)

2                    THE COURT:  Please have a seat.

3                    Would counsel wish to raise anything?

4                    MR. MUKHI:  Your Honor, may we contact your Honor's

5    deputy if there's a need to discuss after we have conferred

6    with Mr. Gage on the defense exhibit list?

7                    THE COURT:  Certainly.

8                    MR. MUKHI:  And if there's any paring down to be done.

9                    THE COURT:  Okay.  We'll be on a break until two.

10                   MR. MUKHI:  Thank you, your Honor.

11                   (Luncheon recess taken)

12                   (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

FC29SKE4                        White - cross

1                              AFTERNOON SESSION

2                                  2:00 p.m.

3              (Jury not present)

4              BJORNULF WHITE, resumed

5              THE COURT:  Please have a seat.

6              We don't have the jury.

7              (Jury present)

8              THE COURT:  We're ready to resume.

9              Mr. Conniff.

10   CROSS-EXAMINATION CONTINUED

11   BY MR. CONNIFF:

12   Q.  Mr. White, when we broke for lunch we were talking about

13   Adam Skelos' consulting agreement?

14   A.  Yes.

15   Q.  Do you recall that?

16   A.  Yes.

17   Q.  And we went through a couple of e-mails just preceding the

18   circulation of the actual agreement.  Do you remember that?

19   A.  Yes.

20   Q.  And on September 5 of 2012 you send the proposal -- the

21   proposed agreement over to Adam; is that correct?

22   A.  On or about then.

23   Q.  Okay.

24              MR. CONNIFF:  We could pull up Government Exhibit

25   2438.

FC29SKE4                          White - cross

1  Q.  Take a look at that.  I don't believe it's yet in evidence.

2  We'll mark it Defense 2438.

3          MR. MASIMORE:  No objection, your Honor.

4          MR. CONNIFF:  My screen is not working.

5          THE COURT:  Defense Exhibit 2438 is received without

6  objection.

7          (Defendants' Exhibit 2438 received in evidence)

8          MR. CONNIFF:  It's working now, your Honor.  Thank

9  you.

10 Q.  Do you recognize that document, Mr. White?

11 A.  Yes, I do.  It's an e-mail from myself to Adam attaching

12 the consulting agreement you referred to.

13         MR. CONNIFF:  Your Honor, the defense offers

14 Defendants' 2438.

15         MR. MASIMORE:  No objection.

16         THE COURT:  It is received without objection.

17 Q.  You can see you send this at about 8:44 a.m., Wednesday,

18 the 5th, correct?

19 A.  Yes.

20 Q.  And after that e-mail do you recall that you speak to Adam

21 that day about the possibility of setting up a meeting with

22 Nassau County?

23 A.  I recall generally speaking with him afterwards.  I don't

24 recall the timeframe though.

25         MR. CONNIFF:  We can take that down and look at

FC29SKE4                        White - cross

1    Government Exhibit 2441, which is in evidence.

2    Q.   And Mr. White, do you see here that you receive an e-mail

3    from Adam saying, "We are set with Nassau County deputy

4    executive Rob Walker on 9/18," correct?

5    A.   Yes.

6    Q.   And that's in connection with the unsolicited proposal that

7    you all planned to do, correct?

8    A.   No.   At this time it was just to present the P3 program

9    generally.

10   Q.   Informational meeting with Mr. Walker to get him interested

11   and get the county interested in potentially doing business

12   with AbTech, right?

13   A.   Yes.

14   Q.   And that's at 3:30 that same day, correct?

15   A.   Yes.

16   Q.   And do you have any discussions with Adam Skelos between

17   the time you send him the agreement and this e-mail that you

18   recall?

19   A.   I don't recall any.

20   Q.   And you say down below there, "If you're overnighting the

21   item today for quick feedback, I'm at the W Hotel in San

22   Diego."  Do you see that?

23   A.   Yes.

24   Q.   What item is that?

25   A.   I don't recall.

FC29SKE4                    White - cross

1    Q.  During that exchange you now -- did you know who Mr. Walker

2    was before you received this e-mail from Adam?

3    A.  No.

4    Q.  So you now know that he's a senior official in the Nassau

5    County executive office, correct?

6    A.  Yes.

7    Q.  And this is a good thing, right?

8    A.  Yes.

9    Q.  That this meeting has been set up?  This is kind of the

10   type of thing that Mr. Rink has in mind when he hired Adam

11   Skelos, correct?

12   A.  Yes.

13   Q.  And it's the following day that you get an e-mail from

14   Mr. Dorego about this very same contract, correct?

15   A.  I recall receiving an e-mail that Glenn forwarded from

16   Charlie.  I don't recall if it was the next day or --

17   Q.  We could take a look at it.  It's Government Exhibit 2442,

18   which is in evidence.

19          This is the next evening, correct?

20   A.  Yes, it is.

21   Q.  And you had heard nothing from Adam Skelos about his view

22   of the contract, correct?

23   A.  No.

24   Q.  In fact, your understanding based on the conversations you

25   had had leading up to September 5 was that he was in general

FC29SKE4                        White - cross

1    agreement with the concepts that you were proposing, correct?

2    A.  Right.

3    Q.  And it's Mr. Dorego who responds and says this is ludicrous

4    and embarrassing to me, correct?

5    A.  Correct.

6    Q.  Mr. Dorego was asking that Adam Skelos be paid, quote, "a

7    hefty commission payable in stock and cash," right?

8    A.  Yes.

9    Q.  Do you see that at the bottom?

10   A.  Yes.

11   Q.  Adam Skelos never raised that with you, did he?

12   A.  No.

13   Q.  At the time you believed this request for additional

14   compensation and commissions was coming directly from

15   Mr. Dorego; that it was his idea, correct?

16   A.  Yes.

17   Q.  And then the next week is when the meeting with Rob Walker

18   gets canceled, correct?

19   A.  Yes.

20   Q.  And at that time Adam Skelos communicates to you that

21   because we still don't have an agreement in place I don't want

22   to move forward, correct?

23   A.  Correct.

24   Q.  But what he also says in that e-mail is once we get the

25   agreement in place I'm happy to reschedule, correct?

-KMW   Document 136   Filed 01/13/16   Page 116 of 234      1650

FC29SKE4                       White - cross

1   A.  Something to that effect, yes, I recall.

2   Q.  And you can understand why somebody would want to have a

3   contract in place as things start to move forward as quickly as

4   these were, correct?

5   A.  Yes.

6   Q.  So you didn't find that that unusual that he would try to

7   slow things down until his agreement was finalized, correct?

8   A.  No.

9   Q.  And, in fact, even though the meeting is canceled, Adam

10  continues to work with you and on his own to move things

11  forward with Nassau County, correct?

12  A.  Yes.

13  Q.  And other municipalities, smaller municipalities on Long

14  Island?

15  A.  Yes.

16  Q.  Places like Islip?

17  A.  Islip came later.  But Babylon, Long Beach.

18  Q.  Oyster Bay?

19  A.  Oyster Bay.

20  Q.  And it's fair to say that Adam was excited about this job,

21  correct?

22  A.  Yes.  I think so.

23  Q.  Fair to say that based on your observations he was

24  enthusiastic about the product and the capabilities for him to

25  be successful in this job, right?

FC29SKE4                          White - cross

1    A.   Yes.

2    Q.   And the government showed you a number of e-mails on direct

3    examination where articles were being forwarded to you and

4    others from Adam.   Do you remember those?

5    A.   Yes.

6    Q.   And some of those came from Adam's family members, correct?

7    A.   Yes.

8    Q.   And you didn't think that was odd, did you?

9    A.   At the time, no.

10   Q.   They were showing an interest in a new job that, in Senator

11   Skelos' case, his son got, right?

12   A.   Yes.

13   Q.   And the articles related to the business, in some respects,

14   of AbTech, correct?

15   A.   Yes.

16   Q.   And these articles are available to anyone who wants to do

17   some web research on stormwater, right?

18   A.   Yes.

19   Q.   I want to talk to you briefly just about Hurricane Sandy

20   and the impact of that on AbTech's business.   Mr. Gage went

21   over a lot of this so I will try keep it brief.   But I want to

22   focus you on that area right now.

23        It's fair to say that the hurricane had an enormous

24   impact on the infrastructure of places like Long Island,

25   correct?

FC29SKE4                          White - cross

1    A.   Correct.

2    Q.   And there was tremendous tragedy arising out of it but it

3    also created an awareness of infrastructure needs.  Is that

4    fair to say?

5    A.   Yes.

6    Q.   There was a heightened interest by governments in insuring

7    their infrastructure was working properly?

8    A.   Yes.

9    Q.   Particularly in the area of water because it had been so

10   negatively affected by the hurricane, correct?

11   A.   Correct.

12   Q.   So, it's fair to say that municipalities, officials inside

13   towns around water, bodies of water, became more interested in

14   your type of -- AbTech's type of work, correct?

15   A.   Yes.

16   Q.   And this presented an opportunity to AbTech?

17   A.   Yes.

18   Q.   And Mr. Rink recognized that opportunity, correct?

19   A.   Yes, he did.

20   Q.   He realized that, not necessarily to take advantage of the

21   hurricane, but the hurricane did provide an enormous

22   opportunity?

23   A.   Correct.

24   Q.   And he communicated that to you?

25   A.   Yes.

FC29SKE4                         White - cross

1   Q.  That we, being AbTech, really needed to push in the

2   aftermath of the hurricane to get into these municipalities,

3   correct?

4   A.  Yes.

5   Q.  And the other issue was that the federal government and

6   various emergency relief agencies were focused on providing

7   financial relief to some of these devastated areas, correct?

8   A.  Correct.

9   Q.  So there might be financial opportunities -- or not

10  opportunities -- but finances available publicly that could

11  fund some of the type of work that companies like AbTech would

12  do?

13  A.  Yes.

14  Q.  So it was in some ways a very unique opportunity in Long

15  Island for a company like AbTech, right?

16  A.  Yes.

17  Q.  And you reach out to Adam after speaking with Mr. Rink,

18  correct?

19  A.  Regarding what?

20  Q.  Regarding kind of a push to get things going in Nassau,

21  correct?

22  A.  Yes.  Glenn asked me to speak to Adam, correct.

23  Q.  Let me show you Government Exhibit 2456 which is in

24  evidence.  Do you recall you spoke a bit about this e-mail on

25  your direct examination?

FC29SKE4                        White – cross

1   A.  Yes, I do.

2   Q.  And you say in this e-mail that we heard that Suffolk and

3   Nassau County are putting their FEMA packages together real

4   time?

5   A.  Correct.

6   Q.  Who did you get that information from?

7   A.  Glenn.

8   Q.  And we have about a three-week window to make something

9   happen on that, correct?

10  A.  Correct.

11  Q.  Where did that information come from?

12  A.  From Glenn.

13  Q.  So Glenn Rink, the CEO of AbTech, is providing you with the

14  information about where this funding is coming from, correct?

15  A.  Yes.

16  Q.  It didn't come from any three-way communications that you

17  had with Senator Skelos, correct?

18  A.  The three-way call you're referring to?

19        He confirmed that that's what he was hearing but, yes,

20  we knew it independently too.

21  Q.  You knew the information that Senator Skelos provided in

22  that quick three-way call independently because it was well

23  known generally, correct?

24  A.  Yes.

25  Q.  Mr. Rink was doing research, trying to find out where

1  opportunities would be.

2  A.  Yes.  It was also in the news too.

3  Q.  It was generally in the news, correct?

4  A.  Yes.

5  Q.  Most of what Senator Skelos told you was, in fact, in the

6  news, right?

7  A.  Yes.

8  Q.  And then you go on and say we have about a three-week

9  window to make something happen on that.  And then, in

10  parentheses, in terms of getting included on the FEMA requests,

11  right?

12  A.  Yes.

13  Q.  And I'm getting pressure to make sure we get into those.

14         That's the pressure you talked about before lunch,

15  that Mr. Rink was applying?

16  A.  Yes.

17  Q.  You say this is ahead of our planned timeline but I wanted

18  to reach out and ask if you think you could assist us.

19         So you were reaching out to Adam to try to get him

20  involved in this process, right?

21  A.  Correct.

22  Q.  And was that at your decision or was that at Mr. Rink's?

23  A.  Mr. Rink's.

24  Q.  When you say "ahead of our planned timeline," what did you

25  mean by that?

FC29SKE4                          White - cross

1   A.   The timeline that Adam had mentioned in his plan in the

2   beginning when I first met with him.  So, there was a certain

3   plan in place absent Hurricane Sandy.  This was going to shift

4   the priority of it in the timeline.

5   Q.   So this was going to accelerate everything that you had

6   discussed with Adam that you planned to do in a longer term?

7   Is that fair to say?

8   A.   Yes.

9   Q.   And then you say, "The concept is including stormwater

10  controls, water quality, treatment devices, in the requests."

11          So when the municipalities make these requests your

12  hope, AbTech's hope is that you're a part of this, correct?

13  A.   Correct.

14  Q.   And what Adam tells you, even though he's, you know,

15  canceled the meetings in the past and doesn't have a contract

16  yet, "we'll get on this now," correct?

17          You can look up at the top e-mail.

18  A.   Yes.

19  Q.   "Call you when I hear something," correct?

20  A.   Yes.

21  Q.   And, again, this is essentially what Mr. Rink's strategy is

22  for using people like Adam Skelos, correct?

23  A.   Yes.

24  Q.   That when quick movements need to be had like this, he's

25  able to do them?

FC29SKE4                           White - cross

1   A.  I don't think it's fair to say quick.  I think regardless

2   of the timeline.

3   Q.  Fair enough.

4           The next thing that happens is a meeting, a new

5   meeting gets set up with Sheila Shah, correct?

6   A.  Correct.

7   Q.  Maybe we can look at Government Exhibit 2457 which is in

8   evidence.

9           This is Mr. Skelos telling you that he's been

10  successful in setting up a conference call with Ms. Shah,

11  correct?

12  A.  Yes.

13  Q.  And this is November 9, 2012, correct?

14  A.  Yes.

15  Q.  And it looks like the call is going to be November 12,

16  correct?

17  A.  Yes.

18  Q.  And Adam Skelos doesn't have a contract with AbTech at this

19  point, does he?

20  A.  No.

21  Q.  And he doesn't say I'm canceling this call, correct?

22  A.  No.

23  Q.  He proceeds with the effort to try to move AbTech's efforts

24  along here, right?

25  A.  Yes.

FC29SKE4                         White - cross

1    Q.   It's fair to say -- the contract was signed in later

2    November, correct?

3    A.   Yes.

4    Q.   I think the 28th or so?  Does that sound correct?

5    A.   27th or 28th.  I don't recall the exact date.

6    Q.   Sometime the end of November?

7    A.   Late November, yeah.

8    Q.   Fair to say.

9         The original contract that you had sent Adam or

10   September 5 was dated for September 1 start, correct?

11   A.   I don't recall the start date.

12   Q.   Or early September start.  Is that fair to say?

13   A.   Yes, generally.

14   Q.   We can go back to it if you'd like.

15   A.   No.  I mean -- we were looking for an immediate start, so.

16   Q.   So it was going to be a contemporaneous start with the

17   signing of the contract?

18   A.   Correct.

19   Q.   So literally two-and-a-half months have gone by between the

20   time when Adam was supposed to start getting paid pursuant to

21   the agreement you sent on September 5 and the ultimate

22   agreement that's signed toward the end of November, correct?

23   A.   Well, yeah.  It was two-and-a-half months later since the

24   contract was originally planned to have started.

25   Q.   And he didn't receive backpay for that period of time when

FC29SKE4                    White - cross

1   the contract wasn't in place, did he?

2   A.  No.

3   Q.  Now, I want to talk to you about a couple of the recordings

4   that we heard over the last few days.

5          Now, the first one is Government Exhibit 2472, which

6   is an e-mail we can pull up.

7          Do you see this e-mail?  You ask Adam about whether

8   the RFP has been posted, correct?

9   A.  Yes.

10  Q.  And he says, "Seeing the county executive tonight and will

11  follow up," correct?

12  A.  Yes.

13  Q.  You don't know whether Adam Skelos ever met with the county

14  executive, do you?

15  A.  No.

16  Q.  You don't know whether the county executive ever told Adam

17  Skelos anything about the RFP, do you?

18  A.  No.

19  Q.  You don't know whether he was just saying that to you to

20  let you know that he was kind of on the case, do you?

21  A.  Correct.  I wouldn't know.

22  Q.  We can look at Government Exhibit 1613T and maybe just if

23  it's okay, your Honor, just have the jurors pull the binder up.

