UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA              :

   -v.-                                          :         S1 15 Cr. 317 (KMW)

DEAN SKELOS and ADAM SKELOS,          :

             Defendants.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANTS' PRETRIAL MOTIONS

ROBERT KHUZAMI
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Edward B. Diskant
Thomas A. McKay
Douglas S. Zolkind
Assistant United States Attorneys
     -Of Counsel-

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

  I. THE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR A RULE 6(E) HEARING ARE
BARRED BY LAW OF THE CASE DOCTRINE ........................................................................3

    A. APPLICABLE LAW .............................................................................................................3

    B. DISCUSSION ....................................................................................................................4

      1. The Court Need Not Consider The Defendants' Motion to Dismiss ..............................4

      2. The Court Need Not Consider The Defendants' Rule 6(e) Motion ................................6

  II. THE DEFENDANTS' MOTION TO DISMISS THE INDICTMENT SHOULD BE DENIED ................8

    A. STANDARD FOR MOTION TO DISMISS INDICTMENT .............................................................8

    B. ANY ERROR IN THE GRAND JURY INSTRUCTIONS WAS HARMLESS .....................................10

      1. The Indictment is Facially Valid ................................................................................11

      2. Any Error in the Grand Jury Instructions Does Not Render the Indictment Invalid ...............12

      3. Any Dismissal Would Be Without Prejudice .............................................................17

    C. *MCDONNELL* DOES NOT INVALIDATE THE AS-OPPORTUNITIES-ARISE THEORY ...................18

    D. THE MOTION TO DISMISS THE GRATUITIES CHARGES SHOULD BE DENIED ..........................22

    E. THE DEFENDANTS' REMAINING ARGUMENTS ...................................................................24

  III. THE DEFENDANTS' MOTION FOR A RULE 6(E) HEARING FAILS, AGAIN ...........................25

    A. THE ORIGINAL MOTION ..................................................................................................25

    B. THE INSTANT MOTION ....................................................................................................27

      1. The Additional Articles ..............................................................................................27

        a. The April 16 N.Y. Post Article ...........................................................................28

        b. The April 16 Newsday Article and the April 17 N.Y. Post Article ......................28

        c. The May 2 N.Y. Post Article ...............................................................................29

      2. The Walters Case .......................................................................................................30

    C. APPLICABLE LAW ...........................................................................................................32

    D. DISCUSSION ..................................................................................................................36

      1. The Defendants Fail To Make a Prima Facie Showing That "Matters Occurring Before the Grand Jury"
Were Improperly Disclosed by the Government ..............................................................36

      2. The Defendants Fail To Articulate Any Cognizable Prejudice ....................................41

  IV. THE DEFENDANTS' MOTION TO CHANGE VENUE SHOULD BE DENIED .............................44

    A. APPLICABLE LAW ...........................................................................................................44

    B. DISCUSSION ..................................................................................................................45

      1. Given the Size and Diversity of this District, Voir Dire and Jury Instructions Are Sufficient to Ensure an
Impartial Jury .................................................................................................................45

      2. The Press Coverage In This Case Has Not Displaced the Judicial Process ...............48

      3. The Government's Public Statements Have Not Prejudiced the Defendants ...............50

  CONCLUSION ...........................................................................................................................52

# TABLE OF AUTHORITIES

## Cases

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36 (2d Cir. 2012) .................................... 35, 36

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988)........................................ 10, 13, 34, 35, 41, 43

*Barry v. United States*, 865 F.2d 1317 (D.C. Cir. 1989)........................................................................ 32

*Blalock v. United States*, 844 F.2d 1546 (11th Cir. 1988) (per curiam) ..................................................... 34

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) ................................................................. 9

*Cty. of Suffolk v. Stone & Webster Eng'g Corp.,* 106 F.3d 1112, 1117 (2d Cir. 1997) .............................. 4

*Coleman v. Kemp*, 778 F.2d 1487 n.25 (11th Cir. 1985) ......................................................................... 46

*Costello v. United States*, 350 U.S. 359 (1956) ...................................................................................... 8

*Evans v. United States,* 504 U.S. 255, 268 (1992) ......................................................................... 11, 24

*Garrett v. United States*, 471 U.S. 773 (1985) .................................................................................... 46

*Hamling v. United States*, 418 U.S. 87 (1974) ...................................................................................... 9

*In re Grand Jury Investigation*, 610 F.2d 202 (5th Cir. 1980) .......................................................... 33, 34

*In re Grand Jury Proceedings*, 417 F.3d 18 (1st Cir. 2005) ................................................................... 34

*In re Grand Jury Subpoena*, 103 F.3d 234 (2d Cir. 1999) ................................................................ 33, 34

*In re Grand Jury Subpoena*, 920 F.2d 235 (4th Cir. 1990) ................................................................... 33

*In re Health Mgmt. Sys. Inc. Secs. Litig.*, 113 F. Supp. 2d 613 (S.D.N.Y. 2000)...................................... 35

*In re Sealed Case No. 99-3091*, 192 F.3d 995 (D.C. Cir. 1999) ............................................................ 33

*In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015) ......................................................................................... 50

*In re United States*, 441 F.3d 44 (1st Cir. 2006) ................................................................................... 35

*In re Zarnel*, 619 F.3d 156 (2d Cir. 2010) ........................................................................................... 23

*James v. United States*, No. S297 Cr. 185, 2002 WL 1023146 (S.D.N.Y. May 20, 2002) ........................ 9

*McDonnell v. United States*, 136 S. Ct. 2355 (2016) .... 1, 4, 5, 6, 10, 11, 12, 13, 14, 15, 18, 20, 21, 22, 24

*Murphy v. Florida*, 421 U.S. 794 (1975) ........................................................................................ 49, 50

*Parrish v. Sollecito*, 253 F. Supp. 2d 713 (S.D.N.Y. 2003) ............................................................. 35, 44

*Patton v. Yount*, 467 U.S. 1025 (1984) ............................................................................................... 49

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ........................................................................................... 49

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000) ................................................. 22

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255 (2d Cir. 1995) ..................................................................... 35

*Skilling v. United States*, 561 U.S. 358 (2010) .................................................. 16, 24, 45, 48, 49, 50, 51

*United States v. al Fawwaz*, 98 Cr. 1023 (LAK), 2015 WL 400621 (S.D.N.Y. Jan. 23, 2015) ......... 45, 47

*United States v. Autorino*, 381 F.3d 48 (2d Cir. 2004) ..................................................................... 12, 15

*United States v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006) ...................................... 44, 45, 46, 47

*United States v. Ayala*, 64 F. Supp. 3d 446 (E.D.N.Y. 2014) .......................................................... 45, 46

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) ............................................................................ 23

*United States v. Bell*, 988 F.2d 247 (1st Cir. 1993) ....................................................................... 4, 6, 8

*United States v. Ben Zvi*, 242 F.3d 89 (2d Cir. 2001) ................................................................. 3, 5, 6, 19

*United States v. Blaszczak*, 2018 WL 1322192 (S.D.N.Y. Mar. 12, 2018) .................... 7, 33, 35, 39, 40

*United States v. Botti*, 711 F.3d 299 (2d Cir. 2013) .............................................................................. 13

*United States v. Bowling*, 108 F. Supp. 3d 343 (E.D.N.C. 2015) ........................................................... 17

*United States v. Boyland*, 862 F.3d 279 (2d Cir. 2017) ......................................................................... 24

*United States v. Breslin*, 916 F. Supp. 438 (E.D. Pa. 1996) .................................................................. 15

*United States v. Broward*, 594 F.2d 345 (2d Cir. 1979) .......................................................................... 9

*United States v. Brown*, 602 F.2d 1073 (2d Cir. 1979) ........................................................................... 9

*United States v. Cassellas-Toro*, 807 F.3d 380 (1st Cir 2015) .............................................................. 46

*United States v. Chagra*, 669 F.2d 241 (5th Cir. 1982) ........................................................................ 46

*United States v. Cornielle*, 171 F.3d 748 (2d Cir. 1999) ....................................................................... 13

*United States v. Coyne*, 4 F.3d 100 (2d Cir. 1993) ............................................................................... 18

*United States v. Crozier*, 987 F.2d 893 (2d Cir. 1993) .......................................................................... 23

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) .................................................................. 8, 15

*United States v. Diaz*, 122 F. Supp. 3d 165 (S.D.N.Y. 2015) ............................................................... 22

*United States v. D'Alessio*, 822 F. Supp. 1134 (D.N.J. 1993) ........................................................ 16, 18

*United States v. Dyman*, 739 F.2d 762 (2d Cir. 1984) .......................................................................... 9

*United States v. Eastern Air Lines, Inc.*, 923 F.2d 241 (2d Cir. 1991) .............................................. 34

*United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992) ........................................................................... 34

*United States v. Fattah*, 223 F. Supp. 3d 336 (E.D. Pa. 2016) .......................................................... 20

*United States v. Fields*, 592 F.2d 638 (2d Cir. 1978) ........................................................................... 9

*United States v. Finazzo, No. 10 Cr. 457* (RRM), 2011 WL 3794076 (E.D.N.Y. Aug. 24, 2011) .......... 15

*United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988) ................................................................... 35

*United States v. Gaggi*, 811 F.2d 47 (2d Cir. 1987) ........................................................................... 46

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) .............................................. 11, 18, 19, 22, 23

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985) ...................................................................... 9

*United States v. Gonzalez*, 686 F.3d 122 (2d Cir. 2012) .................................................................... 12

*United States v. Gotti*, 399 F. Supp. 2d 214 (S.D.N.Y. 2005) ...................................................... 46, 47

*United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) ............................................................... 24

*United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983) .......................................................................... 9

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) .......................................................................... 14

*United States v. Jennings,* 160 F.3d 1000 (4th Cir. 1998) ................................................................. 19

*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002) ..................................................................... 15

*United States v. Lawson*, 736 F.2d 835 (2d Cir. 1984) ........................................................................ 4

*United States v. Leeper*, No. 06 Cr. 58A, 2006 WL 1455485, at *5 n.7 (W.D.N.Y. May 22, 2006) ....... 17

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ..................................................... 45

*United States v. Mangano,* No. 16 Cr. 540 (JMA), 2018 WL 851860 (E.D.N.Y. Feb. 9, 2018) ........ 20, 29

*United States v. Mechanik*, 475 U.S. 66 (1986) ........................................................................... 14, 35

*United States v. Menendez,* No. Cr. 15-155, 2018 WL 526746 (D.N.J. Jan. 24, 2018) ..................... 20, 21

*United States v. Miller*, 471 U.S. 130 (1985) .................................................................................... 11

*United States v. Monzon-Luna,* No. 11 Cr. 722, 2014 WL 223100 (E.D.N.Y. Jan. 21, 2014) ................... 9

*United States v. Newman*, 534 F. Supp. 1109 (S.D.N.Y. 1982) ......................................................... 17

*United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y. 2017) ..................................................................... 20

*United States v. Percoco, No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017)* ...... 20, 22

*United States v. Quintieri*, 306 F.3d 1217 (2d Cir. 2002) ..................................................................... 3

*United States v. Rahimi*, 16 Cr. 760 (RMB) ...................................................................................... 47

*United States v. Repak*, 852 F.3d 230 (3d Cir. 2017) ........................................................................ 19

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) ........................................................................ 9

*United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) ................................................................ 32, 34, 37

*United States v. Roman*, 870 F.2d 65 (2d Cir. 1989) ......................................................................... 16

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) ......................................................................... 19

*United States v. Rosen*, 471 F. Supp. 2d 651 (E.D. Va. 2007) ........................................................... 26

*United States v. Rosenthal*, 9 F.3d 1016 (2d Cir. 1993) ..................................................................... 15

*United States v. Roshko*, 969 F.2d 1 (2d Cir. 1992) ........................................................................... 16

*United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010) ..................................................... 45, 49, 50

*United States v. Salameh,* No. 93 Cr. 180 (KTD), 1993 WL 364486 (S.D.N.Y. Sept. 15, 1993) ........... 45

*United States v. Salim*, 151 F. Supp. 2d 281 (S.D.N.Y. 2001) ...................................................... 45, 47

*United States v. Salim*, 189 F. Supp. 2d 93 (S.D.N.Y. 2002) ............................................................ 47

*United States v. Silver,* 15 Cr. 93 (VEC), 2018 WL 1406617 (S.D.N.Y. Mar. 20, 2018) ................. 11, 20

*United States v. Silver*, 864 F.3d 102 (2d Cir. 2017) .......................................................................... 21

*United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017) ......................................... 2, 11, 13, 17, 19

*United States v. Skelos*, No. 15 Cr. 317, 2016 WL 1532253 (S.D.N.Y. Apr. 14, 2016) ............................ 1

*United States v. Skelos*, 2015 WL 6159326 ...................................... 6, 9, 13, 25, 28, 33, 36, 37, 38, 40, 41

*United States v. Stanley*, 54 F.3d 103 (2d Cir. 1995) ........................................................................... 5

iii

*United States v. Stevens*, 83 F.3d 60 (2d Cir. 1996) (per curiam) ............................................... 49

*United States v. Stevens*, 771 F. Supp. 2d 556 (D. Md. 2011) ...................................................... 17

*United States v. Stevenson*, 660 F. App'x 4, 7 n.1 (2d Cir. 2016) ............................................. 14

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ...................................................... 9, 12, 23

*United States v. Suhl*, __ F.3d __ WL 1414227, at *5 (8th Cir. Mar. 22, 2018) ...................................... 19