24         Now on the first page of that call I just direct the

25  jury's attention to, if I may, your Honor, lines 2 through 10.

 1            Mr. White says, "I see.  And did you get the -- were
 2     you able to get the materials to like -- did you meet with
 3     Mangano?  Did you --"
 4            And then Adam Skelos says, "You know what?  He's
 5     actually been out the last couple days.  He's been in Albany,
 6     but I'm seeing him Monday to give him that information I, I --
 7     it would have been -- it would have been better had I got it to
 8     him beforehand, but I'm seeing my dad tomorrow morning so he'll
 9     have that for the next week."
10            Do you see that?
11     A.  Yes.
12     Q.  Now you sat for some calls yesterday that you weren't on,
13     correct?
14     A.  Correct.
15     Q.  And one of those was Government Exhibit 1513T, which I'd
16     ask the jury to turn to.  That's a call from the previous day.
17            Do you have a binder, Mr. White?
18     A.  Yes, I do.
19     Q.  That's a call from the previous day, March 12, correct?
20     A.  Yes.  Correct.
21     Q.  And it's between Adam and somebody at Mr. Mangano's office
22     named Doreen?
23     A.  Yes.
24     Q.  And do you recall we listened to this?
25     A.  Yes, I do.

1    Q.  Yesterday?

2            And Doreen told Adam that Mr. Mangano's schedule was

3    booked up for the next few days, correct?

4    A.  Correct.

5    Q.  And that there might be a hold on one time that he could

6    fit her into -- fit Adam into but it was not definite, correct?

7    A.  Correct.

8    Q.  She never said during this call that Mr. Mangano was in

9    Albany, did she?

10   A.  No.

11   Q.  In fact, she told him that the schedule was booked up but

12   he might actually be able to see him -- Adam might be able to

13   see Mr. Mangano the following day, if a hold was lifted,

14   correct?

15   A.  Yes.

16   Q.  And Mr. Mangano, as you know, is the Nassau County

17   executive, right?

18   A.  Yes.

19   Q.  His office is in Nassau County, right?

20   A.  Yes.

21   Q.  Then we could move to Government Exhibit 1614T.  This is a

22   call again between you and Adam Skelos, correct?

23   A.  Yes.

24   Q.  During the this call Adam mentions to you that he spoke to

25   the chief of staff.  Do you see that on page one?

1    A.  Yes, I do.

2    Q.  "I called his chief of staff.  Apparently the governor's

3    proposal.  You're right.  It's only state agencies."

4           Do you recall that?

5    A.  Yes.

6    Q.  And do you recall that we also listened to a call that you

7    were not on, but were present for yesterday, 1527T, correct?

8           Take a look at that one.

9    A.  Yes.  I recall.

10   Q.  And that's Mr. Alleva, correct?

11   A.  Yes.

12   Q.  And the only information that Mr. Alleva tells Adam Skelos

13   is about essentially where his dad is, right?

14   A.  Generally, yes.  Correct.

15   Q.  And then he tells him a little bit about the fact that the

16   budget, he asks him about whether the budget is going to pass,

17   on page two, and he says, you know, Adam says, "Yeah, I know,

18   well, they're not going to finalize everything by Friday,

19   right," asking a question.

20          And Mr. Alleva says, "You know, I, I don't know.  I'm

21   not really sure what's going on.  I mean they have -- they have

22   to have bills in by, let's see, I think by midnight Friday in

23   order to pass it on for the 31st."

24          And then Adam says, "Oh, F."

25          And Alleva goes on and says, "I don't think -- because

1    I don't think they can count Sunday, but I'm not sure if they

2    can count Sunday, they can pass the bills."

3              Correct?

4    A.  Correct.

5    Q.  Now going back to 1614T, none of that information that Adam

6    is sharing with you appeared in that earlier conversation, did

7    it?

8    A.  No, it did not.

9    Q.  And, in fact, if you look at 1614T for just another moment

10   you'll see that Adam at one point even says that he's read some

11   of the information that he's providing to you, right?

12   A.  (No response).

13   Q.  Do you see that?

14   A.  I'm not --

15   Q.  It's on page four, Mr. White, top of the page.  Lines 1

16   through 5.  Adam says, "Yeah, and also the other thing that I

17   read..."

18   A.  Yes.

19   Q.  "...too."  And then he goes on to describe some more

20   things, correct?

21   A.  Yes.

22   Q.  He doesn't say anywhere in there that he had talked to his

23   dad and gotten that information, correct?

24   A.  Correct.

25              MR. CONNIFF:  You can take that down.  Thank you.

FC29SKE4                    White - cross

1   Q.  Now I'm going to move to a different subject for a minute,

2   Mr. White.

3           Do you remember we talked -- you talked on direct

4   examination a bit about the -- AbTech's Nassau County proposal,

5   the unsolicited proposal?

6   A.  Yes.

7   Q.  Do you recall that?

8           And the government showed you Government Exhibit 2464

9   which had the actual proposal on it.  Do you recall that?

10  A.  The consensual proposal or the --

11  Q.  We could pull it up.  2464.

12  A.  Yes.

13  Q.  Do you recall this?

14          Just for the jury's assistance this is the unsolicited

15  proposal; is that right?

16  A.  The next attachment behind this is for the stormwater

17  project.

18  Q.  The e-mail?

19  A.  Correct.  The e-mail is attaching them, yes.

20  Q.  And then the actual proposal that you testified a lot on

21  direct about creating and putting --

22  A.  Yes.  Correct.

23  Q.  But there was one section that the government pointed out

24  to you that had some information that was similar to a

25  newspaper article.  Do you recall that?

1    A.  Yes.

2    Q.  And I think they showed you Government Exhibit 2459 which

3    we can pull up and point out to you that this article that had

4    been forwarded from Senator Skelos to Adam had some of the same

5    language that was in the proposal, correct?

6    A.  Correct.

7    Q.  Do you remember that?

8          But Adam Skelos isn't the only person who sent you

9    that e-mail, is he -- that article, is he?

10   A.  I don't recall.

11   Q.  Do you recall that the same article had been sent to you by

12   another consultant prior to the creation of the proposal?

13   A.  I don't recall at this time.

14   Q.  Let me show you what we've marked as Defense OOO for

15   identification.  I'll hand it up to you Mr. White but I think

16   it's on your screen as well.

17          You recall getting this e-mail?

18   A.  Yes.

19          MR. CONNIFF:  Government offers -- Defense offers

20   Defense OOO.

21          MR. MASIMORE:  No objection.

22          THE COURT:  Defendants' Exhibit OOO is received

23   without objection.

24          (Defendants' Exhibit OOO received in evidence)

25   Q.  You said you recognize it?

FC29SKE4                        White - cross

1    A.   Yes.

2    Q.   Mr. White, who is Pam Schade?

3    A.   She was a consultant who worked or AbTech and ended up

4    being on the capture team as well.

5    Q.   And the capture team just to remind everyone --

6    A.   The team to put together --

7            THE COURT:   I'm going to ask you both not to interrupt

8    one another.   The court reporter has to try to take it all

9    down.

10           MR. CONNIFF:   Sorry, your Honor.   Go ahead, Mr. White.

11           THE WITNESS:   The team that I put together for

12   developing the full proposal.

13   Q.   So Pam was on -- and Mr. Lowther was also on the team?

14   A.   Mr. Lowther was an engineer, yes.

15   Q.   And this e-mail is coming from Pam Schade to you, Brian,

16   and Christopher Wang.   Remind me who that is?

17   A.   He was an analyst for AbTech that was also on the capture

18   team.

19   Q.   Pam writes on her e-mail, "Here's the intel on the Nassau

20   County wastewater plan failures.   Perhaps we should consider

21   submitting copies of our proposals to the legislators listed in

22   the article?   Would you like me to run this by Cushing?"   And

23   then the same article appears, correct?

24   A.   Correct.

25   Q.   The same language that the government pointed out to you

FC29SKE4                         White - cross

1   yesterday, the 65 million gallons of partially treated sewage,

2   which later appeared in your unsolicited proposal, was also

3   found by Pam Schade, correct?

4   A.  Correct.

5   Q.  And you don't know who put that language in, do you?

6   A.  Yes, I do.

7   Q.  Who did?

8   A.  Brian Lowther.

9   Q.  Brian Lowther did?

10  A.  Yeah.

11  Q.  And he's on this e-mail, correct?

12  A.  Yes.

13          MR. CONNIFF:  If I could just have a moment, your

14  Honor.  Trying not duplicate.

15  Q.  It's fair to say -- we talked about this a bit -- but it's

16  fair to say that the process from the unsolicited proposal to

17  the RFP was slow, correct?

18  A.  Correct.

19  Q.  And delayed more often than you would have liked, correct?

20  A.  Correct.

21  Q.  And when I say "you," I mean you and Mr. Rink?

22  A.  And all of AbTech.

23  Q.  And all of AbTech.  And it was a bit frustrating for you at

24  times, correct?

25  A.  Yes.

FC29SKE4                         White - cross

1   Q.  And at one point Adam Skelos told you that unfortunately

2   this is kind of the way state government in New York works,

3   that it's kind of slow, correct?

4   A.  Yes.  I recall municipalities or local governments or

5   something like that, something to that effect.

6   Q.  That it would be, in his mind, kind of par for the course

7   for something to move as slowly as this was moving, right?

8   A.  Right.

9   Q.  I just want to move briefly to the $400,000.  You talked a

10  bit about that on direct examination.  But that was an amount

11  that you learned in 2013 was coming to you, correct, from an

12  e-mail?

13  A.  No.  In 2014.

14  Q.  '14.  Excuse me.  Maybe we could pull up the e-mail.

15          MR. CONNIFF:  Sorry, your Honor.

16          THE COURT:  Take your time.

17          (Pause)

18          THE COURT:  This might be a good time to stand and

19  stretch if you want to.

20          MR. CONNIFF:  I can move on, your Honor, when

21  everybody is ready.

22  Q.  You recall generally the e-mail I'm talking about?

23  A.  (No response).

24  Q.  Came from Nassau County and represented that there was

25  going to be $400,000 available to --

FC29SKE4                         White - cross

1   A.  I'm sorry.  The e-mail from Tim Kelly?

2   Q.  Yes.

3   A.  Yes.  I recall.

4   Q.  And that was good news for AbTech, correct?

5   A.  Yes.

6   Q.  Because it appeared that Nassau County was making

7   available, potentially available additional funding, correct?

8   A.  Yes.

9   Q.  As we had seen in the original contract there was a

10  331,000-dollar allotment, is that fair to say, for initial

11  spending?

12  A.  Correct.

13  Q.  And this appeared to be an additional 400,000 that was on

14  top of that, correct?

15  A.  Correct.

16  Q.  And that money never came to AbTech, did it, as long as you

17  were at the company?

18  A.  Correct.

19  Q.  And this was something that you and Adam -- there's the

20  e-mail, just in time -- this is something that you and Adam

21  talked about and worked on from the time of this e-mail in June

22  really through an extended period of time while you were both

23  still at the company, right?

24  A.  What do you mean?

25  Q.  Let me rephrase it.  After you received this e-mail in June

FC29SKE4                        White - cross

1    of 2014, you and Adam made efforts to collect this money,

2    correct, or make it unencumbered for AbTech, correct?

3    A.   Yes.  In addition to the project team as well.

4    Q.   Project team meaning other people were doing it as well?

5    A.   Right.  There were meetings aimed at that that I was not a

6    party to.

7    Q.   But it's fair to say that from AbTech's perspective this

8    was a priority, to get this money unencumbered and available to

9    you, right?

10   A.   It was one of the priorities.

11   Q.   Well by December of that year you say that you're baffled

12   that the money hasn't arrived yet, correct?

13   A.   Correct.

14   Q.   And you start expressing real frustration in e-mails with

15   Adam about why this isn't happening, correct?

16   A.   Correct.

17   Q.   And, in fact, you kind of joke about the fact that you

18   think Mr. Mangano must have something in for you at times,

19   correct?

20   A.   Yes.

21   Q.   Because you see -- you see an article, actually, where it

22   appears that Nassau County has actually got another P3 going

23   for $12 million, correct?

24   A.   Correct.

25   Q.   And this is obviously quite frustrating to you because

FC29SKE4                          White - cross

1    you've been waiting since June to have your money unencumbered,

2    right?

3    A.   Correct.

4    Q.   And then Adam tells you that that money -- that he's spoken

5    to Ed Mangano and that money is going to come immediately,

6    right?

7    A.   Yes.

8    Q.   He says it's going to flow that day because Ed has promised

9    it to him?

10   A.   Yes.

11   Q.   And that never happened, did it?

12   A.   No.

13   Q.   In fact, you kept complaining even after that day that no

14   money had come, correct?

15   A.   Correct.

16   Q.   I just want to go back and touch briefly on the four

17   thousand to ten thousand dollar increase.  And we've already

18   talked about it a little bit this morning but I just want to

19   focus on your response when you first learned about it.  Okay.

20   And the fact is that when you first saw that e-mail you thought

21   that Mr. Dorego was using Senator Skelos' name as a tool to get

22   what he wanted, right?

23   A.   That was an initial reaction, yes.

24   Q.   In fact, when you met with the government you told them

25   that you thought it was outrageous for Mr. Dorego to use Dean

FC29SKE4                    White - cross

1    as a bargaining tool, correct?

2    A.  Something to that effect, yeah.

3    Q.  And that you actually believed what Mr. Dorego was saying

4    in that e-mail wasn't even factually correct?

5    A.  With respect to the need for legislation and the 45 days

6    from RFP.  Those were incorrect facts.

7    Q.  But he didn't even have the right facts to make this demand

8    that he was making, correct?

9    A.  Correct.

10   Q.  And, in fact, you didn't even think that Senator Skelos or

11   Adam could really have an impact on it because it was in front

12   of the technical committee and getting done, correct?

13   A.  My immediate reaction was to think that and say that to

14   Glenn, yeah.

15   Q.  And ultimately, as we talked about this morning, that raise

16   was authorized by Mr. Rink, correct?

17   A.  Correct.

18   Q.  Now, we -- on direct examination there was a lot of focus

19   on the December, January, February, 2014 into 2015 time period.

20   Do you remember that?

21   A.  Yes.

22   Q.  You listened to a large number of calls in the winter into

23   early spring of 2015, correct?

24   A.  Correct.

25   Q.  Many of which you were on and some of which you were not

FC29SKE4                      White - cross

1    on, correct?

2    A.   Correct.

3    Q.   And you became familiar at that time that -- of how the New

4    York State budget worked from a timing perspective?

5    A.   A little bit of it, yes.

6    Q.   Are you familiar with the fact that in New York the budget,

7    if a budget is passed on time it's actually passed on April 1

8    of the calendar year?  Are you aware of that?

9    A.   Yes.  I became aware of that.

10   Q.   And that's why many of the calls that you had with Adam and

11   others were talking about getting things in the budget,

12   correct?

13   A.   Correct.

14   Q.   Adam was hired in 2012, correct?

15   A.   Correct.

16   Q.   And a budget in New York State came up in April of 2014,

17   correct?

18   A.   Presumably, yes.

19   Q.   Did any grant money come to AbTech from New York State as a

20   result of the 2014 budget that you're aware of?

21   A.   No.

22   Q.   Did any design-build or P3 legislation get passed in the

23   2014 budget that you're aware of?

24   A.   No.

25   Q.   Nothing in that budget that you're aware of directly

FC29SKE4                         White - cross

1   assisted AbTech, did it?

2   A.  No.

3   Q.  And Adam had been working there for the better part of a

4   year, correct?

5   A.  Yes.

6   Q.  He had started in 2012.  This was 2014, correct?

7   A.  Correct.  So it was longer.

8   Q.  Actually longer than a year.

9           Nothing out of that budget at all, correct, for

10  AbTech?

11  A.  Out of the 2014 budget, no.

12  Q.  And, in fact, nothing came out of the 2015 budget for

13  AbTech either, correct?

14  A.  To my knowledge, no.

15  Q.  No design-build, correct?

16  A.  Correct.

17  Q.  No P3, correct?

18  A.  Correct.

19  Q.  Are they the same thing, in your mind?  So I can use the

20  right -- design-build and P3?

21  A.  Not entirely.

22  Q.  But for my purpose I may say design-build to mean both?

23  Okay?

24  A.  Sure.

25  Q.  No grants or monies to AbTech to pay the Nassau County

FC29SKE4                         White - cross

1    contract, correct?

2    A.  No.

3    Q.  And just directing your attention to the July 2014 time

4    period.  Correct me if I'm wrong you have a meeting at that

5    time with Sheila Shah and Mr. Walker?