*United States v. Tenzer*, 213 F.3d 34 (2d Cir. 2000) ...................................................... 6, 7

*United States v. Uccio*, 940 F.2d 753 (2d Cir. 1991) ....................................................... 4

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) ....................................................... 13

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ...................................................... 8

*United States v. Walters*, 16 Cr. 338 (PKC), Dkt. 104 (S.D.N.Y. Mar. 1, 2017)................... 30, 31, 32, 37

*United States v. Webb*, 98 F.3d 585 (10th Cir. 1996) ...................................................... 5, 6, 7

*United States v. Welch*, 248 F. Supp. 2d 1061 (D. Utah 2001) ............................................... 16

*United States v. Yaron,* No. 10 Cr. 363 (GBD), 2011 WL 3279054 (S.D.N.Y. July 28, 2011) ............... 16

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ...................................................... 46, 48, 50

*United States v. Yousef,* No. 93 Cr. 180 (KTD), 1997 WL 411596 (S.D.N.Y. July 18, 1997) .............. 47

*United States v. Yousef,* No. S3 08 Cr. 1213, 2012 WL 691400 (S.D.N.Y. Mar. 5, 2012) ..................... 35

*Yates v. United States*, 354 U.S. 298 (1957) ...................................................... 16

**Rules and Statutes**

18 U.S.C. § 666 ...................................................... 5, 18, 23, 24

Federal Rule of Criminal Procedure 6(e) ...................................................... 32

Federal Rule of Criminal Procedure 7(c)...................................................... 8, 11

Federal Rule of Criminal Procedure 21(a) ...................................................... 45

U.S. Const. art. III, § 2, cl. 3 ...................................................... 44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

  -v.-                                                    :        S1 15 Cr. 317 (KMW)

DEAN SKELOS and ADAM SKELOS,                :

          Defendants.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANTS' PRETRIAL MOTIONS

The United States of America respectfully submits this Memorandum of Law in

opposition to the defendants' pretrial motions.  For the reasons set forth below, the defendants'

motions are without merit and should be denied in their entirety.[1]

### PRELIMINARY STATEMENT

After a month-long jury trial in 2015, defendants Dean Skelos and Adam Skelos were

convicted of all eight counts charging them with public corruption offenses.  As this Court

found, the evidence at trial established that the defendants "followed a brazen pattern of

pressuring, bullying and threatening companies with substantial business before the New York

State Senate, all to force the companies to enrich [Adam Skelos]."  *United States v. Skelos*, No.

15 Cr. 317, 2016 WL 1532253, at *6 (S.D.N.Y. Apr. 14, 2016).

On appeal, the Second Circuit ruled that the intervening Supreme Court decision in

*McDonnell v. United States*, 136 S. Ct. 2355 (2016), rendered the jury instructions on the

---

[1]    The Government is submitting this omnibus response to the defendants' three separate
motions.  Consistent with the Court's individual rules, which allow up to 25 pages for
memoranda in opposition to a motion, the Government has limited this omnibus response to the
defendants' three separate motions to less than 75 pages.

definition of "official act" erroneous.  *United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017) (summary order).  Because the Second Circuit could not conclude that this error was harmless beyond a reasonable doubt, it was "obliged to vacate defendants' convictions in their entirety and remand for a new trial."  *Id.* at 738.  Notably, the Second Circuit rejected the defendants' remaining challenges to their convictions, including by finding that the evidence was "more than sufficient" to withstand their motion for a judgment of acquittal.  *Id.*  Indeed, the Second Circuit noted the "abundant record evidence that Dean Skelos traded his vote for legislation beneficial to PRI and Glenwood in exchange for benefits to his son."  *Id.* at 739.

The Second Circuit remanded the case "for a new trial."  *Id.* at 738.  Yet the defendants now seek much more than a new trial.  They seek to relitigate issues and motions previously considered and rejected by this Court in opinions the defendants chose not to appeal.  For example, the defendants again seek to dismiss the indictment, based on arguments that they could have but chose not to raise on appeal, even though this Court has previously denied such a motion with respect to certain counts, and even though the Second Circuit has found that the evidence is more than sufficient to permit a new trial on all counts.  They also again seek a Rule 6(e) hearing, even though this Court already rejected the exact same motion and the defendants chose not to appeal that decision either.  The Court may reject these arguments based on the law of the case doctrine alone.

These motions also fail on the merits.  The charges that the defendants seek to dismiss are well-grounded in both fact and law and comport with Supreme Court and Second Circuit precedent.  The defendants' Rule 6(e) motion fails for substantially the same reasons this Court denied it several years ago, and no new information has arisen that should cause the Court to reconsider its decision.  And, finally, the defendants have not established that they cannot receive

a fair trial in the Southern District of New York, a venue in which newsworthy cases are tried almost every day.

The defendants' motions should be denied in their entirety.

## I.      THE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR A RULE 6(e) HEARING ARE BARRED BY LAW OF THE CASE DOCTRINE

### A.      Applicable Law

The law of the case doctrine has two distinct, but related, components.  First, under what is more commonly known as the "mandate rule," a defendant is barred from raising "issues previously waived by the defendant or decided by the appellate court."  *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).  "The mandate rule compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court."  *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (internal quotation marks and alterations omitted).  "Likewise, where an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, the mandate rule generally prohibits the district court from reopening the issue on remand unless the mandate can reasonably be understood as permitting it to do so."  *Id.*

Second, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise."  *Quintieri*, 306 F.3d at 1225 (internal quotation marks and citations omitted).  Under the law of the case doctrine, "a decision made at a previous stage of litigation, which could have been challenged in the ensuing appeal but was not, becomes the law of case; the parties are deemed to have waived the right to challenge that decision."  *Ben Zvi*, 242 F.3d at 96

(quoting *Cty. of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997)).[2]

This is because "it would be absurd that a party who has chosen not to argue a point on a first

appeal should stand better as regards the law of the case than one who had argued and lost." *Id.*;

*see also United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993) (explaining that law of the case

doctrine is justified by "important policy considerations" such as "stability in the decisionmaking

process, predictability of results, proper working relationships between trial and appellate courts,

and judicial economy" (internal quotation omitted)).

**B.      Discussion**

**1.   <u>The Court Need Not Consider The Defendants' Motion to Dismiss</u>**

As discussed in Part II, *infra*, the defendants have moved to dismiss the indictment on

various bases.  Each and every one of these arguments, however, was equally available to the

defendants at the time of their appeal.  For example, Points I and II of the defense brief are

principally based on the Supreme Court's decision in *McDonnell*.  (*See* MTD Br. 2-20).[3]  And

*McDonnell* was obviously well-known to the defendants at the time of their appeal, as they

argued that the instructions given to the petit jury were defective as a result of it.  Yet despite

having every incentive and opportunity to do so, the defendants did not raise on appeal the other

*McDonnell*-based arguments they raise now, namely that the instructions given to the grand jury

---

[2] In the context of a remand for a new trial, the waiver provisions of Rule 12 do not bar parties from raising new issues.  *United States v. Lawson*, 736 F.2d 835, 837 (2d Cir. 1984).  But *Lawson* does not concern the law of the case, which continues to apply after remand for a new trial.  *See United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991).

[3] "MTD Br." refers to the defendants' memorandum of law in support of their motion to dismiss (Dkt. 248); "6(e) Br." refers to the defendants' memorandum of law in support of their motion for a Rule 6(e) hearing (Dkt. 251); "Shapiro Decl." refers to defense counsel's declaration in support of the Rule 6(e) motion (Dkt. 252); "Venue Br." refers to the defendants' memorandum of law in support of their motion to change venue (Dkt. 257); and "Ind." refers to the Superseding Indictment in this case (Dkt. 18).

require dismissal of the indictment, or that *McDonnell* invalidates the as-opportunities-arise theory of bribery.  Nor did they argue that Section 666 does not criminalize gratuities (*see id.* at 21-24), that Section 666 is unconstitutional (*see id.* at 24-29), that the honest services fraud statute is unconstitutional (*see id.* at 29-31), or that the Hobbs Act does not cover bribery (*see id.* at 31-32).

This was undoubtedly a strategic decision.  As set forth below, each of these arguments flies in the face of settled Supreme Court and/or Second Circuit precedent.  (Indeed, as to some of these arguments, the defendants concede as much.)  Thus, the defendants chose to make the more modest argument on appeal that the instructions to the petit jury were not harmless beyond a reasonable doubt.  Having made that decision, however, the defendants are now bound by it, and the law is clear that they may not now litigate these other, more ambitious arguments on remand.  *See Ben Zvi*, 242 F.3d at 96 ("The proper time for defendant to have challenged the timeliness of the wire fraud conspiracy charge was on the first appeal when the issue was then ripe for review. She did not do so, and as a result, is foreclosed from raising it now."); *accord United States v. Stanley*, 54 F.3d 103, 107 (2d Cir. 1995).  To permit them to do so would yield the "absurd" result that "a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost."  *Ben Zvi*, 242 F.3d at 96.

None of the "exceptional circumstances" that might justify a departure from the law of the case doctrine exist here.  *See United States v. Webb*, 98 F.3d 585, 587 (10th Cir. 1996) (exceptional circumstances include "a dramatic change in controlling legal authority," "significant new evidence," or that a "blatant error" from a prior decision would result in "serious injustice"); *see also Ben Zvi*, 242 F.3d at 95 (citing *Webb*'s discussion of "circumstances

when departure from mandate rule may be warranted").  There has been no change in controlling

legal authority; as noted, *McDonnell* had been decided by the time of the defendants' appeal and

the current arguments based on *McDonnell* were fully available to the defendants at the time of

the trial in this case.  The defendants do not identify any significant new evidence, and, as set

forth below, there has been no blatant error that must be corrected to prevent "manifest

injustice." *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000).  Nor is this a case of an

"isolated instance of inadvertent oversight on the part of a beleaguered defendant," but rather is

one in which the defendants were represented by "able counsel" who made a strategic decision to

present certain arguments – and only those arguments – to the Second Circuit.  *Bell*, 988 F.2d at

251-52.  They should not be permitted to take the Second Circuit's remand for a new trial as an

opportunity to reopen pretrial issues they could have argued previously, but chose not to.  The

Court can and should deny the defendants' motion to dismiss the Indictment on this basis alone.

## 2.   The Court Need Not Consider The Defendants' Rule 6(e) Motion

The defendants have also moved, a second time, for a hearing to explore alleged leaks of

matters occurring before a grand jury.  Their motion is substantially the same motion that they

made before the first trial.  (Dkt. 22.)  This Court considered that motion in 2015 and denied it in

a detailed opinion.  *See Skelos*, 2015 WL 6159326, at *8-*12.  The defendants then chose not to

appeal that decision.  This Court's prior decision thus constitutes the law of the case, and the

renewed motion should be denied on that basis alone.  *See Ben Zvi*, 242 F.3d at 95-96.

Without addressing the law of the case doctrine, the defendants claim that their renewed

motion is justified by "subsequent developments" including "additional evidence that is now

before this Court and summarized herein."  (6(e) Br. 2).  In fact, the defendants have identified

no evidence that was not available to them when the prior motion was made, nor any intervening

change in controlling law that would justify an exception from the mandate rule or law of the case doctrine.  Rather, as set forth in detail in Part III, *infra*, their claimed "new evidence" consists solely of certain news articles published in April or May 2015, long before the defendants' prior motion was filed and therefore available to them at the time of the motion, and the conduct of a single FBI agent in an unrelated investigation who had no involvement in this case whatsoever.

Neither is the sort of "significant new evidence" that would warrant reopening this Court's prior decision.  *See Webb*, 98 F.3d at 587 (exceptional circumstances include "a dramatic change in controlling legal authority" or "significant new evidence"); *Tenzer*, 213 F.3d at 39 (requiring "an intervening change in controlling law" or "the availability of new evidence").  Nor would either excuse the defendants' failure to appeal that prior ruling.  Indeed, the defendants make no argument as to why the purportedly "new" articles and alleged leaks they rely upon in the instant motion were not included in their prior motion.  Nor do they articulate any reason for their failure to appeal this Court's decision denying that prior motion in its entirety.

Once again, the defendants made a strategic decision not to appeal this Court's ruling on their original Rule 6(e) motion – presumably because, as set forth below, they did not and cannot make the requisite showing including, among other things, a showing of cognizable prejudice or identification of an available remedy, both fatal to the instant motion.  *See, e.g.*, *United States v. Blaszczak*, 17 Cr. 375 (LAK), 2018 WL 1322192 (S.D.N.Y. Mar. 12, 2018).  Having chosen to accept this Court's prior ruling – by not challenging it on appeal – they should not be permitted to relitigate the same issues a second time.[4]

---

[4] It bears mention, in this respect, that the law of the case doctrine exists to promote finality, and to protect against the prejudice that arises not only from having to relitigate issues previously decided but also from the passage of time.  *See, e.g.*, *Bell*, 988 F.2d at 250.  As discussed further

## II.     THE DEFENDANTS' MOTION TO DISMISS THE INDICTMENT SHOULD BE DENIED

The defendants move to dismiss the indictment on numerous grounds, each of which is contrary to settled Supreme Court and/or Second Circuit precedent.  The motion should be denied.

### A.     Standard For Motion to Dismiss Indictment

The law is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).  Accordingly, dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted).