6    A.  Those were two of the attendees, yes.

7    Q.  And at that point -- is it at that point that you learn

8    that the county is taking the position that without

9    design-build legislation we really aren't going to move forward

10   with much here?

11   A.  No.  It wasn't that strong.  But it was the first time that

12   Ken Arnold mentioned it, which I took as almost an excuse for

13   the delays.

14   Q.  That they were just looking for an excuse to slow this

15   down?

16   A.  No.  No.  Not to slow it down actively but rather just that

17   was Ken Arnold's explanation as to why things were -- had not

18   progressed further.

19   Q.  And at that point Adam Skelos tells you that if we're going

20   to move toward a state focused activity; i.e., trying to get

21   legislation passed, I cannot do that, correct?

22   A.  No.  That came a little later.

23   Q.  It was before you started looking to do any kind of

24   activity with the state, correct?

25   A.  Correct.  But it was in conjunction with our Corvias

FC29SKE4                         White - cross

1   relationship, not the meeting.

2   Q.  Fair point.  I'm just saying after that meeting is it fair

3   to say that you -- that AbTech kind of realizes that they may

4   need to do some lobbying with the state to get this legislation

5   passed?  Is that fair to say?

6   A.  Yes.  At some point after, yes.

7   Q.  And it's around those conversations that Adam tells you

8   that if we want to do anything at the state level he can't be

9   involved but you need to use an outside lobbyist, correct?

10  A.  Yes.  That's when he said to hire lobbyists, yes.

11  Q.  He said to hire lobbyists because he could not actually do

12  it, correct?

13  A.  Correct.  He could not be in those meetings.

14  Q.  And you do hire lobbyists, correct?

15  A.  Yes, we do.

16  Q.  You hire the Capitol Group?

17  A.  Correct.

18  Q.  And the Capitol Group subs out some of their work.  Are you

19  familiar with that?

20  A.  I became familiar but I didn't realize at the beginning.

21  Q.  And it was to somebody named Mike Avella?

22  A.  Correct.

23  Q.  And he was -- if you know, he was more of a, kind of a

24  Democrat-leaning lobbyist.  Is that fair to say?

25  A.  I came to learn later, that, yes -- yes, yeah.

FC29SKE4                         White - cross

1   Q.   That he had more relationships on kind of the Democratic

2   Party side and Mr. Barrella had more relationships on the

3   Republican side?

4   A.   Yes.

5   Q.   And so Mr. Avella was more focused on the executive office,

6   the governor, since he was a Democrat and the Assembly,

7   correct?

8   A.   There wasn't talk about governor contract at that time.

9   Q.   What was Mr. Avella going to be focused on, do you know?

10  A.   Initially Adam said that he was the one who really knew how

11  to sort of get into drafting potential legislation and he would

12  be the more detailed person.  And then later I became aware

13  that he was also more Democrat leaning and would be stronger on

14  the Assembly side.

15  Q.   And the use -- the plan to use these lobbyists is to

16  approach legislators both on the fracking issue and on the P3

17  over time, correct?

18  A.   Over time the fracking issue came up too, yeah.

19  Q.   Initially they were hired for the design build?

20  A.   Just the stormwater P3, yeah.

21  Q.   Ultimately you also used their resources to do some

22  lobbying on the -- around fracking?

23  A.   In the late fall, 24014.

24  Q.   And you paid -- "you" meaning AbTech, you paid them a good

25  amount of money, correct?

FC29SKE4                        White - cross

1    A.   Yes.

2    Q.   I think we may have looked at the agreement.  $11,000 a

3    month, correct?

4    A.   Correct.

5    Q.   And they registered as lobbyists?

6    A.   Yes, they did.

7    Q.   They were your official lobbyists?  There was nothing

8    secretive about any of it, correct?

9    A.   They filed a lobby authorization form.

10   Q.   And is it fair to say that at the start of that

11   relationship you and Adam didn't think that Nick Barrella in

12   particular was doing enough?

13   A.   I'm sorry.  Is it fair to say that I didn't think so?

14   Q.   Yeah.  Did you have a view on that?

15   A.   Not in particular, no.

16   Q.   Adam did, correct?

17   A.   Yes.

18   Q.   He thought that Nick Barrella should be doing a lot more,

19   correct?

20   A.   Yes.

21   Q.   That he was a little -- Adam was a little frustrated that

22   Nick had not set up any meetings, correct?

23   A.   Yes.

24   Q.   Particularly around the fracking because there were these

25   rumors that the moratorium -- the governor might lift the

1  moratorium, that there was some urgency, correct?

2  A.  Yes.

3  Q.  And Adam was a bit frustrated that Nick didn't respond as

4  quickly as he would have liked, correct?

5  A.  Correct.

6  Q.  And he reported that to you?

7  A.  Correct.

8  Q.  I think we listened to a call yesterday where he was saying

9  that he -- he said I got heated yesterday with one of

10  Mr. Barrella's assistants because things weren't moving along,

11  correct?

12  A.  Yes.

13  Q.  And during the time that Adam -- during the time that the

14  lobbyists were in place, Adam had more of a backseat, correct?

15  A.  It depends on the timeframe you're referring to.

16  Q.  Well while the lobbyists were working for you, they were

17  setting up -- they were trying to set up meetings with

18  legislators, right?

19  A.  Yes.

20  Q.  And they were trying to set up meetings that you would

21  attend with legislators, correct?

22  A.  Yes.

23  Q.  And they were setting up calls with you so you could brief

24  them on kind of the technical aspects of AbTech so that when

25  they went to their meetings they could speak intelligently,

FC29SKE4                          White - cross

1   correct?

2   A.  Yes.

3   Q.  And that was all being done by them up to a certain point,

4   right?

5   A.  Yes.

6   Q.  And then in January of 2015 you testified on direct

7   examination that Mr. Silver, you learned, gets arrested,

8   correct?

9   A.  Correct.

10  Q.  And this -- it's fair to say this sends shock waves through

11  people you're associated with who are connected to Albany,

12  correct?

13  A.  I don't -- I really can't characterize it.  I only know --

14  I only know the limited conversations from Nick Barrella later

15  on that month.

16  Q.  Barrella and his group basically resigned, correct?

17  A.  At the very end of January.

18  Q.  Well you know that the arrest came on the -- I believe the

19  21st of January -- 26th of January?

20  A.  Okay.

21  Q.  So he resigned very shortly after the arrest, right?

22  A.  Yes.

23  Q.  And, in fact, did he tell you that a lobbyist he was

24  associated with had been subpoenaed in connection with the

25  case?

1   A.  I don't recall him saying that.  No.  I don't recall him

2   saying that.

3   Q.  Did you learn that?

4   A.  I did eventually but I don't recall if I learned it

5   independent from the recordings I've listened to.

6   Q.  But it's fair to say that in the immediate aftermath of the

7   arrest that -- and there's an article I think we've talked

8   about on direct examination saying that Senator Skelos was now

9   under investigation, correct?

10  A.  Yes.

11  Q.  And in the almost immediate aftermath of that the lobbyists

12  say they're resigning, correct?

13  A.  Correct.

14  Q.  And we listened to that call yesterday, you were here,

15  where Adam expressed some surprise about their resignation,

16  correct?

17  A.  Yes.

18  Q.  And once they go, you and Adam continue on, correct?

19  A.  Correct.

20  Q.  Now, the large difference is that you have been approached

21  by the FBI and agents in the very early part of February,

22  correct?

23  A.  Yes.

24  Q.  And so whereas in January you were just a colleague of

25  Adam's, you are now a colleague and somebody cooperating with

FC29SKE4                        White - cross

1     the government, correct?

2     A.   I wouldn't say colleague, but I was assisting the FBI.

3     Q.   Well you were a colleague of Adam's, correct?

4     A.   A colleague of Adam's.

5     Q.   And you were assisting the FBI, correct?

6     A.   Yes.

7     Q.   Simultaneously.

8              And at that time you reach out to Adam -- I think we

9     listened to the call, 1601T -- and tell him that you are now a

10    lobbyist?  AEWS, correct?

11    A.   Correct.

12    Q.   Was that true?

13    A.   Yes -- not me personally.  But the AEWS, the firm, our

14    registration had come through.

15    Q.   When did you begin that registration process?

16    A.   Sometime in January.

17    Q.   After you learned about this arrest?

18    A.   No.  Before.  It could have been even -- I'm sorry.  It

19    could have been as -- December even.

20    Q.   Why did you register to become a lobbyist?

21    A.   Well, advice of counsel.

22    Q.   And you then tell Adam in that first phonecall, I, AEWS,

23    are now lobbyists, correct?

24    A.   Correct.

25    Q.   And his reaction is "great," correct?

1   A.  Yes.

2   Q.  That we can still move forward now, right?

3   A.  Yes.  Something to that effect.

4   Q.  Because you can now go to the meetings?

5   A.  Correct.

6   Q.  Right?

7           And he says during that call, in fact, this may even

8   be better because you actually know a lot about the product,

9   right?

10  A.  Correct.

11  Q.  You would be a better advocate than the paid lobbyists that

12  we were dealing with for a couple of months, right?

13  A.  Correct.

14  Q.  But the difference is that he now needs to kind of help you

15  get the meetings set up, correct?

16  A.  Correct.

17  Q.  And the meetings that are being set up are with senators

18  who the lobbyists were trying to set up meetings with back when

19  they were working, right?

20  A.  Yes.

21  Q.  It was Senator Croci?

22  A.  Correct.

23          THE COURT:  I'll ask you to slow down.

24  Q.  Senator Croci?

25  A.  Yes.  He was one of them.

FC29SKE4                         White - cross

1   Q.   And Senator Venditto?

2   A.   Correct.

3   Q.   And they were both local Long Island senators whose

4   districts had been affected by Sandy, correct?

5   A.   Correct.

6   Q.   And those were the people you pursued to get this done,

7   correct?

8   A.   Yes.

9   Q.   And you pursued them both while the lobbyists were working

10  on your behalf and then when you, AEWS, became a lobbyist,

11  correct?

12  A.   Correct.

13  Q.   And the difference --

14          THE COURT:   I'm sorry.   I just want you to slow down.

15          MR. CONNIFF:   I'm sorry, your Honor.

16  Q.   And the difference between when you were working with the

17  lobbyists and when you were on your own, so to speak, as AEWS,

18  was that Adam was now taking a much bigger role in setting up

19  meetings, correct?

20  A.   That was one difference, yeah.

21  Q.   He was calling the senators, correct?

22  A.   That's what he said.

23  Q.   And setting up the meetings?

24  A.   Yes.

25  Q.   And he would tell you that he would meet up with the

1  senators after at various fundraisers?

2  A.  Yes.  He said that.

3  Q.  And he was not a lobbyist, was he?

4  A.  No.

5  Q.  And much of what he started hiding from people in terms of

6  being on phonecalls and the like was to hide this lobbying

7  activity that he was doing, correct?

8  A.  I'm not sure.

9  Q.  Well, he had told you already in the past that he was not a

10  lobbyist, correct?

11  A.  Yes.  He had said that.

12  Q.  He had told you earlier on that he should not be involved

13  in kind of lobbying the state, correct?

14  A.  Correct.

15  Q.  But as a result of the termination of the lobbyist you had,

16  he stepped into that role, correct?

17  A.  At that time, yes, he stepped in once the Capitol Group had

18  terminated.

19  Q.  Because it was his effort to kind of get over the finish

20  line on what you guys had started much earlier, correct?

21  A.  I'm not sure what you mean by finish line but to continue

22  the effort.

23  Q.  Get some -- are you finished?

24  A.  Yes.

25  Q.  Get the legislation passed, get Senator Croci and Senator

FC29SKE4                     White - cross

Venditto to sponsor some legislation that would allow Nassau

County to do a design-build for stormwater, correct?

      MR. MASIMORE:  Objection, your Honor.

      THE COURT:  Sustained.

      MR. CONNIFF:  Just so I can correct it, your Honor?

      THE COURT:  All right.  It's compound.

      MR. CONNIFF:  That, it was.

      MR. MASIMORE:  Your Honor, additional objection to

foundation.  Calls for testimony about the state of mind of a

different person.

      THE COURT:  Yes.

Q.  Well Adam Skelos told you that he couldn't lobby, correct?

A.  That is correct.

Q.  And after the lobbyists left or were terminated, he started

engaging in setting up meetings and meeting with senators at

these cocktail parties?  At least that's what he told you,

correct?

A.  Correct.

Q.  And you and he -- as far as you knew, he was working to get

that legislation passed and sponsored by Senator Croci and

Senator Venditto, correct?

A.  Yes.

Q.  I just want to talk for a few minutes about your first

approach again.  You said that the FBI was -- there was an

agent from the FBI, I think a U.S. Attorney Office investigator

FC29SKE4                        White - cross

1    and then maybe another FBI agent?

2    A.  He said local FBI, yes.

3    Q.  Came to your door at 7:30 in the morning, correct?

4    A.  Around then, yes.

5    Q.  And this was approximately a week after the publicity

6    around the arrest of Mr. Silver, correct?

7    A.  It was the following week, yeah.

8    Q.  And this was right at the time when -- or right after the

9    time when an article appeared in the paper saying Senator

10   Skelos was under investigation, correct?

11   A.  A few days after, yes.

12   Q.  And you had been working with Adam Skelos for a good number

13   of months, correct?

14   A.  Longer than just months but yes.

15   Q.  And you go down to your door at 7:30 in the morning -- was

16   it a weekday or a weekend?

17   A.  Weekday, Thursday.

18   Q.  Thursday morning at 7:30 and there are agents standing at

19   your door, correct?

20   A.  Well they knocked, yes, and then I came to the door, yeah.

21   Q.  Well you opened the door, right?

22   A.  Correct.

23   Q.  And they were there, right?

24   A.  Correct.

25   Q.  And you weren't scared when you saw three agents standing

FC29SKE4                      White - cross

1    on your doorstep asking to speak with you at 7:30?

2    A.  I was a little nervous.

3    Q.  You were very nervous, weren't you?

4    A.  Just a little nervous.

5    Q.  Had federal agents ever showed up at your door before?

6    A.  No.

7    Q.  Had any police ever showed up at your door before to ask

8    you questions at 7:30 in the morning?

9    A.  No.

10   Q.  You were quite scared, weren't you?

11   A.  Like I said, I was nervous, concerned, sure.

12   Q.  And you had your exchange with them and then tell them you

13   want to speak to your lawyer and will get back to them,

14   correct?

15   A.  Yes.

16   Q.  And you do that?

17   A.  Yes.

18   Q.  And then you start making these recordings for them,

19   correct?

20   A.  Correct.

21   Q.  Both the body wire -- body recordings and the telephone

22   recordings, correct?

23   A.  Correct.

24   Q.  And one of the calls -- one of the meetings we listened

25   to -- well let me step back a little farther.  When you had

FC29SKE4                        White – cross

1    these calls they would tell you what to say, correct?

2    A.  No.  That's not entirely correct.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC3TSKE5                      White - cross

1   BY MR. CONNIFF:

2   Q.  They would tell you the topics they wanted you to cover?

3   A.  The topics to hit, yes.

4   Q.  And you would try to do that, correct?

5   A.  Correct.

6   Q.  Were they usually present with you when you were making the

7   calls?

8   A.  Usually -- no, never, actually.

9   Q.  You did it on your own and brought the tapes to them?

10  A.  Are you talking about telephone calls?

11  Q.  Yes.

12  A.  There were no tapes involved.

13  Q.  The phone would pick it up?

14  A.  The FBI system would record it.  I don't know how it worked

15  on their end.

16  Q.  Fair enough.  And the first consensual meeting that you

17  had, the recorded meeting, is 1602T, correct?

18          Maybe we can just look at that.

19  A.  Yes, it is.

20  Q.  1602AT.

21  A.  Yes.

22  Q.  And this meeting was set up by you, correct?

23  A.  Myself and Adam.

24  Q.  And who chose the W Hotel?

25  A.  I did, as I recall.

FC3TSKE5                        White - cross

1   Q.  And that meant you meeting at the bar of the hotel?

2   A.  We met in the lobby.

3   Q.  You were drinking while this meetings was going on,

4   correct?

5   A.  Yes.

6   Q.  In fact, Adam had a number of drinks during the meeting,

7   correct?

8   A.  Two or three.

9   Q.  Two or three during the three-hour meeting, that's your

10  recollection?