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1)) (alterations omitted).  "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v.*

---

herein, when the defendants' original motion was made, the Government interviewed all of the lawyers and case agents assigned to the investigation, and submitted an affidavit indicating each of their denials of providing information to the media.  Now, some three years after the media reports in question, the defendants' instant motion for a Rule 6(e) hearing is not only meritless but would raise hardships for potential witnesses, including for a majority of the Assistant U.S. Attorneys then assigned to the case who no longer work for the Government, and the original FBI case agents, many of whom have moved on to other assignments in other FBI offices around the country.

*United States*, 418 U.S. 87, 117 (1974)); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).  On a pretrial motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, the allegations of the indictment must be taken as true.  *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

"The Second Circuit has previously described dismissal of an indictment as 'the most drastic remedy available' and an 'extreme sanction,' and has noted that dismissals have been upheld 'only in very limited and extreme circumstances,' and should be 'reserved for the truly extreme cases,' 'especially where serious criminal conduct is involved.'"  *Skelos*, 2015 WL 6159326, at *1 (S.D.N.Y. Oct. 20, 2015) (quoting *United States v. Fields*, 592 F.2d 638, 647 (2d Cir. 1978) and *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979)); *see also United States v. Monzon-Luna*, No. 11 Cr. 722, 2014 WL 223100, at *1 (E.D.N.Y. Jan. 21, 2014) ("Dismissal of an indictment because of defects in grand jury proceedings is 'the most drastic remedy, and thus is rarely used.'" (quoting *United States v. Dyman*, 739 F.2d 762, 768 (2d Cir. 1984)).  This remedy "has been applied only in extreme situations" such as "flagrant and unconscionable acts" by the prosecutor.  *James v. United States*, No. S297 Cr. 185, 2002 WL 1023146, at *12 (S.D.N.Y. May 20, 2002) (quoting *United States v. Hogan*, 712 F.2d 757, 761-62 (2d Cir. 1983)); *see also United States v. Brown*, 602 F.2d 1073, 1077 (2d Cir. 1979) (dismissal of indictment is an "exceptional" remedy that "must be reserved for the truly extreme cases" such as where "the pattern of misconduct is widespread or continuous" (internal citation omitted)).

Before dismissing an indictment for errors in grand jury proceedings, the Court must find that such errors prejudiced the defendant.  *Bank of Nova Scotia v. United States*, 487 U.S. 250,

254 (1988).  In this context, prejudice may be found only "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations."  *Id.* at 256 (internal quotations omitted).

## B.     Any Error in The Grand Jury Instructions Was Harmless

In the Second Circuit, the defendants successfully argued that the instructions given to the petit jury on the definition of "official act" were erroneous, and that the Government could not prove beyond a reasonable doubt that the error was harmless.  They now seek to take that argument much further by arguing that if the same instructions were given to the grand jury, then the indictment must be dismissed in its entirety.   (MTD Br. 2-14).  The Court need not review the instructions given to the grand jury on the definition of official act, however, because even assuming that the instructions were erroneous,[5] the defendants' motion would be meritless.  This is because the indictment sufficiently alleges a *quid pro quo* agreement involving official action, and the defendants' speculation about the basis for the indictment ignores critical differences between the grand jury and the petit jury, including the applicable burden of proof and the effect of the grand jury's findings when it returns an indictment.  Moreover, even if the defendants' motion were deemed meritorious, the law is clear that any dismissal would be without prejudice; the defendants have not argued otherwise, and the "remedy" would simply be for the Government to seek a superseding indictment.

---

[5] To be clear, the Government is not conceding that the instructions given to the grand jury were erroneous.  The Court simply need not review the instructions, for the reasons stated below.

1. <u>**The Indictment is Facially Valid**</u>

The indictment is facially valid.  Each of the charged bribery counts "requires a *quid pro quo* agreement, that is, a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority."  *Skelos*, 707 F. App'x at 738.  And while an "official act" must be the object of the corrupt agreement, it is settled that the law does not require that an official act in fact be taken.  *See McDonnell*, 136 S. Ct. at 2370-71 (citing *Evans v. United States*, 504 U.S. 255, 268 (1992)).  Nor does it require that any specific official act be identified at the time of the corrupt agreement is made.  *See United States v. Ganim*, 510 F.3d 134,142-43 (2d Cir. 2007); Part III, *infra*.  Thus, it is plainly sufficient for the indictment to simply allege that there was a *quid pro quo* agreement for official action, without necessarily listing each specific official act that Dean Skelos took or agreed to take.  *See* Fed. R. Crim P. 7(c); *United States v. Miller*, 471 U.S. 130, 136 (1985) (indictment sufficient if "the crime and the elements of the offense that sustain the conviction are fully and clearly set out").  To the extent that the defendants are contending that *McDonnell* somehow raises the bar for pleading, these arguments are misplaced.  As Judge Caproni recently explained in denying a similar motion:  "*McDonnell* involved the definition of 'official action' as used in jury instructions for bribery charges, and made no law as to what an indictment must allege."  *United States v. Silver*, 15 Cr. 93 (VEC), 2018 WL 1406617, at *7 (S.D.N.Y. Mar. 20, 2018).

For each of the bribery counts, the indictment adequately alleges a *quid pro quo* involving an agreement to take official action.  *See* Ind. ¶ 32 (as to Count One, defendants caused entities to "direct payments to ADAM SKELOS with the expectation that DEAN SKELOS would take official actions favorable to their interests"); ¶ 35 (as to Count Two, object of conspiracy was that Dean Skelos "would take official action in return for payments to his son"); ¶ 37 (as to Count Three, defendants caused a business "to make and direct payments to ADAM

SKELOS in exchange for official actions by DEAN SKELOS"); ¶¶ 39, 41 (as to Counts Four

and Five, defendants caused businesses "to make payments to ADAM SKELOS in exchange for

official actions by DEAN SKELOS"); ¶¶ 43, 45, 47 (as to Counts Six through Eight, defendants

"solicited and accepted cash and things of value . . . intending for DEAN SKELOS to be

influenced").  The indictment is therefore sufficient to call for trial on the charges contained

therein.  *See Stringer*, 730 F.3d at 124; *see also United States v. Gonzalez*, 686 F.3d 122, 132 (2d

Cir. 2012) (indictment sufficient where "[t]he text of the indictment gives the necessary

assurance that the grand jurors knew and agreed to charge *that which the text describes*"

(emphasis added)).  To the extent that any of the factual allegations in the speaking portion of the

indictment describe as "official" acts that are no longer so under *McDonnell*, those superfluous

allegations do not constitute a basis for dismissing the indictment, but are at worst the sort of

"harmless surplusage" that may be stricken or simply not submitted to the jury.[6]  *United States v.*

*Autorino*, 381 F.3d 48, 54 (2d Cir. 2004) (error to dismiss indictment based on allegations that

are superfluous to essential elements of the offense, because such allegations "did not negate the

other, appropriately pleaded allegations, which satisfactorily allege violation of the pertinent

sections").

## 2. Any Error in the Grand Jury Instructions Does Not Render the Indictment Invalid

Notwithstanding its facial validity, the defendants speculate that the grand jury's decision

may have been based on improper legal instructions.  But even assuming that the defendants'

speculation about the content of the instructions were correct, the defendants misapprehend the

---

[6] Indeed, at the first trial, the version of the indictment the Court read to the jury and sent back
for the jury to consider in its deliberations redacted everything but the statutory allegations.
(Trial Tr. 2760).  The Government presumes the Court will follow the same practice at the
retrial, meaning that any such "harmless surplusage" could not possibly impact the jury.

legal standard necessary to invalidate an indictment on this basis.  When a petit jury is erroneously instructed and returns a general guilty verdict, the conviction is vacated unless it is "clear *beyond a reasonable doubt*" that the jury would have convicted absent the error.  *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) (emphasis added).  By contrast, errors occurring before the grand jury may result in dismissal of the indictment only "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is *grave doubt* that the decision to indict was free from the substantial influence of such violations."  *Bank of Nova Scotia*, 487 U.S. at 256 (emphasis added).  Put differently, in the petit jury context, the error is presumed to be prejudicial unless the court finds – by a very demanding standard – that it was not; by contrast, in the grand jury context, the indictment is presumed to be valid and will stand unless the court has grave doubt as to whether the decision to indict was untainted by the alleged error.  *See also United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999) (indictment brought within limitations period enjoys a "strong presumption of validity").  This is why dismissal of an indictment is a remedy used "only in very limited and extreme circumstances," and is "reserved for the truly extreme cases.'"  *Skelos*, 2015 WL 6159326, at *1 (citations omitted).

The defendants fall far short of meeting this heavy burden.  As an initial matter, the Second Circuit has already held that, even after *McDonnell*, the evidence adduced at trial was "more than sufficient" for a rational trier of fact to find the essential elements of the crimes charged in the indictment beyond a reasonable doubt.  *Skelos*, 707 F. App'x at 738.  In so holding, the Second Circuit necessarily found that the evidence was not in mere equipoise.  *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 522 (2d Cir. 2015).  By contrast, probable cause—the standard for a grand jury to indict – requires only a "probability or substantial chance of criminal

activity," and thus is "a lower standard than preponderance of the evidence." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). It cannot be that the evidence was sufficient to convict the defendants beyond a reasonable doubt of the charges in the indictment, yet there is "grave doubt" about the grand jury's finding of probable cause. *Cf. United States v. Mechanik*, 475 U.S. 66, 67 (1986) (holding that "a jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted," despite argument that the evidence presented to the grand jury should not be compared to evidence presented to petit jury).

Moreover, the defendants' speculation about the basis of the grand jury's decision to indict is defeated by the indictment itself, which includes a detailed recitation of the acts performed by the defendants, many of which are undoubtedly "official." For example, the grand jury specifically alleged that Dean Skelos "promoted and voted for various real estate legislation sought by and favorable to" Glenwood (Ind. ¶ 27(c)), "pressured Nassau County officials (i) to obtain additional funding so that work on the Nassau County Contrat could progress, and (ii) to make payments to [Abtech]," (*id.* ¶ 27(e)), and "supported legislation critical to [PRI's] business, including the renewals in 2012 and 2015 of legislation that gives special protection to medical practice insurers from being liquidated by New York State even when operating a negative balance," (*id.* ¶ 27(h)). Each of these acts undoubtedly remains an "official act" under *McDonnell*. *See McDonnell*, 136 S. Ct. at 2368-70 (pressuring another official to take official action); *United States v. Stevenson*, 660 F. App'x 4, 7 n.1 (2d Cir. 2016) (proposing legislation is an official act).[7] Accordingly, it is clear from the face of the indictment that the grand jury found

---

[7] The defendants claim that the reference to "support[ing] legislation" beneficial to PRI is not official action if the phrase "refers to simply expressing support for legislation in those same lobbyist meetings." (MTD Br. 9). But as they well know, Dean Skelos *voted for* the legislation

that Dean Skelos took actions that included undisputed official actions (even though the grand jury was not required to do so), and those findings defeat the defendants' instant motion. *See United States v. Breslin*, 916 F. Supp. 438, 445-46 (E.D. Pa. 1996) (noting that a grand jury "must return an indictment only if they have probable cause to believe that the persons named in the indictment did the things described in the indictment" and finding error in an instruction that the grand jury may return an indictment even if it does not "agree with each and every sentence"); *see also De La Pava*, 268 F.3d at 162 (indictment failed to specifically allege that defendant was an alien, but was nevertheless sufficient in light of other factual allegations); *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) ("[A]n indictment must be read to include facts which are necessarily implied by the specific allegations made.") (internal quotations omitted); *United States v. Finazzo*, No. 10 Cr. 457 (RRM), 2011 WL 3794076, at *5 (E.D.N.Y. Aug. 24, 2011) (rejecting argument that indictment failed to allege actual or contemplated harm, because indictment "as a whole" made such allegation implicit).

The Court therefore need not speculate whether any error in the jury instructions would have substantially influenced the grand jury's vote and caused it to indict based solely on meetings. The grand jury's findings that Dean Skelos took specific actions that constitute "official acts" even after *McDonnell* demonstrate that any error did not affect its ultimate

---

beneficial to PRI. And though the defendants' quotation omits this, the indictment itself makes this clear, when, in the same sentence, it specifies that the legislation in question was renewed in 2012 and 2015. (Ind. ¶ 27(h)). That the indictment uses the word "support" rather than the more specific "voted for" is not a basis to dismiss the indictment, particularly given that the performance of such an official act is not a requirement. *See Autorino*, 381 F.3d at 54 (error to dismiss indictment based on allegations that are superfluous to essential elements of the offense); *United States v. Rosenthal*, 9 F.3d 1016, 1023 (2d Cir. 1993) ("allegations in an indictment that go beyond the essential elements which are required for conviction do not increase the Government's burden"); *see also De La Pava*, 268 F.3d at 162 ("An indictment . . . need not be perfect, and common sense and reason are more important than technicalities.").

decision.  *See United States v. Yaron*, No. 10 Cr. 363 (GBD), 2011 WL 3279054,at *4 (S.D.N.Y.