11  A.  Yeah, that's my recollection.

12  Q.  Could have been more?

13  A.  Not during the time I was with him.

14  Q.  You remember specifically that he had two or three drinks.

15          How many did you have?

16  A.  Two, I think.

17  Q.  Did you tell the agents before you went to this meeting

18  that it was likely that you would be drinking at it?

19  A.  As I recall, they already knew.

20  Q.  They already knew that Adam Skelos would be drinking while

21  you were recording, is that what you're telling us?

22  A.  No, they didn't say that, they said meet with him, if you

23  have a drink or two, that's fine.

24  Q.  They never suggested maybe you should try to divert him to

25  a coffee shop or restaurant?

1   A.  No.

2   Q.  Because you had been out with Adam in the past and

3   socialized with him, right?

4   A.  Correct.

5   Q.  You knew he enjoyed an alcoholic beverage, correct?

6   A.  Sure, yes.

7   Q.  And so while you were recording him, he was -- what was he

8   drinking, scotch?

9   A.  I don't really recall, I'm sorry.

10   Q.  And this went on for three hours, correct?

11   A.  Yeah.

12   Q.  If we look at the last section that the government played

13   on direct examination, I believe it's the last page of 1602AT,

14   it says 2:54:25, do you see that?

15   A.  Yes.

16   Q.  Meaning you had been there for two hours and 54 minutes

17   with Mr. Skelos, correct?

18   A.  Correct.

19   Q.  And drinking during that time, correct?

20   A.  Yes.

21          MR. MASIMORE:  Objection, your Honor, concerning

22   whether the witness knows what the time in the exhibit refers

23   to.

24          THE COURT:  All right.  Sustained.

25   Q.  Do you know what that time stands for, Mr. White?

FC3TSKE5                          White - cross

1    A.  I would only be able to speculate, so --

2    Q.  Well, you met with the government about 20 times, correct?

3    A.  Thereabouts, yeah, I don't remember the exact number.

4    Q.  And went over the recordings with them, correct?

5    A.  Correct.

6    Q.  And went over the transcripts to make sure they were

7    accurate?

8    A.  Correct.

9    Q.  And you don't know what that number means then?

10   A.  I assume -- I know what I understand it to be, but I was

11   never independently told.

12   Q.  What do you understand it to be?

13   A.  I understand it to be the time period in that particular

14   recording.

15   Q.  And it's at that time, two hours and 54 minutes into the

16   recording that you say to Mr. Skelos:  Is there like a safe

17   number I can call you on?  Correct?

18   A.  Yes.

19   Q.  You raised the issue of whether he should be calling on

20   some other number, correct?

21   A.  Correct.

22   Q.  And did the agents tell you to do that?

23   A.  Yes.

24   Q.  They told you to try to get Adam to use a different line,

25   correct?

FC3TSKE5                           White – cross

1    A.  No, they asked me to see if he was using some kind of other

2    phone or number.

3    Q.  You said:  Is there a safe number I can call you at?

4    Correct?

5    A.  Correct.

6    Q.  And that's what they told you to ask, correct?

7    A.  No, they didn't give me any words, they told me generally

8    to find out if he had a different number or phone.

9    Q.  And you waited the two hours and 54 minutes to find that

10   out?

11   A.  I asked after that time period, yes.

12   Q.  And then just a few questions about Government

13   Exhibit 3308, which maybe we can pull up.

14           Do you remember this exhibit, Mr. White?

15   A.  Yes, I do.

16   Q.  Now this is a listing of your consensual calls, correct?

17   A.  Correct.

18   Q.  That were admitted into evidence, correct?

19   A.  Correct.

20   Q.  And I think Mr. Masimore asked you at times to either look

21   at or he identified the numbers in the "to" section, correct?

22   A.  Yes.

23   Q.  And pointed out there were different numbers there,

24   correct?

25   A.  Correct.

FC3TSKE5                        White – redirect

1    Q.   Now Adam Skelos continued to communicate with you on his

2    2603 phone as well, correct?

3    A.   Correct.

4    Q.   In fact, we looked at Government Exhibit 1495T, you may

5    recall that's on February 20, correct?

6    A.   Correct.

7    Q.   And Government Exhibit 1500T is on February 23rd, correct?

8    A.   Correct.

9    Q.   Same day that there's a call to this 9100 number, Adam used

10   his own cell phone as well, correct?

11   A.   Correct.

12   Q.   And the same is true of Government Exhibit 1515, correct?

13   A.   Correct.

14   Q.   And the same is true of Government Exhibit 1520T, correct?

15   A.   Yes, correct.

16   Q.   And 1522T, correct?

17   A.   Yes, correct.

18   Q.   And in fact, we listened -- I know you're not on them, but

19   we listened to some other calls, you may recall, when the 2603

20   phone was also used to call other people, including Senator

21   Skelos, correct?

22   A.   I don't recall with the senator, but yes, I do recall about

23   generally.

24        MR. CONNIFF:  Just a moment, your Honor, I just want

25   to check my notes.

FC3TSKE5                        White - redirect

1                    THE COURT:  Take your time.

2                    (Pause)

3                    MR. CONNIFF:  Nothing further, your Honor.

4                    THE COURT:  Mr. Masimore.

5                    MR. MASIMORE:  Thank you, your Honor.

6      REDIRECT EXAMINATION

7      BY MR. MASIMORE:

8      Q.  Mr. White, do you recall being asked questions during

9      cross-examination by Mr. Gage about whether or not funding had

10     made it through the budget?

11     A.  Yes.

12                    MR. MASIMORE:  If we could publish Government

13     Exhibit 1534.  This is not in the jury binders, but we'll put

14     up a transcript of 1534T.  1534 is a call March 31st, 2015, the

15     participants in the call are Adam Skelos and Dean Skelos.

16                    (Audio recording played)

17     Q.  Mr. White, do you recall questions during your

18     cross-examination by Mr. Gage about whether you were aware that

19     John Cameron was concealing information?

20     A.  Yes.

21                    MR. MASIMORE:  If we could pull up Government

22     Exhibit 2532B in evidence, please.

23     Q.  Now this is the email -- the chain starts at the bottom,

24     email from John Cameron to Rob Walker of the county.  Do you

25     see that?

FC3TSKE5                     White - redirect

1   A.  Yes.

2   Q.  I believe you testified --

3           MR. GAGE:  Objection.  He's not on this email.  I was

4   asking about his knowledge.

5           THE COURT:  All right.

6           MR. MASIMORE:  That's the point of my question, your

7   Honor, Mr. White is not on this email with respect to John

8   Cameron.

9           THE COURT:  All right.

10          MR. GAGE:  So your Honor, this witness's knowledge is

11  what I was asking about.

12          THE COURT:  I understand.

13  BY MR. MASIMORE:

14  Q.  Mr. White, did you receive this email where John Cameron

15  writes to Senator Skelos:  This is what I sent to Robby

16  yesterday after he and I spoke.  I'm part of their urgency to

17  him on the phone.  I was careful about what I put in the email,

18  as you never know where it could wind up.

19          Were you part of this email?

20  A.  No.

21  Q.  Did anybody ever tell you about this email?

22  A.  No.

23          MR. MASIMORE:  If we could pull up Government

24  Exhibit 2801 in evidence, please.

25  Q.  Now this is an email from November 15, 2012.  Do you

1  recall, Mr. White, that was just before the finalization of the

2  compensation agreement between AbTech and Adam Skelos?

3  A.  Yes.

4  Q.  And do you see it's an email from John Cameron on

5  November 15 to Senator Skelos:  Dean, thanks for a great night

6  last night.  And it goes on with some personal conversation.

7  And then do you see Senator Skelos responds:  Great time.  More

8  often.  Adam may call about some environmental issue.

9  A.  Yes, I see that.

10  Q.  Were you aware that Senator Skelos had been in contact with

11  John Cameron about the contract or just in general about

12  environmental issue?

13  A.  No, not at all.

14       MR. MASIMORE:  Pull up Government Exhibit 2964 in

15  evidence.

16  Q.  Do you see that's an email also from November 14, 2012, the

17  day before.  You see this email is from Adam Skelos to Senator

18  Skelos, subject John Cameron.  Do you see that?

19  A.  Yes.

20  Q.  In the initial email Senator Skelos wrote with the subject

21  line John Cameron:  Talk to him about AbTech.  He does a lot of

22  environmental –– and there's a word "Orkney."  And then Adam

23  Skelos replies:  I thought about mentioning it to him.  Call

24  him tomorrow.

25       Do you see that?

FC3TSKE5                        White - redirect

1    A.   Yes.

2    Q.   Did there come a time where you first met John Cameron?

3    A.   Yes.

4    Q.   And when was that, approximately?

5    A.   It was at the time that we were -- it was late 2012, I

6    don't remember exactly.

7    Q.   And who was at the meeting?

8    A.   John Cameron, Mark Wagner, Adam Skelos and myself.

9    Q.   How was that meeting arranged?

10   A.   By Adam.

11   Q.   And what, if anything, did Adam Skelos tell you about John

12   Cameron before that meeting?

13   A.   He said that John was -- John Cameron was -- well, first of

14   all, this engineering firm was -- he was almost like one of the

15   go-to consulting engineers for Nassau and Suffolk County, that

16   he was a big Republican, sort of known Republican, known in

17   Catholic circles and such, and I believe that's it.

18   Q.   What, if anything, before the meeting did Adam Skelos tell

19   you about John Cameron's relationship with Senator Skelos

20   personally?

21   A.   Nothing that I recall.

22   Q.   What, if anything, did Adam Skelos tell you about Adam

23   Skelos' relationship with John Cameron?

24   A.   Nothing.

25   Q.   So what happened when you got into the meeting?

1    A.   When we got into the meeting Adam and John Cameron hugged.

2    Q.   And what, if anything, did they say to each other?

3    A.   Something about whether they were going to see each other

4    at some kind of future event, like a fund raiser or something.

5    I wasn't sure what it was.

6    Q.   How much money did AbTech pay John Cameron's company out of

7    the money that came in to AbTech?

8    A.   Well, I recall out of the first invoicing it was about half

9    of it.   I don't recall from -- I don't know from the subsequent

10   invoices, but it was a substantial portion.

11   Q.   Now do you recall during one of the cross-examinations

12   being asked questions about Adam Skelos mentioning that he had

13   talked to Ed Mangano at a funeral?

14   A.   Yes.

15   Q.   And if we direct our attention and pull up 1442T, and page

16   1, beginning line 2, Adam Skelos said:   Anyway, so on the

17   business side of news, I saw Ed Mangano with my dad this last

18   weekend at a wake.   And then he goes on to talk about business

19   being done at a wake.

20            Do you remember that conversation?

21   A.   Yes.

22   Q.   Was this the conversation you were asked about on

23   cross-examination?

24   A.   Yes.

25   Q.   And you were asked about how Adam then related to you

FC3TSKE5                    White - redirect

1   information from the county executive saying that Adam heard it

2   at a funeral?

3   A.   I don't recall that it was at a funeral, but just that he

4   heard it from Ed.

5   Q.   And so this call, if we look at the first page, this is

6   from January 5th, January 5th, 2015.  Now if we go to a call

7   the day before, a call on January 4th, it's call 1441, and if

8   we could pull up 1441T.  You see this a call the day before,

9   the participants are Adam Skelos and Senator Skelos.  And you

10  see in the middle of the page at line 14 Senator Skelos says:

11  All claims that are in will be taken care of.

12         Do you see that?

13  A.   Yes.

14  Q.   And then Adam respond:  What's that?  Then Senator Skelos

15  replies:  All claims that are in will be taken care of.

16         Do you see that?

17  A.   Yes.

18  Q.   Then the speaker says:  Good morning, ladies and gentlemen.

19  And then later Senator Skelos says:  And will -- I will discuss

20  the rest with you later.

21         Do you see that?

22  A.   Yes.

23  Q.   Now when Adam Skelos was relating to you in that call the

24  next day information from the county executive, did you have

25  any doubt in your mind that the information he was providing to

FC3TSKE5                    White - redirect

1    you came from the county executive?

2    A.  No.

3               MR. GAGE:  Objection.

4               THE COURT:  Sustained.

5    Q.  Based on what Adam Skelos had told you in the call the next

6    day, where did you understand that the information came from?

7               MR. GAGE:  Same objection.

8               THE COURT:  I'll permit it.

9    A.  That Ed Mangano told Adam that.

10   Q.  Now you were asked questions on cross-examination about

11   your initial reaction to the communication from Charlie Dorego

12   about increasing Adam's compensation back in April 2013?

13   A.  Correct.

14   Q.  And do you recall saying that your initial reaction was

15   that Charlie was using the information about Senator Skelos for

16   some purpose?

17   A.  Correct.

18   Q.  Now did your initial reaction come to change?

19   A.  Yes, it did.

20   Q.  And how did it come to change?

21   A.  Because of what Glenn told me over the course of the next

22   week as we talked.

23   Q.  And as you talked to Glenn Rink over the course of the next

24   week after seeing that email, what became your reaction?

25   A.  Well, after he had spoken to Charlie, he was -- Glenn

FC3TSKE5                    White - redirect

1    relayed that it was coming from them and it was a legitimate

2    relay of information.

3    Q.  Now you were asked some questions on cross-examination

4    about Glenn Rink initially indicating that he eventually wanted

5    to have Adam earn $10,000, I think the words were used "as he

6    gained traction."

7            Do you recall those questions?

8    A.  Yes.

9            MR. MASIMORE:  If we could pull up 2467 in evidence,

10   please, page 2.  Focus on the top.

11   Q.  Do you recognize this to be the final executed -- fully

12   executed written contract with Adam Skelos?

13   A.  This is the chart summarizing it, yes, the final structure.

14   Q.  And this summarizes the final structure in place as of the

15   end of November 2012?

16   A.  Yes.

17   Q.  And this was the final structure that was in place in

18   April 2013 as Mr. Rink and yourself were reacting to Charlie

19   Dorego's email, correct?

20   A.  Yes.

21   Q.  And can you explain to the jury how, if at all, this

22   initial contract structure provides for Adam to be able to make

23   $10,000 a month when he gains traction?

24   A.  Once there are six contracts in place from Adam's

25   introductions and the sixth one is generating revenue earnings

1    to AbTech, then his payment would go up to 10,000.

2              MR. MASIMORE:  The government offers Government

3    Exhibit 212, if we could pull that up for counsel.

4              THE COURT:  Let me know if there's an objection.

5              MR. CONNIFF:  No objection.

6              THE COURT:  Government Exhibit 212 is received without

7    objection.

8              (Government's Exhibit 212 received in evidence)

9    Q.  Mr. White, do you recall being asked questions about

10   whether Nassau County ended up paying AbTech $400,000?

11   A.  Yes.

12   Q.  And you were asked questions about well, that payment

13   didn't come through and AbTech didn't receive that money?

14   A.  Correct.

15             MR. MASIMORE:  Let's publish Government Exhibit 212.

16   Zoom in under that page.

17   Q.  You see this is a list of checks from 2013 up through the

18   end of January 2015.  Do you see that?

19   A.  Yes.

20             MR. MASIMORE:  Let's flip to the next page of this

21   exhibit.

22   Q.  Do you see each one of these is a check -- if we flip

23   through, each one is a check to Adam Skelos, correct?

24   A.  Yes.

25   Q.  So money wasn't flowing from the county, but money was

1    flowing to Adam Skelos the entire time, correct?

2              MR. CONNIFF:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q.  Mr. White, you were asked questions about your impression

5    of Adam Skelos during the first meeting you had with him.

6    A.  Yes.

7    Q.  Can you remind us, what was your impression during the

8    first meeting?

9    A.  I was impressed with his level of preparation, his

10   enthusiasm, and his plan to roll out marketing and sales

11   strategy across New York.

12   Q.  Did your impression remain the same over time of Adam

13   Skelos?

14   A.  No, it did not.

15   Q.  And how did your impression change?

16   A.  Well, as I said before, basically I became aware that he

17   wasn't interested in getting involved in the substance of what

18   we were doing from the stormwater perspective.

19   Q.  Can you explain what you mean by that?

20   A.  Participating in proposals, substantive participation in

21   meetings, presentations.

22             MR. MASIMORE:  If we could pull up Government

23   Exhibit 2472, please.

24   Q.  Now you were asked questions, do you recall, on

25   cross-examination about whether you were aware of any contacts

FC3TSKE5                           White - redirect

1   between Adam Skelos and County Executive Ed Mangano immediately

2   around this particular email, December 4, 2012.