July 28, 2011) (rejecting motion to dismiss indictment after *Skilling* where indictment

"specifically alleges activities that fall squarely within the meaning of 'kickback'").  Because the

grand jury returned an indictment that specifically included their finding of probable cause to

believe that the schemes charged entailed conduct that unquestionably remains an official act

even post-*McDonnell*, there cannot be "grave doubt" that the indictment was based on meetings

alone.[8]

        The cases cited by the defendant do not require a different result.  The defendants identify

two out-of-district cases that purportedly support their argument that charges based in part on a

valid legal theory and in part on an invalid legal theory must be dismissed because it is

impossible to tell upon which theory the grand jury relied.  (MTD Br. 8).  The first case on which

they rely fails to cite the applicable "grave doubt" standard and indeed fails to cite any relevant

legal authority for its holding that the inclusion of an improper legal theory on the intangible

rights fraud charge "may have also played a part in the [grand] jury's decision to indict on the

tangible rights fraud charges."  *United States v. D'Alessio*, 822 F. Supp. 1134, 1145 (D.N.J.

1993).  The second case similarly fails to cite the "grave doubt" standard, cites only *D'Alessio*

for its conclusion that the inclusion of the erroneous legal theory "may have influenced the grand

jury's decision," and was in any event reversed on appeal.  *United States v. Welch*, 248 F. Supp.

---

[8] In this regard, the jury's return of the indictment is not like a petit jury's return of a general verdict, in which "the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."  *Yates v. United States*, 354 U.S. 298, 312 (1957).  Rather, it is more like a petit jury's return of a special verdict, which permits "an assessment of whether the jury's determination of guilt rested on a permissible basis."  *United States v. Roman*, 870 F.2d 65, 73 (2d Cir. 1989); *see also United States v. Roshko*, 969 F.2d 1, 4 (2d Cir. 1992) (jury's finding on special interrogatory regarding overt acts "in effect determined that the statute of limitations did not bar the prosecution").

2d 1061, 1064-65 (D. Utah 2001), *rev'd* 327 F.3d 1081 (10th Cir. 2003).  Moreover, neither of

these cases were, like *Skelos*, cases in which the Court of Appeals had already concluded that the

evidence was sufficient for a jury to convict the defendants on the charges in the indictment.

They are both inapposite and unpersuasive.

### 3. <u>Any Dismissal Would Be Without Prejudice</u>

Finally, while the defendants repeatedly claim that the indictment must be dismissed,

they fail to mention that any dismissal would be *without prejudice*.  The law is clear in this

respect, *see, e.g.*, *United States v. Newman*, 534 F. Supp. 1109, 1111 (S.D.N.Y. 1982), as even

the cases relied upon by the defendants illustrate, *see, e.g.*, *United States v. Bowling*, 108 F.

Supp. 3d 343, 353 (E.D.N.C. 2015) (dismissing without prejudice because government's

erroneous legal instruction was made in good faith); *United States v. Stevens*, 771 F. Supp. 2d

556, 568 (D. Md. 2011) (same); *United States v. Leeper*, No. 06 Cr. 58A, 2006 WL 1455485, at

*5 n.7 (W.D.N.Y. May 22, 2006) (dismissal without prejudice where no bad intent by

prosecutors because the remedy is to restore defendant to position he would have been in absent

violation).  The defendants do not, and cannot, claim that the Government acted in bad faith in

instructing the grand jury, as the defendants themselves argue that the instruction they assume

the Government provided was an accurate reflection of the state of Second Circuit law when the

instruction was given.  (*See* MTD Br. 6 ("At the time of the indictment in 2015, Second Circuit

precedent imposed virtually no limits on the definition of official action.")).

It would be a truly absurd result for an indictment to be dismissed *with prejudice* when

the indictment was returned based on an instruction that all agree would have been consistent

with then-existing binding precedent, and when the Second Circuit has already found that there

is sufficient evidence for a reasonable jury to convict the defendants even after the change in

law.  Thus, even if the Court were inclined to dismiss the indictment – which, for the reasons set

forth above, it should not – the Government should be permitted to resubmit the indictment to a

the grand jury with appropriate instructions.  *See D'Alessio*, 822 F. Supp. at 1136 (dismissing

indictment because of erroneous legal instruction but stating that it may be resubmitted without

reference to improper instruction).

**C.**     ***McDonnell* Does Not Invalidate the As-Opportunities-Arise Theory**

The defendants next argue that, to be guilty of the bribery counts, Dean Skelos must have

"agreed to act on a specific official matter at the time he allegedly solicited or accepted

payments" for Adam Skelos (MTD Br. 14-18), and that the indictment and the grand jury

instructions were both deficient in this regard (*id.* at 18-20).  This argument is contrary to

binding Second Circuit precedent.

In *United States v. Ganim*, the Second Circuit addressed "whether proof of a government

official's promise to perform a future, but unspecified, official act is sufficient to demonstrate the

requisite quid pro quo for a conviction" for Hobbs Act extortion, honest services fraud, or federal

programs bribery under Section 666 – the same crimes charged in this case.  510 F.3d 134, 141-

42 (2d Cir. 2007); *see also id.* at 144-45 (noting that the defendant "claim[ed] that th[e]

instruction misled the jury as to what establishes a quid pro quo under the Hobbs Act, because it

did not require the jury to find 'that any of the benefits received were connected to a 'specific'

act'").  The Second Circuit observed that it had previously "explained that 'the government does

not have to prove an explicit promise to perform a particular act made at the time of payment,'"

and that, "[i]nstead, 'it is sufficient if the public official understands that he or she is expected as

a result of the payment to exercise particular kinds of influence—*i.e.*, on behalf of the payor—as

specific opportunities arose.'"  *Id.* at 144 (quoting *United States v. Coyne*, 4 F.3d 100, 114 (2d

Cir. 1993)).   The court further noted that "in order to establish the *quid pro quo* essential to

proving bribery, 'the government need not show that the defendant intended for his payments to

be tied to specific official acts (or omissions).'"  *Id.* at 148 (quoting *United States v. Jennings*, 160 F.3d 1000, 1014 (4th Cir. 1998)).  Accordingly, the Second Circuit held that "that the requisite quid pro quo for the crimes at issue may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise."  *Id.* at 142.  There is no ambiguity in the law of this Circuit:

> We have made it crystal clear that the federal bribery and honest services fraud statutes that [the defendant] was convicted of violating criminalize schemes involving payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise, even if the opportunity to undertake the requested act has not arisen, . . . and even if the payment is not exchanged for a particular act but given with the expectation that the official will exercise particular kinds of influence.

*Unietd States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (internal quotations marks, citations, and brackets omitted).

The "as opportunities arise" principle articulated in *Ganim* and *Rosen* – sometimes called the "retainer theory" – remains good law.  Indeed, the Second Circuit cited this well-established principle in rejecting the defendants' sufficiency arguments in this case.  *Skelos*, 707 F. App'x at 738 (quoting the above passage from *Rosen*).[9]  The defendants attempt to brush this fact off in a footnote by stating the the parties did not litigate this precise issue on appeal.  (MTD Br. 17 n.5). That is precisely why they are precluded under the law of the case doctrine from pursuing it now. *See Ben Zvi*, 242 F.3d at 96 ("[I]t would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost.").

---

[9] Other courts of appeals have also continued to apply the as-opportunities-arise theory after *McDonnell.  See, e.g.*, *United States v. Repak*, 852 F.3d 230, 251 (3d Cir. 2017); *United States v. Suhl*, __ F.3d __, 2018 WL 1414227, at *5 (8th Cir. Mar. 22, 2018).

Regardless, the argument fails on the merits as well, because *McDonnell* does nothing to undermine the well-established principles quoted above.  Indeed, every court to have considered the argument that *McDonnell* invalidates the as-opportunities-arise theory has rejected it.  *See, e.g.*, *United States v. Silver*, 2018 WL 1406617, at *4 (S.D.N.Y. Mar. 20, 2018); *United States v. Mangano*, No. 16-CR-540, 2018 WL 851860, at *4 (E.D.N.Y. Feb. 9, 2018); *United States v. Menendez*, No. Cr. 15-155, 2018 WL 526746, at *3-5 (D.N.J. Jan. 24, 2018); *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *5 (S.D.N.Y. Dec. 11, 2017); *United States v. Fattah*, 223 F. Supp. 3d 336, 363 (E.D. Pa. 2016); *see also United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y. 2017), Trial Tr. at 3789-92, 4238 (in which defense counsel argued that the as-opportunities-arise theory is "no long viable under *McDonnell*" and sought to strike the language from the jury charge, but was denied).  As Judge Caproni recently explained in rejecting this very argument:

> Defendants again misread *McDonnell* in arguing that the Supreme Court found the "retainer theory" of bribery impermissible and that the acts to be performed must be specified at the time of the quid pro quo agreement.  The Court did no such thing.  *McDonnell* held only that the matter on which official action is *ultimately* taken must be specific and focused, as evidenced by the contrast the Court drew between acts taken to further "Virginia business and economic development" (too diffuse to be an "official act") and the decision to initiate research studies (sufficiently focused to be an "official act").

*Percoco*, 2017 WL 6314146, at *5.

In making the argument, the defendants attempt to cobble together disparate quotes from *McDonnell* to suggest that it held something that it manifestly did not.  As this Court is well aware, *McDonnell* concerned the definition of "official act."  The Supreme Court held that an official act must be taken on a matter that is "specific and focused" – not a broad policy objective like the "Virginia business and economic development" campaign at issue in that case. *McDonnell*, 136 S. Ct. at 2374.  One will search the opinion in vain, however, for the place

where the Court "made clear that the public official must agree to exercise power of this sort on a

'focused and concrete' matter that is specifically 'identified' at the time of the corrupt bargain."

(MTD Br. 15).  That quote comes from the defendants' brief, not *McDonnell*, and is supported

not by any complete quotation but by a smattering of words and phrases taken out of context

from four different pages of the opinion.  (MTD Br. 15).[10]  As another court noted in rejecting a

similar effort to "manufacture" such a holding from *McDonnell*:

> Defendants point to two statements from *McDonnell* and argue that, taken together, they
> impose a strict nexus requirement between *quid* and *quo*. First, they identify the statement
> that the factfinder must "determine whether the public official agreed to perform an
> 'official act' at the time of the alleged quid pro quo." *McDonnell*, 136 S.Ct. at 2371. They
> then point to *McDonnell*'s holding that an official act "must also be something specific and
> focused that is 'pending' or 'may by law be brought' before a public official." *Id.* at 2372.
>
> From these statements, Defendants manufacture a temporal requirement at odds with the
> stream of benefits theory: that the official act that is the object of a *quid pro quo* must be
> "specific and focused" and identified at the time the agreement is made. But the two
> passages Defendants quote from *McDonnell* are distinct. The Government has always been
> required to prove that a public official "agreed to perform an 'official act' at the time of
> the alleged quid pro quo." . . . That the official acts ultimately taken by the public official
> must be "specific and focused" under *McDonnell* in no way imposes a requirement that
> they be precisely identified at the time the agreement is made.

*Menendez*, 2018 WL 526746, at *3-4.   Put differently, the Supreme Court's holding that the

matter on which official action is required must be *specific* (as in "not diffuse") says nothing

about whether the official action must be *specified* (as in "determined") at the time of the corrupt

agreement.  *McDonnell* concerns the *quo*, not the *pro*.

---

[10] The defendants' attempt to argue that the Government conceded as much is specious. (MTD
Br. 15 n. 5).  The quoted passage from the Government's appellate brief describes how the
Court's instructions were consistent with the notion that an official act must be specific and
focused; it did *not* suggest – just as *McDonnell* did not suggest – that the specific act must be
identified at the time of the corrupt agreement.  Similarly misleading is the defendants' quotation
from the *Silver* opinion, in which the defendant elides two sentences in an attempt to make them
say something that they clearly do not.  *See* MTD Br. 17 (quoting *United States v. Silver*, 864
F.3d 102, 119 (2d Cir. 2017)).

The defendants' attempt to invoke constitutional concerns is equally unpersuasive.  As the Supreme Court itself held in *McDonnell*, those constitutional concerns were remedied by the narrowed definition of official act.  136 S. Ct. at 2375.  And as the Second Circuit has already explained, the defendants' preferred reading of the law "would legalize some of the most pervasive and entrenched corruption, and cannot be what Congress intended." *Ganim*, 510 F.3d at 147; *see also Percoco*, 2017 WL 6314146, at *5 n.4 ("Whether a government official takes a bribe for a specific act known at the time the bribe is paid or takes a bribe to compromise the public good as the opportunity arises to assist the bribe-giver is of no moment—both are corrupt and both corrode the very foundation of good government.").

In sum, there is no basis in *McDonnell* to suggest that it in any way undermines the well-established viability of the as-opportunities-arise theory.  The Supreme Court "does not normally overturn . . . earlier authority *sub silentio*," *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000), and this Court is bound to follow a precedential opinion by the Second Circuit "unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit."  *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015) (internal quotation omitted).  This Court should join every other court to have considered the argument the defendants make here and reject it.

Because the defendants are wrong that *McDonnell* invalidates the as opportunities arise theory, their arguments that the indictment is deficient on this basis (MTD Br. 18-20) and that the grand jury must have been improperly instructed (*id.* at 20) necessarily fail.

**D.       The Motion to Dismiss the Gratuities Charges Should Be Denied**

The defendants next argue that the "gratuity charges must be dismissed because § 666 does not prohibit gratuities," but they also concede that the Second Circuit has squarely held that

Section 666 *does* prohibit illegal gratuities.  (MTD Br. 21-22).  *See Ganim*, 510 F.3d at 150;

*United States v. Bahel*, 662 F.3d 610, 636 (2d Cir. 2011); *United States v. Crozier*, 987 F.2d 893

(2d Cir. 1993).  Because this precedent remains controlling law unless and until it is overruled by

the Second Circuit sitting *en banc* or by the Supreme Court, this argument should be rejected.