3               Do you recall those questions?

4   A.  Yes.

5               MR. MASIMORE:  Now if we could pull up Government

6   Exhibit 108 at page 254, please.

7   Q.  These are phone records from the cell phone of Senator

8   Skelos?

9               MR. CONNIFF:  Objection, your Honor.

10               MR. GAGE:  I join the objection.

11               THE COURT:  Ground?

12               MR. CONNIFF:  This is argument.  It has nothing to

13   with this witness.  The question was -- the question on

14   cross-examination was about Adam Skelos' representation.  We're

15   now going into Senator Skelos' telephone records.  It's

16   argument.

17               THE COURT:  Sustained.

18   Q.  Mr. White, what, if anything, were you told Mr. White

19   concerning --

20               What, if anything -- during the time period where

21   there was a delay between the unsolicited proposal going in and

22   Nassau County issuing the RFP, do you recall that time period?

23   A.  Yes.

24   Q.  Do you recall that was from about late November 2012

25   through the mid to end time period of February 2013?

FC3TSKE5                        White - redirect

1   A.  Yes.

2   Q.  Do you recall testifying about there being a delay and

3   Glenn Rink wanting some follow up relating to that?

4   A.  Yes.

5   Q.  Now during that time period you testified that you had made

6   requests for Adam Skelos to follow up on those, correct?

7   A.  Correct.

8   Q.  Now at any time did Adam Skelos report back to you

9   concerning whether or not Senator Skelos had followed up?

10  A.  He did not.

11  Q.  Did Adam Skelos report back any phone conversations between

12  Senator Skelos and county officials during that time period?

13  A.  No.

14          MR. MASIMORE:  One moment, your Honor.

15          (Pause)

16          MR. MASIMORE:  Your Honor, this may be a good time for

17  a break.  And I seek to see the Court at sidebar to discuss a

18  line of questioning we would propose after the break.

19          THE COURT:  Very good.  We'll take a 15-minute break.

20          (Continued on next page)

21

22

23

24

25

1           (Jury not present)

2           AUDIENCE MEMBER:  Your Honor, John Riley, I object to

3   any sidebar.  The jury is out, there's no reason that it can't

4   be in open court.

5           THE COURT:  I don't know if there's a reason,

6   Mr. Masimore.

7           MR. MASIMORE:  I agree.  Now that the witness and jury

8   is out, that's fine.

9           THE COURT:  Good point.

10          MR. MASIMORE:  Thank you.

11          Your Honor, there were some questions during the

12  cross-examination about various reasons it seemed that Adam

13  Skelos might be not able to lobby, not able to do certain

14  things, and we think that that implicates sort of the documents

15  we discussed this morning and the calls.  So we wanted to go

16  into that on redirect, if the Court permits.  And also if the

17  Court permits, we wanted to recheck and make sure the redaction

18  on Exhibit 3066 that we talked about was in order before that

19  happened because we didn't want to accidently publish something

20  that wasn't permitted under the Court's ruling.  We could

21  display it now.

22          THE COURT:  I need to review what you just said.

23          MR. MASIMORE:  Okay, thank you.

24          (Pause

25          THE COURT:  I don't have 3066 in front of me.  Is that

1    the email chain?

2              MR. MUKHI:  It should be up on your screen, your

3    Honor, with redactions.

4              MR. MASIMORE:   The redactions are in white.

5              THE COURT:  My recollection is that you redacted it

6    correctly, but you might want to show it to defense counsel.

7              MR. CONNIFF:  Redactions are correct.  We have an

8    objection, but the redactions are correct.

9              MR. GAGE:  So do I.

10             THE COURT:  I understand the objection, I overrule it.

11             MR. GAGE:  I don't doubt the Court, but to be clear,

12   this is akin to argument.  That was my objection on the earlier

13   objection.  It doesn't -- the witness is not on this document.

14   It's like the phone records.  They could put it in at the

15   appropriate time and the appropriate way, and if they want to

16   close on it, if, then so be it.  But to allow them to argue it

17   when in fact the witness has nothing to do with this material,

18   I just -- it's been a concern throughout, and that's the basis

19   of this objection.

20             THE COURT:  I think it's a fair objection.

21             MR. MASIMORE:  Sorry, your Honor?

22             THE COURT:  I think it's a fair objection.  It's not

23   that this is inadmissible, it's just not through this witness.

24             Do I have that wrong, do you think?

25             MR. GAGE:  No, I think your Honor has it right.

1             THE COURT:  I know you do.

2             MR. CONNIFF:  I concur.

3             MR. MASIMORE:  Your Honor, I think it goes to the more

4    general point that during cross-examination, as they should as

5    advocates, they are making and they have been asking

6    argumentative questions.  And so in response to that argument,

7    the government is seeking to publish these at a time when it

8    makes sense in the context of what has already been argued

9    during cross.

10            Similarly, that's why we were seeking to publish some

11   of the phone records.  Some of the arguments that were made

12   during cross-examination was that Adam Skelos had sent an email

13   that was arguably exaggerating in the sense that he said he was

14   going to have contacts with Ed Mangano, and sort of my intent

15   on redirect was to publish portions to at least respond in a

16   redirect fashion to that and show that well, you had been asked

17   questions about this but there are phone records that show

18   this.  And so it's sort of the same vein.  And I understand the

19   Court's ruling, but that was the intent.  I would ask the Court

20   perhaps --

21            THE COURT:  Reconsider.

22            MR. MASIMORE:  Reconsider, yes.

23            MR. CONNIFF:  Your Honor, what I would say, it's

24   twofold.  First, the questions that are being asked are not

25   arguments, they're leading questions for this witness about his

1    knowledge.  The government, as Mr. Gage pointed out, is welcome

2    to sum up and will sum up on what all this means.  But to show

3    the witness -- really not even show him, but show the jury what

4    the counterargument is during the redirect is not correct.

5            Second, on the issue of the lobbying, I know your

6    Honor made a ruling and the information is coming in, but I'm

7    sure your Honor captured the essence of the examination there,

8    which is yes, at one point Adam Skelos knew he couldn't lobby,

9    a lobbying firm was hired, they abruptly terminated the

10   relationship in January.  Adam was doing things that he

11   potentially shouldn't have been doing under the lobbying laws,

12   used the phone, et cetera, for that reason.  But that's not the

13   crime that's charged here.  That's a lobbying violation.  And

14   so we didn't raise any issue that even brings up this email.  I

15   know the government wants to put it in to show the familial

16   relationship and the lobbying and all that, and your Honor

17   ruled, but it shouldn't come in.  I think the spectator --

18           THE COURT:  I agree with you.

19           MR. MASIMORE:  Okay.

20           THE COURT:  Okay, we'll be on a break.

21           MR. MASIMORE:  I was going to ask for an additional

22   three or four minutes to use the restroom, because we used up

23   all our time arguing.

24           THE COURT:  We'll resume in ten minutes.

25           MR. MASIMORE:  Thank you.

FC3TSKE5                          White – recross

1                    (Recess taken)

2                    THE COURT:  Counsel, the more I examine those two

3        documents the more difficult I find it to trace relevance.  And

4        so at the end of the day I would like to have more argument on

5        it, or at least a discussion.

6                    The jury is ready.

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC3TSKE5                         White – recross

1                    (Jury present)

2                    THE COURT:  Mr. Masimore.

3                    MR. MASIMORE:  Thank you, your Honor.

4                    Nothing further.

5                    THE COURT:  Mr. Gage.

6                    MR. GAGE:  Thanks, your Honor.

7    RECROSS EXAMINATION

8    BY MR. GAGE:

9    Q.  Mr. White, I just want to talk briefly about Cameron

10   Engineering.  As you said this morning, they were part of

11   AbTech's executive summary in connection with its request for

12   proposal in Nassau County, correct?

13   A.   In connection with its proposal responding to the RFP.

14   Q.   So part of the key presentation you made to Nassau County

15   was the RFP, right?

16   A.   I'm sorry?

17   Q.   In the RFP, let me say it simply, Cameron Engineering was

18   listed as one of the resources that AbTech would be associating

19   with to serve the county, correct?

20   A.   In the proposal.

21   Q.   In the proposal?

22   A.   Correct.

23   Q.   In the RFP?

24   A.   The RFP asks for the proposal.

25   Q.   Right.

1   A.  So the RFP doesn't mention it.

2   Q.  In the hundred-plus page --

3   A.  The proposal.

4   Q.  -- Cameron Engineering --

5         THE COURT:  I want him to be able to answer.

6   Q.  In the hundred-plus page written proposal, Cameron

7   Engineering was part of the executive summary?

8   A.  Correct.

9   Q.  And also in the body of the presentation, the hundred page

10  presentation to the county, Cameron had a separate section,

11  correct?

12  A.  Yes.

13  Q.  Where their qualifications were talked about?

14  A.  Correct.

15  Q.  And the projects they worked on in Nassau County were

16  listed.  Do you recall that?

17  A.  Yes.

18  Q.  So for example, the Mill Pond water quality improvements,

19  the restoration of Massapequa Creek Preserve, do you recall

20  that?

21  A.  I recall the Massapequa, I don't recall the first one.

22  Q.  And Cameron has been in business -- and this is part of the

23  presentation also -- since 1985, correct?

24  A.  Correct.

25  Q.  So they were hired because they brought a legitimate

FC3TSKE5                         White - recross

1    resource to the effort, correct?

2    A.  Yes.

3    Q.  And Cameron also contributed the concept of a pretreatment

4    system?

5    A.  No.  Well, it was a collaborative effort.

6    Q.  And by collaborative, Cameron was part it, correct?

7    A.  Yes.

8    Q.  And I will be brief about this, but before the debris gets

9    to the sponge, larger debris has to be stopped so it doesn't in

10   effect overly clog the sponge, is that a fair simplistic --

11   A.  Correct.

12   Q.  Lastly, Cameron took the lead and made the final

13   presentation on which of the outfall pipes were most

14   productively retrofitted by the county, correct?

15   A.  I don't recall whether or not they were the lead on that,

16   I'm not sure, but they were part of that, absolutely.

17   Q.  So there were 60 initially and then the focus was on 14,

18   correct?

19   A.  Correct.

20   Q.  And a significant engineering effort went into identifying

21   the correct 14.

22   A.  Yes.

23   Q.  And Cameron was a critical part of that.

24   A.  Yes.

25              MR. GAGE:  Nothing further, your Honor.

1           THE COURT:  Mr. Conniff.

2   CROSS-EXAMINATION

3   BY MR. CONNIFF:

4   Q.  You were asked on redirect examination, Mr. White, about

5   Exhibit 2467.  Maybe we can pull that up.

6           On page 2 of the document you were -- your attention

7   was drawn to the top?

8   A.  Yes.

9   Q.  And you were asked about this document in connection with

10  some questions I asked you about Mr. Rink's view that once Adam

11  got traction he would be paid $10,000, correct?

12  A.  Yes.

13  Q.  And you laid out for the jury the parameters of the

14  November agreement, correct?

15  A.  Yes.

16  Q.  And pointed out that after six contracts -- stormwater

17  contracts of greater than $100,000, Adam would get boosted up

18  to 10,000 a month, correct?

19  A.  Yes.

20  Q.  And the contract, the RFP that was under way, the proposal

21  that was under way at the time Adam got his boost was the

22  Nassau County project, correct?

23  A.  Correct.

24  Q.  At that time people believed that would be a $12 million

25  project potentially for AbTech, correct?

FC3TSKE5                         Clancy - direct

1    A.  Correct.

2    Q.  And that would be pretty good traction, wouldn't it?

3    A.  Yes.

4              MR. CONNIFF:  Nothing further, your Honor.

5              MR. MASIMORE:  No thank you, your Honor.

6              THE COURT:  Okay, thank you.  You may step down.  And

7    if the jurors want to stand and stretch while we wait.

8              MR. MUKHI:  The government calls James Clancy.

9              THE COURT:  Mr. Clancy, good afternoon, please come to

10   the stand.

11    JAMES CLANCY,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MR. MUKHI:

16   Q.  Mr. Clancy, where do you currently work?

17   A.  Currently I'm a consultant at a law firm, Brown & Weinraub.

18   Q.  What did you do before that?

19   A.  I worked at the Department of Health for roughly seven

20   years.

21   Q.  Is that the New York State Department of Health?

22   A.  Correct, New York State Department of Health.

23   Q.  What years did you work at the New York State Department of

24   Health?

25   A.  From going back -- that's a good question, 2008 through

FC3TSKE5                          Clancy – direct

1    2014, roughly.

2    Q.   2008 to 2014 roughly?

3    A.   Yeah.

4    Q.   What positions did you hold while you were at the

5    Department of Health or DOH?

6    A.   The first six years I was the deputy commissioner for

7    governmental and external affairs, and last six to eight months

8    I was the director of the office of licensure.

9    Q.   Now what position did you hold in January 2014 of those two

10   positions?

11   A.   Deputy commissioner for governmental and external affairs.

12   Q.   And who did you report to as the deputy commissioner for

13   governmental and external affairs?

14   A.   Sue Kelly, the executive director, and the commissioner.

15   Q.   And what were your duties and responsibilities as the

16   Department of Health's deputy commissioner of governmental and

17   external affairs?

18   A.   I was the main liaison between the legislature and the

19   department, the administration, the governor's office and the

20   department, and any other state callers in the department.

21   Q.   And in that role, what interactions, if any, did you have

22   with New York State legislators?

23   A.   A lot of interaction with legislators.

24   Q.   And what sorts of interactions with legislators?

25   A.   I would get you calls from their office with questions,

FC3TSKE5                        Clancy - direct

constituent issues that they would have, questions of policy or

regulations that the department had or statute.

Q.  And how frequently were you in touch with legislative staff

in your position at the Department of Health as deputy

commissioner?

A.  Almost daily.

Q.  And what types of meetings, if any, would legislative staff

contact you about?

A.  A variety.  They could have constituents that had problems

with Medicaid payments, issue with health care facility, health

care providers.

Q.  And when legislative staff contacted you about meetings,

the meetings were between who and who?

        You mentioned a constituent, and who else?

A.  It would be a member of the Department of Health's staff,

whoever was the appropriate staff for that subject matter, the

subject matter expert.

Q.  And now were these constituent requests for meetings with

the department, were they on behalf of individuals, companies,

or both?

A.  Both.

Q.  And how often did you get such requests for meetings

between constituents and Department of Health staff?

A.  Quite often, couple times a week, probably.

Q.  And would you facilitate these meetings as part of your

FC3TSKE5                        Clancy - direct

1    official duties at the Department of Health?

2    A.   If they were deemed to be appropriate meetings and

3    requests, we would, yes.

4    Q.   And when deemed to be appropriate, you would facilitate

5    them in your official capacity?

6    A.   That's correct.

7    Q.   Now are you familiar with fracking?

8    A.   I am.

9    Q.   And what was the status of fracking in the State of New

10   York in January 2014?

11   A.   The Department of Health was undergoing a health review of

12   the outcomes of fracking.

13   Q.   Now are you familiar with a company called AbTech?

14   A.   I am.

15   Q.   And how did you first learn about AbTech?

16   A.   I was requested to set up a meeting between AbTech and one

17   of the subject matter experts with respect to fracking.

18   Q.   And if you recall, who requested your assistance in setting

19   up a meeting between AbTech and the DOH experts on fracking?

20   A.   Elizabeth Garvey.

21          MR. MUKHI:  Your Honor, the government offers 2110.

22          MR. GAGE:  No objection, your Honor.

23          THE COURT:  Government Exhibit 2110 is received

24   without objection.

25          (Government's Exhibit 2110 received in evidence)

FC3TSKE5                          Clancy – direct

```
 1              MR. MUKHI:  And Ms. Danzo, if we could zoom in on the
 2    top.
 3    Q.  Do you see this is an email from Elizabeth Garvey at
 4    nysenate.gov to yourself on January 28, 2014?
 5    A.  I do.
 6    Q.  And who is Elizabeth Garvey or Beth Garvey?
 7    A.  I believe Beth Garvey is the general counsel to majority
 8    leader.
 9    Q.  And who is the majority leader at the time of this email?
10    A.  Senator Skelos.
11    Q.  And if you see the subject is:  Question, Jim, can you tell
12    me who is the technical person who is doing the hydrofracking
13    review?
14              Do you see that?
15    A.  I do.
16    Q.  And says:  Thanks, Beth.  Then it says:  Beth Garvey,
17    Republican Conference Council.
18              Do you see that?
19    A.  I do.
20    Q.  And now CC'ed to this email is someone named
21    wickham@nysenate.gov.  Who is that?
22    A.  Tom Wickham is, was, I guess, at the time, the policy and
23    program -- health policy and program director for the
24    Republican conference.
25    Q.  And what interactions did you have with Mr. Wickham around
```

FC3TSKE5                        Clancy – direct

1    this time period, if any?