*See In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010).

     Nor is there any merit to the defendants' claim that the indictment "does not adequately

allege that any of the payments were, in fact, illegal gratuities."  (MTD Br. 23.)  The argument

confuses the issue of what the Government must allege in the Indictment with the issue of

whether the Government will be able to prove the allegations at trial.  *See Stringer*, 730 F.3d at

124 ("An indictment is sufficient if it . . . contains the elements of the offense charged and fairly

informs a defendant of the charge against which he must defend" (quotation omitted)).

     The Indictment alleges, in pertinent part, that Dean Skelos, aided and abetted by Adam

Skelos, engaged in the "[s]olicitation of . . . [g]ratuities" by soliciting and accepting things of

value from Glenwood, AbTech, and PRI, during particular timeframes, "intending for [Dean

Skelos] to be . . . rewarded."  (Ind. ¶¶ 42-43 (Count Six); ¶¶ 44-45 (Count Seven); and ¶¶ 46-47

(Count Eight).)  Each count also alleges the other requisite elements of a Section 666 violation.

(*Id.*)  Although nothing more is necessary to establish the sufficiency of the illegal gratuity

allegations, the Indictment actually provides significantly more information.  For instance, it

alleges that Dean Skelos promoted and voted for legislation favorable to Glenwood (Ind. ¶¶

27(b), 27(c)) and other legislation favorable to PRI (Ind. ¶ 27(h)); that he pressured local

officials to obtain additional funding (Ind. ¶ 27(e)); that he did so not only in exchange for the

illegal payments to Adam Skelos but also "to ensure [such payments] would continue" (Ind.

¶ 27); and that during the same time period, Glenwood, AbTech, and PRI directed various

payments and benefits to Adam Skelos (*e.g.*, Ind. ¶¶ 8(a) – 8(c), 13-16, 19, 25).  No more specificity (indeed, much less) is required to withstand a motion to dismiss.

## E.   The Defendants' Remaining Arguments

The defendants contend that if the Government argues that *McDonnell* does not apply to the Section 666 charges in this case, those charges should be dismissed because they are unconstitutional.  (MTD Br. 24-29.)  Yet, as the defendants correctly note, the Government has already provided notice, in writing, that in an abundance of caution, the Government expects to request the Court to instruct the jury on the key principles of *McDonnell* in connection with the Section 666 counts.  (*Id.* at 25.)  Their motion is therefore moot.[11]

The defendants raise two additional arguments that they concede are barred by controlling precedent: (1) that the honest-services fraud statute is unconstitutionally vague (MTD 29-31), and (2) that the Hobbs Act does not prohibit bribery (*id.* at 31-32).  The honest services fraud statute is not unconstitutionally vague.  *McDonnell*, 136 S. Ct. at 2375; *Skilling v. United States*, 561 U.S. 358, 409 (2010); *United States v. Halloran*, 664 F. App'x 23, 26 (2d Cir. 2016).  And the Hobbs Act does prohibit bribery.  *Evans*, 504 U.S. at 268.  Given this controlling and squarely applicable precedent, the defendants' arguments should be rejected.

---

[11] To be clear, the Government does not concede that *McDonnell*'s definition of "official act" must be used in Section 666 cases, because, among other reasons, Section 666's plain text refers to a "business, transaction or series of transactions" rather than an "official act," and Section 666 applies to private parties for whom an official act requirement would be non-sensical.  *See United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (stating that "we do not see that the *McDonnell* standard applied to" the Section 666 counts in that case).  But for present purposes, the Court need not resolve an academic debate about the constitutionality of Section 666 absent the limiting principles described in *McDonnell*.  The Court can determine the precise way to apply *McDonnell*'s limiting principles to Section 666 in connection with the jury instructions.

**III.     THE DEFENDANTS' MOTION FOR A RULE 6(E) HEARING FAILS, AGAIN**

Next, the defendants ask the Court for a second time for a Rule 6(e) hearing.  While

acknowledging, as they must, that "this Court previously denied this relief because the motion

the defendants filed before the first trial failed to show that government sources had disclosed

any matters occurring before the grand jury," (6(e) Br. 2), the defendants assert that "subsequent

developments" warrant revisiting that opinion.  As noted above, the defendant's motion should

be denied based on the law of the case doctrine.  But even if the motion is reviewed anew and

analyzed under the demanding standard applicable to motions for reconsideration, it is meritless.

**A.     The Original Motion**

The original motion filed by the defendants on September 4, 2015 alleged that the

Government had improperly leaked grand jury information to the press and sought a hearing

pursuant to Rule 6(e).  (Dkt. 22 (the "Original Motion")).   The Original Motion focused on three

media reports – a January 29, 2015 report by WNBC News (the "January 29 WNBC Report");

an April 15 article in the *New York Times* (the "April 15 NYT Article"); and a May 1, 2015

article in the *Wall Street Journal* (the "May 1 WSJ Article") – as well as an April 2, 2015 letter

from a reporter at the *New York Times* to Adam Skelos which sought comment on a series of

specific issues relevant to the investigation (the "April 2 NYT Letter") (collectively, the

"Original Reports").

In denying that motion, this Court concluded that the defendants had failed to make the

requisite showing for two separate, but equally fatal reasons.  First, this Court found that none of

the Original Reports cited by the defendants reflected the disclosure of "matter[s] occurring

before a grand jury."  *Skelos*, 2015 WL 6159326, at *10.  In particular, this Court rejected, as

insufficient to establish a Rule 6(e) violation, reports about the fact of a grand jury investigation,

or the fact that subpoenas had issued to particular individuals because those details "do not

25

clearly pertain to the 'secret aspects of the inner workings of the grand jury.'" *Id.* (quoting *United States v. Rosen*, 471 F. Supp. 2d 651, 654 (E.D. Va. 2007)).  The Court also found that disclosures about the Government's investigation of the defendants, including the subjects of the investigation, and investigative steps being taken by the Government did not establish "matter[s] occurring before a grand jury" because the "Government was conducting its own investigation outside the grand jury" at the time, and disclosures about that investigation would not amount to "a violation of grand jury secrecy." *Id.*

Second, the Court found that the defendants "failed to demonstrate that the Government was the source of any of these alleged disclosures." *Id.* at *11.  The Court noted that, during the relevant time period, the Government issued more than 100 subpoenas to third parties and interviewed approximately 20 witnesses, meaning that "[t]here were hundreds of individuals not covered by Rule 6(e) who would have had information about the existence and aspects of the investigation, and who could have provided this information to members of the press." *Id.* at *12.  The Court also noted that the Government had submitted an affidavit on behalf of "all government attorneys 'in charge of the prosecution and who attended the grand jury presentations, as well as case investigating agents and investigators' affirming that none of them spoke to any member of the press about information relating to the investigation." *Id.* at *11; *see also* (Dkt. 27-1 ("Martins Aff.") ¶¶ 13-16.).

Accordingly, the Court denied the defendants' request for "discovery or a hearing on this issue," adding that, as a consequence, the Court found it unnecessary to consider whether the defendants had suffered any prejudice from any of the alleged disclosures. *Id.* at *12.

**B.      The Instant Motion**

In the Instant Motion, the defendants reiterate many of the claims made based on the

Original Reports – claims which, as discussed above, this Court has considered and rejected.  In

asking the Court to revisit that ruling, the defendants add two "new" arguments, which they

contend require a different result.  First, they argue that the Court should consider four additional

new reports, all of which were published between April 16 and May 2, 2015 and thus were

unquestionably available to the defendants at the time of the Original Motion.  Second, they

suggest that the acts of a lone FBI agent in an unrelated case somehow have relevance here, even

though the agent in question had no involvement in this case.

**1.   The Additional Articles**

As noted, the defendants principally rely upon four additional press reports from April or

May 2015.  Noting that two of the four articles source at least some information to "law

enforcement sources" and a third refers to a "government source briefed on the case," the

defendants assert that these additional articles demonstrate that the Government – *i.e.*, the United

States Attorney's Office or the FBI – was the source of leaks about the substance of Nassau

County Executive Edward Mangano's grand jury testimony and the "Grand Jury's Impending

Indictment."  (6(e) Br. 6-7, 9.)[12]

---

[12] The defendants also refer, at various points, to statements and reports this Court has already concluded do not amount to "matters occurring before the grand jury."  For example, the defendants refer to certain statements of then-U.S. Attorney Preet Bharara at a press conference in January 2015 about an investigation into Dean Skelos (*E.g.*, 6(e) Br. 3-4.)  As an initial mater, it must be noted that the defendants' descriptions of these statements are extraordinarily misleading.  (*E.g. id.* at 3 (pasting together completely disparate phrases from distinct sentences to give the false impression that Bharara specifically accused Skelos of misconduct, when in fact Bharara referred not to any particular individual but instead to a commonly cited statistic about how often state senators in New York are expelled from office by voters rather than by arrest).  In any event, as this Court has previously held, disclosures about the Government's own investigation do not run afoul of Rule 6.  Moreover, the grand jury did not even begin hearing

a.   The April 16 N.Y. Post Article

First, the defendants highlight an April 16, 2015 article in the *New York Post* entitled "Skelos grand jury Eyed in contract for firm that hired son" (the "April 16 N.Y. Post Article") (attached as Exhibit A).  This article principally reiterated previously reported information about the investigation, citing "a report in the *New York Times*" for example, in reporting that the investigation was focused on "Skelos' relationship with an Arizona contracting company that hired Skelos' son" and citing unidentified "sources" as noting that the investigation was looking at a payment "by a title insurance company" to Adam Skelos "for which he never worked."  (Ex. A.)  The article also referred to publicly available information, including information obtained from a website for the title company in question.  Finally, the article included the following: "Law-enforcement sources told The Post that state senators have been subpoenaed in the investigation, and evidence has been presented to a grand jury."  (Ex. A.)  The article also noted that the U.S. Attorney's office "declined to comment."  (Ex. A.)

b.   The April 16 Newsday Article and the April 17 N.Y. Post Article

Second, the defendants highlight an April 16, 2015 article in *Newsday* that reports on the grand jury appearance of Nassau County Executive Edward Mangano (the "April 16 Newsday Article" (attached as Exhibit B)), and an April 17, 2015 article in the *New York Post* about same (the "April 17 N.Y. Post Article" (attached as Exhibit C)).  The *Newsday* article reported that Mangano had appeared before the grand jury.  Citing unspecified "sources," the article reported that Mangano – who was, at the time, under investigation himself for unrelated conduct – "did not appear to be a target of the investigation and there was no suggestion that he had done

---

evidence in this case until April 2015 (Martins Aff. ¶ 8), thereby making it impossible for any public statements in January to reveal any "secret aspect of the inner workings of the grand jury."  *Skelos*, 2015 WL 6159326, at *10 (internal quotations omitted).

anything wrong, the sources said. He was questioned mostly about procedures and facts, such as what contracts had been let and who had bid on them, the sources said."  (Ex. B.)[13]

The following day, the April 17 N.Y. Post Article ran, also reporting on Mangano's grand jury appearance.  Citing a "government source briefed on the case," the article reported that "County Executive Ed Mangano . . . appeared before the secret panel last week and was asked about various contracts signed by the county."  (Ex. C.)  No other information in the article was attributed to the "government source."  However, the article did quote for attribution one "government source," *i.e.*, Mangano's official spokesperson at the Nassau County Executive's Office, who apparently told the Post that Mangano "and the county have been notified they are not targets of the investigation."  (Ex. C.)  Finally, the article simply cited "sources" in reporting that "Nassau County's highest-ranking official and nearly all of Long Island's state senators have been subpoenaed as part of a federal grand-jury probe targeting" the defendants.  (Ex. C.)

c.   The May 2 N.Y. Post Article

Finally, the defendants highlight a May 2, 2015 article in the *New York Post* which erroneously reported that the grand jury planned to indict the defendant "as early as" the following Monday (the "May 2 N.Y. Post Article") (attached as Exhibit D).  This article stated that "law enforcement sources told the Post" that "a federal grand jury is planning to indict [Dean Skelos] on corruption charges . . . It is not clear what specific charges will be filed against

_____

[13] Mangano was ultimately indicted himself on unrelated corruption charges by a grand jury sitting in the Eastern District of New York.  *See United States v. Mangano et al.*, 16 Cr. 540 (JMA).  His trial is currently in progress.

Skelos . . ., but an arrest may come as early as Monday. . . . Also to be indicted is Skelos' son,

Adam."  (Ex. D.)  No other information in the article is attributed to a "law enforcement source."

As discussed further below, and as the defendants own motion amply demonstrates, the

reporting in that article was *wrong*.  While the criminal complaint was unsealed "as early as

Monday" May 4, the grand jury was still hearing evidence at that time.  Indeed, the Government

had not even begun to present the bulk of its evidence to the grand jury as of May 2, (*e.g.*,

Shapiro Decl. Exs. 5-7), and, as is now matter of public record, the grand jury did not vote to

return an Indictment until May 28, nearly a month later.