2    A.  I had many interactions with Tom.

3    Q.  Prior to this email, had you ever had any interactions with

4    Ms. Garvey?

5    A.  Not in email form like this, not on a request like this,

6    no.

7    Q.  Had she ever made a request like this to you while you were

8    at the Department of Health prior to this email?

9    A.  No.

10              MR. MUKHI:  The government offers 3219 into evidence.

11              MR. GAGE:  No objection, your Honor.

12              THE COURT:  Government Exhibit 3219 is received

13   without objection.

14              (Government's Exhibit 3219 received in evidence)

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

FC29SKE6                         Clancy - direct

Q.   Now, Mr. Clancy, do you see this is an e-mail, it's about
six minutes after the first e-mail we just looked at and it's
from JMC36 at health.ny.gov?

A.   I do.

Q.   Whose e-mail address is that do you know?

A.   That is mine -- was mine.

Q.   And you forward the e-mail to Courtney Burke, Sally Dreslin
and they have the parenthetical chamber.  Who are Ms. Burke and
Ms. Dreslin?

A.   Ms. Burke was the governor's deputy secretary for health
and human services and Sally Dreslin was her deputy.

Q.   And who are the rest of the people on the two line
agreement?

A.   Sandi Toll was the council, the Governor's Council for
Health and Human Services.

           SEK11 was Sue Kelly, the Department of Health
Executive Director.

           Guthrie S. Birkhead.  Dr. Birkhead was the head of the
Office of Public Health.

           Ellen Anderson was his deputy.

           And Bill Schwartz was -- he was the Public Information
Officer.  Sorry.

Q.   And why were you forwarding Ms. Garvey's e-mail to these
individuals?

A.   Wanted to make sure that they knew that we had a request

1  regarding fracking and wanted them to know that it was coming

2  from the Senate Majority.

3  Q.  And when you wrote to these individuals, "Find it curious

4  that Senate Republican council is reaching me out to me

5  directly.  Thoughts on a response."

6       Who are you referring to as "Senate Republican

7  council"?

8  A.  Beth Garvey.

9       MR. MUKHI:  The government offers 3221 into evidence.

10      MR. GAGE:  No objection, your Honor.

11      THE COURT:  Government Exhibit 3221 is received

12 without objection.

13      (Government's Exhibit 3221 received in evidence)

14 Q.  Mr. Clancy, do you see -- this is at the bottom -- the same

15 e-mail from Ms. Garvey to yourself?  And this time you forward

16 it to someone named Betsey Ball?

17 A.  Yes, I do.

18 Q.  Who is Betsey Ball?

19 A.  Betsey Ball was the governor's director of governmental

20 affairs.

21 Q.  Why were you forwarding her the e-mail?

22 A.  Basically my boss, if you will.  Not that I reported to her

23 but most -- all the deputy commissioners and other agencies of

24 internal affairs kind of reported to Betsey.

25 Q.  You wrote to her when you forwarded the e-mail, "This is a

FC29SKE6                          Clancy - direct

1    biggie.  Can we talk today."

2    A.  Yes.

3    Q.  What did you mean by "this is a biggie"?

4    A.  Because it was a fracking request.

5    Q.  And what was big about a fracking request during the time

6    period?

7    A.  We were having a lot -- at this point fracking was very

8    controversial and the governor and the state hadn't decided

9    which way they were going to come down on whether fracking

10   would be allowed or not allowed in the state.

11   Q.  Now, after you asked, "Can we talk today," Ms. Ball wrote

12   back, "I am sorry.  I just saw this.  Will call you

13   momentarily."

14          Do you see that?

15   A.  I do.

16   Q.  What, if anything, happened next after you received this

17   e-mail from Ms. Ball?

18   A.  We spoke and discussed that I had been reached out to by

19   Beth on behalf of the Senate Majority to have this -- this

20   meeting regarding fracking and we talked about what it meant.

21   Q.  And what, if anything, did you decide with Ms. Ball to do

22   next after your conversation with her?

23   A.  Well we had decided that there would be no meetings.  We

24   had had previous meetings because of fracking with -- regarding

25   the health review itself and/or any regulations that may or may

FC29SKE6                         Clancy – direct

1    not come out of that review.  And we had decided not to take

2    any of those meetings until the review process was done.  So we

3    needed to follow up with Beth to find out what the meeting was

4    going to entail.

5    Q.  Did you follow up with Ms. Garvey about what the meeting

6    was?

7    A.  Yeah.

8    Q.  And what did you discuss with Ms. Garvey when you followed

9    up with her about the meeting request?

10   A.  Sure.  Basically just said we weren't going to be doing any

11   meetings that had to do with discussing the health review

12   and/or any possible regulations that may come out of that.

13   Wanted to make sure that she knew that.

14   Q.  And how did she respond?

15   A.  By stating that this was actually a request of -- I used

16   the term science, there was a science meeting, scientists, with

17   scientists is what they were looking for; that they had a

18   product, a science.

19   Q.  Did she mention whose product she was requesting a meeting

20   for?

21   A.  Yeah.  Around this time I think is when I had first heard

22   that it was going to be AbTech.

23   Q.  And what did Ms. Garvey say about AbTech to the best of

24   your recollection during this first phonecall?

25   A.  That they had a product that could be used to help in the

1    fracking process and then I believe she sent me a link.

2    Q.  And what, if anything, did Ms. Garvey say about whether or

3    not AbTech was one of Senator Skelos' constituents?

4    A.  There was no discussion of that.

5              MR. MUKHI:  The government offers 2113 into evidence.

6              MR. GAGE:  No objection, your Honor.

7              THE COURT:  Government Exhibit 2113 is received

8    without objection.

9              (Government's Exhibit 2113 received in evidence)

10   Q.  Mr. Clancy, you mentioned that Ms. Garvey sent you a link

11   after your conversation.  Do you recognize this e-mail?

12   A.  I do.

13   Q.  What is it?

14   A.  It is an e-mail from Beth Garvey with the link.

15             MR. MUKHI:  The government offers 3209-A into

16   evidence.

17             MR. GAGE:  No objection, your Honor.

18             THE COURT:  Government Exhibit 3209-A is received

19   without objection.

20             (Government's Exhibit 3209-A received in evidence)

21             MR. MUKHI:  If you could just put it side by side with

22   2114.

23             I'm sorry.  2113.

24   Q.  Mr. Clancy, do you recognize what's on the right-hand side

25   of your screen, Government Exhibit 3209-A?

FC29SKE6                          Clancy - direct

1    A.  I do.

2    Q.  What is it?

3    A.  It was the information included as part of the link.

4            MR. MUKHI:  If we could just zoom in underneath the

5    heading, Ms. Danzo.

6    Q.  Do you see this provides information concerning AbTech and

7    possible uses concerning clean water as it relates to the oil

8    and gas industry?

9    A.  I do.

10           MR. MUKHI:  The government offers 2114 into evidence.

11           MR. GAGE:  No objection.

12           THE COURT:  Government Exhibit 2114 is received

13   without objection.

14           (Government's Exhibit 2114 received in evidence)

15   Q.  Do you see you responded to Ms. Garvey's AbTech link with

16   "Thanks.  Stay tuned"?

17   A.  I do.

18           MR. MUKHI:  The government offers 2115 into evidence.

19           MR. GAGE:  No objection, your Honor.

20           THE COURT:  Government Exhibit 2115 is received

21   without objection.

22           (Government's Exhibit 2115 received in evidence)

23   Q.  And Ms. Garvey wrote back to you, "Thanks for your

24   efforts"?

25   A.  Yes.

1   Q.  What did you tell Ms. Garvey you would do after she

2   explained what AbTech was to you during the phonecall?

3   A.  That I would talk to the appropriate folks at the

4   department to see if we deemed this meeting request

5   appropriate.

6           MR. MUKHI:  The government offers Government Exhibit

7   3209 into evidence.

8           MR. GAGE:  No objection.

9           THE COURT:  Government Exhibit 3209 is received

10   without objection.

11           (Government's Exhibit 3209 received in evidence)

12   Q.  Mr. Clancy, do you see this is an e-mail at the top from

13   yourself, January 31, to Guthrie Birkhead, health

14   parenthetical, and Nathan Graber, also followed by a health

15   parenthetical.  And you're forwarding them Ms. Garvey's e-mail

16   with the AbTech link?

17   A.  That's correct.

18   Q.  Who is Guthrie Birkhead?

19   A.  Dr. Birkhead was the assistant commissioner and director of

20   the Office of Public Health.

21   Q.  And who is Nathan Graber?

22   A.  Dr. Graber is the Director of the Office of Environmental

23   Health.

24   Q.  And why were you forwarding Ms. Garvey's e-mail with the

25   AbTech link to Dr. Birkhead and Dr. Graber?

1  A.  Well Dr. Graber, being the Director of the Office of

2  Environmental Health, that was the office that was dealing with

3  the fracking review.  And Dr. Birkhead is Dr. Graber's

4  supervisor.

5  Q.  Why were you sending them the AbTech link in particular?

6  A.  Because if there was going to be a meeting they would be

7  participating in it.

8         MR. GAGE:  No objection your Honor.

9         MR. MUKHI:  The government offers 2119.

10         THE COURT:  Government Exhibit 2119 is received

11  without objection.

12         (Government's Exhibit 2119 received in evidence)

13  Q.  Mr. Clancy, do you see at the bottom is Ms. Garvey's e-mail

14  from January 28, her original e-mail.  Do you see that?

15  A.  I do.

16  Q.  And then you respond on February 19, "Whatever happened

17  with this?"

18         And Ms. Garvey replied, "Nothing."

19         Do you see that?

20  A.  I do.

21  Q.  And after the e-mails -- in between the e-mails we saw in

22  January and this e-mail chain had you heard anything further

23  with respect to the request for an AbTech meeting?

24  A.  No.

25  Q.  And why did you follow up with Ms. Garvey to ask "Whatever

FC29SKE6                        Clancy - direct

1   happened to the request?"

2   A.  Well, I kept a list of all the requests that I had and

3   issues I was working on from day-to-day, week-to-week.  And as

4   I would finish the issue and get crossed off.  And the AbTech,

5   Senator Skelos' AbTech was still on my sheet.

6              MR. GAGE:  No objection, your Honor.

7              MR. MUKHI:  The government offers 2120 into evidence.

8              THE COURT:  Government Exhibit 2120 is received

9   without objection.

10             (Government's Exhibit 2120 received in evidence)

11  Q.  Do you see -- this is a continuation of the same string in

12  February?

13  A.  Yes.

14  Q.  And you replied, "They know longer interested"?

15  A.  Correct.

16  Q.  And then Ms. Garvey replied.  "Clarification.  They are

17  still interested in a meeting.  Seems unnecessarily complicated

18  for us to participate."

19             Do you see that?

20  A.  I do.

21  Q.  What do you understand Ms. Garvey to mean by it "seems

22  unnecessarily complicated for us to participate"?

23             MR. GAGE:  Objection unless he has an understanding.

24             THE COURT:  Sustained.

25             MR. MUKHI:  I'll move on.

FC29SKE6                          Clancy - direct

1              MR. GAGE:  No objection.

2              MR. MUKHI:  The government offers 2127.

3              THE COURT:  Government Exhibit 2127 is received

4    without objection.

5              (Government's Exhibit 2127 received in evidence)

6    Q.  Mr. Clancy, do you see this is an e-mail a few days later,

7    another chain between you and Ms. Garvey?

8    A.  I do.

9    Q.  And Ms. Garvey wrote to you on February 25.  "Subject:

10   AbTech Industries.  Has contact been made yet?"

11             "The contact I have there is (480)874-4000.  Bjornulf

12   White."

13             Do you see that?

14   A.  I do.

15   Q.  And then you wrote back, "No one has contacted me."

16             Do you see that?

17   A.  Correct.  Yes.

18   Q.  And Ms. Garvey wrote back, "Would you be so kind as to

19   reach out."

20             Do you see that?

21   A.  I do.

22   Q.  And you wrote back, "Sorry, Beth, I'm not going to be able

23   to do that."

24             Why did you write back, "I'm not going to be able to

25   do that"?

1    A.  It was just part of our protocol.  It was the

2    responsibility of the legislative offices to basically do the

3    leg work with their constituents.  Happy to facilitate

4    meetings, and we were happy to facilitate meetings.  But we

5    wouldn't be doing the outreach.  I wouldn't be doing the

6    outreach.

7              MR. GAGE:  No objection.

8              MR. MUKHI:  The government offers 3210 into evidence.

9              THE COURT:  Government Exhibit 3210 is received

10   without objection.

11             (Government's Exhibit 3210 received in evidence)

12   Q.  Now do you see this is an e-mail the next day, February 27?

13   A.  I do.

14   Q.  It's to yourself.  And it's from Nicollette Van Hoesen.  Do

15   you see that?

16   A.  Correct.  I do.

17   Q.  Who is Nicollette Van Hoesen?

18   A.  Nicolette was my assistant.

19   Q.  And she wrote to you "Subject:  Phone message.  Bjornulf

20   White, AbTech industries, referred by Beth Garvey."  And then

21   there are two phone numbers there.  Do you see that?

22   A.  I do.

23   Q.  Did you speak to Mr. White at any time around this e-mail?

24   A.  I did.

25   Q.  And what did you talk to Mr. White about?

FC29SKE6                         Clancy - direct

1   A.  About setting -- helping to facilitate setting up a meeting

2   between AbTech and the department.

3   Q.  And did that meeting eventually happen between AbTech and

4   the Department of Health?

5   A.  It did.

6        MR. MUKHI:  Your Honor, at this time the government

7   offers 3213 and 3214 into evidence.

8        MR. GAGE:  No objection, your Honor.

9        THE COURT:  Government Exhibits 3213 and 3214 are

10  received without objection.

11       (Government's Exhibits 3213 and 3214 received in

12  evidence)

13       MR. MUKHI:  If we could do 3213 first.

14  Q.  Do you see, Mr. Clancy, this is an e-mail chain between

15  yourself, your assistant, and Mr. White.  Subject:  AbTech

16  Industries Meeting?

17  A.  I do.

18  Q.  And in the lower e-mail your assistant lists, "Below are a

19  few potential dates with Jim Clancy and the Department of

20  Health"?

21  A.  Correct.

22  Q.  And the bottom one is May 2 after 1 p.m.  Do you see that?

23  A.  I do.

24  Q.  And then Mr. White responded, "Friday, May 2 would be the

25  best option for us."  Do you see that?

FC29SKE6                        Clancy - direct

1   A.  I do.

2           MR. MUKHI:  And if we go to 3214 now which is in

3   evidence.

4   Q.  Do you see this is a calendar entry.  It includes yourself

5   as the organizer.  And it's a meeting with AbTech/Bjornulf

6   White.  And it says CR 2.  14th floor.  What does that

7   indicate?

8   A.  Conference room 2.

9   Q.  In which building?

10  A.  Sorry.  14th floor of the Corning Tower the Empire State

11  Plaza in Albany.

12  Q.  Is that where the Department of Health is located?

13  A.  The executive floor, yes.

14  Q.  And Dr. Graber is also listed as a required attendee?

15  A.  Correct.

16  Q.  And this indicates that there's a meeting with AbTech on

17  May 2, 2014.  Do you see that?

18  A.  I do.

19  Q.  Do you recall whether that was the day that the meeting you

20  referred to took place on?

21  A.  That is correct.  Yes.

22  Q.  Now, why don't you tell us.  Did you attend the meeting

23  between AbTech and the Department of Health?

24  A.  I did.

25  Q.  Who attended the meeting from the Department of Health

FC29SKE6                         Clancy - direct

1    side?

2    A.   Myself and -- sorry.

3    Q.   Besides yourself?

4    A.   Dr. Graber.

5    Q.   And who attended the meeting that you recall from AbTech's

6    side?

7    A.   There were three gentlemen.  I don't really remember them.

8    Bjornulf White is one that attended.  The other two gentlemen,

9    I don't recall their names.

10   Q.   And what happened at the meeting?

11   A.   They made a presentation explaining what their water

12   filtration system did and how it could be used to -- not

13   scientific -- clean frack water.

14   Q.   And what was your role at the meeting?

15   A.   Just to really make sure that the subject matter of the

16   meeting did not stray into any areas that we had already said

17   we were not going to be participating in or discussing.

18   Q.   What was Dr. Graber's role at the meeting?

19   A.   To listen.

20   Q.   And who did most of the talking at the meeting?

21   A.   Bjornulf.

22   Q.   And did yourself or Dr. Graber ask any questions to the

23   company?