## 2.   The Walters Case

Next, the defendants argue that the "prosecutorial misconduct here is not an isolated

incident" but is instead part of a more "systematic and pervasive violation[] of grand jury

secrecy."  (6(e) Br. 11.)  In support of this claim, the defendants rely solely on *United States v.*

*Walters*, 16 Cr. 338 (PKC), a case in which, as defense counsel well knows, there was no finding

of "prosecutorial misconduct."  In that case, a lone FBI agent who principally supervised

securities fraud investigations admitted to the United States Attorney's Office ("USAO") that he

had leaked sensitive information about a number of investigations to financial reporters at the

*New York Times* and the *Wall Street Journal*.  Judge Castel specifically found that the leaks by

that agent were not only "unauthorized," but that the agent in question, David Chaves, took

significant steps to conceal them from both his supervisors at the FBI and representatives of the

U.S. Attorney's Office, including using his personal cell phone to make his calls harder to trace;

deleting a personal email account he used to communicate with one of the reporters; and initially

lying when asked about his involvement in the leaks.  *Walters*, Dkt. 104 (S.D.N.Y. Mar. 1, 2017)

("Walters Op."), at 6-7, 10.[14]

Consistent with the unauthorized nature of the conduct, upon its discovery, the

Government immediately referred the matter to the Department of Justice's Public Integrity

Section, which opened a criminal investigation.  (*Id.* at 2.)  However, and of considerable

relevance here, even on those facts, Judge Castel ultimately denied the defendant's motion

---

[14] The Government notes a pattern of misstatements and mischaracterizations of fact in the defendants' brief, some of which require direct response.  First, the defendants assert that in *Walters* the government "took responsibility for what it now admits was an 'outrageous' and 'reprehensible' *pattern of prosecutorial misconduct*." (6(e) Br. 11-12 (emphasis added)).  This is false.  There was no admission, let alone finding, of prosecutorial misconduct in *Walters*, and the quotations the defendants lift entirely out of context reflect just the opposite, that is, the seriousness with which prosecutors took the leaks at issue.  For example, the reference to "outrageous" conduct comes from an email sent by then-U.S. Attorney Preet Bharara to senior leadership at the FBI New York Office reacting to one of the original leaks, and stating: "I know you agree these leaks are *outrageous and harmful*.  Let me know what action you want to take together." (Dkt. 65-6) (emphasis added).

Similarly false are the assertions that the leaks in *Walters* were made "with the tacit approval of the USAO." (6(e) Br. 13). As noted above, the U.S. Attorney himself expressed unequivocal frustration and concern about the leaks at the time, a fact Judge Castel noted in declining to grant relief in *Walters*, and it was the USAO that discovered the agent's involvement in the leaks and thereafter immediately referred him to the Department's Office of Inspector General for potential criminal prosecution.  (Walters Op. 2, 10, 19-20.)

The defendants further state that "the government admitted that, over the past decade, the FBI's New York Office systematically and pervasively violated Rule 6(e)." (6(e) Br. 11.)  This is also false.  To the contrary, Judge Castel found "[n]o evidence . . . that others besides Chaves were illegally sharing information with the press."  (Walters Op. 19.)  Similarly false is the assertion that it was "undisputed" in *Walters* that leaking information "has become part of the government's investigative playbook." (Rule 6(e) Br. 12)  That claim quotes a highly disputed assertion from the *defendant's brief* in *Walters*, although one would not realize that from the manner in which it is portrayed in the defendants' brief in this case.

These blatant and repeated mischaracterizations are particularly troubling given that, as noted above, one of the attorneys for defendant Dean Skelos is now counsel of record in *Walters*, and thus should be familiar with the actual facts.

because the defendant made no showing of "cognizable prejudice" stemming from the leaks.  (*Id.* at 20.)

Chaves, who, as noted above, worked principally with securities fraud investigations, had no involvement in the investigation or prosecution of this case.  The reporters he admitted to leaking sensitive information to – Matthew Goldstein and Ben Protess at the *New York Times* and Susan Pulliam and Michael Rothfield of the *Wall Street Journal* – wrote none of the articles highlighted by the defendants in either the Original Motion or the instant motion.  Moreover, as Judge Castel found in denying the motion in *Walters*, "[n]o evidence has been presented indicating that others besides Chaves were illegally sharing information with the press."  (*Id.* at 19).  As such, neither *Walters* nor the conduct of Chaves is of any discernable relevance to the instant motion, and aside from conclusory and entirely unfounded assertions about "pattern[s] of prosecutorial misconduct" – assertions starkly belied by the actual record in *Walters* – the defendants make no argument to the contrary.

## C.     Applicable Law

The rule of grand jury secrecy prohibits the disclosure of "a matter occurring before the grand jury" by, among others, "[a] grand juror, an interpreter, a court reporter, an operator of a recording device, a person who transcribes recorded testimony, [or] an attorney for the government," absent certain exceptions not relevant here.  Fed. R. Crim. P. 6(e).  To warrant a hearing on an alleged violation of the Rule, "the defendant must establish a *prima facie* case" that (1) matters occurring before the grand jury have been disclosed, and (2) that the source of the disclosure was a prohibited party.  *United States* v. *Rioux*, 97 F.3d 648, 662 (2d Cir. 1996) (citing *Barry* v. *United States,* 865 F.2d 1317, 1321 (D.C. Cir. 1989)).  Moreover, because relief for an alleged Rule 6 violation is only available to a defendant who can demonstrate cognizable

prejudice, requests for a hearing are properly denied where no such showing has been made. *See, e.g.*, *Blaszczak*, 2018 WL 1322192 at \*6-\*7.

With respect to the first prong, while the rule itself does not define "a matter occurring before the grand jury," as this Court has previously explained, not every disclosure regarding a grand jury establishes a violation of the Rule. *See Skelos*, 2015 WL 6159326, at \*10-11; *see also In re Sealed Case No. 99-3091*, 192 F.3d 995, 1001-02 (D.C. Cir. 1999) (Rule 6 does not require that a "veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury.")  Instead, "the rule protects only the essence of what takes place in the grand jury room, in order to preserve the freedom and integrity of the deliberative process," and, as such, the Rule is intended to prevent disclosures "that would reveal some secret aspect of the inner workings of the grand jury." *Skelos*, 2015 WL 6159326, at \*9 (internal quotations omitted); *see also id.* ("At its core, Rule 6(e)(2) protects from disclosure evidence that is actually presented to the grand jury.").

Moreover, the Rule does not apply to information obtained independently of the grand jury process, even if the same information might later be presented to the grand jury. *See, e.g.*, *In re Grand Jury Subpoena*, 103 F.3d 234, 238-29 (2d Cir. 1999); *Skelos*, 2015 WL 6159326, at \*10-11.  Similarly, "information produced by criminal investigations paralleling grand jury investigations does not constitute matters 'occurring before the grand jury' if the parallel investigation was truly independent of the grand jury proceedings." *In re Grand Jury Subpoena*, 920 F.2d 235, 242 (4th Cir. 1990); *see also In re Grand Jury Investigation*, 610 F.2d 202, 217 (5th Cir. 1980) ("the disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule 6(e)").  The determination of whether something occurring before a grand jury for purposes of Rule 6(e) is

thus a "fact-specific inquiry." *In re Grand Jury Subpoena*, 103 F.2d at 239.

With respect to the second prong, if a defendant shows that news articles contained actual matters occurring before a grand jury, then the court looks to whether the cited articles reveal the source of the information to be one proscribed by Rule 6(e). For example, Rule 6(e) "does not prevent disclosures by a witness who testifies before the grand jury." *In re Grand Jury Investigation*, 610 F.2d at 217; *accord In re Grand Jury Proceedings,* 417 F.3d 18, 26 (1st Cir. 2005). It also "does not protect from disclosure information obtained from a source other than the grand jury, even if the same information is later presented to the grand jury." *United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991) (quoting *Blalock v. United States*, 844 F.2d 1546, 1551 (11th Cir. 1988) (*per curiam*)). The Court must also weigh any evidence presented by the Government to rebut allegations of a Rule 6(e) violation. *See, e.g.*, *Rioux*, 97 F.3d at 662. The Government's evidence typically is presented in the form of an affidavit from the prosecuting attorneys. *Id.* (holding that District Court properly considered the government attorney's affidavit in finding that the defendant did not make a *prima facie* showing) (citing cases); *see also In re Grand Jury Investigation*, 610 F.2d at 219 ("[t]he inability to show a definite source for some of the information contained in the articles might cause a prima facie case to fail if a responsive affidavit denying the allegations is made").

Finally, because an alleged violation of Rule 6(e) should not result in "granting a windfall to an unprejudiced defendant," a defendant must establish specified, cognizable prejudice in order to warrant relief. *Bank of Nova Scotia*, 487 U.S. at 263. The Second Circuit has made clear that "a defendant seeking . . . a hearing regarding alleged grand jury abuse *must show prejudice or bias*." *United States v. Eisen*, 974 F.2d 246, 261 (2d Cir. 1992) (emphasis added). Because a violation of Rule 6(e), if established, "is one affecting the grand jury proceeding and is

not in any sense a trial error[,] . . . the logical focus of the harmless error inquiry is an examination of the influence of the error on the charging decision."  *Mechanik*, 475 U.S. at 76 (O'Connor J., concurring in the judgment).  Thus, relief "is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations."  *Bank of Nova Scotia*, 487 U.S. at 256 (internal citations omitted).  By contrast, where a defendant "fail[s] to articulate any cognizable theory of prejudice," denial of the motion without a hearing is appropriate on that basis.  *See, e.g.*, *United States v. Blaszczak*, 2018 WL 1322192, at *6; *see also United States v. Friedman*, 854 F.2d 535, 583-84 (2d Cir. 1988) (same); *In re United States*, 441 F.3d 44, 64 (1st Cir. 2006) ("Dismissal of the indictment is not appropriate when secrecy violations 'could not have affected the [grand jury's] charging decision.'") (quoting *Bank of Nova Scotia*, 487 U.S. at 259-60)).

Motions for reconsideration are governed by Local Civil Rule 6.3.  *See United States v. Yousef*, No. S3 08 Cr. 1213, 2012 WL 691400, at *2 (S.D.N.Y. Mar. 5, 2012).  Reconsideration of a decision is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."  *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (quoting *In re Health Mgmt. Sys. Inc. Secs. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).   Accordingly, a motion for reconsideration should be denied unless the moving party "can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  As the Second Circuit has explained, a motion for reconsideration is not a "vehicle for relitigating old issues, presenting the case under new theories . . . or otherwise taking a second bite at the apple."  *Analytical Surveys,*

*Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012).

**D.     Discussion**

Here, the defendants cannot meet their burden of establishing their entitlement to a hearing for at least two reasons.  *First*, they cannot make a *prima facie* showing that matters occurring before the grand jury were improperly disclosed by the Government.  *Second*, even if they could, they cannot demonstrate any form of cognizable prejudice that would entitle them to relief should they prevail at such hearing.  The defendants' motion is simply an attempt to take "a second bite at the apple."  *Analytical Surveys, Inc.*, 684 F.3d at 52.  It should again be denied.

**1.     The Defendants Fail To Make a Prima Facie Showing That "Matters Occurring Before the Grand Jury" Were Improperly Disclosed by the Government**

As an initial matter, and as noted above, to the extent the instant motion seeks to rely on the same four reports cited in the Original Motion, those claims can and should be rejected out of hand.  This Court has already found, among other things, that those reports did not contain disclosures of "matters occurring before the grand jury" within the meaning of Rule 6.  *Skelos*, 2015 WL 6159326, at *10-11.  The defendants offer no reason to disturb that finding, which renders immaterial the source of the alleged "leaks."

With respect to the additional articles highlighted for the first time by the defendants in support of the instant motion, as noted, the defendants generally assert that they support a finding that the Government leaked information about (1) the "Testimony and Identity of Witnesses," namely Edward Mangano, (6(e) Br. 6), and (2) the Grand Jury's "impending indictment" (*Id.* at 9.)  Neither claim withstands scrutiny.

With respect to the former, the defendants rely principally on the April 16 Newsday Article – which, as noted above – cites "sources" in describing the contents of Mangano's testimony and the April 17 N.Y. Post Article which cites a "government source *briefed on the*

*case*" in reporting the same.  While the Government does not dispute that the substance of

Mangano's testimony constitutes a "matter occurring before the grand jury," it does dispute that

any such disclosure came from an individual bound by Rule 6(e).  As an initial matter, and as

noted above, the Court has an affidavit submitted on behalf of every Assistant U.S. Attorney

involved in that grand jury presentation and the then-Chief of the Public Corruption Unit denying

any involvement in leaking information to the media.   That weighs strongly against a finding

that a "government source" affiliated with the prosecution was responsible for the leak.  *See, e.g.*,

*Rioux*, 97 F.3d at 662; *Skelos*, 2015 WL 6159326, at *11.[15]

Indeed, the articles on their face give rise to the far more likely inference that the

information was coming from "government source" of an entirely different (and non-law

enforcement) variety:   someone affiliated with Mangano, himself a government official, albeit

one not restricted by the secrecy provisions of Rule 6(e).  In particular, the *Newsday* "source"

appeared to have a vested interest in making clear that Mangano "did not appear to be a target of

the investigation and there was no suggestion that he had done anything wrong."  Tellingly, both

that "source" and the "government source" cited by the Post used the same witness-oriented

articulation – *i.e.*, describing what Mangano "was asked about" – and limited their disclosure of

---

[15] It bears mention, in this respect, that in its initial response to the motion made in *Walters*, the Government submitted an affidavit that was considerably narrower in focus than the affidavit submitted in this case.  The "Kasulis Declaration" filed in *Walters* and highlighted by the defendants in the instant motion included representations by only one attorney for the Government and one agent at the FBI.  After Judge Castel ordered a hearing in that case, the Government expanded the scope of its inquiry, which resulted in the interview of Chaves, among others.  It was through those interviews that the Government learned of Chaves' involvement in the leaks.  (*See* 16 Cr. 338, Dkt. 65).  By contrast, in this case, the Government conducted a more thorough range of interviews immediately in response to the motion, and the Martins Affidavit submitted in this case reported the results of interviews of every member of the investigative team, including five attorneys for the Government, two investigators, and four agents at the FBI involved in the investigation, all of whom formally denied any involvement in providing information to the media.

the contents of his testimony to information utterly benign to Mangano.  The Newsday "source,"

for example, apparently said Mangano was "asked about various Nassau County contracts . . . He

was questioned mostly about procedures and facts."  The "government source" cited by the Post

similarly relayed that Mangano was "asked about various contracts signed by the county."[16]  On

these facts, and particularly in light of the Martins Affidavit, which included representations

from every member of the prosecution team who was present at the Mangano grand jury

proceeding, there can be no prima facie showing that these leaks came from a (federal)

Government source or person bound by the prohibitions of Rule 6.