24   A.   Yeah.  I'm sure there were some questions that were asked.

25   Q.   And how long did the meeting last, approximately?

1    A.  Around an hour, I'd say.

2             MR. MUKHI:  If we could publish 2302 which is already

3    in evidence.

4             Zoom in to the cover.

5    Q.  Do you see that this is an AbTech Industries Water

6    Management in the On-Shore Oil and Gas Industry presentation to

7    the New York State Department of Health, May 2, 2014.  Do you

8    recognize this document?

9    A.  I do.

10   Q.  What is it?

11   A.  It was a document PowerPoint presentation that they walked

12   us through.

13            MR. MUKHI:  One moment, your Honor.

14            THE COURT:  Yes.

15            (Pause)

16            MR. GAGE:  No objection.

17            MR. MUKHI:  The government offers 3215, 3217, and 3218

18   into evidence.

19            THE COURT:  Government Exhibits 3215, 3217, and 3218

20   are received without objection.

21            (Government's Exhibits 3215, 3217, and 3218 received

22   in evidence)

23            MR. MUKHI:  If we could put 3215 on the screen.

24   Q.  Mr. Clancy, do you recognize this form of document?

25   A.  I do.

FC29SKE6                         Clancy - direct

1   Q.   What is it?

2   A.   Call it the sunshine form.

3   Q.   And what is the sunshine form?

4   A.   When we would have meetings the department staff would have

5   meetings with outside stakeholders or FC groups anyone

6   basically that came in to talk to us, we would fill these out

7   and these were available.  Sunshine was a transparency

8   movement, I guess, for lack of a better term.

9   Q.   And this form in particular -- at the top it says notice of

10  appearance.  And there's an individual named Jacob Digel.  And

11  there's a business card.

12          Do you recognize that person?

13  A.   He was one of the gentlemen from AbTech that we met with.

14          MR. MUKHI:  And briefly 3216, which is already in

15  evidence.

16  Q.   And do you see this is the same form.  And the name of the

17  individual appearing is Bjornulf White?

18  A.   I do.

19  Q.   By the way, when were these documents filled out, if you

20  know?

21  A.   At the meeting.

22  Q.   Now, at any point prior to you agreeing to facilitate the

23  meeting between AbTech and the Department of Health did you

24  learn that the Majority Leader's son was being paid by AbTech?

25  A.   I did not.

FC29SKE6                          Clancy – cross

1              MR. MUKHI:  One moment, your Honor.

2              THE COURT:  Yes.

3              (Pause)

4              MR. MUKHI:  Nothing further.

5              THE COURT:  Mr. Gage.

6    CROSS-EXAMINATION

7    BY MR. GAGE:

8    Q.  Good afternoon, Mr. Clancy.

9    A.  Good afternoon.

10   Q.  Could we talk generally for a moment about the Department

11   of Health study?

12   A.  Sure.

13   Q.  And this is the study of high volume hydraulic fracturing

14   study?

15   A.  Okay.

16   Q.  For how long was that study ongoing?

17   A.  Several --

18   Q.  Approximately?

19   A.  Approximately, I'm going to go with a year.  I really had

20   very little to do with that.

21   Q.  But you know generally that the effort was to collect as

22   much information from as many sources to do -- make the best

23   effort to have a complete accurate report, correct?

24   A.  Yes.

25   Q.  And, in fact, the Department of Health met with, would it

1    be fair to say, scores and scores of people to collect the

2    relevant information?

3              MR. MUKHI:  Your Honor, objection --

4              THE COURT:  Just a moment.

5              MR. MUKHI:  Objection as to form, as well as a scope

6    objection.

7              THE COURT:  Sustained on both grounds.

8    Q.  Mr. Clancy, you're aware the Department of Health was

9    meeting with certain persons to obtain information relating to

10   the hydrofracking study?

11   A.  No.

12   Q.  How did they collect information?

13   A.  The scientists were --

14   Q.  Okay.

15   A.  I'm assuming they were looking -- I really can't answer

16   that question.

17             THE COURT:  You shouldn't assume.  If you're

18   speculating, we move on to the next.

19   Q.  Scientific information was being corrected, collect --

20   collected, correct?

21   A.  Collect -- correct.

22   Q.  Sorry.  I may have misled you there.

23   A.  No problem.

24   Q.  So the goal was to collect scientific information; is that

25   correct?

FC29SKE6                        Clancy - cross

1    A.  Correct.

2            MR. GAGE:  And if we could put up the first Government

3    Exhibit.  This would be the January 28 e-mail.  If we could go

4    to the top of the page, please.

5    Q.  This is the contact with Ms. Garvey, correct?

6    A.  Correct.

7            MR. GAGE:  And if we could go to the next e-mail,

8    please.  2319.  32.  I'm sorry.

9            If we could zoom in on the top, please.

10   Q.  And you described the various persons in this e-mail,

11   correct?

12   A.  Correct.

13   Q.  And the short of it is it was certainly no secret that

14   Ms. Garvey had made this request, correct?

15   A.  Correct.

16           MR. MUKHI:  Objection as to the form.

17           THE COURT:  Sustained.

18   Q.  Well you circulated the request, as we can see on the

19   e-mail, to seven individuals, correct?

20   A.  I'm sorry?

21   Q.  You circulated Ms. Garvey's request to seven additional

22   persons on the e-mail?

23   A.  Correct.

24   Q.  You also circulated it to Ms. Ball; is that correct?

25   A.  Correct.

FC29SKE6                       Clancy - cross

1   Q.  And you reviewed AbTech's website during this time,

2   correct?

3   A.  Correct.

4   Q.  And you and Ms. Ball discussed AbTech's website.  Do you

5   recall that?

6   A.  Correct.

7            MR. GAGE:  Pardon me, your Honor.  Just a minute.

8            THE COURT:  Sure.

9            MR. GAGE:  Your Honor, the defense offers Defense

10  Exhibit DS AA.

11           MR. MUKHI:  No objection, your Honor.

12           THE COURT:  Defense Exhibit DS AA is received without

13  objection.

14           (Defendants' Exhibit DS AA received in evidence)

15  Q.  Can you see it there on the screen, Mr. Clancy?

16  A.  I can.

17  Q.  If we could read from the top.  "Spoke with Beth.  Here is

18  the group."

19           And just to be clear this is an e-mail from you to

20  Ms. Ball; is that correct?

21  A.  That is correct.

22  Q.  "Spoke with Beth.  Here is the group.  And that's the

23  AbTech website, correct?

24  A.  That is correct.

25  Q.  And then, "Sounded legit.  And they don't even want to meet

FC29SKE6                          Clancy - cross

1    with the commissioner.  Want the scientists.  I'm feeling okay

2    about it.  You?"

3            And that's from you to Ms. Ball, correct?

4    A.  That's correct.

5    Q.  And Ms. Ball responded she had also reviewed the matter,

6    correct?  The request?

7    A.  Correct.

8    Q.  And she felt fine about it too, correct?

9    A.  Correct.

10   Q.  So on that basis, after talking to Ms. Ball and reviewing

11   the material, you said you're prepared to go forward with the

12   meeting, correct?

13   A.  Correct.

14   Q.  And you don't disagree with your conclusion here that it

15   was legit?

16   A.  Correct.

17   Q.  And then, in fact, nobody from AbTech reached out for you,

18   correct?

19   A.  That is correct.

20   Q.  You actually had to reach back to Ms. Garvey and say,

21   gee -- in effect, gee, what's going on here, correct?

22   A.  Correct.

23   Q.  And then she got back to you and said they still have some

24   interest; is that right?

25   A.  That is correct.

FC29SKE6                        Clancy - cross

1   Q.  And then the meeting proceeded, correct?

2   A.  Correct.

3   Q.  And you made it -- the understanding was at this meeting

4   the talk would be a technical scientific talk.  There would not

5   be talk about regulations, correct?

6   A.  Correct.

7   Q.  And when you said that -- you explained it was protocol but

8   just to review it for a moment.  Because of protocol, you

9   weren't prepared to reach out to somebody from AbTech, correct?

10  A.  That is correct.

11  Q.  But you made clear to Ms. Garvey you didn't have any

12  problem if somebody from AbTech reached out for you?

13  A.  Correct.

14  Q.  And on that basis the meeting was set up?

15  A.  That's right.

16  Q.  So, as you say, that the meeting went for approximately an

17  hour; is that right?

18  A.  That's correct.

19  Q.  And you're -- Dr. Graber was at the meeting, right?

20  A.  That's correct.

21  Q.  Can you tell us again what Dr. Graber's role was?

22  A.  Sure.  He was the Director for the Office of Environmental

23  Health which is part of the Department of Health.

24  Q.  And during the meeting your role there was to essentially

25  shutdown any discussion of the regulations or hydrofracking

FC29SKE6                         Clancy - cross

1    study that you thought was inappropriate, correct?

2    A.  Correct.  True.

3    Q.  So you were in effect the watchdog at that meeting,

4    correct?

5    A.  Correct.

6    Q.  And nothing inappropriate did occur at that meeting,

7    correct?

8    A.  Correct.

9    Q.  And at the end of the meeting you and Mr. -- Dr. Graber

10   spoke, correct?

11   A.  I'm sorry.  Could you repeat that question.

12   Q.  At the end of the meeting you and Dr. Graber had a

13   conversation about the meeting?

14   A.  We did.

15            THE COURT:  Please slow down.

16            MR. GAGE:  Sorry.

17            THE WITNESS:  Yes, we did.

18   Q.  And you both concluded it was a good meeting, a good

19   presentation?

20            MR. MUKHI:  Objection.  Hearsay.

21            THE COURT:  Sustained.

22   Q.  There was no objection to the meeting after following its

23   conclusion?

24   A.  No.

25   Q.  Let's just talk generally about the process.  DOH was doing

FC29SKE6                              Clancy - cross

1    the study, correct?

2    A.   The health study, correct.

3    Q.   And what was your role in the health study?

4    A.   Zero.

5    Q.   So you really didn't know who Department of Health was

6    speaking to across the board?

7    A.   That's correct.

8    Q.   You don't know what, if any --

9              THE COURT:  Slow down.

10             MR. GAGE:  I'm sorry, your Honor.

11   Q.   You don't know where, if elsewhere, they collected

12   information?

13             MR. MUKHI:  Your Honor, objection.  He said he wasn't

14   involved in the process several times.

15             THE COURT:  Sustained.

16             MR. GAGE:  I'd just like to draw his attention --

17             THE COURT:  I'm sustaining.

18   Q.   So the Department of Health was doing the study and then --

19   but the Department of Health couldn't issue permits, correct?

20   A.   No.  No.  Not the Department of Health.

21   Q.   By the way, during the meeting no one asked the Department

22   of Health to issue a permit for AbTech, correct?

23   A.   No.

24   Q.   They weren't asking that somehow they be hired for a job,

25   correct?

FC29SKE6                          Clancy - cross

1    A.   Correct.

2    Q.   It was, as you say, a technical presentation?

3    A.   That's correct.

4    Q.   And it's the DEC, if you know, that can issue permits,

5    correct?

6    A.   That's my understanding, yes, correct.

7    Q.   But if hydrofracking had been approved -- well let's start.

8    Hydrofracking was not approved, correct?

9    A.   That's correct.

10            THE COURT:  I think you're really testing the ability

11   of the court reporter to follow you.  You really must slow

12   down.

13            MR. GAGE:  Just to repeat.  Apologies, your Honor.

14   Q.   It's the DEC -- the moratorium was not lifted, correct?

15   A.   That's correct.

16   Q.   And only the DEC, as we discussed, just to repeat, could

17   issue permits, correct?

18   A.   That's my understanding, correct.

19            MR. GAGE:  Just a moment, your Honor.

20            (Pause)

21   Q.   Let me just ask.  Would Dr. Graber be the person that would

22   be aware of the manner in which information was collected for

23   the study?

24   A.   (No response).

25   Q.   For the hydrofracking study?

FC29SKE6                        Clancy - redirect

1    A.  I don't know the answer to that question.

2              MR. GAGE:  Nothing further, your Honor.

3              MR. CONNIFF:  No questions, your Honor.

4              MR. MUKHI:  Very briefly, your Honor.

5              THE COURT:  Yes.

6              MR. MUKHI:  If we could put up Defense Exhibit AA.

7    While that's coming up if we could focus in on the top two

8    e-mails.

9              THE COURT:  Defense Exhibit DS AA.

10             MR. MUKHI:  DS AA.  Thank you, your Honor.

11   REDIRECT EXAMINATION

12   BY MR. MUKHI:

13   Q.  Now, Mr. Clancy, do you recall you were asked questions on

14   cross-examination about your statement that this quote sounded

15   legit?

16   A.  I do.

17   Q.  Did you -- and this is a forward of Ms. Garvey's e-mail to

18   you?

19   A.  (No response).

20             MR. MUKHI:  If we zoom out.

21             THE WITNESS:  Originally.

22   Q.  Originally.  Yes.

23             Did you ever find out how Ms. Garvey got the

24   information concerning AbTech?

25   A.  No.

FC29SKE6                        Clancy - redirect

1   Q.  Did you ever find out who provided Ms. Garvey with

2   information about AbTech?

3   A.  No.

4           MR. MUKHI:  And if we go to 2127.

5   Q.  Do you recall we looked at this e-mail and Ms. Garvey is

6   following up with you asking if contact has been made and she

7   provides Bjornulf White's contact information?

8   A.  I do.

9   Q.  Did you ever find out who had asked Ms. Garvey to follow up

10  with you on the status of the AbTech meeting and the Department

11  of Health?

12  A.  I did not.

13  Q.  And on direct examination you said that you were not aware

14  of any financial arrangement between AbTech -- let me -- I'll

15  rephrase.

16          Separately did you ever become aware of any future

17  compensation that the Majority Leader's son would obtain --

18          MR. GAGE:  Objection.

19          THE COURT:  Ground.

20          MR. GAGE:  Relevance.  And it's been asked and

21  answered.

22          MR. MUKHI:  It's a different question.

23          THE COURT:  I'll permit it.

24  Q.  Did you ever find out about any future compensation that

25  the Majority Leader's son would receive if fracking were

FC29SKE6                          Clancy - recross

1    approved by the state?

2    A.  No.

3              MR. MUKHI:  One moment, your Honor.

4              (Pause)

5              Nothing further.

6    RECROSS EXAMINATION

7    BY MR. GAGE:

8    Q.  Mr. Clancy, if anything inappropriate had occurred at that

9    meeting, the AbTech meeting, you would have shut it down,

10   correct?

11             MR. MUKHI:  Your Honor, to his knowledge anything

12   inappropriate.

13             THE COURT:  Yes.  To your knowledge, if anything

14   inappropriate had happened at the meeting to your knowledge

15   would you have shut it down?

16             THE WITNESS:  Yes.

17   Q.  And you were there for that purpose, to shut it down if

18   something in your view inappropriate had occurred?

19   A.  Yes.

20             MR. GAGE:  Nothing further, your Honor.

21             MR. MUKHI:  Thank you, your Honor.

22             THE COURT:  All right.  Thank you.  You may step down.

23             (Witness excused)

24             THE COURT:  You should feel free to stand and stretch

25   while we wait for the next witness.

1           MS. MARTINS:  The government calls Kelliann Cummings.

2           THE COURT:  Good afternoon, Ms. Cummings.  Please come

3    to the witness stand.  Please remain standing and raise your

4    right hand.

5      KELLIANN CUMMINGS,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. MARTINS:

10   Q.  Good afternoon, Ms. Cummings.  Are you testifying here

11   today voluntarily or pursuant to a subpoena?

12   A.  Pursuant to a subpoena.

13   Q.  Now, where do you currently work?

14   A.  For the New York State Senate.

15   Q.  What is your position in the New York State Senate?

16   A.  Director of Communications.

17   Q.  Do you work for a particular senator?

18   A.  Yes, I do.

19   Q.  Who do you work for?

20   A.  The Senate Majority Leader.

21   Q.  And who is the current Senate Majority Leader?

22   A.  John Flanagan.

23   Q.  Was there a time when you worked for Majority Leader Dean

24   Skelos?

25   A.  Yes.

1    Q.  Which years did you work for Senator Dean Skelos?

2    A.  November 2010 until May of 2015, this year.

3    Q.  And what was your title when you first started working for

4    Senator Skelos?

5    A.  Director of Policy Development.

6    Q.  And did there come a time when your title changed?

7    A.  Yes.

8    Q.  And when was that?

9    A.  In 2010.

10   Q.  And what did it become?

11   A.  I became the Director of Communications.

12   Q.  And as the Director of Communications what were some of

13   your duties and responsibilities?