    With respect to the April 16 N.Y. Post Article – and its report that "Law enforcement

sources told The Post that state senators have been subpoenaed in the investigation, and evidence

has been presented to a grand jury" – while such disclosures by law enforcement, if they in fact

occurred,[17] would be not be appropriate, this Court has previously concluded that substantively

---

[16] Getting that message out would likely have been of considerable interest to Mangano, who was himself publicly criticized when initial reports indicated that the Government was examining the Nassau County contract with AbTech.  Indeed, as the *Newsday* article alludes to and other contemporaneous news reports detail more fully, the Nassau County District Attorney's Office also announced its intention to have its public corruption bureau investigate the county's decision to enter into the AbTech contract.  *See, e.g.*, Timothy Bolger, "Reports or Probe Into Dean Skelos Spark Nassau Inquiry," *Long Island Press*, Apr. 16, 2015.

[17] It bears noting that the defendants' arguments also rest on assumptions about the accuracy and precision of reporting that may be unrealistic.  Whether a "law enforcement source" is federal, state or county, connected to the investigation or not, or whether a "government source" is one affiliated with the grand jury investigation or, as described above, affiliated with a distinct "government" body, are all distinctions of real significance in this context, but a journalist or editor working on a news story may not draw those distinctions as finely.  Indeed, as discussed below with respect to the Post's report about the grand jury's "plan[] to indict," journalists or sources can and do confuse or mischaracterize information (i.e., whether the defendants imminent arrest will be on an indictment or complaint) simply because the distinctions at issue here are of far less meaning or relevance to them.  In this respect, the Government further notes that the Post story specifically noted that the USAO "declined to comment" when questioned about the substance of the article.  *See Skelos*, 2015 WL 6159326, at *11 (noting that "at least one [article at issue in the prior motion] explicitly states that the U.S. Attorney's Office and FBI representatives declined to comment").

identical reporting did not violate Rule 6 because it did not reveal the "secret aspect of inner workings of the grand jury."  *Skelos*, 2015 WL 6159326, at *9 (quotations omitted).  Indeed, the April 15 NYT Article highlighted in the Original Motion – and expressly cited as a source of the April 16 Post Article at issue – had previously reported the same information. (Dkt. 25 Ex. J at 2.)

The final article noted by the defense is the May 2 N.Y. Post Article, which reported, as noted above, that "law enforcement sources told the Post" that "a federal grand jury is planning to indict [Dean Skelos] on corruption charges . . . It is not clear what specific charges will be filed against Skelos . . ., but an arrest may come as early as Monday. . . . Also to be indicted is Skelos' son, Adam."  No other information in the article is attributed to a "law enforcement source."

The principle problem with the defendants' reliance on the May 2 article is that the information ostensibly attributed to "law enforcement sources" is wrong.  As is now a matter of public record, the grand jury did not make the decision to return an indictment until May 28, 2015, or nearly a month after the "sources" quoted in the *Post* speculated that the grand jury was "planning to indict" and that charges would be announced shortly.  Indeed, as the attachments to the defendants' motion make clear, as of May 2, the Government had not even begun to present the bulk of its evidence to the grand jury, let alone asked the grand jury to consider returning an indictment.  To the contrary, those presentations, made principally through the testimony of a case agent, began on May 19 and occurred over several days, concluding on May 26. Accordingly, and as Judge Kaplan recently noted in denying a similar motion, while it is "not absolutely impossible that" a Government source would "leak incorrect information," the "far simpler and overwhelmingly more likely conclusion is that the source . . . was not a government

agent but, instead . . . some person 'familiar' with incomplete information [who] speculated incorrectly to a reporter." *Blaszczak,* 2018 WL 1322192, at \*5.

As the Court is aware, the defendants were, in fact, arrested the following Monday, May 4, but they were arrested pursuant to a *criminal complaint*. As such, another entirely plausible inference is that Post reporter mistakenly understood information disclosed about the impending charges in the criminal complaint to be information about the actions of a grand jury. To the extent information about the criminal complaint was disclosed by a law enforcement source, that would of course have been inappropriate, but as this Court has concluded, the criminal complaint "is not a matter occurring before the grand jury and therefore its disclosure cannot form the basis of a Rule 6(e) violation." *Skelos*, 2015 WL 6159326, at \*11. Accordingly, the May 2 N.Y. Post Article does not form the basis for a *prima facie* showing of a Rule 6 violation since no material covered by the Rule's secrecy provisions was disclosed.

Finally, the fact that a single FBI agent, who had no involvement in this investigation or prosecution, leaked information in a completely unrelated case, does nothing to support the defendants' attempt to establish a *prima facie* violation here. The FBI's New York Field Office has more than 1,000 agents working in more than 100 different "squads" devoted to various types of criminal investigation. The suggestion that because one agent – David Chaves – leaked information in one case, all other leaks in other cases investigated by the FBI are attributable to him or to the Government more generally is preposterous. Indeed, Judge Kaplan recently rejected a similar argument in a case that, unlike this one, was investigated by the very same group that Chaves supervised. *See Blaszczak*, 2018 WL 13322192, at \*5 & n.3 ("[W]hatever Chaves previously had done with regard to the Walters Investigation does not add materially to the likelihood that Chaves was the source of anything in the 2016 Article because the Walters

disclosures occurred much earlier.").  Applied to *this* case, which was investigated by an entirely separate group of the FBI and in which Chaves undisputedly had no involvement, the argument is even more meritless.

### 2.  The Defendants Fail To Articulate Any Cognizable Prejudice

The defendants' motion should be denied without a hearing for the independent and alternative reason that they cannot demonstrate prejudice.  As noted, because the alleged violation is one affecting the grand jury proceeding, relief is appropriate *only* "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (internal citations omitted).  The defendants cannot meet that burden.

In an effort to establish prejudice from the alleged leaks, the defendants suggest that the Government "parlayed the illicit leaks into additional evidence" that the Government then presented to the grand jury.  (6(e) Br. 10).  That argument is meritless for at least three reasons.

*First*, the "evidence" allegedly derived from the "leaks" in fact substantially *predated* all but one of the alleged leaks at issue.[18]  For example, the defendants highlight a call intercepted on January 30, 2015, in which defendant Adam Skelos discussed, in substance, the "need to lay low" in light of the recent "press attention to corruption issues."  (*Id.* (citing Shapiro Decl. Ex. 5 at 46-47.))  Similarly, and based on the same call, a Government witness testified that Adam Skelos "change[d] the way he communicated on the phone" as a result of, among other things

---

[18] That one alleged leak is the January 29, 2015 News 4 report.  But this Court has already found that the defendants could *not* demonstrate that this report contained material occurring before the grand jury, *Skelos*, 2015 WL 6159326, at *10, and as such, the defendants "reactions" to them, cannot amount to prejudice from a Rule 6(e) violation.

including as the recent arrest of Sheldon Silver, "the articles about Dean Skelos being

investigated." (*Id.*) (citing Shapiro Decl. Ex. 5 at 49.)  But January 30, 2015 was a matter of

months *before* the alleged leaks raised in the instant motion, such that these calls can in no sense

be the product of any Rule 6(e) violation.

The defendants also highlight evidence about a call intercepted in March 2015 and

testimony about how the defendants developed a "new strategy" to illicitly benefit Abtech in

return for the no-show job Adam Skelos was given.  This, too, occurred well before the alleged

leaks at issue here.  Similarly, the defendants note that the grand jury heard testimony that Adam

Skelos' departure from AFP – which also occurred in March 2015 – "coincided with 'public

reports of investigations of the defendants."  (*Id.*) (quoting Shapiro Shapiro Decl. Ex. 7 at 29-31.)

But because all of these pieces of evidence pre-dated the alleged leaks of grand jury material,

they cannot possibly have "tainted" the grand jury and its decision to indict.

*Second*, the defendants' brief obscures the fact that the consciousness of guilt evidence at

issue was not solely the product of media reports regarding the Skeloses, but was also driven by

– and described to the grand jury as reactive to – unrelated media reports that caused the

defendants to change their behavior.    Indeed, January 30, 2015 – the date of the first call

highlighted by the defendants – was just days after the former Speaker of the Assembly Sheldon

Silver was arrested on corruption charges.  As the grand jury testimony in full makes clear, the

relevant witness testified that the defendants' changed behavior and "need to lay low" came in

response to a series of events that collectively focused attention on public corruption issues,

including not just the News 4 Report about the Skeloses (which, again, did not contain grand jury

information), but also Silver's arrest and a contemporaneous announcement by Governor Cuomo

about "significant ethics reform in New York State". (*E.g.*, Shapiro Decl. Ex. 5 at 45-46.)  There

was thus no suggestion to the grand jury – nor any rational inference to be drawn more generally – that the defendants' conduct was being motivated uniquely or exclusively by the press coverage of this investigation.  Thus, even if the defendants could demonstrate a Rule 6(e) violation, it is speculative to state that such violation "generated" the evidence in question.

*Third*, the consciousness of guilt evidence that the media coverage of public corruption did provoke formed a very small fraction of the multi-month presentation of evidence to the grand jury.  Indeed, the evidence cited by the defendants comprises in total just 10 pages of grand jury testimony all generally regarding just two intercepted calls.  That is a tiny fraction of the evidence presented to the grand jury, which heard testimony from nine witnesses over ten days (resulting in approximately 500 pages of testimony, in total), and saw and heard more than 60 exhibits.  While the Government does not believe there was anything remotely improper about the manner in which the evidence at issue was gathered or presented to the grand jury, it simply blinks reality to suggest that the allegedly tainted evidence "substantially influenced the grand jury's decision to indict."  *Bank of Nova Scotia*, 487 U.S. at 256.

In sum, the defendants have not demonstrated prejudice, nor could they given the posture of the case.  Indeed, as the defendants themselves argue in their motion to dismiss the Indictment, "several years have passed since the grand jury returned the Indictment, and the matters [occurring] before the grand jury have already been the subject of a public trial and appeal.  Very little of what the grand jury heard or did remains secret."  (MTD Br. 13).

*     *     *

Because the defendants fail to make a *prima facie* showing that matters occurring before the grand jury were disclosed by the Government, and because the defendants fail to establish any prejudice (and thus any remedy they might plausibly be entitled to through a hearing), they

have once again failed to meet the standard for a hearing, and in no event have they established

that this is a case warranting the "extraordinary remedy" of reconsideration of the Court's prior

decision. *Parrish*, 253 F. Supp. 2d at 715. The motion should be denied once again.

## IV.   THE DEFENDANTS' MOTION TO CHANGE VENUE SHOULD BE DENIED

A defendant seeking a change of venue prior to jury selection bears the heavy burden of

establishing that pretrial publicity is so pervasive and prejudicial that it corrupts the criminal

process and renders a fair trial virtually impossible. The defendants contend that "[t]his is an

unusual case" because of "the high public profile of the defendants and the extraordinary wall to

wall coverage" which has purportedly resulted in a "poisoned jury pool." (Venue Br. 1-2.) Even

if the defendants' unsubstantiated claim that "[f]rom the time charges were filed, coverage of the

Skelos prosecution has been one-sided, inflammatory, and highly negative" (*id.* at 5) were taken

at face value—and it should not be—they still have not met their burden. The SDNY is one of

the largest and most diverse Districts in the country, one which has served as a fair and

appropriate venue for innumerable high-profile trials relating to criminal conduct in and around

New York City, including cases involving terrorism, organized crime, corruption, and other

conduct far more sensational than that at issue here. Any risk of prejudice can be mitigated using

thorough voir dire and jury instructions. This case plainly can—and should—be tried at 500

Pearl Street. Accordingly, the defendants' motion should be denied.

### A.   Applicable Law

The U.S. Constitution provides that criminal trials shall be held in the state and district

where the crimes were committed. *See* U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI.

"Many high profile cases have been tried in the Southern and Eastern Districts of New York, and

courts have relied on thorough voir dire examinations . . . to produce unbiased juries." *United*

*States v. Awadallah*, 457 F. Supp. 2d 246, 254 (S.D.N.Y. 2006) (internal quotation marks

omitted).  The Constitution's place-of-trial requirements may yield only in the "extreme case,"

*Skilling v. United States*, 561 U.S. at 381, in which "publicity in essence displace[s] the judicial

process," *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010) (internal quotation marks

omitted).  Rule 21(a) also provides that "the court must transfer the proceeding against that

defendant to another district if the court is satisfied that so great a prejudice against the defendant

exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

Fed. R. Crim. P. 21(a); *see also Sabhnani*, 599 F.3d at 232 (describing non-exhaustive list of

relevant considerations).