14   A.  To communicate the priorities of the Senate Republican

15   Conference to the press and to the public through press

16   releases, organizing press conferences, writing speeches,

17   op-eds, answering reporter inquiries as well.

18   Q.  And during the time that you were the communications

19   director for Senator Skelos did you report directly to him?

20   A.  Yes.

21   Q.  Were you considered a member of his senior staff?

22   A.  Yes.

23   Q.  Now as his communications director was it also one of your

24   duties and responsibilities to accompany the senator on

25   interviews or locations where he gave public speeches?

FC29SKE6                    Cummings - direct

1    A.  Yes.

2    Q.  What was the purpose of accompanying him on those

3    occasions?

4    A.  To often audiotape what he had to say so I can hear what,

5    you know, whatever the questions were.  And to, the next day,

6    if I -- or later on, if I had to read the articles that were

7    generated from the interviews, to make sure that they were

8    accurate.

9             MS. MARTINS:  With the Court's permission I'd like to

10   hand what's been marked for identification as Government

11   Exhibit 507.

12   Q.  Ms. Cummings do you see what's been marked for

13   identification as Government Exhibit 507 in front of you?

14   A.  Yes.

15   Q.  Is that a CD?

16   A.  Yes, it is.

17   Q.  Do you recognize that CD?

18   A.  Yes.  I viewed this earlier today.

19   Q.  And how do you know that this is a particular CD that you

20   viewed?

21   A.  Because I initialed it and dated it earlier today.

22   Q.  And what is --

23             MS. MARTINS:  The government offers Government Exhibit

24   507.

25             MR. GAGE:  Your Honor, could we approach briefly?

FC29SKE6                           Cummings – direct

1               THE COURT:  Yes.

2               (Continued on next page)

FC29SKE6                          Cummings - direct

1          (At the sidebar)

2          MR. GAGE:  There's a lot of material here.  I'm not

3    certain exactly what this is, but I'm going to make certain

4    there's nothing relating to the law firm issue on this CD.  I

5    just want to make certain of that.

6          MS. MARTINS:  This is -- we provided to you a while

7    ago -- an excerpt of an interview, sort of like a press gaggle

8    that's happening with the senator as he's leaving a particular

9    event.  She's in it with him.  And he's asked some questions.

10   This is actually the day after the complaint and arrest.  And

11   he's asked some questions about whether there was anything

12   inappropriate about Adam Skelos' involvement with his work.

13   And he answers that question.

14         MR. GAGE:  Just reviewing it.  There is a reference to

15   the law firm in there.

16         MR. MUKHI:  We've redacted it.

17         MS. MARTINS:  Let me just make sure.  I think there's

18   a misunderstanding in the question that's asked to the senator.

19   The reporter asks about Adam Skelos and about whether or not he

20   actually worked or something to that effect.  And the senator

21   responds I worked at my law firm, or something like that.  And

22   then the report -- it's very -- you can't really hear it.  And

23   then the reporter says no, your son.  And he says everything

24   was above board or whatever it is that he says.  So that was --

25   there's nothing explicit about it.  He just misunderstands a

1  question.

2           MR. MUKHI:  There's nothing prejudicial because he

3  says I worked for.

4           MS. MARTINS:  There's nothing prejudicial about it.

5  He did work at a law firm.

6           THE COURT:  What is the objection?

7           MR. GAGE:  That it raises this whole law firm issue,

8  outside income which is not part of the case.

9           MS. MARTINS:  Your Honor, we've already introduced

10  W2s, for example, of the senator that related to his employment

11  at RMF without objection, in fact, pursuant to stipulation.

12  This is the same type of thing.  The fact that the senator just

13  spontaneously says I worked at a law firm or whatever he says.

14           MR. GAGE:  That's to show income.

15           THE COURT:  I overrule the objection.

16           MR. CONNIFF:  Your Honor, I don't know if we're going

17  to get to it in the next ten minutes, but there are a couple of

18  articles, I think, that are coming in.  And they are about the

19  arrest and things like that.

20           MS. MARTINS:  I can stop you because I'm not going to

21  offer any articles except for one article, City & State, which

22  is the senator's own report.  It's basically an interview

23  that's printed, question and answer.

24           MR. CONNIFF:  The four-section thing?

25           MS. MARTINS:  The four-section thing.

FC29SKE6                    Cummings – direct

1            MR. CONNIFF:  I'm just worried about the arrest

2    because there's a lot of --

3            MS. MARTINS:  That's not coming in.  I using it to

4    refresh her recollect of the date of one particular article but

5    nothing is coming in.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC29SKE6                      Cummings - direct

1              (In open court)

2              MS. MARTINS:  The government offers Government Exhibit

3    507.

4              MR. GAGE:  Your Honor, based on our discussion at

5    sidebar.

6              THE COURT:  All right.  I understand.  Government

7    Exhibit 507 is received over objection.

8              (Government's Exhibit 507 received in evidence)

9    Q.  And Ms. Cummings, what is on Government Exhibit 507?

10   A.  It's video of a press gaggle that occurred, I believe,

11   sometime in May in Albany.

12   Q.  May of 2015?

13   A.  Yes.

14   Q.  What is a press gaggle?

15   A.  It's a group of reporters who, after an event, were at an

16   event and wanted to ask Senator Skelos some questions, so

17   gathered around him and as we traveled back to the capitol

18   asked him several questions.

19   Q.  So let me just ask you now in your role as communications

20   director for Senator Skelos were you involved in substantive

21   policy discussions with the senator or other senators?

22   A.  Yes, if it pertained to how it would be perceived by the

23   press or -- yes.  In that regard only.

24   Q.  During the time you were the communications director for

25   Senator Skelos, who had approval authority over quotes and

1    statements issued on his behalf?

2    A.   Senator Skelos.

3    Q.   And is there a difference between a quote and a statement

4    in your line of work?

5    A.   Usually a quote is in response to a single reporter's

6    inquiry and then a statement would be -- it's actually a form

7    of a press release that would be -- is like a giant quote that

8    would be blasted out probably statewide to statewide media.

9    Q.   So you said that Senator Skelos had the ultimate approval

10   authority over anything issued on his behalf; is that right?

11   A.   Yes.

12   Q.   Did he also have approval authority over posts or

13   statements issued on behalf of the Republican Conference?

14   A.   Yes.  But those were issues and policies that were

15   discussed amongst the conference.  Yes.

16   Q.   Now, how did you go about insuring that Senator Skelos

17   approved the statements or quotes that your office issued on

18   his behalf or on behalf of the conference?

19   A.   I would e-mail them to him if he was not in Albany or call

20   him or, you know, read it to him or go down to his office in

21   Albany and show it to him in person.

22   Q.   And were there occasions where he might have changes to a

23   particular quote or statement?

24   A.   Yes.

25   Q.   And how would he communicate that to you?

1    A.  Either e-mailing me back or calling me or just, you know,

2    discussing it with me.

3    Q.  Did you ever issue a statement or policy position or quote

4    that was attributed to the senator that was not personally

5    approved by him?

6    A.  No.

7    Q.  Now once a statement or quote is issued to the press on

8    behalf of the senator or the Republican conference how do you

9    go about making sure that it's accurate?

10   A.  I read the story that would be generated by the quote.

11   Q.  And what was your practice if you found that a statement

12   had been misquoted or a quote had been misquoted?

13   A.  Contact the reporter and point that out.

14   Q.  Would you ask for a correction to be issued?

15   A.  Yes.

16          THE COURT:  Just I'll ask you not to interrupt one

17   another.

18          THE WITNESS:  Sorry.

19   Q.  Now, focusing on March 2011 were you Senator Skelos'

20   communications director at that time?

21   A.  Yes.

22   Q.  And I'd like to show you what's marked for identification

23   as Government Exhibit 1166.

24          MS. MARTINS:  If you could just put that up for the

25   witness and counsel.

FC29SKE6                      Cummings - direct

1    Q.  Do you see that in front of you?

2    A.  Yes.

3    Q.  And do you see that to be an e-mail that contains a news

4    article in it?

5    A.  Yes.

6    Q.  Do you see any quotes from Senator Skelos in that news

7    article?

8    A.  Yes.

9    Q.  And at that time did you have the same practice as you've

10   just described which is that any quote or statement issued has

11   been personally approved by the senator?

12   A.  Yes.

13             MS. MARTINS:  Your Honor, the government offers

14   Government Exhibit 1166.

15             MR. GAGE:  No objection, your Honor.

16             THE COURT:  Government Exhibit 1166 is received

17   without objection.

18             (Government's Exhibit 1166 received in evidence)

19             MS. MARTINS:  If we could just focus on the article.

20   Q.  Ms. Cummings, are you aware of rent control laws that

21   periodically come up for renewal in the Senate?

22   A.  Yes.

23   Q.  Were they up for renewal in 2011?

24   A.  Yes.  I believe so, yes.

25   Q.  Actually let me just -- I am sorry.  Let me focus on the

FC29SKE6                         Cummings - direct

1    top just to get a date.

2              Do you see the date of that e-mail is March 21, 2011?

3    A.  Yes.

4    Q.  And the title of the article contained in the e-mail is:

5    Dean Skelos Separate Rent Laws, Budget.  By Celeste Katz.

6    A.  Mm-hmm.

7    Q.  Are you familiar with Celeste Katz?

8    A.  Yes.

9    Q.  Who is she?

10   A.  She used to write for the Daily News.

11   Q.  She write for the Daily News at this time?

12   A.  No.

13   Q.  Do you know who she wrote for at this time?

14   A.  Presently?

15   Q.  No.  I meant did she write for the Daily News --

16   A.  Yes.  My recollection is yes, she was with the Daily News

17   at that time.

18   Q.  If we look at the bottom of that e-mail it says, "The

19   Senate Leader also hinted that the GOP does not want to further

20   strengthen the laws.  I think the plain extender would be

21   appropriate, he said."

22              Do you see that?

23   A.  Yes.

24   Q.  Was this consistent with the senator's position in 2011 on

25   the rent laws?

1    A.  I honestly do not recall March 2011 what the position was

2    on rent laws, and so.

3    Q.  Was it your practice at that time to issue any corrections

4    if anything was quoted in a way that was not --

5    A.  Yes.

6    Q.  -- consistent with his position?

7    A.  Yes.

8    Q.  Did you ever issue a correction related to this article or

9    this quote that you can recall in 2011?

10   A.  I do not recall that.

11   Q.  Now let's turn to --

12           MS. MARTINS:  You can take that down.

13   Q.  Let's turn to the New York budget.  When is the budget for

14   New York typically approved?

15   A.  March 31.

16   Q.  And is that every year?

17   A.  It has been the last few years since we've been back in the

18   majority.

19   Q.  And was that true for this year's budget, 2015?

20   A.  Yes.

21   Q.  Does the budget in New York typically cover one year, more

22   than one year?

23   A.  One fiscal year.

24   Q.  So the budget that passed this year would be for the fiscal

25   year March 2015 to March 2016?

FC29SKE6                          Cummings - direct

1   A.  Yes.  March 30 -- I'm sorry.  April 1, 2015 to March 31,

2   2016.

3                THE COURT:  I'll ask both of you to slow down.

4   Q.  Now with respect to the budget that was passed this year,

5   approximately when did the Senate start issuing public

6   statements about what the legislative priorities would be for

7   the budget?

8   A.  Formally that is done in response to the governor's budget

9   presentation.  Although we would discuss some of our priorities

10  in interviews before that as well, priorities for the coming

11  year.

12  Q.  And priorities, would it be fair to say, legislation or

13  other things that would be negotiated for in the budget?

14  A.  Yes.  As well as other legislative priorities which are

15  some type -- in response to the governor's State of the State

16  as well.

17  Q.  And during this year's budget negotiation process, did

18  Senator Skelos issue public statements about his positions on

19  the legislative priorities for the upcoming budget

20  negotiations?

21  A.  I'm sorry.  What time period?

22  Q.  For this year's budget negotiation, did Senator Skelos

23  issue statements relating to his priorities prior to the budget

24  being passed?

25  A.  Yes.  He had some media interviews where he did layout some

FC29SKE6                        Cummings - direct

1    of our priorities.

2            MS. MARTINS:  Your Honor, I'm told it's 5:00.  I'll be

3    happy to stop.  I'll be happy to continue.  Whatever the Court

4    would like.

5            THE COURT:  I think it's been a long enough day that

6    we should stop.

7            I remind the jury, as I do every night, please don't

8    read anything about the case.  Don't listen to anything about

9    the case.  And please don't talk about it.

10           Have a good evening.  See you at 10.

11           (Jury excused)

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  Ms. Cummings, you may step down.

 3              (Witness excused)

 4              THE COURT:  Do counsel have anything tonight?

 5              MR. MUKHI:  Your Honor, just with respect to the issue

 6    your Honor raised --

 7              THE COURT:  Please have a seat.

 8              MR. MUKHI:  With respect to the e-mail and the

 9    transcript relating to the governor's daughter.  I guess the

10    government would propose -- I think we'd like to think about it

11    some more if we're going to pursue it further I think we'll put

12    something in in writing and we can have further discussion at

13    that time if appropriate.

14              THE COURT:  Good.  That's good.  Thank you.

15              MR. MUKHI:  Thank you, your Honor.

16              THE COURT:  When did you anticipate getting that to

17    me?

18              MR. MUKHI:  I think we're going to think about it.  We

19    can notify the court tonight about whether we're putting in a

20    letter before tomorrow morning within the next hour or so.

21              THE COURT:  All right.  If the government wants to

22    pursue it, we should meet at say 20 to 10 tomorrow.  Otherwise

23    10 o'clock.

24              Thank you.

25              (Adjourned to December 3, 2015 at 10:00 a.m.)
```

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    BJORNULF WHITE

 4    Direct By Mr. Masimore . . . . . . . . . . .1547

 5    Cross By Mr. Gage  . . . . . . . . . . . . .1550

 6    Cross By Mr. Conniff . . . . . . . . . . . .1610

 7    Redirect By Mr. Masimore . . . . . . . . . .1695

 8    Recross By Mr. Gage  . . . . . . . . . . . .1712

 9    Cross By Mr. Conniff . . . . . . . . . . . .1715

10    JAMES CLANCY

11    Direct By Mr. Mukhi  . . . . . . . . . . . .1716

12    Cross By Mr. Gage  . . . . . . . . . . . . .1738

13    Redirect By Mr. Mukhi  . . . . . . . . . . .1747

14    Recross By Mr. Gage  . . . . . . . . . . . .1749

15     KELLIANN CUMMINGS

16    Direct By Ms. Martins  . . . . . . . . . . .1750

17                       GOVERNMENT EXHIBITS

18    Exhibit No.                            Received

19     212   . . . . . . . . . . . . . . . . . . .1703

20     2110    . . . . . . . . . . . . . . . . . .1719

21     3219    . . . . . . . . . . . . . . . . . .1721

22     3221    . . . . . . . . . . . . . . . . . .1723

23     2113    . . . . . . . . . . . . . . . . . .1726

24     3209-A    . . . . . . . . . . . . . . . . .1726

25     2114    . . . . . . . . . . . . . . . . . .1727
```

 1   2115   . . . . . . . . . . . . . . . . . .1727

 2   3209   . . . . . . . . . . . . . . . . . .1728

 3   2119   . . . . . . . . . . . . . . . . . .1729

 4   2120   . . . . . . . . . . . . . . . . . .1730

 5   2127   . . . . . . . . . . . . . . . . . .1731

 6   3210   . . . . . . . . . . . . . . . . . .1732

 7   3213 and 3214   . . . . . . . . . . . . . .1733

 8   3215, 3217, and 3218   . . . . . . . . . . .1736

 9   507   . . . . . . . . . . . . . . . . . . .1757

10   1166   . . . . . . . . . . . . . . . . . .1760

11                        DEFENDANT EXHIBITS

12   Exhibit No.                              Received

13   LL   . . . . . . . . . . . . . . . . . . .1562

14   2481   . . . . . . . . . . . . . . . . . .1570

15   DS D   . . . . . . . . . . . . . . . . . .1582

16    DS C   . . . . . . . . . . . . . . . . . .1585

17   DS OOOOO   . . . . . . . . . . . . . . . .1590

18   2310   . . . . . . . . . . . . . . . . . .1629

19   2437   . . . . . . . . . . . . . . . . . .1639

20   2438   . . . . . . . . . . . . . . . . . .1646

21   OOO   . . . . . . . . . . . . . . . . . . .1665

22   DS AA   . . . . . . . . . . . . . . . . . .1741

23

24

25