　　In order to warrant a change of venue, a defendant must demonstrate "a reasonable

likelihood that prejudicial news prior to trial will prevent a fair trial." *United States v.*

*Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990) (internal quotation marks omitted).

This is a "difficult burden." *United States v. Salim*, 151 F. Supp. 2d 281, 282 (S.D.N.Y. 2001);

*see also United States v. al Fawwaz*, No. 98 Cr. 1023 (LAK), 2015 WL 400621, at *2-3

(S.D.N.Y. Jan. 23, 2015); *United States v. Ayala*, 64 F. Supp. 3d 446, 449-50 (E.D.N.Y. 2014).

## B.　　Discussion

### 1.　Given the Size and Diversity of this District, Voir Dire and Jury Instructions Are Sufficient to Ensure an Impartial Jury

　　The Southern District of New York is "one of the largest and most diverse districts in the

country." *Salim*, 151 F. Supp. 2d at 284; *see also Awadallah*, 457 F. Supp. 2d at 253 ("[T]he

Southern District of New York serves one of the country's most diverse cross-section of

ethnicities, backgrounds, and experiences.") (internal quotation marks omitted).[19]  According to

---

[19] In *United States v. Salameh*, which related to the 1993 bombing of the World Trade Center, the court observed:  "I must seek, therefore, jurors willing to try this case with an open mind, and

the U.S. Census Bureau, approximately 5.2 million people live in the District, and there is substantial diversity in terms of race, socioeconomic status, and national origin.[20]  Certainly, this District is more populous and diverse than the locations to which the defendant requests that his trial be transferred.  (Venue Br. 18.)

Accordingly, and especially because the defendants cannot show that pretrial publicity has displaced the judicial process (as discussed below), this Court can rely on jury selection and instructions to ensure an appropriately impartial jury, just as it did the first time the defendants stood trial.  *See United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *Ayala*, 64 F. Supp. 3d at 452; *Awadallah*, 457 F. Supp. 2d at 254; *United States v. Gotti*, 399 F. Supp. 2d 214, 222 (S.D.N.Y. 2005).  Indeed, even if a defendant establishes a *presumption* of prejudice, the presumption is rebuttable and may be overcome through searching voir dire and jury instructions.  *See United States v. Chagra*, 669 F.2d 241, 250 (5th Cir. 1982) ("This presumption is rebuttable, however, and the government may demonstrate from the voir dire that an impartial jury was actually impaneled in appellant's case."), *overruled on other grounds by Garrett v. United States*, 471 U.S. 773 (1985); *see also United States v. Casellas-Toro*, 807 F.3d 380, 389 (1st Cir. 2015) (assuming presumption is rebuttable); *Coleman v. Kemp*, 778 F.2d 1487, 1541 n.25 (11th Cir. 1985) (same).

---

who will render a decision based solely upon the evidence, or lack thereof, against the individual defendants.  It is just as likely, if not more so, that jurors from this district, one of the largest and most diverse districts in the country, will fit this description as well as jurors from other parts of the country."  No. 93 Cr. 180 (KTD), 1993 WL 364486, at *1 (S.D.N.Y. Sept. 15, 1993); *accord United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir. 1987) ("It is not an uncommon occurrence for a notorious trial held in Metropolitan New York to engender extensive publicity.").

[20] U.S. Census Bureau, Quick Facts (population estimate as of July 1, 2016), *available at* https://www.census.gov/quickfacts/table/PST045216/00 (last accessed March 13, 2018).

Based in part on these considerations, courts in this District have routinely denied

motions for a change of venue, including in cases involving far more sensational conduct and

likely greater publicity than that at issue here, such as:

- *United States v. Rahimi*, 16 Cr. 760 (RMB), Transcript of conference on May 8, 2017 (Dkt. #82) at 31: denying pretrial change-of-venue motion by Ahmad Khan Rahimi in connection with trial relating to the 2016 bombing in the Chelsea neighborhood of Manhattan, noting, "[T]here is in fact a long line of compelling precedents that demonstrate overwhelmingly that the Southern District of New York is regularly able to impanel fair juries and to conduct fair trials in complex, high-profile, and highly publicized cases";

- *United States v. Yousef*, No. 93 Cr. 180 (KTD), 1997 WL 411596, at *3 (S.D.N.Y. July 18, 1997), *aff'd* 327 F.3d at 155:  denying (and affirming denial of) pretrial change-of-venue motion by Ramzi Yousef in connection with trial relating to terrorist attacks, including the 1993 bombing of the World Trade Center;

- *United States v. Salim*, 151 F. Supp. 2d at 282-85 (S.D.N.Y. 2001), 189 F. Supp. 2d 93, 95-97 (S.D.N.Y. 2002):  denying pretrial change-of-venue motions—including a ruling just six months after September 11, 2001—by Mamdouh Mahmud Salim, a senior al Qaeda member and associate of Usama bin Laden, in connection with trial relating to stabbing of correctional officer that Salim committed while facing charges in the District related to the 1998 Embassy bombings in Africa, which killed 224 people and injured thousands;

- *United States v. Gotti*, 399 F. Supp. 2d at 222 (S.D.N.Y. 2005):  denying pretrial change-of-venue motion by Joseph D'Angelo in connection with trial of Gambino crime family boss and other organized crime figures on racketeering charges;

- *United States v. Awadallah*, 457 F. Supp. 2d at 252-54 (S.D.N.Y. 2006):  denying pretrial change-of-venue motion by Osama Awadallah in connection with retrial on perjury charges relating to Awadallah's relationship with a participant in the September 11, 2001 attacks of the World Trade Center; and

- *United States v. al Fawwaz*, 2015 WL 400621, at *5 (S.D.N.Y. Jan. 23, 2015): denying pretrial change-of-venue motion by Khalid Al Fawwaz, al Qaeda member and associate of Usama bin Laden, in connection with trial on charges relating to the 1998 Embassy bombings in Africa.

Thus, as has been the case with so many well-publicized cases in this District, "[g]iven

this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not

be empaneled is hard to sustain." *Skilling*, 561 U.S. at 382.  The defendants have not met the heavy burden of demonstrating that they cannot obtain a fair and impartial trial here.

### 2.   The Press Coverage In This Case Has Not Displaced the Judicial Process

The defendants base their motion on a selection of press articles and editorials that appeared in various publications over the past three years.  Tellingly, they have made no effort to conduct any sort of survey to quantify the press coverage and document how it varied over time (either in frequency or tenor) or whether and to what extent it was concentrated in particular media markets, to compare it to the press coverage in other cases for which transfer-of-venue motions were raised, and most importantly, to demonstrate how it has affected (or not affected) the views of average members of the public in this District.[21]

Instead of presenting concrete evidence, the defendants offer only platitudes and selective snippets from years'-old press articles, which reveal very little about the qualifications, or lack thereof, of prospective jurors in this District in June 2018.  By contrast, and to deal with the same potential problem, this Court put questions about these very issues to the prospective jurors themselves during *voir dire* at the first trial three years ago.  Despite the fact that the media coverage at the time of the first trial was far greater than it is now or is likely to be at the time of the second trial, this Court had no difficulty picking a fair and impartial jury.  While some – though far from all – members of the jury pool had seen some coverage of the case, the Court was easily able to eliminate any possible prejudice through searching voir dire, which is the preferred remedy for pretrial publicity.  *See Yousef*, 327 F.3d at 155.  The defendants have not

---

[21] The defendants refer repeatedly to the prosecution of Sheldon Silver and the press coverage associated with it.  (*See, e.g.*, Venue Br. 1, 8, 11, 16.)  But notably, although Silver's retrial is scheduled to begin in less than a month, Silver has not filed a motion to transfer venue.

claimed that the *voir dire* process was inadequate during the first trial, and they have failed to demonstrate that it would be inadequate this time around.

Even assuming *arguendo* that the defendants accurately characterize the nature of the press coverage, they fail to meet the heavy burden of establishing "extraordinary local prejudice." *Skilling*, 561 U.S. at 378. The Supreme Court has rejected the proposition that "juror exposure to . . . news accounts of the crime alone presumptively deprives the defendant of due process." *Id.* at 380 (internal quotation marks omitted). "[E]ven pervasive, adverse publicity . . . does not inevitably" require a change of venue. *Id.* at 384 (internal quotation marks omitted); *see also United States v. Stevens*, 83 F.3d 60, 66 (2d Cir. 1996) (per curiam) ("Substantial publicity alone is not enough to require a change of venue."). Rather, for prejudicial pretrial publicity to warrant a change of venue, that publicity must "in essence displace[] the judicial process," *Sabhnani*, 599 F.3d at 233 (internal quotation marks omitted), rising to the level at which it effectively supplants the trial as the ultimate arbiter of the defendant's guilt. *See Skilling*, 561 U.S. at 380-81; *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963) (observing that the pretrial publicity "in a very real sense was [the defendant's] trial"). In short, a change of venue is warranted only where pretrial publicity causes "such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984).

Such circumstances arise in only the rarest of cases. *See Skilling*, 561 U.S. at 381 ("A presumption of prejudice, our decisions indicate, attends only the extreme case."); *Sabhnani*, 599 F.3d at 233. Prior cases in which the Supreme Court overturned convictions for failure to grant a change-of-venue motion involved convictions "obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy v. Florida*, 421 U.S. 794, 798 (1975).

The defendants similarly fail to show—and, in fact, make no effort to show—that the press coverage has had any actual effect on the views of average members of the jury pool in this District.  Long-standing, black-letter law makes clear that the critical question is not exposure to pretrial publicity, but rather "actual prejudgment by the venire of the issues to be decided in the case." *Sabhnani*, 599 F.3d at 233.  "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (emphases in original).  Indeed, "any high-profile case will receive significant media attention.  It is no surprise that people in general, and especially the well-informed, will be aware of it.  Knowledge, however, does not equate to disqualifying prejudice.  Distinguishing between the two is at the heart of the jury selection process." *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam); *see also Murphy*, 421 U.S. at 800 n.4.  Thus, where ongoing press coverage principally tracks court proceedings, such publicity does not require a change of venue.  *See Sabhnani*, 599 F.3d at 233 (observing that "most of the press coverage tracked the frequent court proceedings" and that "[c]overage of actual developments in a criminal case generally will not rise to the level of prejudicial publicity that will warrant a venue change").[22]

### 3.   The Government's Public Statements Have Not Prejudiced the Defendants

Finally, the defendants claim that "[t]he Government bears considerable responsibility for whipping up the storm of publicity that has engulfed this case."  (Venue Br. 13.)  This argument is meritless.  The defendants first point to statements made by the then-U.S. Attorney during a

---

[22] Furthermore, the defendants fail to distinguish between press coverage at earlier stages of the case—such as when they were charged, when they were convicted, or when their convictions were overturned—and press coverage in more recent months.  As courts have repeatedly observed, even significant, continuing, and prejudicial pretrial publicity can dissipate to acceptable levels by the time of the trial.  *See, e.g.*, *Skilling*, 561 U.S. at 383; *Sabhnani*, 599 F.3d at 233; *Yousef*, 327 F.3d at 155.

press conference in January 2015.[23]  (*Id.* 13-14.)  But not only do the defendants fail to identify

anything prejudicial about the U.S. Attorney's statements, they utterly fail to explain why

statements made more than three years ago could possibly prejudice the jury pool today.

Next, the defendants point to statements made by the then-Acting U.S. Attorney on the

occasion of the Second Circuit's decision vacating the defendants' convictions.  (*Id.* 14.)  But

there is nothing prejudicial about the Acting U.S. Attorney stating publicly that the evidence of

the defendants' "guilt" is "overwhelming" when the Government had already argued precisely

that to the jury in the first trial and to the Second Circuit in arguing for affirmance, and will do so

again at the retrial.  Moreover, the defendants offer no explanation of how these purportedly

improper public statements impacted—in any way whatsoever—the press coverage of this case.

Instead, they merely assert, based on nothing but their say-so, that the Acting U.S. Attorney's

statement "had a galvanizing effect on press coverage" as evidenced by the fact that the New

York Times "immediately ran an editorial" in which it quoted the statement in the course of

arguing that the defendants should be retried.  (*Id.* 15)  The defendants' apparent suggestion—

that the New York Times would not have quickly covered or opined on the Second Circuit's

decision had the Acting U.S. Attorney not put out a brief statement—defies credulity.  The

defendants have failed to show that the Government's public statements were improper or that

they impacted the press coverage in a manner that could prejudice members of the jury.

Finally, as explained above, even if the defendants had identified pervasive prejudicial

media publicity, "the size and characteristics" of this District "dilute[] the media's impact."

*Skilling*, 561 U.S. at 382, 384.  The defendants have not established presumptive prejudice, and

---

[23] The defendants' claim that the Government "repeatedly and unlawfully disclosed grand jury secrets in order to gain a tactical advantage" (Venue Br. 13) is meritless for the reasons stated above.

any prejudice can be cured during jury selection.  Accordingly, the motion to transfer venue should be denied.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny the defendants' motions in their entirety.

Dated:    March 29, 2018
          New York, New York

Respectfully submitted,

ROBERT KHUZAMI
Acting United States Attorney

By:    _____
       Edward B. Diskant
       Thomas A. McKay
       Douglas S. Zolkind
       Assistant United States Attorneys